**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAREMONT CORPORATION, <u>et al.</u>,[1] | Case No. 19-____ (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF CARL D. ANDERSON, II**
**IN SUPPORT OF FIRST DAY PLEADINGS**

1.      I am the Chairman of the Board and sole officer of Maremont Corporation and the sole officer and director of each of the other debtors in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>").[2]  I am familiar with the Debtors' businesses, asbestos and environmental litigation and claims history and financial affairs.

2.      I am authorized to submit this declaration in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), filed on January 22, 2019 (the "<u>Petition Date</u>"), and the first-day motions (the "<u>First Day Motions</u>") filed by the Debtors on the Petition Date.  I have read, and am generally familiar with, the First Day Motions, and submit this declaration in support of the relief requested therein.  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based on my experience, knowledge, and information provided to me concerning the Debtors' businesses, asbestos and environmental

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal taxpayer identification number, are: Maremont Corporation ("<u>Maremont</u>") (6138); Maremont Exhaust Products, Inc. ("<u>MEP</u>") (9284); AVM, Inc. ("<u>AVM</u>") (9285); and Former Ride Control Operating Company, Inc. (f/k/a ArvinMeritor, Inc., a Delaware corporation) ("<u>FRCOC</u>") (9286) (collectively, the "<u>Debtors</u>"). The mailing address for each Debtor for purposes of these chapter 11 cases is 2135 West Maple Road, Troy, MI 48084.

[2] Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Debtors' Plan (as defined herein).

litigation and claims history and financial affairs.  If called upon to testify, I would testify competently to the facts set forth herein.

## BACKGROUND

### I.      The Debtors' Corporate History and Business Operations

3.      Maremont is a Delaware corporation and wholly-owned subsidiary of Meritor, Inc. ("Meritor"), a public company organized under the laws of the State of Indiana.  Maremont is headquartered in Troy, Michigan.  Maremont's Debtor affiliates Maremont Exhaust Products, Inc. ("MEP"), AVM, Inc. ("AVM"), and Former Ride Control Operating Company, Inc. ("FRCOC") are wholly-owned by Maremont.  AVM is a South Carolina corporation and FRCOC and MEP are incorporated in Delaware.

4.      Historically, Maremont and its subsidiaries manufactured, distributed, and sold aftermarket friction products, including aftermarket brake linings, disc pads, and clutch facings (the "Friction Products Business"), as well as aftermarket mufflers (the "Exhaust Products Business"), aftermarket shock absorbers and strut assemblies (the "Ride Control Business"), and original equipment vacuum actuators for automotive climate controls systems, superchargers and turbochargers, and gas springs (the "Motion Control Business").  Certain of the products manufactured and sold as part of the Friction Products Business and the Exhaust Products Business contained asbestos.  However, Maremont and its subsidiaries have not manufactured or sold any asbestos-containing products since 1978.

5.      Maremont divested its business lines over time pursuant to multiple sale transactions, beginning with the sale of the Friction Products Business in June 1977.  This was followed by the sale of the Exhaust Products Business and the Motion Control Business in 2006 and the sale of the Ride Control Business in 2009.  By 2013, the Debtors had ceased all

operations and divested all remaining operating assets.[3]  Accordingly, the Debtors' only ongoing operations as of the date hereof relate to (a) managing their legacy environmental and asbestos liabilities and (b) owning the Commercial Property (as defined below) and collecting rents on a lease of that property.

## II.     The Debtors' Remaining Assets

6.     Maremont's assets consist of the Meritor Loan Receivable (as defined below), the Commercial Property and Commercial Property Lease (as defined below), cash in two bank accounts, and the Maremont Insurance.  Maremont also owns an environmental clean-up site in Paulding, Ohio that has little, if any, value.

### A.     *The Meritor Loan Receivable*

7.     Maremont and Meritor are parties to that certain Amended and Restated Loan Agreement (the "A&R Intercompany Loan Agreement"), dated as of January 12, 2016, with a maximum principal amount of $40 million.  As of the Petition Date, Meritor owed Maremont approximately $20 million under the A&R Intercompany Loan Agreement (the "Meritor Loan Receivable").  Interest is payable on the balance under the A&R Intercompany Loan Agreement at 12-month U.S. LIBOR plus 7.0%.  When Maremont requires cash to fund general expenses (i.e., unrelated to asbestos liabilities and litigation), Maremont requests a paydown of the Meritor Loan Receivable and uses the funds received from Meritor on account of the Meritor Loan Receivable to satisfy those expenses.  Maremont also used draws of the Meritor Loan Receivable to pay for certain defense and indemnity payments related to its asbestos liabilities and litigation. The A&R Intercompany Loan Agreement is a demand facility, and I anticipate that Maremont may seek to draw further funds under the agreement during these Chapter 11 Cases.

---

[3] A more detailed description of the Debtors' corporate history, sale transactions, and historical business activities can be found in Section III.A.2 of the Disclosure Statement.

B.    *The Commercial Property and Commercial Property Lease*

8.    On or about December 14, 2018, Maremont purchased an income-producing commercial property in Grand Blanc, Michigan (the "Commercial Property") for approximately $1.4 million under an Agreement of Purchase and Sale of Real Property and Escrow Instructions dated on or about October 24, 2018.  The Commercial Property is a *Dollar General* store leased under a 15-year triple-net lease (the "Commercial Property Lease") that will generate net rents totaling approximately $91,000 in annual revenue.  Maremont intends to manage and derive revenue from the Commercial Property business during the Chapter 11 Cases and assume the Commercial Property Lease pursuant to the Plan, such that Reorganized Maremont can continue to manage and benefit from revenue generated under the Commercial Property Lease.

C.    *Bank Accounts*

9.    Maremont maintains two bank accounts, as described in detail in the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Continue to Use Their Existing Cash Management System, Including Existing Bank Accounts and Business Forms, (II) Authorizing the Continuation of Certain Intercompany Transactions, (III) Waiving the Requirements of Section 345(b) of the Bankruptcy Code on an Interim Basis, and (IV) Granting Related Relief*.  The first account, held at Bank of America, N.A., is a controlled disbursement account into which Maremont deposits insurance reimbursement payments from Fireman's Fund Insurance Company ("FFIC") pursuant to a coverage-in-place settlement and from which the Debtors fund defense costs arising from asbestos-related litigation and make settlement payments to asbestos personal injury claimants on account of their claims (the "Litigation Account").  As of the Petition Date, the Litigation Account held approximately $244,000.[4]  The second account (the

---

[4] This includes a check in the approximate amount of $190,000 that was deposited on or about January 18, 2019 that had not cleared prior to the Petition Date.

"Corporate Account" and, together with the Litigation Account and any other bank accounts that the Debtors may open in the ordinary course of their business, collectively, the "Bank Accounts"), held at JPMorgan Chase Bank, N.A., is a primary concentration account from which Maremont pays its business expenses in the ordinary course of business.  As of the Petition Date, the Corporate Account held approximately $1.1 million.  Maremont intends to use the cash in the Bank Accounts to fund the Chapter 11 Cases.  If, however, during the course of the Chapter 11 Cases, such available cash is insufficient to satisfy administrative costs incurred in connection with the Chapter 11 Cases, Maremont intends to request a further paydown of the Meritor Loan Receivable to cover any such shortfall.

D.    *Insurance Assets*

10.    Historically, Maremont maintained insurance coverage for asbestos liabilities under a number of primary and excess insurance policies issued by various insurers. The majority of Maremont's insurance coverage has been exhausted and released through insurance coverage settlements and is no longer available to provide coverage for asbestos-related personal injury or other claims.  Maremont reached (a) lump-sum payment settlements with (i) Transit Casualty Company ("Transit") in 2001, (ii) Everest Reinsurance Company ("Everest") and Mt. McKinley Insurance Company ("Mt. McKinley") in 2005, and (iii) Zurich Insurance Company, Ltd. ("Zurich") in 2015, and (b) a coverage-in-place settlement agreement (the "FFIC Agreement") with FFIC in 2010.  As of December 31, 2018, the estimated book value of the Maremont Insurance was approximately $22 million, which estimate was based on estimates of Maremont's future contingent asbestos-related liabilities.

11.    The only remaining coverage currently held by Maremont is with FFIC pursuant to the FFIC Agreement.  As of the Petition Date, the remaining indemnity limits under the FFIC Agreement are approximately $7 million, and Maremont has a receivable owed to it by FFIC in

5

the approximate amount of $1.3 million for reimbursements billed but not yet paid.  In addition, Maremont anticipates submitting a further reimbursement request in February 2019 to FFIC for prepetition defense and indemnity payments incurred during January 2019 prior to the Petition Date in the amount of approximately $285,000.

## III.    The Debtors' Liabilities

12.    The Debtors' liabilities principally comprise intercompany obligations owed by each of Debtors AVM, MEP, and FRCOC to Meritor, environmental obligations, and current and future asbestos-related liabilities, including defense and other costs related to such liabilities. Other than the Intercompany Payables defined and described below, I am unaware of any liquidated and outstanding claims against any Debtor.

### A.    *Asbestos-Related Liabilities*

13.    The Debtors' decision to commence the Chapter 11 Cases was precipitated by the continuing assertion of claims by personal injury plaintiffs alleging that Maremont and MEP are liable for damages caused by exposure to asbestos-containing products.  Specifically, Maremont and MEP have collectively been subject to thousands of personal injury and wrongful death claims asserting that they are liable for damages caused by exposure to asbestos-containing products that they or their predecessor(s)-in-interest allegedly used, sold, manufactured, marketed, produced or distributed or that were allegedly present in their manufacturing facilities (the "Maremont Asbestos Lawsuits").  These suits commenced in 1977 and have continued to the present.  As of December 31, 2018, there were approximately 13,000 pending asbestos-related lawsuits against Maremont and MEP, of which approximately 1,900 are considered by the Debtors to be active.  During the five-year period ending December 31, 2018, approximately 2,600 asbestos-related lawsuits were asserted against Maremont and MEP.  During this same period, Maremont has incurred and paid approximately $43.8 million in defense and settlement

costs on account of the Asbestos Personal Injury Claims, including over $6.2 million in the calendar year ended December 31, 2018. Of those amounts, defense costs account for approximately 74% of the historical total and approximately 62% of the amount expended in the most recently concluded fiscal year. Maremont recently reported its contingent asbestos liabilities as of the end of fiscal year 2018 for the next 41 years at approximately $107 million (including future defense costs of approximately $79.6 million, of which $27.4 million was estimated to be incurred over the next five years).

14.    In addition to the claims asserted against Maremont and its subsidiaries, certain plaintiffs also have alleged asbestos-related personal injury or wrongful death claims against one or more Non-Debtor Affiliates of Maremont, including Meritor, based upon or arising from alleged exposure to the Debtor Product Lines. These claims appear to name Non-Debtor Affiliates solely on account of the plaintiffs' purported exposure to the Debtor Product Lines. To the best of my knowledge, none of the Non-Debtor Affiliates has ever engaged in or been involved in the manufacture, distribution or sale of any of the Debtor Product Lines, and, to date, no court has issued a ruling or made a finding that any Non-Debtor Affiliate is liable for any claims based upon or arising from any of the Debtor Product Lines or that any such Non-Debtor Affiliate should be treated as a successor in interest or alter ego of the Debtors, or that Maremont's corporate veil should be pierced.

15.    In addition, Meritor and certain of its predecessors and affiliates other than the Debtors have been named as defendants in asbestos lawsuits alleging personal injury or wrongful death as a result of exposure to asbestos used in the Rockwell Product Lines of Rockwell International Corporation (the "Rockwell Claims"). Liability for certain Rockwell Claims was transferred to a predecessor of Meritor at the time of the spin-off of Rockwell International's

automotive business to that predecessor in 1997.  The Rockwell Claims, however, will not be channeled to the Asbestos Personal Injury Trust under the terms of the Plan.

 B. *Environmental Obligations*

 16. In connection with their operation of the Friction Products Business, Exhaust Products Business, Ride Control Business, and Motion Control Business discussed above, Maremont and its subsidiaries operated at various manufacturing and distribution properties that they owned or leased.  As a result of historic operations on such properties, the Debtors have been subject to certain environmental claims for which they have agreed either to undertake remedial action or remit certain environmental remediation payments.  The Environmental Sites for which environmental obligations have been identified are as follows: (a) Easley, South Carolina, (b) Paulding, Ohio, (c) Chickasha and Hardage, Oklahoma, (d) Marion and Zion, South Carolina, and (e) Cape Town, South Africa.  The Debtors' remaining obligations for Environmental Claims arising in connection with the foregoing real property sites are currently estimated at approximately $4.2 million in the aggregate.

 C. *Intercompany Obligations*

 17. Each of FRCOC's, AVM's, and MEP's books reflect intercompany payables owed to Meritor related to legacy operating expenses, asbestos defense and consultant costs and fees, allocated shared services fees, and expenses in respect of Environmental Sites, which Meritor pays on behalf of FRCOC, AVM and MEP (collectively, the "Intercompany Payables"). The aggregate amount of the Intercompany Payables is approximately $165 million.

## IV. Prepetition Settlement Negotiations

 18. In the face of mounting costs to defend and resolve Asbestos Personal Injury Claims, and dwindling insurance and other assets, Maremont decided to investigate a potential restructuring to be implemented through a proceeding initiated under chapter 11 of the

Bankruptcy Code, both to preserve remaining assets and utilize section 524(g) of the Bankruptcy Code to establish and fund a trust that would provide for the fair and equitable treatment of all Holders of Asbestos Personal Injury Claims.  To assist in this process, Maremont hired Sidley Austin LLP ("Sidley") as restructuring counsel and Sidley, in turn, engaged Alvarez & Marsal Disputes and Investigations, LLC ("A&M") to estimate the present value of the Debtors' potential current and future asbestos liabilities.  Sidley and A&M performed diligence on the Debtors' corporate, transactional and litigation history in order to determine the potential feasibility of a potential restructuring strategy and estimate the Debtors' liabilities.

19.    After thorough investigation and fact-finding, and after obtaining A&M's analysis of the present value of Maremont's current and future asbestos-related liabilities, Maremont determined that it would engage in discussions with a future claimants' representative to evaluate the potential for agreeing on the terms of a consensual plan of reorganization that would establish a section 524(g) trust.  Selecting a future claimants' representative was necessary to protect the interests of persons who have been exposed to asbestos but have yet to manifest an asbestos-related disease.  In February 2018, Maremont selected James L. Patton, Jr. as the Future Claimants' Representative.  Maremont selected Mr. Patton based on his reputation for integrity, renown in the field of complex mass tort proceedings, and extensive experience with asbestos-related personal injury litigation.  Mr. Patton, in turn, engaged Young Conaway Stargatt & Taylor, LLP as counsel, and Ankura Consulting Group, LLC as claims estimation advisor.

20.    After extensive diligence by, discussions with, and preliminary settlement negotiations with, the Future Claimants' Representative, Maremont decided to establish an *ad hoc* committee of current claimants as well, in an effort to extend the negotiations to all asbestos creditor constituencies and establish consensus on the framework for a chapter 11 plan of

reorganization that would satisfy the requirements of section 524(g) of the Bankruptcy Code. Three law firms representing a significant number of asbestos claimants with active cases pending and/or with clients with significant recent Maremont-related settlements were selected to serve on the Asbestos Claimants Committee: Gori Julian & Associates, P.C.; Simmons Hanly & Conroy LLC; and Law Offices of Peter Angelos, P.C.  In May 2018, Montgomery McCracken Walker and Rhoades LLP was engaged to represent this committee.  Subsequently, counsel for the Asbestos Claimants Committee engaged Legal Analysis Systems to advise the Asbestos Claimants Committee on claims estimation issues.  Prior to the Petition Date, counsel for the prepetition Asbestos Claimants Committee transitioned to the law firm of Robinson & Cole LLP, which represents the Asbestos Claimants Committee as of the date hereof.

21.     The Future Claimants' Representative and the Asbestos Claimants Committee, personally and/or through their respective representatives, conducted extensive due diligence concerning the background, nature, and scope of the Asbestos Personal Injury Claims.  This investigation included careful review of the facts concerning the Debtors' historical involvement with asbestos, the nature and extent of past and pending asbestos litigation against the Debtors, including the types of claims asserted and the legal issues raised, the projected amount of the present and future Asbestos Personal Injury Claims, and Maremont's asbestos insurance and related settlements and other financial assets.  The Asbestos Claimants Committee and the Future Claimants' Representative also examined the Debtors' corporate and transactional history and the potential for recovery by the Debtors and/or Holders of Asbestos Personal Injury Claims from current or former affiliates of Maremont based upon a variety of legal theories, including derivative liability theories, such as alter ego and successor liability, and/or fraudulent conveyance theories.

22.     As part of this investigation, the Debtors shared thousands of pages of Maremont- and Meritor-related documents with the Future Claimants' Representative and the Asbestos Claimants Committee.  In addition, the Debtors, Meritor, and their respective counsel have had multiple meetings with representatives of the Future Claimants' Representative and Asbestos Claimants Committee to discuss relevant factual and legal issues.  During this process, the Debtors responded to all requests for information posed by representatives of the Future Claimants' Representative and the Asbestos Claimants Committee, and engaged in numerous arm's length discussions and meetings regarding the Plan and Asbestos Personal Injury Trust with representatives of Meritor, the Asbestos Claimants Committee and the Future Claimants' Representative.  In addition, it is my understanding that the advisors to the Asbestos Claimants Committee and the Future Claimants' Representative engaged in numerous discussions regarding the terms of potential settlements and conducted their own negotiations regarding the terms of the Asbestos Personal Injury Trust and related payment percentages and distribution procedures for Holders of current Claims and future Demands.

23.     Prior to the commencement of the Solicitation (as defined below), representatives of the Debtors, the Asbestos Claimants Committee and the Future Claimants' Representative also spent considerable time negotiating a settlement with Meritor, including the principal terms of a significant contribution by Meritor to Maremont to help fund the Asbestos Personal Injury Trust.  The parties' negotiation of the terms of the Plan and Asbestos Personal Injury Trust ultimately centered around fixing the amount of the Meritor Contribution for its and its affiliates' protections under the Asbestos Personal Injury Channeling Injunction and related provisions of the Plan.  Following several months of good faith, arm's length negotiations, the parties agreed to the terms of a settlement now embodied in the Debtors' Plan.  Under the terms of the Plan,

Meritor will contribute to Maremont the Intercompany Payables, repay the remaining Meritor Loan Receivable in full on demand, pay Maremont a settlement payment in the amount of $28 million, provide a comprehensive release of the Debtors and their representatives, and assume the Environmental Claims from the Reorganized Debtors.

24.     Given the advanced stages of the negotiations and to preserve estate assets for the Debtors' creditors, the Debtors, Meritor, the Future Claimants' Representative, and the Asbestos Claimants Committee agreed to pursue prepackaged bankruptcy cases, and the parties worked in good faith to document the settlement framework through a prepackaged chapter 11 plan. Weeks of further negotiations regarding the terms of the solicitation documents ultimately resulted in the completion of the *Joint Prepackaged Plan of Reorganization of Maremont Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* filed concurrently herewith (the "Plan"), the *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of Maremont Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"), also filed concurrently herewith, and the other documents that were included in the Solicitation Packages, as described and defined below.

25.     As a result of the settlement with Meritor embodied in the Plan and the cessation of defense costs, there will be substantially more assets available to pay Holders of Asbestos Personal Injury Claims under the Plan than if Maremont were to remain in the tort system or liquidate.  In addition, the Environmental Claims will be assigned to a creditworthy entity with further financial assurances from Meritor HVS, Meritor's main U.S. operating subsidiary, which owns nearly all of Meritor's assets in North America and conducts nearly all of Meritor's North American business operations, with revenues of approximately $2.6 billion for fiscal year 2018. The Debtors also believe that streamlined prepackaged cases will help preserve assets for their

asbestos creditors and any other creditors.  For that reason, the Debtors are seeking confirmation of the Plan, which was unanimously accepted by the Holders of Asbestos Personal Injury Claims that voted on the Plan – the only class of non-insider claims that is impaired under the Plan.

## V.      The Debtors' Solicitation Process

26.      After finalizing the terms of the Plan and Disclosure Statement, the Debtors, with the assistance of Donlin, Recano & Company, Inc. ("DRC"), as Claims, Notice, and Balloting Agent, commenced the solicitation of votes on the Plan (the "Solicitation") on December 4, 2018, and completed a supplemental service on December 12, 2018.  Under the terms of the Plan, Holders of claims in Class 4, comprising Asbestos Personal Injury Claims, are the only Holders entitled to vote to accept or reject the Plan.  The Debtors caused Solicitation Packages to be transmitted to counsel of record who filed suit in the tort system on behalf of Holders of the Asbestos Personal Injury Claims as well as to individual Holders of Asbestos Personal Injury Claims in limited circumstances in which the Debtors did not maintain information regarding a Holder's counsel of record.  As set forth in greater detail in the *Declaration of Jung W. Song of Donlin, Recano & Company, Inc. Regarding Solicitation of Votes and Tabulation of Ballots Cast on the Joint Prepackaged Plan of Reorganization of Maremont Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Voting Declaration") filed contemporaneously herewith, the Claims, Notice, and Balloting Agent transmitted Solicitation Packages to 359 law firms and two individual Holders of Asbestos Personal Injury Claims with respect to the Holders of Asbestos Personal Injury Claims in the Voting Class.  At the request of one law firm, the Debtors caused the transmission of individual Solicitation Packages to that law firm for distribution to its clients holding Asbestos Personal Injury Claims.

27.      Each complete Solicitation Package included (i) the Disclosure Statement in electronic format on a USB drive; (ii) the Plan (including, as exhibits, the Asbestos Personal

Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures) in electronic format on a USB drive; (iii) a Ballot or Master Ballot for voting with respect to a Class 4 Asbestos Personal Injury Claim(s), as applicable; (iv) a preaddressed return envelope; (v) an instruction letter for law firms, providing the options that such firms had to ensure that Solicitation Packages could be distributed to their clients holding Asbestos Personal Injury Claims; (vi) a letter from the Asbestos Claimants Committee and the Future Claimants' Representative urging Holders of Asbestos Personal Injury Claims to vote to accept the Plan; and (vii) cover letters describing the contents of the Solicitation Package, with instructions for obtaining hard copies of the materials provided in electronic format on the enclosed USB drive free of charge (together, the "Solicitation Package").

28.     To further ensure that all Holders of Asbestos Personal Injury Claims and their counsel had notice of the solicitation and the opportunity to request Solicitation Packages, the Debtors published notice of the Solicitation on December 10, 2018 in the national editions of the *New York Times*, *USA Today*, and the *Wall Street Journal*.  The Debtors also published notice in the December 19, 2018 edition of *Mealey's Litigation Report: Asbestos* and the December 21, 2018 edition of *Mealey's Asbestos Bankruptcy Report*.  In addition, the Debtors made the Disclosure Statement and Plan available in electronic format on a dedicated website established by the Claims, Notice, and Balloting Agent (www.donlinrecano.com/maremont).

29.     The solicitation period expired on January 18, 2019 at 4:00 p.m. (ET) (the "Voting Deadline").  In order to be counted, completed ballots must have been received by the Claims, Notice, and Balloting Agent by the Voting Deadline.  Accordingly, Holders of Asbestos Personal Injury Claims and their counsel had forty-five (45) days from the commencement of Solicitation to vote on the Plan.  Following its tabulation of the votes timely received, the

Claims, Notice, and Balloting Agent determined that the Holders of Asbestos Personal Injury Claims that voted on the Plan voted unanimously in favor of the Plan.

## FIRST DAY MOTIONS

30.     On the Petition Date, the Debtors filed the First Day Motions, which, if granted, will facilitate the Debtors' smooth entry into chapter 11 and avoid unnecessary disruptions and costs pending confirmation of the Plan.   I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions will facilitate an orderly administration of the Chapter 11 Cases and is critical to the Debtors' ability to preserve the value of their assets and/or will be critical to the Debtors' ability to achieve a successful reorganization.   Capitalized terms, used in the following sections but not otherwise defined herein, shall have the meanings ascribed to such terms in the respective First Day Motions.

## I.     Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion")

31.     These Chapter 11 Cases involve four affiliated Debtors.    In the Joint Administration Motion, the Debtors request consolidation of the Chapter 11 Cases and joint administration for procedural purposes only.  I believe that joint administration of the Chapter 11 Cases will provide significant administrative convenience and cost savings to the Debtors without harming the substantive rights of any party in interest.

32.     Many of the motions, hearings, and orders in the Chapter 11 Cases will affect each Debtor entity.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration of the Chapter 11 Cases, for procedural purposes only, under a single docket, will also ease the administrative burden on the United States Bankruptcy Court for the District of Delaware (the

"Court") and simplify supervision of these cases by the Office of the United States Trustee (the "U.S. Trustee") by allowing the Chapter 11 Cases to be administered as a single joint proceeding rather than multiple independent Chapter 11 Cases. Accordingly, I believe that joint administration of the Chapter 11 Cases is in the best interests of the Debtors' respective estates, creditors, and all other parties in interest.

## II. Debtors' Application for Entry of an Order Appointing Donlin, Recano & Company, Inc. as Claims and Noticing Agent, *Nunc Pro Tunc* to the Petition Date (the "Claims and Noticing Agent Application")

33.     Pursuant to the Claims and Noticing Agent Application, the Debtors seek entry of an order appointing DRC as the Claims and Noticing Agent for the Debtors in the Chapter 11 Cases, effective *nunc pro tunc* to the Petition Date.

34.     Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of DRC to act as the Claims and Noticing Agent is appropriate under the circumstances and is in the best interests of the Debtors' estates. In connection with DRC's engagement, I reviewed the Claims and Noticing Agent's engagement agreement and the description of services that the Claims and Noticing Agent has agreed to provide, along with the compensation and other terms of the engagement as provided in the Claims Agent Application. Moreover, it is my understanding that based on the four engagement proposals obtained and reviewed that DRC's rates are competitive and comparable to the rates charged by their competitors for similar services.

35.     I understand that it is anticipated that a substantial number of parties will receive notice in the Chapter 11 Cases. In light of the number of parties in interest and the claims and noticing requirements of the Chapter 11 Cases, I believe that the appointment of the Claims and Noticing Agent will provide the most effective and efficient means of – and will relieve the

Debtors and/or the Clerk's office of the administrative burden of – providing claims and noticing services, and is necessary and in the best interests of the Debtors, their estates and their creditors.

**III.    Debtors' Motion for Entry of an Order (I) Scheduling Combined Hearing to Consider Approval of Disclosure Statement and Confirmation of Prepackaged Plan, (II) Establishing the Plan and Disclosure Statement Objection Deadline and Related Procedures, (III) Approving the Solicitation Procedures and Forms of Ballots, (IV) Approving the Form and Manner of Notice of the Combined Hearing, Objection Deadline, and Notice of Commencement, (V) Conditionally Directing that a Meeting of Creditors Not Be Convened, (VI) Conditionally Extending Deadline to File Schedules and Statements, and (VII) Granting Related Relief (the "<u>Solicitation and Scheduling Motion</u>")**

36.      The Debtors are pursuing the following timeline for the streamlined Plan confirmation process in order to preserve estate assets for their asbestos creditors.  The Plan has the unanimous support of the voting Holders of Asbestos Personal Injury Claims, the Holders in the only impaired Voting Class under the Plan.  To support the Debtors' timeline, the Debtors are filing the Solicitation and Scheduling Motion, requesting, among other things, that the Court approve and schedule the following case and confirmation-related dates and deadlines:

| Event | Proposed Dates/Deadlines |
| --- | --- |
| Mailing of Notice Deadline | January 25, 2019 |
| Plan Supplement Filing Date | February 15, 2019 |
| Second Day Hearing Date | February 25, 2019 |
| Objection Deadline | March 4, 2019 |
| Reply Deadline | March 11, 2019 |
| Confirmation Order Deadline | March 11, 2019 |
| Confirmation Brief Deadline | March 11, 2019 |
| Combined Hearing Date | March 14, 2019 |

37.      In addition to proposing the foregoing timeline of events and deadlines, pursuant to the Solicitation and Scheduling Motion, the Debtors request: (i) conditional approval of the prepetition Solicitation Procedures utilized by the Debtors for the Solicitation of votes on the

Plan, including the form of ballots; (ii) approval of the form and manner of the Notice, which provides notice of the commencement of the Chapter 11 Cases, the Combined Hearing and the Objection Deadline; (iii) conditional direction that the U.S. Trustee not convene the Creditors' Meeting, provided that the Plan is confirmed within ninety (90) days of the Petition Date; and (iv) conditional extension of the date by which the Debtors must file the Schedules and Statements, provided that the Plan is confirmed within ninety (90) days of the Petition Date.

38.     The ballots used in the prepetition Solicitation of votes on the Plan described above contained detailed instructions regarding the process for completion and how to make any applicable elections contained therein.  Further, the ballots stated in clear and conspicuous language that Holders of Asbestos Personal Injury Claims in the Voting Class must properly complete, execute, and deliver their ballots to the Solicitation Agent so that they were received no later than the Voting Deadline; provided that for law firms of record representing Holders of Asbestos Personal Injury Claims for whom they would not or could not vote on their behalf, I understand that such firms were advised to return such client information with sufficient time for the Solicitation Agent to effect the direct or indirect transmission of Solicitation Packages to such Holders or to the law firms prior to the Voting Deadline.  As part of the Solicitation Package, a specific instruction letter was provided to law firms representing one or more Holders of claims in the Voting Class containing detailed instructions on the options law firms had to ensure that Solicitation Packages could be distributed to their clients.

39.     I believe that the proposed dates and deadlines are fair to all parties in interest. Compliance with this schedule is critical to preserving the value of the Debtors' remaining assets for their asbestos and other creditors, and to implement the negotiated settlement embodied in the Plan so as to accord fair and equitable treatment to all present and future Holders of Asbestos

Personal Injury Claims.  The schedule also provides parties in interest with sufficient time to evaluate their rights in respect of the Plan before the Combined Hearing.  Similarly, the requested conditional waiver and extension, and the request for conditional approval, on a first-day basis, of the Solicitation Procedures and the Combined Notice will permit the Debtors to proceed expeditiously toward confirmation without unnecessary delays or distractions.

**IV.    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Continue to Use Their Existing Cash Management System, Including Existing Bank Accounts and Business Forms, (II) Authorizing the Continuation of Certain Intercompany Transactions, (III) Waiving the Requirements of Section 345(b) of the Bankruptcy Code on an Interim Basis, and (IV) Granting Related Relief (the "<u>Cash Management Motion</u>")**

40.    Pursuant to the Cash Management Motion, the Debtors seek entry of an order: (i) authorizing the Debtors to continue to use their existing Cash Management System, including existing Bank Accounts and business forms, (ii) authorizing the Debtors to continue intercompany transactions by and between the Debtors and Meritor, and (iii) waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis with respect to the Debtors' deposit and investment practices (to the extent applicable).

41.    The Debtors maintain a Cash Management System that is designed to collect, transfer and disburse funds and pay the Debtors' business, litigation, and professional expenses. The Cash Management System is part of a broader cash management system for Meritor and its subsidiaries, managed through oversight procedures and controls implemented by the Debtors and Meritor pursuant to a shared services agreement between Maremont and Meritor.  Through the Cash Management System, the Debtors facilitate cash monitoring, forecasting, and reporting, monitor collection and disbursement of funds, and reduce administrative expenses with respect to the administration of their Bank Accounts.  As described above, the Cash Management

System currently utilizes two Bank Accounts owned by Maremont – the Corporate Account and the Litigation Account.

42.    In the ordinary course of business, the Banks charge certain service and other fees, costs and expenses in accordance with the applicable agreements governing the Bank Accounts (collectively, the "Bank Fees").  The Debtors estimate that the Bank Fees total approximately $1,150 per month.  The Banks invoice the Bank Fees through certain master services agreements with Meritor, and Meritor pays the Bank Fees on behalf of Maremont.  As described in greater detail below, the payment of the Bank Fees by Meritor on behalf of Maremont is charged back to Maremont through the shared services agreement between Meritor and Maremont.

43.    As described above, the Corporate Account functions as Maremont's main operating account and is used to pay ordinary course business expenses, including the payment of professional fees and expenses related to the restructuring, payments related to Maremont's environmental liabilities, and the payment of corporate expenses such as directors' fees. Payments are conducted through the Corporate Account via manual wire transfers upon my authorization as Maremont's sole officer.  Cash comes in to the Corporate Account through the payment of rent under the Commercial Property Lease and the payment of the Meritor Loan Receivable by Meritor upon demand by Maremont to the extent needed to cover any shortfalls.  I understand that the average balance of the Corporate Account over the preceding 30 days was approximately $260,000.

44.    When Maremont requires cash from the Corporate Account to fund general expenses in excess of the account balance, Maremont formally requests a paydown of the Meritor Loan Receivable from Meritor pursuant to the A&R Intercompany Loan Agreement.

Meritor then makes a wire transfer of the funds to Maremont and reduces the balance of the Meritor Loan Receivable by the same amount. Corresponding book entries are recorded in Maremont's and Meritor's books and records.

45. Prior to the Petition Date, Maremont deposited insurance reimbursements related to, and made disbursements in respect of, the legacy asbestos liabilities from the Litigation Account. The Debtors maintain a database with PACE, the Claims Administrator that manages and provides claims services in respect of the Debtors' asbestos liabilities. As part of these services, the Claims Administrator has signature authority on the Litigation Account and, prior to the Petition Date, made defense and indemnity payments via check transfers from the account to defense law firms and claimants on the Debtors' behalf. I am informed that the Claims Administrator is the only third party with authority to initiate payments on the Debtors' behalf. Prior to the Petition Date, the only disbursements from the Litigation Account were certain administrative costs related to the asbestos litigation, settlement payments made on account of asbestos claims to the plaintiffs' law firms for distribution to the claimants, and payment of invoices to Maremont's asbestos defense law firms.

46. The Litigation Account is funded through the receipt of insurance reimbursements and payment of the Meritor Loan Receivable by Meritor. I have been advised that the average balance of the Litigation Account during the preceding 30 days was approximately $300,000. As with the Corporate Account, prior to the Petition Date, from time to time, Maremont used draws of the Meritor Loan Receivable to fund the Litigation Account in order to pay for certain defense and indemnity payments related to its asbestos liabilities and litigation. Maremont would formally request paydowns of the Meritor Loan Receivable from Meritor, and upon receipt of the request I understand that Meritor made wire transfers of the fund to the Litigation Account and

reduced the balance of the Meritor Loan Receivable by the same amount.  Corresponding book entries were recorded in Maremont's and Meritor's books and records.

47.     Prior to the Petition Date, Maremont issued checks to make payments from the Litigation Account in the ordinary course of business.  Although Maremont may not use the Litigation Account to issue paper checks during the Chapter 11 Cases, I believe that allowing Maremont to continue its use of all checks in use immediately before the Petition Date without reference to its status as a debtor in possession will assist Maremont in avoiding the expense and delay of immediately implementing new checks as I understand is required by the U.S. Trustee Operating Guidelines.

48.     Historically, the Debtors and Meritor engaged in intercompany transactions in which Meritor paid liabilities of certain of the Debtors related to legacy operating expenses, asbestos defense and consultant costs and fees, and expenses in respect of Environmental Sites, and Meritor accepted receivables in return for making such payment.  Maremont and Meritor initially formalized this process between them in 2008 through the A&R Intercompany Loan Agreement, which they have amended and restated several times and most recently in 2016. Pursuant to the A&R Intercompany Loan Agreement, upon written notice Maremont may accelerate and call the maturity of some or all of the outstanding amount owed by Meritor thereunder.

49.     Intercompany balances between the Debtors and Meritor also arise from a shared services agreement between Maremont and Meritor, payment of which occurs through reductions of the Meritor Loan Receivable and increases to the Intercompany Payables.  Meritor charges the Debtors a total monthly fee of $19,575 for certain administrative, legal, environmental, financial, accounting, treasury, claims management, tax and insurance coverage administration services

that it provides to the Debtors, which fee is inclusive of the monthly Bank Fees that Meritor pays on Maremont's behalf.  Ledger entries are recorded to allocate the monthly fee to each of the Debtors, and the balance of the Meritor Loan Receivable is reduced to reflect Maremont's allocated amount, while the Intercompany Payables owed to Meritor by the other Debtors are increased to reflect their respective allocated charged amounts.

50.     Because of the disruption that would result if Maremont were required to close its existing Bank Accounts, I believe it is critical that the existing Cash Management System remain in place.  Closing the Bank Accounts would impair both the efficiency of the current Cash Management System and the Debtors' efforts to preserve the value of their estates and reorganize in an efficient manner.  The relief requested in the Cash Management Motion is necessary to avoid disruption in the Chapter 11 Cases and maximize the value of the Debtors' estates for the benefit of all stakeholders.  For these reasons, I believe that the relief being requested in the Cash Management Motion is in the best interests of the Debtors' estates and creditors and should be approved.

**V.     Debtors' Motion for Entry of an Order (I) Authorizing the Filing of a List of (A) the Twenty-Five Law Firms Representing the Largest Numbers of Asbestos Plaintiffs Asserting Claims Against the Debtors and (B) the Unsecured Creditors of the Debtors, (II) Authorizing the Listing of Addresses of Counsel for Asbestos Claimants in the Creditor Matrix in Lieu of Claimants' Addresses, (III) Approving Notice Procedures for Such Claimants, and (IV) Granting Related Relief (the "<u>Notice Procedures Motion</u>")**

51.     Pursuant to the Notice Procedures Motion, the Debtors are requesting entry of an order: (i) authorizing the Debtors to file (a) a single consolidated list of the twenty-five (25) law firms representing the largest numbers of asbestos plaintiffs asserting claims against the Debtors (the "<u>Top Asbestos Counsel List</u>") and (b) a single consolidated list of creditors holding unsecured claims against the Debtors other than asbestos-related claims (the "<u>Unsecured Creditors List</u>"), in lieu of a list of the Holders of the twenty largest unsecured claims for each

Debtor (the "Top Twenty List"), (ii) authorizing the Debtors to list the addresses of counsel for asbestos claimants in the creditor matrix in lieu of such claimants' addresses, and (iii) approving notice procedures for asbestos claimants.

52.     As described above, Maremont and its Debtor affiliate MEP have collectively been subject to thousands of personal injury and wrongful death claims through the Maremont Asbestos Lawsuits.  I understand that nearly all of the Debtors' known contingent creditors are claimants in the Maremont Asbestos Lawsuits, as the only known Claims against the Debtors as of the Petition Date other than Asbestos Personal Injury Claims are (i) the Intercompany Payables, (ii) certain Environmental Claims, and (iii) certain Claims of the Delaware taxing authorities.

53.     Because virtually all of the asbestos claimants hold unliquidated claims against the Debtors, it would be impossible to determine which individual asbestos claimants hold the largest unsecured claims in the Chapter 11 Cases.  It is my understanding that it is extremely rare for asbestos plaintiffs to assert a damages amount in their complaints, and thus there is no means for Maremont to determine which of the approximately 13,000 known Asbestos Personal Injury Claims are the largest.  In addition, as described below in more detail, the Debtors do not have the proper information necessary to populate a Top Twenty List with the asbestos claimants themselves, rather than the law firms representing the largest number of such claimants, as the individual plaintiff information in the claims database maintained for the Debtors by PACE is in many cases incomplete or obsolete, and supplemental information cannot be obtained in an efficient or complete manner.  Accordingly, the Debtors seek to file the Top Asbestos Counsel List in lieu of a Top Twenty List that includes individual asbestos claimants.  In addition, the Debtors will file a list of their unsecured claims other than Asbestos Personal Injury Claims.

54.     The Debtors, through their vendor PACE, maintain a litigation database to track the Maremont Asbestos Lawsuits, which largely contains only the addresses of counsel of record for the claimants in the Maremont Asbestos Lawsuits.  Moreover, for Maremont Asbestos Lawsuits in which the Debtors do have a record of a claimant's address, such addresses were most likely obtained from the original complaints filed by such claimants, many of which were filed years ago.  Thus, for the majority of the Maremont Asbestos Lawsuits, I am informed that the addresses of the claimants are not available to the Debtors (nor are phone numbers or other contact information that would be required for inclusion on a Top Twenty List).  Gathering the individual addresses now would require an onerous review of the files maintained by the Debtors' various past and present asbestos litigation counsel across the country and such review would yield incomplete and potentially inaccurate results at best.  Even if the Debtors were to undertake this onerous task, I understand that the Debtors would not be able to verify the accuracy of the information provided in an efficient manner and without cooperation from the 359 firms that represent these plaintiffs, who may not be willing to assist given client confidentiality and privacy issues.  Additionally, given ethical considerations related to communications with a person represented by counsel, communications regarding the Maremont Asbestos Lawsuits prior to the Petition Date – including the prepetition Solicitation of votes on the Plan – have occurred through and with such counsel.  Maremont seeks to continue that communications protocol through the relief sought in the Notice Procedures Motion.

55.     I believe that the actual notice that claimants will receive, via their counsel, pursuant to the notice protocol set forth in the Notice Procedures Motion will be superior to the notice that such claimants would receive if the Debtors were to attempt to deliver notices and other communications directly to the claimants.  I also believe that listing and using the

addresses of counsel of record for asbestos claimants will ease the burden on both claimants and the Debtors.  Many of the claimants in the Maremont Asbestos Lawsuits are laypersons, many of whom may never have been involved in a commercial bankruptcy case.  Such claimants may be unfamiliar with the types of notices and pleadings that will be served in the Chapter 11 Cases, or any required actions in response to such communications.  In addition, listing the addresses of counsel of record for each asbestos claimant in lieu of individual addresses will dramatically ease the administrative burden on the Debtors of attempting to obtain verified information, and of sending notices to thousands of personal injury claimants, resulting in a more cost-effective notice procedure that benefits the Debtors' estates and creditors.  As a result, the Debtors are requesting authority to list the addresses of the counsel of record for the asbestos claimants instead of the addresses of the individual claimants on the Debtors' creditor matrix.

56.    Additionally, I am informed that throughout the Chapter 11 Cases, the Debtors will be required to send certain notices, mailings and other communications to the asbestos claimants that have asserted claims against the Debtors.  In order to ensure that these claimants receive proper and timely notice of filings and critical events in the Chapter 11 Cases, the Debtors seek to implement the Asbestos Claimant Notice Procedures.  For the reasons set forth above, I believe that the notice that asbestos claimants will receive via their counsel under the Asbestos Claimant Notice Procedures will be superior to the notice that such claimants would receive if the Debtors were to attempt to deliver notices and other communications directly to the claimants based on the information we have in the claims database.  The Asbestos Claimant Notice Procedures will also ease the administrative burden of sending notices to thousands of asbestos claimants, resulting in a more cost-effective notice procedure that benefits the Debtors'

estates and creditors by providing meaningful notice and due process to the Holders of Asbestos Personal Injury Claims while also improving the administration of the Chapter 11 Cases.

*[Remainder of Page Intentionally Left Blank]*

## <u>CONCLUSION</u>

In the First Day Motions, the Debtors seek relief that will enable them to smoothly transition to, and effectively and efficiently operate in, these Chapter 11 Cases, pending confirmation of the Plan.  For the reasons described herein and in the First Day Motions, I believe that the relief requested in the First Day Motions is in the best interests of the Debtors and their estates and should be granted.

*/s/ Carl D. Anderson, II*
Carl D. Anderson, II
Chairman of the Board and Sole Officer,
Maremont Corporation