## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

MAREMONT CORPORATION, et al.,[1]

Debtors.

Chapter 11

Case No. 19-_____ (___)

(Joint Administration Requested)

### DEBTORS' MOTION FOR ENTRY OF AN ORDER
### (I) AUTHORIZING THE DEBTORS TO CONTINUE TO USE THEIR
### EXISTING CASH MANAGEMENT SYSTEM, INCLUDING EXISTING
### BANK ACCOUNTS AND BUSINESS FORMS, (II) AUTHORIZING THE
### CONTINUATION OF CERTAIN INTERCOMPANY TRANSACTIONS,
### (III) WAIVING THE REQUIREMENTS OF SECTION 345(b) OF THE BANKRUPTCY
### CODE ON AN INTERIM BASIS, AND (IV) GRANTING RELATED RELIEF

Maremont Corporation ("Maremont") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") submit this motion (this "Motion"), pursuant to sections 105(a), 345(b) and 363(c)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 2015-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an order (the "Proposed Order"), substantially in the form attached hereto as **Exhibit A**, (i) authorizing the Debtors to continue to use their existing cash management system (the "Cash Management System"), including existing bank accounts and business forms, (ii) authorizing the Debtors to continue intercompany transactions by and between the Debtors and their direct or indirect non-debtor parent company,

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal taxpayer identification number, are: Maremont Corporation (6138); Maremont Exhaust Products, Inc. (9284); AVM, Inc. (9285); and Former Ride Control Operating Company, Inc. (f/k/a ArvinMeritor, Inc., a Delaware corporation) (9286). The mailing address for each Debtor for purposes of these chapter 11 cases is 2135 West Maple Road, Troy, MI 48084.

Meritor, Inc. ("Meritor"), (iii) waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis with respect to the Debtors' deposit and investment practices (to the extent applicable), and (iv) granting related relief.  In support of this Motion, the Debtors submit the *Declaration of Carl D. Anderson, II in Support of First Day Pleadings* (the "First Day Declaration") filed contemporaneously herewith and incorporated by reference.[2]  In further support of this Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASES AND JURISDICTION

1.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").  Concurrently with the filing of this Motion, the Debtors have requested joint administration and procedural consolidation of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration or the Plan, as applicable.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and other bases for the relief requested in this Motion are sections 105(a), 345(b) and 363(c)(1) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004 and Local Rule 2015-2.

## BACKGROUND OF THE DEBTORS

5.      Additional information regarding the Debtors' businesses, corporate history, capital structure and the circumstances preceding the Petition Date is set forth in the First Day Declaration and the Disclosure Statement (as defined below).

## THE DEBTORS' PREPACKAGED PLAN OF REORGANIZATION

6.      Concurrently with this Motion, the Debtors have filed a joint prepackaged chapter 11 plan of reorganization (the "Plan") and a related disclosure statement (the "Disclosure Statement").  The Debtors have also filed a motion to schedule a combined hearing for the Court to consider approval of the Disclosure Statement and confirmation of the Plan.

7.      Beginning in mid-2017, Maremont initiated a process to resolve all existing and future asbestos-related personal injury and wrongful death claims stemming from its historical use of asbestos in certain of its friction and exhaust products (as defined in the Plan, the "Asbestos Personal Injury Claims").   Maremont first engaged restructuring and valuation advisors and conducted extensive internal diligence regarding its business, litigation, and corporate history.  Maremont then selected the Future Claimants' Representative, a fiduciary and representative of future claimants, and provided information and engaged in preliminary discussions with the Future Claimants' Representative and his advisors.   After these initial discussions about the terms of a potential pre-negotiated plan of reorganization that would establish an asbestos trust under section 524(g) of the Bankruptcy Code (the "Asbestos Personal

Injury Trust"), an Asbestos Claimants Committee was assembled to represent the interests of current claimants.  After further good-faith negotiations with both creditor constituencies, as well as with Meritor, the parties agreed on the terms of the Meritor settlement and Maremont contribution to the Asbestos Personal Injury Trust embodied in the Debtors' prepackaged Plan.

8.      The Plan channels all Asbestos Personal Injury Claims to the Asbestos Personal Injury Trust  (the "Asbestos Personal Injury Channeling Injunction"), and such claims will be paid from the assets of the trust.  In exchange for certain protections afforded under the Plan, including the Asbestos Personal Injury Channeling Injunction, Maremont and Meritor (on behalf of itself and certain other Non-Debtor Affiliates) will make substantial contributions to the Asbestos Personal Injury Trust.  The total Asbestos Personal Injury Trust assets will be valued, in the aggregate, in the range of $58–65 million, and include cash, insurance coverage and receivables, and all of the equity in Reorganized Maremont, which will own and operate commercial real estate.  The Asbestos Personal Injury Trust will resolve Asbestos Personal Injury Claims asserted by current and future Holders of Asbestos Personal Injury Claims in accordance with the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures.

9.      Holders of Class 4 Asbestos Personal Injury Claims under the Plan were the only class of creditors or interest holders entitled to vote under the Plan and such Holders that voted on the Plan voted unanimously to accept the Plan.  The Plan leaves all other Classes of non-insider Claims Unimpaired.

## THE CASH MANAGEMENT SYSTEM

10.      The Debtors maintain a Cash Management System that is designed to collect, transfer and disburse funds and pay the Debtors' business, litigation, and professional expenses.

The Cash Management System is part of a broader cash management system for Meritor and its subsidiaries, managed through oversight procedures and controls implemented by the Debtors and Meritor pursuant to a shared services agreement between Maremont and Meritor.  Through the Cash Management System, the Debtors facilitate cash monitoring, forecasting, and reporting, monitor collection and disbursement of funds, and reduce administrative expenses with respect to the administration of their bank accounts.  The Cash Management System currently utilizes two bank accounts owned by the Maremont (together with any other bank accounts that the Debtors may open in the ordinary course of their business, collectively, the "Bank Accounts"), which are maintained at two banking institutions (collectively with any other banking institutions at which the Debtors may open Bank Accounts in the ordinary course of their business, the "Banks").

## I.    The Existing Bank Accounts

11.    The existing Bank Accounts are each owned by Maremont: (i) a primary concentration account from which Maremont pays its business and professional expenses in the ordinary course of business (the "Corporate Account"); and (ii) a controlled disbursement account into which Maremont receives insurance reimbursement payments pursuant to a coverage-in-place settlement agreement and from which it disburses litigation defense and indemnity payments (the "Litigation Account").  The Corporate Account is maintained with JPMorgan Chase Bank, N.A. ("Chase"), and the Litigation Account is maintained with Bank of America, N.A. ("Bank of America").

12.    A schedule of the existing Bank Accounts, including the last four digits of the account number of each Bank Account, is attached as **Exhibit 1** to the Proposed Order.  Chase and Bank of America, the Banks where the existing Bank Accounts are maintained, are both on

the list of authorized depositories maintained by the District of Delaware established by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee").

13.     In the ordinary course of business, the Banks charge certain service and other fees, costs and expenses in accordance with the applicable agreements governing the Bank Accounts (collectively, the "Bank Fees").  The Debtors estimate that the Bank Fees total approximately $1,150 per month.  The Banks invoice the Bank Fees through certain master services agreements with Meritor, and Meritor pays the Bank Fees on behalf of Maremont.  As described in greater detail herein, the payment of the Bank Fees by Meritor on behalf of Maremont is charged back to Maremont through the shared services agreement between Meritor and Maremont.

## II.     The Flow of Funds within the Cash Management System

14.     A diagram providing an overview of the movement of cash through the Cash Management System (the "Funds Flow Diagram") is attached as **Exhibit 2** to the Proposed Order.  As depicted on the Funds Flow Diagram, the receipt of funds into the existing Bank Accounts primarily includes payments of the Meritor Loan Receivable (as defined herein) by Meritor upon demand by Maremont, Commercial Property Lease (as defined below) rent proceeds and insurance reimbursements, and the primary disbursements are payments of various corporate and professional expenses and payments in respect of the Debtors' legacy asbestos and environmental liabilities.  Each of these components is briefly described below.

### A.     Corporate Account

15.     As described in greater detail in the First Day Declaration and the Disclosure Statement, the Debtors ceased active operations and divested all remaining operating assets related to their legacy aftermarket friction products, exhaust products, ride control, and motion control businesses by 2013.  As a result, the Debtors' ongoing operations as of the Petition Date

are limited to the management of their legacy environmental and asbestos liabilities and Maremont's ownership of a commercial property that currently generates rental income through a triple-net lease (the "Commercial Property Lease").  The payments of rent pursuant to the Commercial Property Lease are deposited via check into the Corporate Account.  Pursuant to the Cash Management System, the Corporate Account functions as Maremont's main operating account and is used to pay Maremont's business expenses, including the payment of professional fees and expenses related to the restructuring, payments related to Maremont's environmental liabilities, and the payment of corporate expenses such as directors' fees.  Payments are conducted through the Corporate Account via manual wire transfers upon authorization from Maremont's sole officer.

16.     Cash comes in to the Corporate Account through the payment of rent under the Commercial Property Lease and the payment of the Meritor Loan Receivable by Meritor upon demand by Maremont to the extent needed to cover any shortfalls.  The average balance of the Corporate Account over the preceding 30 days was approximately $260,000.  As of the Petition Date, the Corporate Account held approximately $1.1 million.

17.     When Maremont requires cash from the Corporate Account to fund general expenses in excess of the account balance, Maremont formally requests a paydown of the Meritor Loan Receivable (as defined below) from Meritor pursuant to the A&R Intercompany Loan Agreement (as defined below).  Meritor then makes a wire transfer of the funds to Maremont and reduces the balance of the Meritor Loan Receivable by the same amount. Corresponding book entries are recorded in Maremont's and Meritor's books and records.

### B.     Litigation Account

18.     Prior to the Petition Date, Maremont deposited insurance reimbursements related to, and made disbursements in respect of, the legacy asbestos liabilities from the Litigation

Account.  The Debtors maintain a database with PACE, a third party administrator that manages and provides claims services in respect of the Debtors' asbestos liabilities (the "Claims Administrator").  As part of these services, the Claims Administrator has signature authority on the Litigation Account and, prior to the Petition Date, made defense and indemnity payments via check transfers from the account to defense law firms and claimants on the Debtors' behalf.  The Claims Administrator is the only third party with authority to initiate payments on the Debtors' behalf.  Prior to the Petition Date, the only disbursements from the Litigation Account were certain administrative costs related to the asbestos litigation, settlement payments made on account of asbestos claims to the plaintiffs' law firms for distribution to the claimants, and payment of invoices to Maremont's asbestos defense law firms.

19.    The Litigation Account is funded through the receipt of insurance reimbursements and payment of the Meritor Loan Receivable by Meritor.  The average balance of the Litigation Account during the preceding 30 days was approximately $300,000.  As of the Petition Date, the Litigation Account held approximately $244,000.[3]

20.    As with the Corporate Account, prior to the Petition Date, from time to time, Maremont used draws of the Meritor Loan Receivable to fund the Litigation Account in order to pay for certain defense and indemnity payments related to its asbestos liabilities and litigation. Maremont would formally request pay-downs of the Meritor Loan Receivable from Meritor, and upon receipt of the request Meritor made wire transfers of the fund to the Litigation Account and reduced the balance of the Meritor Loan Receivable by the same amount.  Corresponding book entries were recorded in Maremont's and Meritor's books and records.

---

[3] This includes a check in the approximate amount of $190,000 that was deposited on or about January 18, 2019 that had not cleared prior to the Petition Date.

III.    **Existing Business Forms**

21.    Prior to filing the Chapter 11 Cases, Maremont issued checks to make payments from the Litigation Account in the ordinary course of business.  Although Maremont may not use the Litigation Account to issue paper checks during the Chapter 11 Cases, out of an abundance of caution, to minimize unnecessary additional expenses, the Debtors are requesting that the Court authorize Maremont's continued use of all checks in use immediately before the Petition Date without reference to its status as a debtor in possession, rather than requiring Maremont to incur the expense and delay of immediately implementing new checks as required by the U.S. Trustee Operating Guidelines (as defined below).  With respect to checks that Maremont or the Claims Administrator may print themselves, if any, the Debtors propose that Maremont and the Claims Administrator be authorized to begin printing such checks and letterhead with the designation "Debtor in Possession" and the corresponding number of the lead bankruptcy case on all such checks within 14 days of the date of entry of the Proposed Order.

IV.    **Intercompany Transactions with Meritor**

22.    Historically, the Debtors and Meritor engaged in intercompany transactions in which Meritor paid liabilities of certain of the Debtors related to legacy operating expenses, asbestos defense and consultant costs and fees, and expenses in respect of Environmental Sites, and Meritor accepted receivables in return for making such payments.  Maremont and Meritor initially formalized this process between them in 2008 through the predecessor agreement to the A&R Intercompany Loan Agreement (as defined below), which they amended and restated several times and most recently in 2016.  Accordingly, Meritor, as borrower, and Debtor Maremont, as lender, are party to that certain Amended and Restated Loan Agreement dated as of January 12, 2016 (the "<u>A&R Intercompany Loan Agreement</u>"), pursuant to which Meritor owes Maremont certain amounts as provided thereunder (the "<u>Meritor Loan Receivable</u>").  As of

the Petition Date, the outstanding amount of the Meritor Loan Receivable was approximately $20 million. Pursuant to the A&R Intercompany Loan Agreement, upon written notice Maremont may accelerate and call the maturity of some or all of the outstanding amount owed by Meritor thereunder.

23.    Each of Debtors Maremont Exhaust Products, Inc., AVM, Inc., and Former Ride Control Operating Company, Inc.'s books reflect intercompany payables owed to Meritor related to legacy operating expenses, asbestos defense and consultant costs and fees, allocated shared services fees, and expenses in respect of environmental sites that Meritor pays on their behalf (collectively, the "Intercompany Payables"). Intercompany balances between the Debtors and Meritor also arise from a shared services agreement between Maremont and Meritor, payment of which occurs through reductions of the Meritor Loan Receivable and increases to the Intercompany Payables. Meritor charges the Debtors a total monthly fee of $19,575 for certain administrative, legal, environmental, financial, accounting, treasury, claims management, tax and insurance coverage administration services that it provides to the Debtors, which fee is inclusive of the monthly Bank Fees that Meritor pays on Maremont's behalf. Ledger entries are recorded to allocate the monthly fee to each of the Debtors, and the balance of the Meritor Loan Receivable is reduced to reflect Maremont's allocated amount, while the Intercompany Payables owed to Meritor by the other Debtors are increased to reflect their respective allocated charged amounts. By this Motion, the Debtors are seeking to continue the intercompany transactions between the Debtors and Meritor, including those arising from the shared services agreement and pursuant to the A&R Intercompany Loan Agreement.

## RELIEF REQUESTED

24.     By this Motion, the Debtors seek entry of the Proposed Order, substantially in the

form attached hereto as **Exhibit A**, granting the following relief:

(i)      authorizing, but not directing, the Debtors to (a) continue to operate the Cash Management System, (b) continue to use, with existing account numbers, all of the Bank Accounts in the Cash Management System and (c) implement any changes to the Cash Management System as the Debtors may deem necessary and appropriate, including, without limitation, opening new Bank Accounts or closing existing Bank Accounts;

(ii)     authorizing the Banks to (a) continue to maintain, service and administer the Bank Accounts as accounts of the Debtors as debtors in possession and provide related treasury, accounting and cash management services without interruption and in the ordinary course of the Debtors' businesses, and (b) receive, process, honor and pay, to the extent of available funds, any and all checks, drafts, wires, ACH transfers, other electronic transfers or other items presented, issued or drawn on the Bank Accounts;

(iii)    authorizing, but not directing, Maremont to continue to use its existing checks without reference to its status as a debtor in possession for a period of 14 days from entry of the Proposed Order;

(iv)    authorizing the Debtors to continue intercompany transactions by and between the Debtors and Meritor on a postpetition basis, including but not limited to transactions pursuant to the shared services agreement and the A&R Intercompany Loan Agreement;

(v)     waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis with respect to the Debtors' deposit practices to the extent the Bank Accounts do not strictly comply with such requirements; and

(vi)    granting related relief.

## BASIS FOR RELIEF

### I.    The Court Should Authorize the Debtors to Continue to Operate the Cash Management System and Use the Existing Bank Accounts.

25.     The U.S. Trustee has promulgated the *Operating Guidelines for Chapter 11 Cases*

(the "U.S. Trustee Operating Guidelines") pursuant to 28 U.S.C. § 586(a)(3).  The U.S. Trustee

Operating Guidelines require, among other things, that a chapter 11 debtor close all existing bank

accounts upon filing of its petition and open new "debtor-in-possession" accounts with certain financial institutions designated as authorized depositories by the U.S. Trustee.    The requirements are intended to provide a clear line of demarcation between prepetition and post-petition transactions and to prevent the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

26.    The Debtors' continued use of the Cash Management System, including the existing Bank Accounts, is nevertheless permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  The purpose of section 363(c)(1) of the Bankruptcy Code is to provide a debtor in possession with the flexibility to engage in the types of ordinary transactions required to operate its business without undue oversight by creditors or the court.  See In re Roth Am., Inc., 975 F.2d 949, 952 (3d Cir. 1992); In re Nellson Nutraceutical, Inc., 369 B.R. 787, 796 (Bankr. D. Del. 2007); Vision Metals, Inc. v. SMS Demag, Inc. (In re Vision Metals, Inc.), 325 B.R. 138, 145 (Bankr. D. Del. 2005).  Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system.  See Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.), 75 F.3d 1447, 1453 (10th Cir. 1996).  Courts in this and other districts have observed that use of an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash."  In re Columbia Gas Sys., Inc., 136 B.R. 930, 934 (Bankr. D. Del. 1992), aff'd in part and rev'd in part, 997 F.2d 1039 (3d Cir. 1993).

27.     Consistent with these principles, the Bankruptcy Code grants bankruptcy courts discretionary authority to allow debtors to continue using their prepetition bank accounts.  See, e.g., In re The Charter Co., 778 F.2d 617, 618 (11th Cir. 1985) (noting that the bankruptcy court authorized the debtors to maintain its existing bank accounts); In re Grant Broad., Inc., 75 B.R. 819, 820 (E.D. Pa. 1987) (noting an order by the bankruptcy court authorizing use of cash collateral and prepetition bank accounts); In re UAL Corp., 2002 WL 34344255, at *1 (Bankr. N.D. Ill. Dec. 9, 2002) (authorizing the debtors, within the reasonable exercise of their business judgment, to continue using all of their bank accounts in existence on the petition date).  Courts often deviate from the strict recommendations of applicable guidelines based upon the circumstances of each case if doing so facilitates a debtor's successful reorganization.  See, e.g., The Colad Grp., Inc., 324 B.R. 208, 216 (Bankr. W.D.N.Y. 2005) (allowing the debtor to continue to use its existing bank accounts without closing all prepetition accounts and opening new post-petition accounts); In re Charter Behavioral Health Sys., LLC, 292 B.R. 36, 41 (Bankr. D. Del. 2003) (same).  Bankruptcy courts routinely treat debtor requests to continue using prepetition bank accounts as a relatively "simple matter[]."  In re Baldwin-United Corp., 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).

28.     Strict enforcement of the U.S. Trustee Operating Guidelines during the Chapter 11 Cases would disrupt the efficiency of the Debtors' Cash Management System.  It is critical that the Debtors remain able to manage cash and coordinate transfers of funds to efficiently and effectively engage in their corporate activities and financial affairs.  Disrupting the Debtors' current cash management procedures would impair the Debtors' ability to successfully reorganize during the Chapter 11 Cases.  Accordingly, the Debtors request that they be exempted from the U.S. Trustee Operating Guidelines' requirements to close the Bank Accounts and open

new post-petition bank accounts, along with any other similar requirements. The Debtors further request that the Bank Accounts be deemed debtor-in-possession accounts and that the Debtors be authorized to maintain and continue using the Bank Accounts in the same manner and with the same account numbers as those employed during the prepetition period, including the ability to make disbursements from the Bank Accounts other than by check. Courts in this District have routinely waived the requirements of the U.S. Trustee Operating Guidelines in both recent and similar chapter 11 cases.[4]

29.      In addition, the Debtors request that the Court authorize the Debtors to implement any changes to the Cash Management System they may deem necessary and appropriate in their discretion, including, without limitation, opening new bank accounts or closing one or more Bank Accounts. The Debtors, however, shall give notice of any material change to the Cash Management System (including the closing of any Bank Account) to the U.S. Trustee and any statutory committee appointed in the Chapter 11 Cases within 14 days of such change. Any new Bank Account opened by the Debtors shall be maintained with a bank that has executed a Uniform Depository Agreement with the U.S. Trustee or at a bank that is willing to promptly execute such an agreement.

30.      The Debtors further request that the Court authorize the Banks to "charge back" to the Bank Accounts any amounts incurred resulting from returned checks or other returned items attributable to the Bank Accounts, in each case regardless of whether such items were deposited prepetition or post-petition or relate to prepetition or post-petition items.

---

[4] See, e.g., In re Se. Grocers, LLC, Case No. 18-10700 (MFW) (Bankr. D. Del. Apr. 23, 2018) (authorizing the debtors' continued use of existing bank accounts); In re Charming Charlie Holdings Inc., Case No. 17-12906 (CSS) (Bankr. D. Del. Jan. 10, 2018) (same); In re Yarway Corp., Case No. 13-11025 (BLS) (Bankr. D. Del. Apr. 25, 2013); In re Leslie Controls, Inc., Case No. 10-12199 (CSS) (Bankr. D. Del. July 14, 2010).

II. **Authorizing the Banks to Continue to Maintain, Service, and Administer the Bank Accounts in the Ordinary Course of Business Is Warranted.**

31.     As discussed above, strict application of the U.S. Trustee Operating Guidelines in the Chapter 11 Cases would disrupt the Debtors' efforts to preserve the value of their estates and reorganize in an efficient manner.  For these reasons, the Debtors request that the Court authorize the Banks to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business.  In this regard, the Banks should be authorized to receive, process, honor, and pay any and all checks, drafts, ACH transfers, wires, and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto; <u>provided</u> that any check, draft, or other notification that the Debtors advise the Banks to have been drawn, issued, or otherwise presented before the Petition Date may be honored by the Banks only to the extent authorized by order of the Court.

32.     The Debtors further request that the Court authorize the Banks to accept and honor all representations from the Debtors as to which checks, drafts, ACH transfers, wires, or other instructions should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, ACH transfers, wires, or other instructions are dated before, on, or after the Petition Date.  The Debtors also request that, to the extent any of the Banks honor a prepetition check or other item drawn on any Bank Account either: (a) at the direction of the Debtors; or (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored, such Bank shall not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item honored post-petition. The Debtors submit that such relief is reasonable and appropriate because the Banks are

not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

### III.    The Court Should Authorize the Debtors to Continue to Use Existing Checks.

33.    The U.S. Trustee Operating Guidelines require the immediate printing of new checks with the legend "Debtor in Possession" and other information related to the Chapter 11 Cases.    Similarly, Local Rule 2015-2(a) mandates that the Debtors, upon exhausting their existing check stock, order new checks bearing the "Debtor in Possession" legend.  To avoid disruption to the Cash Management System and unnecessary expenses, the Debtors request authorization to continue to use their existing checks substantially in the forms existing immediately before the Petition Date for a period of fourteen (14) days, without reference to their status as debtors in possession.  The Debtors submit that parties in interest will not be prejudiced if the Debtors are authorized to continue to use their checks substantially in the forms existing immediately before the Petition Date.  Such parties will undoubtedly be aware of the Debtors' status as debtors in possession and, thus, changing business forms is unnecessary and would be unduly burdensome.  Courts in this District have regularly allowed debtors to continue to use printed checks created before the Petition Date without the "debtor in possession" label.[5]

### IV.    Cause Exists to Waive the Requirements of Section 345 of the Bankruptcy Code to the Extent the Bank Accounts Do Not Strictly Comply Therewith.

34.    Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C. §

---

[5]  See, e.g., In re Se. Grocers, LLC, Case No. 18-10700 (MFW) (Bankr. D. Del. Apr. 23, 2018) (authorizing the debtors' continued use of preprinted business forms without a "Debtor in Possession" marking until the supply is exhausted); In re Charming Charlie Holdings Inc., Case No. 17-12906 (CSS) (Bankr. D. Del. Jan. 10, 2018) (same); In re True Religion Apparel, Inc., Case No. 17-11460 (CSS) (Bankr. D. Del. July 6, 2017) (same); In re TK Holdings Inc., Case No. 17-11375 (BLS) (Bankr. D. Del. June 27, 2017) (same); In re Keystone Tube Co., LLC, Case No. 17-11330 (LSS) (Bankr. D. Del. June 20, 2017) (same).

345(a). For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) requires debtors to obtain, from the entity with which the money is deposited, a bond in favor of the United States and secured by the undertaking of an adequate corporate entity, or "the deposit of securities of the kind specified in section 9303 of title 31." 11 U.S.C. § 345(b).[6]

35.     As discussed above, each of the Bank Accounts is maintained at a Bank that is an authorized depository under the U.S. Trustee Operating Guidelines, and the Bank Accounts are each insured by the Federal Deposit Insurance Corporation.  Therefore, the Bank Accounts comply with section 345(b) of the Bankruptcy Code.  Out of an abundance of caution, however, to the extent that the Bank Accounts do not strictly comply with section 345 of the Bankruptcy Code, the Debtors submit that cause exists to waive any such noncompliance because all funds are deposited safely and prudently at financially-stable banking institutions in a manner specifically designed to preserve capital, maintain liquidity, and generate returns.[7]  Courts in this District have granted similar relief in both recent and in comparable cases.[8]

---

[6] Strict compliance with the requirements of section 345(b) of the Bankruptcy Code would, in cases such as these, be inconsistent with section 345(a), which permits a debtor in possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money."  Thus, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) of the Bankruptcy Code to provide that its strict investment requirements may be waived or modified if the Court so orders "for cause."  140 Cong. Rec. H. 10,767 (Oct. 4, 1994), 1994 WL 54773.

[7] The Banks pay interest to Maremont on the funds on deposit in the Bank Accounts.  Maremont therefore does not believe that any of the Bank Accounts is an "investment" account within the meaning of section 345(b) of the Bankruptcy Code.

[8] See, e.g., In re Se. Grocers, LLC, Case No. 18-10700 (MFW) (Bankr. D. Del. Apr. 23, 2018) (granting the debtors an extension of time to comply section 345(b) of the Bankruptcy Code); In re Claire's Stores, Inc., Case No. 18-10584 (MFW) (Bankr. D. Del. Mar. 20, 2018) (same); In re Charming Charlie Holdings Inc., Case No. 17-12906 (CSS) (Bankr. D. Del. Dec. 13, 2017); In re Yarway Corp., Case No. 13-11025 (BLS) (Bankr. D. Del. Apr. 25, 2013) (same); In re Leslie Controls, Inc., Case No. 10-12199 (CSS) (Bankr. D. Del. July 14, 2010) (same).

**THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED**

36.     Bankruptcy Rule 6003 empowers the Court to issue an order, within 21 days after the Petition Date, granting a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" if such requested relief "is necessary to avoid immediate and irreparable harm."   FED. R. BANKR. P. 6003(b).   For the reasons discussed above, entry of the Proposed Order is integral to the Debtors' ability to successfully transition into chapter 11.   Specifically, the relief requested is necessary to avoid a potential disruption in the Chapter 11 Cases and maximize the value of the Debtors' estates for the benefit of all stakeholders.   Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**RESERVATION OF RIGHTS**

37.     Nothing contained herein is intended or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' rights to dispute any claim; (iii) a promise or requirement to pay any prepetition claim; (iv) a waiver of any claims or causes of action which may exist against any creditor or interest holder; (v) an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (vi) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (vii) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid.   The Debtors expressly reserve their right to contest any claim related to the relief sought herein.   Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be, nor

should it be construed as, an admission as to the validity of any claim or a waiver of the Debtors'
rights to subsequently dispute such claim.

### WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h) REQUIREMENTS

38.     In addition, by this Motion, the Debtors request a waiver of any stay of the
effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n
order authorizing the use, sale, or lease of property other than cash collateral is stayed until the
expiration of 14 days after entry of the order, unless the court orders otherwise."  FED. R. BANKR.
P. 6004(h).  As set forth above, the Debtors require immediate relief to avoid disruption in the
Chapter 11 Cases and maximize the value of their estates for the benefit of all parties in interest.
Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay
imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

39.     Similarly, for the reasons stated above, the Debtors request a waiver of the notice
requirements of Bankruptcy Rule 6004(a) to the extent they are deemed applicable.

### NOTICE

40.     Notice of this Motion will be provided to (i) the Banks; (ii) the U.S. Trustee;
(iii) the firms listed on the Debtors' consolidated list of twenty-five (25) law firms representing
the largest numbers of asbestos plaintiffs asserting claims against the Debtors; (iv) the creditors
listed on the Debtors' consolidated list of creditors holding unsecured claims against the Debtors
other than asbestos-related claims; (v) counsel to Meritor; (vi) counsel to the prepetition
Asbestos Claimants Committee; (vii) counsel to the prepetition Future Claimants'
Representative; (viii) the United States Attorney's Office for the District of Delaware; (ix) the
Internal Revenue Service; (x) the United States Department of Justice; and (xi) any party that has
requested notice pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered

hereon will be served in accordance with Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order, substantially in the form attached hereto, granting the relief requested herein and any further relief the Court may deem just and proper.

Dated:  January 22, 2019
Wilmington, Delaware

SIDLEY AUSTIN LLP
James F. Conlan
Andrew F. O'Neill
Allison Ross Stromberg
Blair M. Warner
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

SIDLEY AUSTIN LLP
Alex R. Rovira
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Facsimile:  (212) 839-5599

-and-

COLE SCHOTZ P.C.

*/s/ Norman L. Pernick*
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile:  (302) 652-3117

PROPOSED ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION