**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAREMONT CORPORATION, et al.,[1] | Case No. 18-_____ (___) |
| Debtors. | (Joint Administration Requested) |

**DISCLOSURE STATEMENT FOR THE JOINT PREPACKAGED
PLAN OF REORGANIZATION OF MAREMONT CORPORATION AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

> **THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT A CHAPTER 11 PREPACKAGED PLAN OF REORGANIZATION FOR MAREMONT CORPORATION AND ITS DEBTOR AFFILIATES. MAREMONT CORPORATION AND THE COMPANIES LISTED AS DEBTORS HEREIN HAVE NOT FILED FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR APPROVED BY THE BANKRUPTCY COURT OR THE SECURITIES AND EXCHANGE COMMISSION. IN THE EVENT THAT THESE COMPANIES FILE PETITIONS FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND SEEK CONFIRMATION OF THE PLAN DESCRIBED HEREIN, THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL.**

> **THE PLAN OF REORGANIZATION PROVIDES FOR AN "ASBESTOS PERSONAL INJURY CHANNELING INJUNCTION" PURSUANT TO SECTION 524(g) OF THE BANKRUPTCY CODE. FOR A DESCRIPTION OF THE CAUSES OF ACTION TO BE ENJOINED AND THE IDENTITIES OF THE ENTITIES THAT WOULD BE SUBJECT TO THE INJUNCTION, SEE ARTICLE VIII OF THE PLAN AND ARTICLE VII AND SECTION VIII.F OF THIS DISCLOSURE STATEMENT.**

**SIDLEY AUSTIN LLP**
James F. Conlan
Andrew F. O'Neill
Allison Ross Stromberg
Blair M. Warner
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Proposed Co-Counsel to the Debtors*

**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

*Proposed Co-Counsel to the Debtors*

**Dated:  December 4, 2018**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal taxpayer identification number, are: Maremont Corporation (6138); Maremont Exhaust Products, Inc. (9284); AVM, Inc. (9285); and Former Ride Control Operating Company, Inc. (f/k/a ArvinMeritor, Inc., a Delaware corporation) (9286).  The mailing address for each Debtor for purposes of these chapter 11 cases is 2135 West Maple Road, Troy, MI 48084.

### IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

Maremont Corporation ("Maremont") and certain of its subsidiaries, as proposed chapter 11 debtors and debtors in possession (collectively, the "Debtors") are providing you this document and the accompanying materials (this "Disclosure Statement") because you may be a creditor entitled to vote to accept or reject the *Joint Prepackaged Plan of Reorganization of Maremont Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (including all exhibits and schedules attached thereto, and as may be amended, supplemented, or modified from time to time, the "Plan"),[2] which is attached hereto as **Exhibit A**. The Debtors are commencing the solicitation of votes to approve the Plan *before* the Debtors have commenced voluntary cases under chapter 11 of Title 11 of the United States Code, as amended (the "Bankruptcy Code").

The Debtors may file voluntary reorganization Chapter 11 Cases under the Bankruptcy Code to implement the Plan. Because the Debtors have not yet commenced chapter 11 cases, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. If the Debtors file the Chapter 11 Cases, they will promptly seek entry of an order of the Bankruptcy Court (a) approving this Disclosure Statement as having contained "adequate information," (b) approving the Solicitation as having been in compliance with section 1126(b) of the Bankruptcy Code, (c) confirming the Plan, and (d) granting related relief. The Bankruptcy Court may order additional disclosures.

---

**The deadline for the Holders of Claims in Class 4 (the only Class of Claims or Interests entitled to vote on the Plan) (the "Voting Holders") to accept or reject the Plan is *4:00 p.m. (prevailing Eastern Time) on January 18, 2019* (the "Voting Deadline") unless the Debtors extend the Voting Deadline, in which case such extended deadline shall be the applicable Voting Deadline. To be counted, a Ballot or Master Ballot (as described herein) to accept or reject the Plan indicating such acceptance or rejection must be actually received by the Debtors' Claims, Notice and Balloting Agent no later than the Voting Deadline, as described herein. Voting Holders or their authorized representatives should refer to the enclosed Ballots or Master Ballots, as applicable, for further instructions on how to vote on the Plan.**

---

**Please note that the description of the Plan provided throughout this Disclosure Statement is only a summary provided for convenience. For a complete understanding of the Plan, you should read the Plan in its entirety. The Plan is attached hereto as Exhibit A. In the case of any inconsistency between the summary of the Plan in this Disclosure Statement and the Plan, the Plan will govern. The Debtors cannot assure you that the version of the Disclosure Statement, including any Exhibits thereto, that is ultimately approved by the Bankruptcy Court in the Chapter 11 Cases will not contain different, additional, or material terms that do not appear in this Disclosure Statement. The Debtors urge each Voting Holder (i) to read and consider carefully this entire Disclosure Statement, including the Exhibits attached hereto, and (ii) to consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby prior to deciding whether to accept or reject the Plan. You should not rely on this Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan.**

---

**If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Holders of Interests in, the Debtors (including, without limitation, those Holders of Claims or Interests who do not submit Ballots or Master Ballots to accept or reject the Plan or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.**

---

[2] Unless otherwise defined in this Disclosure Statement, all capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

## DISCLAIMER

This Disclosure Statement provides information regarding the Plan. The Debtors believe that the Plan is in the best interest of all stakeholders and urge all Voting Holders to vote in favor of the Plan.

**The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the Disclosure Statement and the Plan have not been approved or disapproved by the Securities and Exchange Commission (the "SEC") or any state or foreign regulatory authority, and neither the SEC nor any state or foreign regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense.**

**This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Rule 3016 of the Bankruptcy Rules, and not necessarily in accordance with federal or state securities laws or other non-bankruptcy law. This Disclosure Statement was prepared with the intent to provide "adequate information" (as defined in the Bankruptcy Code) to enable Holders of Claims against and Interests in the Debtors to make informed judgments about the Plan. Neither the solicitation of votes in connection with the Plan nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.**

Unless the context requires otherwise, references to "*we*," "*our*" and "*us*" are to the Debtors.

Confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein and in the Plan. The Debtors give no assurance that the Plan will be confirmed, or if confirmed, that the conditions precedent to the occurrence of the Effective Date will be satisfied (or waived).

***The Debtors encourage you to read this Disclosure Statement in its entirety, including without limitation the Plan (and all other Exhibits hereto) and Article X hereof, entitled "Risk Factors," before submitting a Ballot or Master Ballot to vote on the Plan.***

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan and the Plan Supplement, as applicable, and the summaries of the financial information and the documents attached to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entireties by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and the Debtors give no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose. The Debtors believe that the summaries of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement are fair and accurate. The summaries of the financial information and the documents attached to this Disclosure Statement, including, but not limited to, the Plan, or otherwise incorporated herein by reference, are qualified in their entireties by reference to those documents.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly stated herein. The financial projections, attached hereto as **Exhibit B** and described in this Disclosure Statement (the "Financial Projections"), have been prepared by the Debtors' management in consultation with their advisors. The Financial Projections, while presented with numerical specificity, necessarily are based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors. Important factors that may affect actual results and cause the management forecasts to not be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' business operations (including their ability to achieve strategic goals, objectives and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions and other factors. The Debtors caution that no representations can be made as to the accuracy of these Financial Projections or to the ultimate performance of the Reorganized Debtors and any subsidiaries of the

foregoing compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance that the forecasted results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigations or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence.  As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial or other effects of the Plan to Holders of Claims or Interests or any other party in interest.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws.  Statements concerning these and other matters are not guarantees of the Debtors' future performance.  Such forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties, and other unknown factors that could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements.  In addition to statements that explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or similar terms to be uncertain and forward-looking.  There can be no assurance that the restructuring and associated Restructuring Transactions (as described herein) will be consummated.  Creditors and other interested parties should see Article X of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the Plan and Reorganized Debtors.

# TABLE OF CONTENTS

ARTICLE I. EXECUTIVE SUMMARY ................................................................................................ 1

    A.      Overview ........................................................................................................ 1
    B.      The Asbestos Personal Injury Channeling Injunction ................................. 2
    C.      Meritor Settlement and Contribution........................................................... 2
    D.      Asbestos Personal Injury Trust Funding...................................................... 3
    E.      Summary of Classification and Treatment of Allowed Claims and Interests Under the Plan.......... 4
    F.      Asbestos Personal Injury Claim Disease Levels and Scheduled Values....................... 5
    G.      Solicitation and Commencement of Chapter 11 Cases ................................. 5

ARTICLE II. VOTING PROCEDURES AND REQUIREMENTS.................................................... 5

    A.      Class Entitled to Vote on the Plan............................................................... 5
    B.      Votes Required for Acceptance by a Class................................................... 6
    C.      Certain Factors to Be Considered Prior to Voting...................................... 6
    D.      Classes Not Entitled to Vote on the Plan ..................................................... 6
    E.      Cramdown .................................................................................................... 7
    F.      Solicitation and Voting Procedures.............................................................. 7
    G.      Combined Confirmation Hearing ............................................................... 11

ARTICLE III. GENERAL INFORMATION ABOUT THE DEBTORS ...................................... 11

    A.      The Debtors' Business and Properties........................................................ 11
    B.      Management of the Debtors......................................................................... 18
    C.      Prepetition Indebtedness, Assets, and Liabilities ...................................... 18

ARTICLE IV. PLAN NEGOTIATIONS AND SETTLEMENT ...................................................... 20

    A.      Overview ..................................................................................................... 20
    B.      The Future Claimants' Representative and the Asbestos Claimants Committee.......... 20
    C.      Due Diligence and Prepetition Plan Discussions ...................................... 21
    D.      Tolling Agreement ..................................................................................... 21
    E.      Prepetition Plan Settlement Negotiations and the Meritor Contribution .................... 22
    F.      The Plan Term Sheet and Finalization of Definitive Documents........................... 22

ARTICLE V. ANTICIPATED EVENTS OF THE CHAPTER 11 CASES ................................... 23

    A.      Expected Timetable of the Chapter 11 Cases ............................................ 23
    B.      First Day Relief........................................................................................... 23
    C.      Professional Retention................................................................................ 25

ARTICLE VI. THE PLAN OF REORGANIZATION ...................................................................... 25

    A.      Classification of Claims and Equity Interests Generally .......................... 25
    B.      Description and Treatment of Unclassified Claims Under the Plan ........... 26
    C.      Classification and Treatment of Classified Claims and Interests ............... 27

ARTICLE VII. DESCRIPTION OF THE ASBESTOS PERSONAL INJURY TRUST, CONTRIBUTIONS BY MAREMONT AND MERITOR, AND THE ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES ...................................................... 31

    A.      The Asbestos Personal Injury Trust .......................................................... 31
    B.      Description of the Consideration Contributed to the Asbestos Personal Injury Trust .................. 34

C.      Other Key Terms of the Asbestos Personal Injury Trust Agreement .......................... 34
D.      Asbestos Personal Injury Trust Distribution Procedures ........................................... 35
E.      Environmental Claims .................................................................................................. 38

ARTICLE VIII. OTHER ASPECTS OF THE PLAN ............................................................... 38

A.      Insurance Agreements .................................................................................................. 38
B.      Distributions Under the Plan on Account of Claims Other than Asbestos Personal Injury Claims 40
C.      Means for Implementation of the Plan ........................................................................ 42
D.      Treatment of Executory Contracts .............................................................................. 44
E.      Effect of Confirmation ................................................................................................. 45
F.      Releases, Injunctions, and Indemnification of Claims................................................. 46
G.      Miscellaneous Provisions ............................................................................................ 51

ARTICLE IX. CONFIRMATION OF THE PLAN .................................................................... 53

A.      Combined Hearing on Confirmation and Approval of Disclosure Statement and Solicitation ...... 53
B.      Requirements for Confirmation of the Plan ................................................................. 54
C.      Issuance of Asbestos Personal Injury Channeling Injunction Pursuant to Section 524(g) of the Bankruptcy Code .......................................................................................................... 55
D.      Best Interests of Creditors / Liquidation Analysis....................................................... 55
E.      Feasibility of the Plan................................................................................................... 56
F.      Conditions to Confirmation and Consummation of the Plan ....................................... 56

ARTICLE X. RISK FACTORS ................................................................................................. 61

A.      Overall Risks to Recovery by Holders of Claims and Interests ................................... 62
B.      Certain Bankruptcy Considerations.............................................................................. 62
C.      Objections to the Plan's Classification or Amounts of Claims and Interests................ 62
D.      Conditions Precedent to the Effective Date of the Plan................................................ 62
E.      Voting Requirements .................................................................................................... 62
F.      Proposal of Alternative Plans........................................................................................ 62
G.      Conversion to Chapter 7 ............................................................................................... 63
H.      Non-Consensual Confirmation ..................................................................................... 63
I.      Projected Financial Information.................................................................................... 63
J.      Maremont Insurance...................................................................................................... 63
K.      Appointment of a Different Future Claimants' Representative..................................... 63
L.      Appointment of a Different Asbestos Personal Injury Trustee and/or Different Members of the Asbestos Personal Injury Trust Advisory Committee for the Asbestos Personal Injury Trust....... 64
M.      Distributions Under the Asbestos Personal Injury Trust Distribution Procedures ....... 64
N.      The Asbestos Personal Injury Channeling Injunction .................................................. 64

ARTICLE XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.................. 65

A.      Liquidation Under Chapter 7 or Chapter 11 ................................................................ 65
B.      Alternative Plan(s) of Reorganization ......................................................................... 65

ARTICLE XII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.... 65

A.      Treatment of the Asbestos Personal Injury Trust......................................................... 66
B.      Consequences to Holders of Asbestos Personal Injury Claims .................................... 66
C.      Information Reporting and Withholding ....................................................................... 67
D.      Reservation of Rights ................................................................................................... 67

ARTICLE XIII. CONCLUSION AND RECOMMENDATION ............................................... 67

**<u>TABLE OF EXHIBITS</u>**

EXHIBIT A        Plan of Reorganization

EXHIBIT B        Financial Projections

EXHIBIT C        Financial Statements

# ARTICLE I.
# EXECUTIVE SUMMARY

## A.    Overview

The purpose of this Disclosure Statement is to describe the Plan and its provisions and provide certain information, as required of the Debtors under section 1125 of the Bankruptcy Code, to claimants who will have the right to vote on the Plan so that they can make an informed decision in doing so. Holders of Asbestos Personal Injury Claims are the only claimants entitled to vote on the Plan. Therefore, as further explained below, the law firms representing Holders of Asbestos Personal Injury Claims for which the Debtors have contact information for such Holders' attorneys of record in the Debtors' claims database will receive Master Ballots, and Holders of Asbestos Personal Injury Claims for which the Debtors do not maintain an attorney of record in the Debtors' claims database will receive individual Ballots to enable them to vote to accept or reject the Plan.

This Disclosure Statement includes, among other things, (1) information pertaining to the Debtors' prepetition business operations and financial history and the events leading to the filing of the Chapter 11 Cases, (2) information respecting significant events that are anticipated to occur during the Chapter 11 Cases, including the Confirmation process, (3) an overview of the Plan, which sets forth certain terms and provisions of the Plan, the effects of confirmation of the Plan, alternatives to the Plan, certain tax consequences and risk factors associated with the Plan, and the manner in which distributions will be made under the Plan, (4) an overview of the discussions leading to the formulation of the Plan, (5) a discussion of the Asbestos Personal Injury Trust and the Asbestos Personal Injury Channeling Injunction; and (6) a discussion of the procedures for voting that must be followed by the Holders of Claims entitled to vote on the Plan in order for their votes to be counted.

The centerpiece of the Plan is the creation of the Asbestos Personal Injury Trust under section 524(g) of the Bankruptcy Code and the Asbestos Personal Injury Channeling Injunction that will channel all Asbestos Personal Injury Claims to the Asbestos Personal Injury Trust. The scope of the injunction will, *inter alia*, cover all current and future asbestos-related personal injury and wrongful death Claims, Demands, and Causes of Action based in whole or in part on actual or alleged conduct or products of Maremont, Maremont Exhaust Products, Inc., AVM, Inc., or Former Ride Control Operating Company, Inc. and the Debtors' predecessors and certain successors-in-interest. The Asbestos Personal Injury Channeling Injunction will enjoin all Asbestos Personal Injury Claims, in any jurisdiction, that are asserted against any of the Protected Parties, including, without limitation, Maremont's parent Meritor and the other Non-Debtor Affiliates other than the Non-Indemnified Parties. Section VIII.C of the Plan sets forth the Asbestos Personal Injury Channeling Injunction and Section I.A.126 of the Plan lists the Protected Parties thereunder.

The Asbestos Personal Injury Trust will be funded with up to approximately $50 million in Cash (consisting of the Maremont Contributed Cash, as described in greater detail herein). The Asbestos Personal Injury Trust will also be assigned the settled Maremont insurance coverage, which is described in greater detail in Section III.A.7 herein and is subject to a further proposed settlement in the Plan intended to clarify certain terms and conditions of the existing coverage as it would relate to the Asbestos Personal Injury Trust and waive any claims by the insurers under certain settlement agreements in exchange, in both cases, for inclusion of the Settling Insurers as Protected Parties under the Plan. It is also currently anticipated that Reorganized Maremont will own a commercial property worth approximately $1.4 million, as described in greater detail in Section III.A.1 herein. Additional consideration will be contributed under the Plan by the Debtors and by Meritor on behalf of itself and certain other Protected Parties pursuant to the Restructuring Transactions, and the Asbestos Personal Injury Trust will receive 100% of the new common stock of Reorganized Maremont. The assets of the Asbestos Personal Injury Trust will be used to resolve all Asbestos Personal Injury Claims in accordance with the terms of the Asbestos Personal Injury Trust Distribution Procedures annexed as <u>Exhibit D</u> to the Plan attached hereto. The assets of the Asbestos Personal Injury Trust are limited and must be managed by the Asbestos Personal Injury Trustees to ensure that funds are available to pay all current claimants as well as all expected future claimants. Nevertheless, for the reasons detailed in this Disclosure Statement, the Debtors believe that there will be substantially more assets available to pay claimants under the Plan than would be the case if there were no Plan and the Debtors were forced to pay Asbestos Personal Injury Claims and Environmental Claims solely from their own assets.

At this time the Debtors do not know whether the insurers will accept the proposed insurance settlements, and the Debtors cannot be certain that such settlements will be effected. In the event that the settlements are not

effected pursuant to the Plan and Confirmation Order, the non-settling insurer(s) will not be deemed Settling Insurers, and the ultimate value of the remaining insurance coverage may be impacted, but there would be no impact on the ability of the Debtors to confirm the Plan and effect its terms as described herein.

The Debtors estimate that the total Allowed amount of all prepetition Claims other than Asbestos Personal Injury Claims, Environmental Claims and Intercompany Claims will be *de minimis*. The Plan provides that all Classes of Claims (other than Asbestos Personal Injury Claims and Intercompany Claims) will be Unimpaired and the Debtors plan to seek the Bankruptcy Court's approval to pay such claims in the ordinary course during the Chapter 11 Cases, as appropriate. The Holders of such Claims are directed to other portions of this Disclosure Statement and to the Plan for a more detailed discussion of the treatment of such Claims.

### B.        The Asbestos Personal Injury Channeling Injunction

The Asbestos Personal Injury Channeling Injunction to be issued as part of the Plan will stay, restrain, bar and enjoin Asbestos Personal Injury Claims against any Protected Party, arising in any jurisdiction, including, without limitation, Claims, Demands, or Causes of Action for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to, the Debtor Product Lines, including, without limitation, any claim based upon a theory of veil piercing, alter ego, successor liability, vicarious liability, mere continuation, fraudulent transfer or conveyance, or conspiracy. The Protected Parties include, without limitation, the Debtors, the Reorganized Debtors, Meritor, the Meritor Related Parties, which includes all the Non-Debtor Affiliates (other than the Non-Indemnified Parties) and their respective officers, directors, shareholders, employees, professionals, and consultants, and the assignees and successors of any of the foregoing, the Settling Insurers, or any Representative of any of the foregoing or successor-in-interest of any of the foregoing, as set forth in the Plan.

The effect of "channeling" Asbestos Personal Injury Claims to the Asbestos Personal Injury Trust is that Asbestos Personal Injury Claims may only be pursued against, and paid from, the Asbestos Personal Injury Trust. Following the Effective Date of the Plan, current and future Asbestos Personal Injury Claims may <u>not</u> be asserted against Maremont, the Reorganized Debtors or any other Protected Party.

### C.        Meritor Settlement and Contribution

On or prior to the Effective Date, Meritor will make the following payments and contributions, or cause them to be paid or contributed, to the Debtors or the Reorganized Debtors in settlement of certain potential causes of action, as discussed in greater detail in <u>Section VII.B</u>, which will, as applicable, in turn be contributed by Maremont to the Asbestos Personal Injury Trust (or retained by the Reorganized Debtors, if so determined by the Asbestos Personal Injury Trust):

(i)        Meritor will pay Maremont the Intercompany Loan Payment, consisting of the entire outstanding amount owing by Meritor to Maremont under the Intercompany Loan Agreement at the time of such payment. The outstanding amount under such agreement was approximately $24.1 million as of October 31, 2018;

(ii)       Meritor will contribute the Intercompany Receivables owed to Meritor by Debtors FRCOC, AVM, and MEP to Maremont;

(iii)      Meritor will pay Maremont the Settlement Payment equal to $28 million in Cash;

(iv)      one or more Responsible Meritor Affiliates (which affiliate(s) will be reasonably acceptable to the Asbestos Claimants Committee and the Future Claimants' Representative and will have the financial wherewithal to satisfy any resulting obligations) will assume the Environmental Claims from the Reorganized Debtors and Meritor Heavy Vehicle Systems, LLC ("Meritor HVS"), as a Responsible Meritor Affiliate, will indemnify and hold harmless the Reorganized Debtors and their affiliates for any such Environmental Claims (other than Asbestos Personal Injury Claims), pursuant to the

Environmental Assumption and Indemnification Agreement, in substantially the form attached to the Plan as <u>Exhibit G</u>; and

(v)    Meritor and its affiliates will waive, release and discharge any and all Claims against the Debtors, the Asbestos Claimants Committee, the Future Claimants' Representative, and all of their respective related parties including their Representatives pursuant to the Meritor Release.

**D.    Asbestos Personal Injury Trust Funding**

On the Effective Date, the Asbestos Personal Injury Trust will receive the following contributions from Maremont (or, if the Asbestos Personal Injury Trust determines it would be beneficial to its ownership of the Reorganized Debtors, the Reorganized Debtors will retain):

(i)    100% of the Maremont Insurance, consisting of insurance proceeds and coverage obligations owed to the Debtors by FFIC, as described in greater detail in Section III.A.7 herein, and as such insurance proceeds and coverage obligations may be amended pursuant to the FFIC Amendment contemplated in the Plan;

(ii)    the Maremont Contributed Cash, consisting of all Cash and cash equivalents held by the Debtors as of the Effective Date after giving effect to the Intercompany Loan Payment and the Settlement Payment, after paying or reserving for (a) the Effective Date Payment, (b) the Reserve Funds, which together will consist of Cash sufficient for payment in full of all Allowed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims and General Unsecured Claims that are not paid prior to the Effective Date or satisfied in full through the Effective Date Payment on the Effective Date, and (c) the Effective Date Working Capital, which will consist of the amount of capital that the Reorganized Debtors will reasonably need to have on hand on the Effective Date in order to adequately capitalize and operate their businesses in the ordinary course in a dollar amount to be agreed on by the Debtors, the Asbestos Claimants Committee and the Future Claims Representative; and

(iii)    100 shares of new common stock in Reorganized Maremont will be issued to the Asbestos Personal Injury Trust, which shall represent 100% of the common stock of Reorganized Maremont after the cancellation of all outstanding shares of Maremont pursuant to the terms of the Plan.

For the reasons detailed in this Disclosure Statement, the Plan Proponents believe that there will be substantially more assets available to resolve Asbestos Personal Injury Claims under the Plan than would be the case if there were no Plan because, among other reasons, Meritor, on its own behalf and on behalf of the other Non-Debtor Affiliates, is contributing substantial assets to the Asbestos Personal Injury Trust, which would not be contributed otherwise.  In addition, Meritor has agreed – through the Meritor Responsible Affiliate(s) – to assume the Environmental Claims from the Reorganized Debtors and indemnify and hold harmless the Reorganized Debtors and their affiliates for any such Environmental Claims.  Without this assumption by the Meritor Responsible Affiliate(s), the Debtors would have to satisfy their environmental liabilities and would have less assets available to satisfy Asbestos Personal Injury Claims.  Moreover, without the settlements and distribution procedures contemplated in the Plan, there likely would be years of costly and time-consuming litigation that would deplete Maremont's remaining assets.  Such further litigation will be avoided through the Plan's orderly administrative process and the establishment of the Asbestos Personal Injury Trust.  Absent the Plan, distributions to claimants would most likely be delayed and, due to the costs of litigation and lack of a Meritor contribution, the funds actually available for distribution to claimants and Demand holders would be reduced substantially.  For these and other reasons explained in detail herein, the Plan Proponents, the Asbestos Claimants Committee and the Future Claimants' Representative believe that all Holders of Claims who are entitled to vote should vote to accept the Plan.

---

**RECOMMENDATION:**

**The Plan Proponents, the Asbestos Claimants Committee, and the Future Claimants' Representative believe that the Plan provides a fair and reasonable recovery to current holders of Asbestos Personal Injury Claims**

---

> and future Demand holders and that acceptance of the Plan is in the best interests of all claimants and Demand holders.  Accordingly, the Plan Proponents, the Asbestos Claimants Committee and the Future Claimants' Representative urge you to vote to accept the Plan.
>
> Please note that if there is any inconsistency between the Plan and the descriptions in this Disclosure Statement, the terms of the Plan will govern.

### E.    Summary of Classification and Treatment of Allowed Claims and Interests Under the Plan

Except for Administrative Expense Claims and Priority Tax Claims, which are not required to be classified, all Claims and Interests that arose prior to the Petition Date are divided into Classes under the Plan.  The following chart summarizes the Plan's treatment of such Claims and Interests.  This chart is only a summary, and reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.  The Plan Proponents, moreover, with the consent of the Asbestos Claimants Committee and the Future Claimants' Representative, reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

| Class | Claim or Interest | Voting Rights | Treatment | Plan Recovery |
|---|---|---|---|---|
| N/A | Administrative Expense Claims | N/A | Unimpaired | 100% |
| N/A | Priority Tax Claims | N/A | Unimpaired | 100% |
| 1 | Priority Non-Tax Claims | Not Entitled to Vote / Presumed to Accept | Paid in full / Unimpaired | 100% |
| 2 | Secured Claims | Not Entitled to Vote / Presumed to Accept | Paid in full / Unimpaired | 100% |
| 3 | General Unsecured Claims | Not Entitled to Vote / Presumed to Accept | Paid in full / Unimpaired | 100% |
| 4 | Asbestos Personal Injury Claims | Entitled to Vote | Paid in accordance with Asbestos Personal Injury Trust Agreement and Asbestos Personal Injury Trust Distribution Procedures / Impaired | 29.1%[3] |
| 5 | Environmental Claims | Not Entitled to Vote / Presumed to Accept | Reinstated / Assumed by Responsible Meritor Affiliate(s) /  Unimpaired | 100% |

---

[3] The current initial payment percentage assumes initial funding of not less than $58 million.  Should the initial funding be between $58 million and $65 million, the initial payment percentage will increase proportionately.  To the extent the Asbestos Personal Injury Trust is funded with less than $58 million or more than $65 million the initial payment percentage may be adjusted.

| 6 | Intercompany Claims | Not Entitled to Vote / Deemed to Reject or Presumed to Accept | Impaired / Unimpaired | 0% / 100% |
| 7 | Maremont Equity Interests | Not Entitled to Vote / Deemed to Reject | Canceled / Impaired | 0% |
| 8 | Inter-Debtor Interests | Not Entitled to Vote / Presumed to Accept | Reinstated / Unimpaired | 100% |

**F.     Asbestos Personal Injury Claim Disease Levels and Scheduled Values**

The Asbestos Personal Injury Trust Distribution Procedures attached to the Plan as <u>Exhibit D</u> (the "<u>TDP</u>") establishes five (5) asbestos-related diseases eligible for potential compensation from the Asbestos Personal Injury Trust (the "<u>Disease Levels</u>"): Mesothelioma 2 (Shade Tree Mechanic Claim), Mesothelioma (Occupationally Exposed Claim), Lung Cancer, Other Cancer, and Severe Asbestosis.

To qualify for payment from the Asbestos Personal Injury Trust, claimants must submit specific medical and exposure evidence as provided in the TDP and as set forth in greater detail in Section VII.D below.  The Asbestos Personal Injury Claim values for each Disease Level are set forth below.[4]

| Level | Disease Category | Scheduled Value |
|-------|------------------|-----------------|
| V | Mesothelioma 2 | $12,100 |
| IV | Mesothelioma | $111,500 |
| III | Lung Cancer | $25,400 |
| II | Other Cancer | $5,400 |
| I | Severe Asbestosis | $25,400 |

**G.     Solicitation and Commencement of Chapter 11 Cases**

After finalization of the terms of the Plan (and after consultation with and with the consent of Meritor, the Future Claimants' Representative, and the Asbestos Claimants Committee), the Debtors, with the assistance of the Claims, Notice and Balloting Agent, commenced the Solicitation on or about December 4, 2018.  The solicitation period is presently scheduled to expire on the Voting Deadline of **January 18, 2019 at 4:00 p.m. (ET)**, unless the Debtors extend the Voting Deadline, in which case such extended deadline shall be the applicable Voting Deadline.

The Debtors intend to file the Plan and this Disclosure Statement upon the commencement of voluntary cases under chapter 11 of the Bankruptcy Code.  If the requisite acceptances of the Plan have been obtained prior to such filing, the Debtors will seek approval of this Disclosure Statement and the Plan as quickly as possible.

**ARTICLE II.**
**VOTING PROCEDURES AND REQUIREMENTS**

**A.     Class Entitled to Vote on the Plan**

The following Class is the only Class entitled to vote to accept or reject the Plan (the "<u>Voting Class</u>"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 4 | Asbestos Personal Injury Claims | Impaired |

---

[4] The figures presented here represent Disease Level claim values for Plan settlement purposes only.  The parties reserve all rights with respect to actual claim values in the event the Plan is not confirmed or is not consummated.

If your Claim or Interest is not included in the Voting Class, you are not a Voting Holder and are not entitled to vote.  If you are a Voting Holder or such Holder's representative, you should read your Ballot or Master Ballot and carefully follow the instructions included in the Ballot or Master Ballot.  Please use only the Ballot or Master Ballot that the Claims, Notice and Balloting Agent provides to you on behalf of the Debtors.

**B.      Votes Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Typically, acceptance by a class of claims requires an affirmative vote of (i) at least two-thirds in dollar amount of the total allowed claims that have voted and (ii) more than one-half in number of the total allowed claims that have voted.  However, section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code provides that, for a debtor to establish a trust to assume its liabilities for asbestos-related personal injury, wrongful death, and/or property damage claims and receive the benefit of an injunction that channels liability for such claims to such a trust, at least seventy-five percent (75%) in number of the holders of claims that are to be addressed by the trust must vote to accept the plan.  Accordingly, it is a condition to confirmation of the Plan that at least seventy-five percent (75%) in number of the holders of Asbestos Personal Injury Claims (Class 4) who actually vote on the Plan have voted to accept the Plan and two-thirds (2/3) in amount of the Holders of Asbestos Personal Injury Claims who actually vote on the Plan must have voted to accept the Plan.

**YOUR VOTE ON THE PLAN IS IMPORTANT.**  The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

**C.      Certain Factors to Be Considered Prior to Voting**

There are a variety of factors that Voting Holders should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement, and the exhibits annexed hereto, has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors will request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Expense Claims, including Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Class or necessarily require a re-solicitation of the Voting Holders.  Holders of Class 4 Claims and other interested parties should see Article X of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the Plan and the Reorganized Debtors.

**D.      Classes Not Entitled to Vote on the Plan**

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the proposed plan on account of their

claims or interests, as applicable, or are otherwise deemed to reject. Because the Holders of Intercompany Claims and Interests in the Debtors are not entitled to receive any distributions, the votes of such Holders will not be solicited and such Holders will be deemed to reject.

The following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 5 | Environmental Claims | Unimpaired | Presumed to Accept |
| 6 | Intercompany Claims | Impaired / Unimpaired | Presumed to Accept / Deemed to Reject |
| 7 | Maremont Equity Interests | Impaired | Deemed to Reject |
| 8 | Inter-Debtor Interests | Unimpaired | Presumed to Accept |

### E.    Cramdown

Section 1129(b) of the Bankruptcy Code permits confirmation of a plan of reorganization notwithstanding the nonacceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

The Debtors intend to pursue a "cramdown" of the Holders of Interests in Class 7 (and to the extent necessary, Holders of Claims in Class 6), who are deemed to have rejected the Plan as further described below in Section VI.C.

### F.    Solicitation and Voting Procedures

Each Holder of an Asbestos Personal Injury Claim as of November 30, 2018 (the "Voting Record Date") is entitled to vote to accept or reject the Plan and each Holder or such Holder's attorney of record shall receive the Solicitation Package (as defined below) in accordance with the solicitation procedures described herein.

The following summarizes the procedures for voting to accept or reject the Plan. Voting Holders and their representatives are encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or to consult their own attorneys.

#### 1.    Solicitation Package

The following materials will be provided to each Holder of an Asbestos Personal Injury Claim or such Holder's attorney of record as of the Voting Record Date, and together constitute the "Solicitation Package," which may be supplemented by the Debtors following the commencement of the Solicitation:

- a cover letter describing the contents of the Solicitation Package and the enclosed USB drive containing a copy of the Disclosure Statement with all exhibits, including the Plan, and instructions for obtaining (free of charge) printed copies of the materials provided in electronic format;

- the appropriate Ballot or Master Ballot, as applicable, and applicable voting instructions (the "Voting Instructions");

- an instruction letter for law firms representing Holders of Class 4 Asbestos Personal Injury Claims that provides detailed instructions on the options law firms have to ensure Solicitation Packages are distributed to their clients;

- a pre-addressed, postage pre-paid return envelope; and

- a letter from the Future Claimants' Representative and the Asbestos Claimants Committee urging the Holders of Asbestos Personal Injury Claims to vote to accept the Plan.

Additional paper copies of these documents may be requested by contacting Donlin, Recano and Company, Inc. as the Claims, Notice and Balloting Agent by email at DRCVote@donlinrecano.com (reference "Maremont Vote" in the subject line) or by telephone at (212) 771-1128. The Solicitation Package, excluding Ballots and Master Ballots, is also available at the Debtors' restructuring website: www.donlinrecano.com/maremont.

On or before ten (10) Business Days prior to the deadline scheduled for the filing of objections to entry of the Confirmation Order, the Debtors intend to file the Plan Supplement. Substantially contemporaneously with their filing, the documents filed with the Plan Supplement may be viewed and downloaded, free of charge, at the Debtors' restructuring website, www.donlinrecano.com/maremont, or for a fee at the Bankruptcy Court's website at http://www.deb.uscourts.gov (PACER account required). If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.

The Claims, Notice and Balloting Agent will send to each attorney of record for a Holder or Holders of Asbestos Personal Injury Claims in Class 4, as listed in the Debtors' claims database maintained by PACE, a Solicitation Package containing a Master Ballot and instruction letter detailing instructions to ensure that Solicitation Packages are distributed to each attorney's clients, which may be distributed through more than one mailing.

If an attorney of record (i) is unable to certify that he or she has the authority to vote on the Plan on behalf of a client that is a Holder of a Class 4 Asbestos Personal Injury Claim, or (ii) wishes to have any Holder of an Asbestos Personal Injury Claim represented by such attorney cast his or her own Ballot on the Plan, such attorney of record must furnish the Claims, Notice and Balloting Agent with the first name, last name, last four digits of the injured party's social security number (U.S. Holders only), and address (the "Client Information") for each such Holder by December 17, 2018; provided, that, if such attorney represents more than twenty (20) such Holders, such Client Information must be provided in electronic format, preferably in Microsoft Excel format via DRCVote@DonlinRecano.com; provided further that if such attorney represents more than twenty (20) such Holders and it is not possible to provide such information in an electronic format, such names and addresses must be sent to the Claims, Notice and Balloting Agent so that they are actually received by December 13, 2018.

If an attorney of record (i) does not have the authority to vote any of his/her clients' Class 4 Asbestos Personal Injury Claims, or (ii) has such authority but does not intend to exercise it, to the extent such attorney would like the Claims, Notice and Balloting Agent to provide him/her with Solicitation Packages for one of more of his/her clients that such attorney will provide to such clients directly, such attorney must: (a) provide a delivery address for the Solicitation Packages and the number of packages needed to the Claims, Notice and Balloting Agent; (b) submit a client list to the Claims, Notice and Balloting Agent on or before December 13, 2018 with the Client Information for each client holding a Class 4 Asbestos Personal Injury Claim to which such attorney will directly send Ballots (such list is subject to the requirements of Item 1 of the Master Ballot, an electronic template of which is available from the Claims, Notice and Balloting Agent upon request); (c) deliver the Solicitation Packages to such clients holding Class 4 Asbestos Personal Injury Claims within three (3) Business Days after receipt; and (d) within three (3) Business Days of delivery of such Solicitation Packages to such clients holding Class 4 Asbestos Personal Injury Claims, and provide the Claims, Notice and Balloting Agent with an affidavit evidencing such service. The affidavit of service need not list each client individually; rather, the affidavit need state only the following: (i) that service of the Solicitation Packages was completed; (ii) the date(s) on which such service took place; and (iii) that such attorney of record has provided, or will provide (on or before December 13, 2018), a client list to the Claims, Notice and Balloting Agent.

For Holders of Asbestos Personal Injury Claims for which the Debtors do not maintain an attorney of record in the Debtors' claims database, the Claims, Notice and Balloting Agent will send a Ballot to such individual Holders,

as listed in the Debtors' claims database.  Individual Holders of Asbestos Personal Injury Claims may also contact the Claims, Notice and Balloting Agent directly to request a Solicitation Package with a Ballot.

In an additional effort to ensure that all individuals and counsel representing clients with Asbestos Personal Injury Claims are given the opportunity to request Solicitation Packages, the Debtors will publish notice of the Solicitation once in each of *The New York Times*, *The Wall Street Journal*, *USA Today*, *Mealey's Litigation Report: Asbestos* and *Mealey's Asbestos Bankruptcy Report*.  The Debtors will also seek to publish notice of the Confirmation Hearing in a newspaper of general circulation prior to the Confirmation Hearing.  Affidavits of such publication will be filed with the Bankruptcy Court after the Petition Date.

In a further effort to maximize notice and ensure that the solicitation process is as transparent as possible, the Debtors will make the Disclosure Statement and its exhibits (including the Plan) available in electronic format at the Debtors' restructuring website at www.donlinrecano.com/maremont.

2.      **Voting Deadline**

To be counted, your Ballot(s) or a Master Ballot(s) including your vote must be <u>actually</u> <u>received</u> by the Claims, Notice and Balloting Agent no later than **<u>January 18, 2019 at 4:00 p.m. (ET)</u>**.  This is the <u>Voting Deadline</u>. If you do not return your Ballot or Master Ballot prior to the Voting Deadline your vote will not be counted.

The Debtors reserve the absolute right, in consultation with Meritor, the Asbestos Claimants Committee and the Future Claimants' Representative at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots and Master Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day following the previously announced Voting Deadline.  The Debtors will give notice of any such extension in a manner deemed reasonable to the Debtors in their discretion.  There can be no assurance that the Debtors will exercise their right to extend the Voting Deadline.

Except to the extent the Debtors so determine or as permitted by the Bankruptcy Court, Ballots and Master Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof).  The Debtors will advise the Asbestos Claimants Committee and Future Claimants' Representative of the Debtors' decision not to count such ballots.

Only Voting Holders are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots or Master Ballots and returning them in the envelopes provided or as otherwise directed on the Ballot or Master Ballot.

All Ballots and Master Ballots are accompanied by return envelopes and will clearly indicate the appropriate return address.  **It is important to follow the specific instructions provided on each Ballot or Master Ballot.**

The Debtors have engaged Donlin, Recano and Company, Inc. as the Claims, Notice and Balloting Agent to assist in the balloting and tabulation process.  The Voting Agent will process and tabulate Ballots and Master Ballots for each Class entitled to vote to accept or reject the Plan and will finalize a voting report (the "<u>Voting Report</u>") as soon as practicable after the Voting Deadline to be filed in the Chapter 11 Cases.

Any Ballot or Master Ballot that is properly executed, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, will not be counted.  Any Ballot or Master Ballot received that is not signed or that contains insufficient information to permit the identification of the holder will be invalid and will not be counted.

Only Ballots and Master Ballots with an original signature that are <u>ACTUALLY</u> received by the Claims, Notice and Balloting Agent by the Voting Deadline will be counted.  Attorneys of record for Holders of Asbestos Personal Injury Claims must also submit originally executed Class 4 Asbestos Personal Injury Claim Master Ballots to the Claims, Notice and Balloting Agent by the Voting Deadline.  Email submission of Ballots and Master Ballots

is **not** permitted.  If you are the Holder of an Asbestos Personal Injury Claim or are submitting a Master Ballot on behalf of Holders of Asbestos Personal Injury Claims, please return your Ballot or Master Ballot, as applicable, by hand delivery, overnight courier, or first class mail to:

<table>
<tr><td><u>If by First Class Mail:</u></td><td><u>If by Hand Delivery or Overnight Mail:</u></td></tr>
<tr><td>**Donlin, Recano & Company, Inc.**<br>**Re: Maremont Corporation, *et al.***<br>**Attn: Voting Department**<br>**PO Box 192016 Blythebourne Station**<br>**Brooklyn, NY 11219**</td><td>**Donlin, Recano & Company, Inc.**<br>**Re: Maremont Corporation, *et al.***<br>**Attn: Voting Department**<br>**6201 15th Ave**<br>**Brooklyn, NY 11219**</td></tr>
</table>

A Ballot or Master Ballot may be withdrawn by delivering a written notice of withdrawal to the Claims, Notice and Balloting Agent, so that the Claims, Notice and Balloting Agent receives the notice before the Voting Deadline.  In order to be valid, a notice of withdrawal must (i) specify the name of the creditor who submitted the Ballot or Master Ballot to be withdrawn, (ii) contain a description of the Claim(s) to which it relates, and (iii) be signed by the creditor or attorney of record in the same manner as on the Ballot or Master Ballot.  The Debtors expressly reserve the right to contest the validity of any withdrawals of votes on the Plan.  After the Voting Deadline, a timely submitted and properly completed Ballot or Master Ballot may only be changed or withdrawn with the approval of the Bankruptcy Court or the consent of the Debtors.  If multiple Ballots and/or Master Ballots are received with respect to the same Claim and no order of the Bankruptcy Court allowing the creditor to change its vote has been entered before the Voting Deadline, the Ballot or Master Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the last timely received, properly-completed Ballot or Master Ballot.

3.      **Voting Tabulation**

Each Ballot and Master Ballot does not constitute, and will not be deemed to be, a Proof of Claim or an assertion or admission of a Claim or Interest.  Only Voting Holders (or Nominees on behalf of such Voting Holders) will be entitled to vote with regard to such Claims.

Unless the Debtors decide otherwise, Ballots and Master Ballots received after the Voting Deadline will not be counted.  The Debtors will advise the Asbestos Claimants Committee and Future Claimants' Representative of the Debtors' decision not to count such ballots.  Except as otherwise provided in the Solicitation Procedures, Ballots and Master Ballots will be deemed delivered only when the Claims, Notice and Balloting Agent actually receives such executed ballots as instructed in the Voting Instructions.  No Ballot or Master Ballot should be sent to any party other than the Claims, Notice and Balloting Agent.

The Debtors expressly reserve the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan).  The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Confirmation.  In that event, the Solicitation may be extended or reopened if, and to the extent, directed by the Bankruptcy Court.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Petition Date, the Voting Report prepared by the Claims, Notice and Balloting Agent.  The Voting Report will, among other things, delineate every Ballot or Master Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each an "<u>Irregular Ballot</u>"), including, but not limited to, those Ballots or Master Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged.  In the event of any discrepancies on amounts shown on a Ballot or Master Ballot, the Claims, Notice and Balloting Agent will attempt to reconcile the amounts with the records of the applicable attorney of record, if applicable, or in the

alternative with the Debtors' records. In the event such amount cannot be timely reconciled without undue effort on the part of the Claims, Notice and Balloting Agent, the amount shown in the records of the attorney of record or, if applicable, the Debtors' records will govern. The Voting Report also will indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots and Master Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification. The Debtors propose that, subject to any contrary order of the Bankruptcy Court and except as otherwise set forth herein, they may waive any defects or irregularities as to any particular Ballot or Master Ballot at any time, either before or after the Voting Deadline, and any such waivers shall be documented in the Voting Report prepared by the Claims, Notice and Balloting Agent.

### G.    Combined Confirmation Hearing

On the Petition Date, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing as a combined hearing to consider the adequacy of the Disclosure Statement, the sufficiency of the solicitation procedures and Confirmation of the Plan, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street North, Wilmington, Delaware 19801. The Debtors will request, among other things, Confirmation of the Plan, as it may be modified from time to time, and expressly reserve the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications).

**ARTICLE III.**
**GENERAL INFORMATION ABOUT THE DEBTORS**

### A.    The Debtors' Business and Properties

### 1.    Company Overview

Maremont is a Delaware corporation and wholly-owned subsidiary of Meritor, a public company organized under the laws of the State of Indiana. Maremont is headquartered in Troy, Michigan. Maremont's Debtor affiliates AVM, FRCOC, and MEP are wholly-owned by Maremont. AVM is a South Carolina corporation and FRCOC and MEP are incorporated in Delaware. Historically, the Debtors manufactured, distributed, and sold aftermarket friction products, including aftermarket brake linings, disc pads, and clutch facings as part of their Friction Products Business, primarily aftermarket mufflers (the "Exhaust Products Business"), aftermarket shock absorbers and strut assemblies (the "Ride Control Business"), and original equipment vacuum actuators for automotive climate controls systems, superchargers and turbochargers, and gas springs (the "Motion Control Business"). The Debtor Product Lines (including those product lines listed on Exhibit F to the Plan) include all asbestos-containing products, equipment, components, parts, improvements to real property, or materials engineered, designed, marketed, manufactured, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, or branded with the name of or under a license granted by (a) any of the Debtors or any predecessor thereof or any subsidiary or business line of any of the foregoing and/or (b) Nuturn Corporation ("Nuturn") or Ferodo America, Inc. as successors-in-interest to Maremont's Friction Products Business, even if not specifically described herein. For the avoidance of doubt, no Rockwell Entity is or shall be deemed to be a predecessor of any Debtor or a subsidiary of any Debtor or Debtor predecessor for purposes of defining the Debtor Product Lines. As of the date of this Disclosure Statement, the product lines listed on Exhibit F to the Plan represent, to the best of Maremont's understanding, all products historically manufactured and sold by Maremont and its subsidiaries. Maremont divested its business lines over time pursuant to multiple sale transactions described in Section III.A.2 below, beginning with the sale of the Friction Products Business in June 1977. This was followed by the sale of the Exhaust Products Business and the Motion Control Business in 2006 and the sale of the Ride Control Business in 2009.

Maremont had ceased all operations and divested all remaining operating assets by 2013. Currently, the Debtors' only ongoing operations are managing their legacy environmental and asbestos liabilities. In addition, on October 24, 2018, Maremont entered into an Agreement of Purchase and Sale of Real Property and Escrow Instructions to purchase a commercial property in Grand Blanc, Michigan for approximately $1.4 million (the "Commercial Property"). The Commercial Property is leased under a 15-year triple-net lease that will generate net

rents totaling approximately $91,000 in annual revenue (the "Commercial Property Lease").  It is currently anticipated that the sale will close prior to the Voting Deadline, and Maremont intends to manage and derive revenue from the Commercial Property business during the Chapter 11 Cases.  Pursuant to the Plan, the Debtors will assume the Commercial Property Lease and assign such lease to Reorganized Maremont, which will continue to own the Commercial Property and run such business after the Effective Date.

### 2.    Corporate History

A predecessor to Maremont was organized in 1877 and engaged in manufacturing and distributing parts for wagons, stage coaches, and street cars, eventually transitioning to automotive exhaust systems and mufflers.  In 1933, Maremont Corporation formed as an Illinois corporation with primary operations in Chicago, Illinois, and eventually reincorporated in Delaware in 1974.

In 1937, Maremont acquired Gem Muffler Company and began to manufacture, distribute, and sell mufflers and began manufacturing aftermarket mufflers under the "Maremont" and "Pratt" trade names in 1954.  A small percentage of such mufflers contained asbestos-wrapped, sealed components until 1978, when use of such asbestos-containing components was discontinued.  In 1953, Maremont acquired the assets of the "Grizzly Brakes" manufacturing business and engaged in manufacturing, distributing and selling aftermarket friction products, including brake linings, disc pads, and clutch facings under the "Grizzly" and "Leland" trade names, certain of which products contained asbestos.  Maremont was also one of a number of brake manufacturers that supplied Sears, Roebuck & Company with brake products under the "Sears" brand name for a time until its divestiture of the Friction Products business, which products contained asbestos.

In June 1977, Maremont divested the Friction Products Business in a sale to Nuturn, l/k/a Ferodo America, Inc., a subsidiary of T&N Limited, and became a 20% owner of Nuturn as part of the sale until 1980, when Maremont sold the remainder of its Nuturn shares.  Pursuant to the terms of the applicable sale documents, Maremont agreed to indemnify Nuturn for, among other things, asbestos personal injury claims related to the Friction Products Business that it had manufactured prior to the sale.  Nuturn and its successors, as a separate business, continued to manufacture and sell products of the Friction Products Business after June 1977.  Thus, as a result of the sale of the Friction Products Business and Maremont's discontinued use of asbestos components in its mufflers in 1978, Maremont no longer manufactured or sold any asbestos-containing products after 1978.  After the sale of the Friction Products Business, Maremont continued to facilitate Nuturn's distribution of friction products allegedly containing asbestos to Sears until 1983.  Maremont is the only Debtor entity that manufactured any asbestos-containing products until the divestiture of the Friction Products Business and discontinuation of the sale of mufflers containing asbestos-wrapped components by 1978—although certain of the other Debtors have been named in asbestos personal injury lawsuits, to the best of the Debtors' knowledge they have been dismissed from any lawsuits in which they have been named.

In addition or in connection with the Friction Products Business and Exhaust Products Business described above, beginning in the 1960s and continuing into the 1970s, Maremont began to expand internationally through the formation of various subsidiaries and joint ventures, including into Venezuela, Panama, and Europe.  In 1979, Alusuisse of America, Inc. ("Alusuisse"), a wholly owned subsidiary of Swiss Aluminum Ltd. ("Swiss Aluminum") acquired then-publicly held Maremont pursuant to a tender offer and multi-stage merger.  At this time, Maremont's principal business divisions were automotive replacement parts manufacturing and ordnance and military equipment manufacturing.  In 1986, Swiss Aluminum sold all of its outstanding shares in Maremont to Arvin Industries, Inc. ("Arvin Industries"), a predecessor in interest to Meritor.[5]

In 1988, Alusuisse entered into a settlement agreement with Arvin Industries, with Alusuisse agreeing to pay Arvin Industries in satisfaction and release of certain indemnification provisions in the 1986 sale agreement of Swiss

---

[5] ArvinMeritor, Inc. (n/k/a Meritor, Inc.) was incorporated in Indiana in 2000 ("ArvinMeritor IN") in connection with the merger of Meritor Automotive, Inc. and Arvin Industries in July 2000.  Both Meritor and Debtor FRCOC (incorporated in Delaware) have used the "ArvinMeritor, Inc." corporate name at different points in their histories, although the entities were incorporated in different states and used the name at different times.  Meritor operated under the name from July 2000 until January 2011, when it officially changed its name back to Meritor, Inc.  Debtor FRCOC utilized the name from August 2011 (when its name was changed from Gabriel Ride Control to ArvinMeritor, Inc.) until October 2018, when its name was further changed to Former Ride Control Operating Company, Inc.).

Aluminum's Maremont shares.  The majority of the settlement amount was allocated as consideration for the release of Arvin Industries' environmental liabilities related to the Environmental Site located in Paulding, Ohio, which is discussed in greater detail in Section III.A.3.

In 1990, Debtor MEP and Gabriel Ride Control Products, Inc. ("Gabriel Ride Control," n/k/a Debtor FRCOC) were incorporated in Delaware.  During this time, MEP operated the Exhaust Products Business, manufacturing and distributing replacement mufflers, catalytic converters, performance exhaust systems, and replacement tailpipes and accessories.  What is now FRCOC operated the Ride Control Business, which managed the design, manufacture, marketing and distribution of shock absorbers and strut assemblies under the Gabriel brand name.  Debtor AVM, acquired by Maremont in 1985 prior to Arvin Industries' (n/k/a Meritor) acquisition of Maremont, also incorporated in 1990 in South Carolina.  AVM manufactured original equipment vacuum actuators for automotive climate control systems, superchargers and turbochargers, and gas springs for automotive and commercial applications including lift supports and dampers under the AVM, MightyLift, StrongArm and SteadyLift brand names.

In 2006, Maremont and a Canadian subsidiary of Meritor sold the North American segment of the light vehicle aftermarket Exhaust Products Business to International Muffler Company, with Maremont and the Meritor subsidiary agreeing to indemnify the purchaser and retain liability with respect to asbestos and other pre-sale liabilities arising from the facilities.

Also in 2006, Gabriel South Africa (Proprietary) Limited ("Gabriel South Africa"), a South African subsidiary of Maremont, executed a sale of the South Africa Ride Control Business, but retained certain environmental liabilities.  Shortly thereafter, AVM sold the assets of the Motion Control Business, also retaining certain environmental liabilities with respect to the manufacturing site.  Meritor acted as a guarantor in both sales.

In 2009, Maremont began divesting its remaining international holdings.  First, what is now FRCOC sold its interests in its Venezuela joint venture to an affiliate of its joint venture partner.  This was followed by the sale of substantially all of the Ride Control Business in North America and Mexico to a third party.  FRCOC retained responsibility for product and environmental liabilities arising prior to the effective date of the sale.  Maremont eventually dissolved its remaining international subsidiaries, which concluded in 2013.  After these dissolutions, business operations ceased.[6]

Maremont is a direct subsidiary of Meritor with 100% of its equity interests directly owned by Meritor.  Meritor maintains indirect ownership of 100% of FRCOC, AVM, and MEP through Maremont.

### 3.    Environmental History

In connection with its operation of the Friction Products Business, Exhaust Products Business, Ride Control Business, and Motion Control Business discussed above, Maremont and its subsidiaries operated at various manufacturing and distribution properties that it owned or leased.  As a result of those operations, or as a result of historic operations on such properties, Maremont and its subsidiaries have been subject to certain environmental claims for which it has agreed either to undertake remedial action or remit certain environmental remediation payments.  The Environmental Sites for which environmental obligations have been identified are as follows:

- Easley, South Carolina.  In 1992, Maremont entered into an environmental trust agreement (the "Easley Trust") with Platt Saco Lowell Corporation ("PSL") as a settlement of an action under CERCLA filed by PSL against Maremont in the United States District Court for South Carolina in 1991.  The Easley Trust was formed to allocate costs in respect of Maremont's former manufacturing site in Easley, South Carolina (the "Easley Site").  The Easley Site was constructed by a third party in 1957, which merged into Maremont in 1960 pursuant to a stock acquisition by Maremont.  Maremont engaged in textile machinery and equipment manufacturing at the Easley Site until 1973, when a predecessor to PSL purchased the assets of the Easley Site from Maremont.

---

[6] A small number of shares remain with respect to a joint venture in Mexico.  Maremont sold its 40% share in the joint venture in 1999, but a small number of shares certificates have remained untraceable.  The Debtors believe that such shares have de minimis or no value.

The Easley site is currently undergoing closure activities pursuant to a RCRA permit issued to the Easley Trust and HSL, Inc. (successor to PSL), and in addition to its remedial cost obligations, Maremont is obligated to maintain financial assurance, currently maintained in the form of an insurance policy, for the benefit of the South Carolina Department of Health and Environmental Control.  Maremont's remaining obligations pursuant to the Easley Site trust agreement and RCRA permit are currently estimated at approximately $2.7 million.

- Paulding, Ohio.  Friction products were formerly manufactured at a facility in Paulding, Ohio (the "Paulding Site") that was acquired by a Maremont subsidiary in 1953 and sold in 1954 to Armour & Co. Salaried Employees Pension Plan (the "Armour Pension Trust") and simultaneously leased back to Maremont.  After the 1977 sale of the Friction Products Business to Nuturn, Nuturn continued production at the Paulding Site until 1982.  The Paulding Site lease expired in July 1984.  In 1986, Maremont and Nuturn received liability notices from Armour Pension Trust pursuant to the federal Comprehensive Environmental Response and Liability Act of 1980, 42 U.S.C. §§ 9601– 9675 ("CERCLA")—also known as the "Superfund" law—and the Resource Conservation and Recovery Act "RCRA").  Armour Pension Trust alleged that the plant building and surrounding property were contaminated by the disposal of asbestos on the premises.  The parties settled the litigation in 1988, with Maremont accepting ownership of the Paulding Site.  Maremont and Nuturn indemnified Armour Pension Trust for future liability.  In 1988, Maremont authorized cleanup and remediation activities at the Paulding Site with support from the Ohio Environmental Protection Agency.  Maremont's remaining CERCLA and RCRA obligations at the Paulding Site are currently estimated at approximately $97,000.

- Chickasha and Hardage, Oklahoma.  In 1972, Maremont built a facility in Chickasha, Oklahoma (the "Chickasha Site") to manufacture and distribute products for the Ride Control Business.  From 1999 to 2006, the Chickasha Site served as a warehouse and distribution center and Maremont continued limited manufacturing of shock absorber components.  Maremont sent waste from the Chickasha Site to a third party disposal site in Hardage, Oklahoma (the "Hardage/Criner Site").  In 1991, as a result of the Hardage/Criner Site's designation as a federal Superfund site under CERCLA, Gabriel Ride Control and other potentially responsible parties were notified of potential liability and formed a nonprofit corporation to implement a court-ordered remedy.  The cleanup remedy has been fully implemented, but FRCOC has ongoing monitoring and maintenance costs through 2040.  In 2014, FRCOC enrolled the Chickasha Site in the Oklahoma Department of Environmental Quality's voluntary environmental cleanup program pursuant to a consent agreement.  FRCOC's remaining obligations for the Hardage/Criner Site and the Chickasha Site are currently estimated at approximately $400,000 and $83,000, respectively.

- Marion and Zion, South Carolina.  AVM manufactured products for the Motion Control Business at a facility in Marion, South Carolina (the "Marion Site").  In the late 1960s (prior to Maremont's acquisition of AVM), a temporary manufacturing facility in Zion, South Carolina (the "Zion Site") was used while the Marion Site was under construction.  In 2002, Meritor entered into a consent agreement with the South Carolina Department of Health and Environmental Control with respect to the assessment and remediation of contamination at the Zion Site.  Maremont subsequently entered into a voluntary cleanup contract in 2006 with respect to historical releases at the Marion Site, and AVM retained liability and indemnified the purchaser in respect of the environmental obligations at the Marion Site during its sale of the Motion Control Business's assets in 2006.  AVM's remaining obligations for the Marion and Zion Sites are currently estimated at approximately $1.2 million.

- Cape Town, South Africa.  In 2005, Gabriel South Africa agreed to certain remediation under a private party agreement with respect to its chrome plant located on part of its Cape Town, South Africa manufacturing site for the South Africa Ride Control Business (the "Cape Town Site").  The manufacturing time period at the Cape Town Site is unknown, but dated back to at a minimum to the 1980s.  In 2006, Gabriel South Africa retained certain of these environmental liabilities, and also retained ownership of the real property underlying the Cape Town Site in connection with the sale

of the South Africa Ride Control Business. Gabriel South Africa continued to lease the Cape Town Site to the purchaser, eventually selling the Cape Town Site real property in 2008. Maremont's remaining obligations for the Cape Town Site are currently estimated at approximately $81,000.

In connection with the Plan, on or prior to the Effective Date, a Responsible Meritor Affiliate(s) will assume all Environmental Claims from the Reorganized Debtors, including, without limitation, liabilities related to the Environmental Sites. The Responsible Meritor Affiliate to assume Environmental Claims will be reasonably acceptable to the Asbestos Claimants Committee and the Future Claimants' Representative, and will demonstrate that it has the financial wherewithal to satisfy Environmental Claims and pay and perform any and all environmental liabilities assumed pursuant to the Environmental Assumption and Indemnification Agreement.

Meritor HVS will indemnify and hold harmless the Reorganized Debtors and their affiliates for any such Environmental Claims, including, without limitation, liabilities related to the Environmental Sites (other than Asbestos Personal Injury Claims). Meritor HVS is Meritor's main U.S. operating subsidiary, and owns nearly all of Meritor's assets in North America in conjunction with conducting nearly all of Meritor's North American business operations. Meritor HVS had revenues of approximately $2.6 billion for fiscal year 2018. Additionally, pursuant to the terms of the Environmental Assumption and Indemnification Agreement, Meritor HVS will represent and warrant that the Responsible Meritor Affiliate that will assume the Environmental Claims from the Reorganized Debtors is and will remain its affiliate during all times in which Meritor HVS has any obligations under the Environmental Assumption and Indemnification Agreement.

4.      **Asbestos-Related Personal Injury and Wrongful Death Claims Against Maremont and Its Debtor Affiliates**

Maremont and its Debtor affiliate MEP have collectively been subject to thousands of personal injury and wrongful death claims asserting that they are liable for damages caused by exposure to asbestos-containing products that the Debtors or their predecessor(s)-in-interest allegedly used, sold, manufactured, marketed, produced or distributed or that were allegedly present in their manufacturing facilities. Such claims are included in the Claims, Demands, and Causes of Action referenced in the Plan as "Asbestos Personal Injury Claims." Asbestos Personal Injury Claims are comprised of, collectively, the following two categories of Claims, Demands, and Causes of Action: "Indirect Asbestos Personal Injury Claims" and "General Asbestos Personal Injury Claims." The Asbestos Personal Injury Claims are for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to asbestos-containing products, equipment, components, parts, improvements to real property, or materials engineered, designed, marketed, manufactured, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, or in any way used by Maremont (including, without limitation, AVM, FRCOC, MEP, and any of the Sellers of the Friction Products Business, the Exhaust Products Business, the Ride Control Business, and the Motion Control Business), including without limitation all asbestos-containing products (including certain Debtor Product Lines listed on Exhibit F to the Plan), equipment, components, parts, improvements to real property, or materials engineered, designed, marketed, manufactured, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, branded with the name of or under a license granted by (a) any of the Debtors or any predecessor thereof or any subsidiary or business line of any of the foregoing and/or (b) Nuturn Corporation or Ferodo America, Inc. as successors-in-interest to Maremont's Friction Products Business—the Debtor Product Lines. For the avoidance of doubt, no Rockwell Entity is or shall be deemed to be a predecessor of any Debtor or a subsidiary of any Debtor or Debtor predecessor for purposes of defining the Debtor Product Lines.

During the previous five years, approximately 2,700 Asbestos Personal Injury Claims have been asserted against Maremont or its subsidiaries. As of October 31, 2018, there were approximately 18,700 pending Asbestos Personal Injury Claims against the Debtors, of which approximately 1,700 are considered by the Debtors to be active. In addition, during the preceding five years Maremont had incurred and paid approximately $43.5 million in defense and settlement costs on account of the Asbestos Personal Injury Claims, including over $6.1 million in the fiscal year ended September 30, 2018.

5.      **Asbestos-Related Personal Injury and Wrongful Death Claims Against Non-Debtor Affiliates of Maremont Based on the Debtor Product Lines**

In addition to the claims asserted against Maremont and its subsidiaries, certain plaintiffs also have alleged asbestos-related personal injury or wrongful death claims against one or more Non-Debtor Affiliates of Maremont based upon or arising from alleged exposure to the Debtor Product Lines. Such claims against the Non-Debtor Affiliates are subsumed within the Plan's definition of General Asbestos Personal Injury Claims. Prior to the Petition Date, plaintiffs brought a number of such claims against ArvinMeritor, Inc. (ArvinMeritor IN, n/k/a Meritor) and/or Meritor, Inc. as purported successors to Maremont or based upon some other form of derivative, joint or vicarious liability. On information and belief, none of such claims appear to identify any product manufactured, distributed, or sold by any of the Non-Debtor Affiliates as a basis for any claims asserted by the applicable plaintiffs against those entities. Instead, the applicable derivative, joint or vicarious liability claims appear to name Non-Debtor Affiliates solely on account of the plaintiffs' purported exposure to the Debtor Product Lines. For example, certain filed complaints include claims against "Meritor, Inc." or "ArvinMeritor, Inc." as an "alternative entity" to "Maremont Corporation."

To the best of the Plan Proponents' knowledge, none of the Non-Debtor Affiliates has ever engaged in or been involved in the manufacture, distribution or sale of any of the Debtor Product Lines. The Non-Debtor Affiliates consistently have denied any liability on account of claims based upon or arising from the Debtor Product Lines. To date, no court has issued a ruling or made a finding that any Non-Debtor Affiliate is liable for any claims based upon or arising from any of the Debtor Product Lines or that any such Non-Debtor Affiliate should be treated as a successor in interest or alter ego of the Debtors, or that Maremont's corporate veil should be pierced. Additionally, Maremont has not entered into or paid any settlements of asbestos-related personal injury or wrongful death claims solely on account of the alleged activities, omissions, or business of a Non-Debtor Affiliate in connection with claims based upon any of the Debtor Product Lines. Maremont has, however, on occasion obtained releases of such claims against the Non-Debtor Affiliates in resolving Asbestos Personal Injury Claims.

6.      **Asbestos-Related Personal Injury and Wrongful Death Claims Against ArvinMeritor IN Not Based on the Debtor Product Lines**

Independently of the Asbestos Personal Injury Claims against and related to Maremont and the Debtor Product Lines, Meritor predecessor ArvinMeritor IN, along with other companies, has been named as a defendant in lawsuits alleging personal injury or wrongful death as a result of exposure to asbestos used in Rockwell Product Lines of Rockwell International (the "Rockwell Claims"). Liability for certain Rockwell Claims was transferred to a predecessor of ArvinMeritor IN at the time of the spin-off of Rockwell International's automotive business to such predecessor in 1997. Additionally, prior to its divestiture of the Friction Products Business in 1977 (and before the spin-off in 1997), Maremont supplied certain brake linings that contained asbestos to Rockwell International. The Rockwell Claims will not be subject to the Asbestos Personal Injury Channeling Injunction pursuant to the Plan, but any Asbestos Personal Injury Claims relating to the brake linings supplied by Maremont will be channeled to the Asbestos Personal Injury Trust.

7.      **Remaining Maremont Insurance**

Historically, Maremont maintained insurance coverage for asbestos liabilities under a number of primary and excess insurance policies issued by various insurers. Maremont's insurance liability coverage spanned from 1981 to 1986, during which time it was owned by Swiss Aluminum, with the exception of a small gap in coverage during the second half of 1983. The majority of Maremont's insurance coverage has been exhausted and released through insurance coverage settlements and is no longer available to provide coverage for asbestos-related personal injury or other claims. Maremont reached (a) lump-sum payment settlements with (i) Zurich Insurance Company, Ltd. in 2015, (ii) Everest Reinsurance Company and Mt. McKinley Insurance Company in 2005, and (iii) Transit Casualty Company in 2001 and (b) a coverage-in-place settlement with Fireman's Fund Insurance Company in 2010. Each of the settlements are described below. Other than as provided for in the settlement agreements described below, Maremont does not have any remaining insurance coverage for asbestos-related claims and defense costs. As of 2018, Maremont had collected on all of the insurance policies under which it had coverage for asbestos liabilities and had recovered over $105 million from the insurers in respect of such policies.

### a.    FFIC Agreement

During the 1980 to 1982 time period, FFIC issued policy number XLX 136 64 170 (June 30, 1980 – June 30, 1981) and policy number XLX 143 63 10 (June 30, 1981 – June 30, 1982) to Maremont, pursuant to which FFIC provided certain excess liability coverage to Maremont.  In 2010, Maremont and FFIC entered into the FFIC Agreement, which is a confidential Settlement Agreement and Release in respect of these policies.  The remaining indemnity limits under the FFIC Agreement were approximately $7.4 million as of October 31, 2018.  Based on Maremont's projected asbestos-related indemnity and defense costs, the Debtors recorded the book value of the outstanding receivable related to such coverage at approximately $20 million as of October 31, 2018.  This receivable included approximately $1,040,000 in amounts billed by Maremont but not yet paid by FFIC (approximately $380,000 of this receivable was paid in November of 2018).  As of the date of this Disclosure Statement, Maremont had accrued additional settlement and defense costs that have not yet been billed to FFIC by Maremont in the amount of approximately $185,000.  Once this amount is billed and paid (and the outstanding approximately $660,000 billed in November is paid), the remaining indemnity limits under the FFIC Agreement will be reduced to approximately $7.3 million.  Pursuant to the Plan, the Debtors intend to amend the FFIC Agreement to clarify how certain provisions in the FFIC Agreement will apply to the Asbestos Personal Injury Trust and assign such agreement, as amended, to the Asbestos Personal Injury Trust.  If such amendment is approved and effected pursuant to the Plan, FFIC will be deemed a Settling Insurer and will be included as a Protected Party under the Plan.  If such amendment is not effected as set forth in the Plan or on terms otherwise acceptable to the Asbestos Claimants Committee, the Future Claimants' Representative, the Debtors and FFIC, FFIC will not be deemed a Settling Insurer and will not be a Protected Party or receive certain releases under the Plan and the Debtors, with the consent of the Asbestos Claimants Committee and the Future Claimants' Representative, reserve the right to reject the FFIC Agreement.

### b.    Zurich Agreement

During 2012, Maremont re-initiated lawsuits against certain insurance carriers seeking a declaration of its rights to coverage for asbestos claims and to facilitate an orderly and timely collection of insurance proceeds, captioned as *Maremont Corp. v. Ace Property & Casualty Ins. Co., et al.* Case No 1:12-cv-01379-RGA, in the United States District Court for the District of Delaware.  Following an unfavorable summary judgment ruling in that litigation against Maremont in 2015, the parties settled the case thereafter pursuant to the Zurich Agreement, consisting of that certain Confidential Settlement Agreement and Release of Asbestos Claims, by and among Maremont and Zurich.  The Zurich Agreement provided for a lump-sum payment by Zurich to Maremont.  Under the Zurich Agreement, Maremont may have potential repayment obligations to Zurich if certain claims and defense payment thresholds are not met in the future and Zurich may have true-up payment obligations to Maremont if certain claims and defense payment thresholds are exceeded in the future.  The Debtors recorded the book value of the receivable related to such potential future true-up obligation from Zurich at approximately $4 million as of October 31, 2018.  Such true-up obligations in the Zurich Agreement are highly unlikely to be triggered by the Asbestos Personal Injury Trust.  The Maremont refund obligations, if triggered by the Asbestos Personal Injury Trust, would not have a material effect on the assets of the Asbestos Personal Injury Trust.  The Debtors believe that the Zurich Agreement is executory in nature, and the Zurich Agreement will be rejected pursuant to the Plan.  In exchange for its release of any claims under the agreement, Zurich will be deemed a Settling Insurer and will be included as a Protected Party under the Plan.  If Zurich does not agree to release any claims under the Zurich Agreement, Zurich will not be deemed a Settling Insurer and will not be a Protected Party or receive certain releases under the Plan.

### c.    Everest Agreement

In 2005, Maremont, Everest and Mt. McKinley entered into the Everest Agreement.  The Everest Agreement is a confidential settlement and release that provided for a lump-sum payment by Everest to Maremont in exchange for a final settlement of the four insurance policies issued by Everest.  Under the Everest Agreement, Maremont agreed to indemnify Everest and Mt. McKinley from claims against Everest or Mt. McKinley related to the settled insurance policies.  The Debtors believe that the Everest Agreement is executory in nature, and the Everest Agreement will be rejected pursuant to the Plan.  In exchange for their release of any claims under the agreement, Everest and Mt. McKinley will each be deemed a Settling Insurer and will each be included as a Protected Party under the Plan.  If Everest and Mt. McKinley do not agree to release any claims under the Everest Agreement, Everest and Mt. McKinley will each not be deemed a Settling Insurer and will not be a Protected Party or receive certain releases under the Plan.

### d. Transit Casualty Co. Settlement

Maremont had four insurance policies with Transit Casualty Co. ("Transit"). In 2001, Maremont reached a settlement with Transit during the course of Transit's receivership proceeding. Maremont received a lump-sum payment from Transit as a final settlement of the four policies. There are no continuing obligations between Maremont and Transit under the Transit policies or settlement.

### 8. Real Properties

The Debtors' address is 2135 West Maple Road, Troy, MI 48084. As discussed above, Maremont currently owns the Paulding Site, which will be assigned to a Responsible Meritor Affiliate and such Responsible Meritor Affiliate shall assume all right, title, and ownership of the real property owned by Maremont in Paulding, Ohio pursuant to the Environmental Liabilities Assumption and Indemnification Agreement and the Plan. In addition, Maremont anticipates closing its purchase of the Commercial Property located in Grand Blanc, Michigan prior to the Voting Deadline. The Debtors do not lease any real properties.

### 9. Shared Services

Pursuant to that certain Services Agreement No. 2, dated October 1, 2015, between Meritor and Maremont, Meritor provides certain administrative, legal, environmental, financial, accounting, treasury, claims management, tax and insurance coverage administration services to the Debtors (the "Services Agreement"), in exchange for compensation via a monthly fee. On the Effective Date, the Services Agreement will be rejected pursuant to Section V.A of the Plan.

## B. Management of the Debtors

### 1. Board of Directors and Senior Executive Officer

As of the date hereof, the Board of Directors of Maremont consists of two members: Sherman K. Edmiston III and Carl D. Anderson, II.

As of the date hereof, the Debtors' current senior leadership consists of Carl D. Anderson, II, who serves as Chairman of the Board and sole officer of Maremont.

## C. Prepetition Indebtedness, Assets, and Liabilities

### 1. Funded Indebtedness

Maremont has no prepetition funded indebtedness.

### 2. Intercompany Receivables and Payables

Historically, the Debtors and Meritor engaged in certain intercompany transactions in which Meritor paid certain liabilities of the Debtors related to administrative overhead, litigation, operations, and other miscellaneous costs and accepted the Debtors' receivables in return for such payments. In 2008, the parties formalized this process with respect to obligations between Maremont and Meritor by entering into the Intercompany Loan Agreement, dated as of September 26, 2008, between ArvinMeritor, Inc. (ArvinMeritor IN, n/k/a Meritor) as borrower, and Maremont, as lender. The Intercompany Loan Agreement resulted in a receivable from Meritor to Maremont (the "Meritor Loan Receivable"), which initially reflected a balance of approximately $15.3 million (with authority to increase the amount) and a maturity of five years. Interest was payable under the Intercompany Loan Agreement at 12-month U.S. LIBOR plus 3.0%.

From September 2012 to January 2013, the Debtors and Meritor engaged in certain intercompany transactions in order to appropriately recognize sale proceeds received by Meritor on behalf of FRCOC, AVM, and MEP. In each case, after Meritor made a loan repayment to Maremont, Maremont issued a dividend to Meritor in the same amount

18

as each loan repayment. In total, Maremont upstreamed approximately $38.9 million dollars to Meritor during this time (the "Dividends").

In May 2014, Maremont and Meritor entered into that certain First Amendment to Loan Agreement, dated as of May 1, 2014, pursuant to which the parties increased the maximum amount of the loan and extended the maturity date to 2018. In January 2016, the parties amended and restated the Intercompany Loan Agreement pursuant to that certain Amended and Restated Loan Agreement (the "A&R Intercompany Loan Agreement"). Interest is payable on the A&R Intercompany Loan Agreement at 12-month U.S. LIBOR plus 7.0%, and the Meritor Loan Receivable may be increased up to $40 million under the A&R Intercompany Loan Agreement. As of October 31, 2018, Maremont was owed the Intercompany Loan Payment, consisting of approximately $24.1 million in respect of the Meritor Loan Receivable, which amount Meritor will repay and Maremont will contribute to the Asbestos Personal Injury Trust as part of the Maremont Contribution.

Separately, each of Maremont, FRCOC, AVM, and MEP's books also reflect the Intercompany Receivables, which consist of intercompany payables owed to Meritor or any of the other Non-Debtor Affiliates related to asbestos defense and consultant costs and fees, legacy operating expenses, and expenses in respect of the Environmental Sites, which Meritor pays on behalf of the Debtors. Altogether, the Intercompany Receivables total approximately $165 million, and comprise part of the settlement with Meritor and the Meritor Contribution pursuant to the Plan. On or prior to the Effective Date of the Plan, Maremont will contribute the Intercompany Receivables to FRCOC, AVM, and MEP, respectively, as the Entities from which such receivables are owed, thereby cancelling the Intercompany Receivables.

### 3.    Maremont Assets and Liabilities

Set forth in **Exhibit C** to this Disclosure Statement is certain historical financial data for the Debtors for each of the last three (3) fiscal years ended September 30, 2018 (the "Financial Statements"). **The Debtors' Financial Statements have been prepared on a going concern basis. The Debtors' historical financial information presented as Exhibit C has been derived from Maremont's historical financial statements. The Debtors' unaudited interim consolidated financial statements do not include all of the disclosures required by accounting principles generally accepted in the United States for annual financial statements. In the opinion of management, all adjustments considered necessary for a fair presentation of the interim period results have been included.**

Maremont's assets consist of a cash account, the Meritor Loan Receivable, and the Maremont Insurance. The cash account held approximately $1.1 million as of October 31, 2018, which Maremont intends to use to pay outstanding obligations and fund the Chapter 11 Cases. The Meritor Loan Receivable was approximately $24.1 million as of October 31, 2018, and the Maremont Insurance had a book value estimated by the Debtors of up to approximately $24 million as of October 31, 2018, as described in greater detail in Section III.A.7 herein. The Meritor Loan Receivable will be reduced through the purchase of the Commercial Property for approximately $1.4 million and the payment of fees and expenses incurred in connection with the Chapter 11 Cases. Maremont intends to manage and derive revenue from the Commercial Property business during the Chapter 11 Cases and assume the Commercial Property Lease. Each of these assets/asset classes will comprise part of the Maremont Contribution.

As reflected in **Exhibit C**, Maremont's and its subsidiaries' liabilities principally consist of the Intercompany Receivables owed to Meritor, liabilities in respect of the Environmental Sites, and current and future asbestos-related liabilities, including defense and other costs related to such liabilities. Maremont previously reported its asbestos liabilities for ASC 450 purposes as of the end of fiscal year 2018 for the next 41 years at approximately $107 million (including defense costs of approximately $79.6 million). The Debtors' remaining obligations for the Environmental Claims are currently estimated for Claims purposes at approximately $4.2 million in total.

# ARTICLE IV.
# PLAN NEGOTIATIONS AND SETTLEMENT

## A.    Overview

Maremont has been a defendant in asbestos-related litigation since the early 1980s. The cost of defending and resolving asbestos-related personal injury and wrongful death claims against Maremont and MEP has been substantial, including over $2.2 million in settlement costs relating to such claims paid out in the preceding twelve-month period, and over $4.7 million in related defense and administrative costs during that same period. In addition, the amount of insurance coverage available to Maremont has continued to decline; indeed, Maremont's last negotiated settlement involving its last remaining insurance policies that were responsive to its asbestos-related claims occurred in 2015.

In light of these circumstances, Maremont determined that it would be appropriate to investigate a potential restructuring to be implemented through a proceeding under chapter 11 of the Bankruptcy Code. Such a restructuring would preserve the Debtors' remaining assets and utilize section 524(g) of the Bankruptcy Code to establish and fund a trust that would provide for the fair and equitable treatment of all Holders of Asbestos Personal Injury Claims. Section 524(g) of the Bankruptcy Code contemplates the creation of a trust to "assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products." 11 U.S.C. § 524(g)(2)(B)(i)(I). Section 524(g) further provides for a "channeling" injunction that directs all present and future asbestos-related "demands" to the trust for liquidation and satisfaction of allowed amounts. 11 U.S.C. § 524(g)(1).

Accordingly, in late 2017, Maremont hired Sidley Austin LLP ("Sidley") as restructuring counsel and Sidley engaged Alvarez & Marsal Disputes and Investigations, LLC ("A&M") to estimate the present value of the Debtors' potential current and future asbestos liabilities. Sidley and A&M commenced diligence on the Debtors' corporate, transactional and litigation history in order to determine the feasibility of a potential restructuring strategy. After completing this analysis, as discussed in further detail below, Maremont determined that it would engage in discussions with a future claimants' representative to evaluate the potential for agreeing on the terms of a consensual plan of reorganization and the establishment of a section 524(g) trust. In connection with the initiation of such discussions, Maremont appointed an Independent Director, Sherman K. Edmiston III. After extensive diligence by, discussions with, and preliminary settlement discussions with, the Future Claimants' Representative, as well as its parent Meritor, Maremont decided to establish an ad hoc committee of current claimants in an effort to establish consensus on the framework for a chapter 11 plan of reorganization that would satisfy the requirements of section 524(g) of the Bankruptcy Code.

## B.    The Future Claimants' Representative and the Asbestos Claimants Committee

### 1.    The Future Claimants' Representative

One requirement for a channeling injunction to be effective under section 524(g) is that "as part of the proceedings leading to the issuance of such injunction, the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert [asbestos-related personal injury or wrongful death claims against the debtor]." 11 U.S.C. § 524(g)(4)(B)(i). In light of this requirement, in February 2018, Maremont engaged the Future Claimants' Representative, an independent third-party representative for persons that had not yet asserted, but may in the future assert asbestos-related personal injury claims (including any court-appointed alternative or successor). Maremont asked James L. Patton, Jr. whether he would be willing to serve as such Future Claimants' Representative, and Mr. Patton agreed. Mr. Patton has a reputation for integrity and has extensive experience with asbestos-related personal injury litigation and asbestos-focused bankruptcy cases. He has been involved in virtually every complex asbestos bankruptcy case in the region, as well as numerous other significant general bankruptcy cases. For example, Mr. Patton served as the future claimants' representative in the Celotex Corporation, Leslie Controls, Inc., United Gilsonite Laboratories, and Yarway Corporation bankruptcy cases, is the proposed future claimants' representative in The Fairbanks Company bankruptcy case, and represented the future claimants' representative in the bankruptcy cases of Federal-Mogul Global Inc., Owens-Corning, Armstrong World Industries, Inc., Babcock & Wilcox Company, The Celotex Corporation, Kaiser Aluminum Corporation, Mid-Valley, Inc. (Halliburton), North

American Refractories Company, Pittsburgh Corning Corporation, USG Corporation and Specialty Products Holding Corp. (Bondex), Kaiser Gypsum Company, Inc. and Bestwall LLC, among others. A full list of the asbestos trusts for which Mr. Patton serves as future claimants' representative is included in Exhibit I to the Plan.

Prior to assuming the role of Future Claimants' Representative, Mr. Patton had no association or relationship with, or other connection to, Maremont or any affiliate of Maremont, and had never represented any plaintiff, defendant or insurer in any asbestos-related litigation against Maremont. Mr. Patton retained his law firm of Young Conaway Stargatt & Taylor LLP ("Young Conaway") to advise on legal matters and Ankura Consulting Group, LLC to estimate the present value of the Debtors' potential current and future asbestos liabilities in connection with his services as Future Claimants' Representative.

### 2.    The Asbestos Claimants Committee

In June 2018, Maremont decided to expand its discussions to include the Asbestos Claimants Committee, an ad hoc committee of Asbestos Claimants and its members appointed to represent the interests of current Holders of Asbestos Personal Injury Claims against the Debtors, in order to explore further the potential for agreement regarding a prepackaged plan of reorganization that would include an asbestos trust and channeling injunction. The members of this prepetition Asbestos Claimants Committee are: Simmons Hanly Conroy LLC, Gori Julian & Associates, P.C., and the Law Offices of Peter G. Angelos, P.C. and such members represent a substantial number of current Holders of Asbestos Personal Injury Claims. The Asbestos Claimants Committee is represented by the law firm of Montgomery McCracken Walker & Rhoads LLP and has retained the services of Mark Peterson at Legal Analysis Systems to estimate the present value of the Debtors' potential current and future asbestos liabilities in connection with its diligence and negotiations regarding the Plan.

### C.    Due Diligence and Prepetition Plan Discussions

The Future Claimants' Representative and the Asbestos Claimants Committee, personally and/or through their various representatives, have conducted extensive due diligence concerning the background, nature, and scope of the Debtors' liabilities for Asbestos Personal Injury Claims related to the Debtor Product Lines. This investigation included, among other things, careful review of the facts concerning the Debtors' historical involvement with asbestos; the nature and extent of past and pending asbestos litigation against the Debtors, including the types of claims asserted and the legal issues raised; the projected value of the present and future Asbestos Personal Injury Claims; and Maremont's asbestos insurance and related settlements. The Asbestos Claimants Committee and the Future Claimants' Representative also examined the Debtors' corporate and transactional history and the potential for recovery by the Debtors and/or holders of Asbestos Personal Injury Claims from current or former affiliates of Maremont based upon a variety of legal theories, including derivative liability theories, such as alter ego and successor liability, and/or fraudulent conveyance theories, related to, without limitation, the Dividends.

To date, thousands of pages of Maremont and Meritor-related documents have been made available to the Future Claimants' Representative and/or the Asbestos Claimants Committee pursuant to a data room maintained by the Debtors. In addition, the Debtors, Meritor, and their respective counsel have had multiple meetings with the Future Claimants' Representative and Asbestos Claimants Committee to discuss relevant factual and legal issues. The Debtors have responded to all requests for information posed by representatives of the Future Claimants' Representative and the Asbestos Claimants Committee, and have engaged in numerous arm's length discussions and meetings regarding the Plan and Asbestos Personal Injury Trust with Meritor, the Asbestos Claimants Committee and the Future Claimants' Representative. In addition, the Asbestos Claimants Committee and the Future Claimants' Representative have engaged in their own good faith negotiations regarding the terms of the Asbestos Personal Injury Trust and related payment percentages and distribution procedures for Holders of current Claims and future Demands.

### D.    Tolling Agreement

As the Asbestos Claimants Committee and the Debtors negotiated a settlement with Meritor and the principal terms of the contributions of Maremont and Meritor to the Asbestos Personal Injury Trust, Maremont, Meritor, and the Asbestos Claimants Committee entered into that certain Tolling Agreement, effective as of September 11, 2018 (as amended by that certain Amendment No. 1 to Tolling Agreement dated as of October 4, 2018, as further amended by that certain Amendment No. 2 to Tolling Agreement dated as of November 27, 2018, and as may be amended,

restated, modified or supplemented from time to time, the "Tolling Agreement"). Pursuant to the Tolling Agreement and in order to continue the good faith negotiations regarding a settlement, the parties agreed to toll any applicable statutes of limitations, repose, or defenses based on the timeliness of any action arising from the Dividends until January 15, 2019.

E.        **Prepetition Plan Settlement Negotiations and the Meritor Contribution**

Prior to the commencement of this Solicitation, the Asbestos Claimants Committee, the Future Claimants' Representative, and representatives of the Debtors and Meritor spent considerable time negotiating a settlement with Meritor, as well as the principal terms of the respective contributions of Maremont and Meritor to the Asbestos Personal Injury Trust. As part of this negotiation, the parties explored the viability of potential derivative Asbestos Personal Injury Claims against Meritor and the other Non-Debtor Affiliates and the potential value of such Claims. Ultimately, Maremont and the Asbestos Claimants Committee and the Future Claimants' Representative determined that Maremont is, and was at all times, a valid legal Entity separate and distinct from Meritor, and Meritor is not, and may not in the future be held liable for any liability of Maremont based upon any legal or equitable theory, including those consisting of or relating to veil piercing, alter-ego, successor liability, or conspiracy, including, but not limited to, denuding the corporation claims, single business enterprise claims, claims that Maremont was the predecessor, mere instrumentality, agent or alter-ego of a Meritor-related party, trust fund claims, or claims that a Meritor-related party conspired with Maremont.

The Future Claimants' Representative and Asbestos Claimants Committee advised that they believed there were potentially litigable issues related to the Dividends. Accordingly, the parties' negotiation of the terms of the Plan and Asbestos Personal Injury Trust ultimately centered around fixing the amount of the Meritor Contribution to settle such putative claims and as a general contribution for its and its affiliates' protections under the Asbestos Channeling Injunction and related provisions of the Plan. The Future Claimants' Representative and Asbestos Claimants Committee believe that the $28 million Settlement Payment by Meritor, as well as the Responsible Meritor Affiliate(s)' assumption of the Environmental Claims and the other Non-Debtor Affiliate contributions pursuant to the terms of the Plan is a fair settlement that brings significant value to the Debtors' estates, and is a reasonable contribution for the protections to be afforded Meritor and the other Non-Debtor Affiliates in the Plan, including the Asbestos Personal Injury Channeling Injunction and the Meritor Release. Further, without such settlement, Meritor would not be contributing to the Asbestos Personal Injury Trust, and the Holders of Asbestos Personal Injury Claims would be faced with significantly lower Maremont funding and potentially significant litigation costs. Although Meritor has agreed to the settlement and making the Meritor Settlement Payment and other contributions, it believes the potential claims against it are without merit.

F.        **The Plan Term Sheet and Finalization of Definitive Documents**

After several months of good faith, arm's length negotiations, the Debtors, Meritor, the Asbestos Claimants Committee, and the Future Claimants' Representative entered into the an agreement to memorialize the terms of their negotiated settlement, dated as of October 19, 2018 (the "Plan Term Sheet"). Pursuant to the Plan Term Sheet, the Plan Proponents, the Asbestos Claimants Committee, and the Future Claimants' Representative agreed to the material terms of the Plan and certain terms of the Asbestos Personal Injury Trust and related disclosure provisions and to support confirmation of the Plan in accordance with the terms of the Plan Term Sheet. After agreeing to this initial deal in principle, the parties focused on finalizing the terms of a prepackaged solicitation process and filing, including the final terms of the Plan and Asbestos Personal Injury Trust. Working together in good faith, the parties were able to implement the terms of the Plan Term Sheet with certain changes to the deal contemplated therein, and agree to the terms of the Plan, Disclosure Statement and related solicitation documents prior to the launch of solicitation.

The parties shall seek a finding of fact and/or conclusion of law in the Confirmation Order to be issued by the Bankruptcy Court and affirmed by the District Court or issued by the District Court providing that the Reorganized Debtors, Meritor, and the Asbestos Personal Injury Trust to be established pursuant to the Plan are valid legal Entities separate and distinct from one another and each of the Reorganized Debtors, Meritor, and the Asbestos Personal Injury Trust are not and may not in the future be held liable for any liability of any of the other entities based upon any legal or equitable theory, including those consisting of or relating to veil piercing, alter ego, successor liability, fraudulent transfer, or conspiracy, including but not limited to fraudulent transfer or fraudulent conveyance claims under applicable state or federal law. However, if the Plan does not become effective no party in interest in the Chapter 11

Cases shall be bound or prejudiced by any representation, written or oral, made by any party in connection with the Plan or the negotiation or prosecution of the Plan, including without limitation the representations made in the Plan, the Disclosure Statement or the Confirmation Order.

For a detailed description of the respective contributions of Maremont and Meritor to the Asbestos Personal Injury Trust and the terms of the Asbestos Personal Injury Trust Distribution Procedures, please see the summary of the Plan provided in Article VI of this Disclosure Statement and Article VII.

## ARTICLE V.
## ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

Under the terms of the Plan Term Sheet, the Debtors anticipate filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code shortly after the Voting Deadline. Once the petitions are filed, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors will be stayed under section 362 of the Bankruptcy Code. The Debtors will continue to operate their business and manage their property as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

The following Debtors (with the last four digits of each Debtor's federal taxpayer identification number) will file chapter 11 bankruptcy petitions on the Petition Date commencing the Chapter 11 Cases: Maremont Corporation (6138); Maremont Exhaust Products, Inc. (9284); AVM, Inc. (9285); and Former Ride Control Operating Company, Inc. (9286).

### A.    Expected Timetable of the Chapter 11 Cases

If the Debtors receive the requisite acceptances in response to the Solicitation, the Debtors intend to promptly commence the Chapter 11 Cases and seek to proceed expeditiously through the Chapter 11 Cases; provided that the Debtors reserve the right not to file the Chapter 11 Cases. From and after the Commencement Date, the Debtors will continue to operate their business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors do not anticipate protracted Chapter 11 Cases. To expedite their emergence from chapter 11, the Debtors intend to seek, among other things, the relief detailed below from the Bankruptcy Court on the Commencement Date. If granted, this relief will facilitate the administration of the Chapter 11 Cases. While bankruptcy courts customarily provide various forms of administrative and other relief in the early stages of a chapter 11 case, there can be no assurance that the Bankruptcy Court will grant the requested relief. The Debtors intend to seek all necessary and appropriate relief from the Bankruptcy Court in order to facilitate their reorganization goals, including the matters described below.

### B.    First Day Relief

On the Petition Date, the Debtors expect to file certain affidavits, motions, and applications with the Bankruptcy Court for relief designed to minimize disruption of business operations and to facilitate their reorganization (the "First Day Motions"). There can be no guarantee, however, that the Bankruptcy Court will grant any or all of the relief sought. The First Day Motions may include, but are not necessarily limited to, the following:

#### 1.    Joint Administration Motion

The Debtors intend to request entry of an order directing procedural consolidation and joint administration of their related Chapter 11 Cases, which will provide significant administrative convenience and cost savings to the Debtors without harming the substantive rights of parties in interest.

2.       **Approval of Solicitation Procedures and Scheduling of Combined Confirmation Hearing**

To expedite the Chapter 11 Cases, the Debtors intend to seek an immediate order setting dates for the Confirmation Hearing to, among other things, (a) approve the adequacy of the Disclosure Statement, (b) approve the Solicitation Procedures and (c) confirm the Plan (the "Solicitation Procedures Order"). The Debtors will request that such hearing occur on a date immediately following the end of the minimum notice period therefor, or as soon thereafter as the Bankruptcy Court's calendar permits. In connection with this motion and the request to set an expedited timeline for the Chapter 11 Cases, the Debtors will also request a conditional waiver of the requirement that the Debtors file schedules of assets and liabilities and statements of financial affairs.

3.       **Claims Agent Application**

The Debtors intent to file an application requesting entry of an order appointing Donlin, Recano and Company, Inc. as claims and noticing agent for the Debtors and the Chapter 11 Cases, effective *nunc pro tunc* to the Petition Date, including assuming full responsibility for the distribution of notices in the Chapter 11 Cases.

4.       **Asbestos Claimant Notice Motion**

The Debtors intend to file a motion requesting approval of certain notice procedures in relation to Holders of Asbestos Personal Injury Claims, which may include (i) authorizing the Debtors to file a list of the twenty law firms representing the largest number of asbestos plaintiffs asserting claims against the Debtors in lieu of a list of holders of the twenty largest unsecured claims, (ii) authorizing the Debtors to list the addresses of counsel for asbestos claimants in the creditors' matrix in lieu of the claimants' addresses, and (iii) approving the notice procedures for such claimants.

5.       **Cash Management Motion**

The Debtors will seek Bankruptcy Court authorization to maintain their existing bank accounts and operate their cash management system substantially as it existed prior to the Petition Date. This relief will facilitate the efficient operations of the Debtors by not requiring them to dismantle their cash management system and incur expenses.

6.       **Motion to Appoint Legal Representative for Future Claimants**

On the Petition Date, the Debtors intend to file a motion authorizing the appointment of James L. Patton, Jr. as the Future Claimants' Representative in the Chapter 11 Cases. Mr. Patton would serve as the legal representative for future asbestos-related claimants in this role. In connection therewith, Mr. Patton intends to file applications to retain Young Conaway Stargatt & Taylor, LLP as his counsel and Ankura Consulting Group, LLC as his claims evaluation consultant.

7.       **Motion to Waive Requirement for Postpetition Statutory Committee**

On the Petition Date, the Debtors will request waiver of the requirement that a statutory committee of creditors be formed pursuant to section 1102 of the Bankruptcy Code, or, in the alternative, will request appointment of the Asbestos Claimants Committee as the statutory committee of creditors.

8.       **Anderson Declaration**

On the Petition Date, the Debtors intend to file an affidavit of Mr. Carl D. Anderson, II, Maremont's sole officer and Chairman of the Board of Directors of Maremont (the "Anderson Declaration"). The Anderson Declaration will provide a background of the Debtors, including their corporate history and prior operations, an overview of the events leading up to the Chapter 11 Cases, including the Debtors' asbestos claims and environmental history and pre-Petition Date negotiations with the Asbestos Claimants Committee and the Future Claimants' Representative, and will provide factual support for the First Day Motions.

C.       **Professional Retention**

The Debtors also plan to file several procedural motions that are standard in chapter 11 cases, and intend to file applications seeking to retain certain professionals, including, but not limited to, Donlin, Recano and Company, Inc. as administrative advisor, Sidley Austin LLP, as bankruptcy counsel, Cole Schotz P.C., as bankruptcy co-counsel, and Alvarez & Marsal, as financial advisor.

## ARTICLE VI.
## THE PLAN OF REORGANIZATION

**THE FOLLOWING SECTIONS PROVIDE A SUMMARY OF VARIOUS IMPORTANT CONSIDERATIONS AND OTHER RISK FACTORS ASSOCIATED WITH THE PLAN; HOWEVER, IT IS NOT EXHAUSTIVE. THIS SUMMARY REFERS TO, AND IS QUALIFIED IN ITS ENTIRETY BY, REFERENCE TO THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>. THE TERMS OF THE PLAN WILL GOVERN IN THE EVENT THAT ANY INCONSISTENCY ARISES BETWEEN THIS SUMMARY AND THE PLAN. THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANY PERSON OR ENTITY. IF THE BANKRUPTCY COURT DOES CONFIRM THE PLAN, HOWEVER, THEN IT WILL BIND ALL CLAIM AND INTEREST HOLDERS.**

**CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT THAT ARE NOT OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.**

**THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE MATERIALLY DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENT.**

A.       **Classification of Claims and Equity Interests Generally**

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Expense Claims and Priority Tax Claims, which, pursuant to section 1123(a)(1), do not need to be classified). The Debtors are also required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting Holder ultimately is deemed to be a member. Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Impaired Claim that ultimately is allowed by the Bankruptcy Court may vary from any estimated allowed amount of such Claim and, accordingly, the total Claims ultimately allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the value of the property that ultimately will be received by a

particular holder of an Allowed Claim under the Plan may be adversely (or favorably) affected by the aggregate amount of Claims ultimately allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below. The Plan Proponents believe that the consideration provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority of such Claims and Interests and the fair value of the Debtors' assets. Although the Plan Proponents believe that the Plan can be confirmed under section 1129(b), there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

**B.      Description and Treatment of Unclassified Claims Under the Plan**

**1.      Administrative Expense Claims Other than Professional Fee Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims (including Professional Fee Claims) and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Section VI.C hereof.

**a.      General**

Except as provided below with respect to Administrative Expense Claims that are Professional Fee Claims or Cure Costs, and except to the extent that a Holder of an Allowed Administrative Expense Claim agrees with the applicable Debtor(s) to a less favorable treatment with respect to such Holder, each Holder of an Allowed Administrative Expense Claim that is unpaid as of the Effective Date shall receive, on account and in full satisfaction of such Allowed Administrative Expense Claim, Cash in an amount equal to the Allowed amount of such Administrative Expense Claim, to be paid on or as soon as is reasonably practicable after the latest of (1) the Effective Date, (2) the date that such Allowed Administrative Expense Claim becomes Allowed, and (3) the date that such Allowed Administrative Expense Claim becomes due and owing in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

**2.      Professional Fee Claims**

**a.      Final Fee Applications**

Retained Professionals asserting a Professional Fee Claim for services rendered or expenses incurred on or before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or any other applicable order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim no later than the Professional Fee Claims Bar Date. Any objections to Professional Fee Claims must be Filed and served on the Reorganized Debtors and the requesting party no later than twenty-one (21) days after the Professional Fee Claims Bar Date. To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Professional Fee Claims. All Allowed Professional Fee Claims shall be paid in full in Cash on or prior to the Effective Date or, if after the Effective Date, from the Reserve Funds.

**b.      Professional Fee Escrow Account**

On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Retained Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Retained Professionals. Such funds in the Professional Fee Escrow Account shall not constitute property of the Debtors' Estates or property of the Reorganized Debtors. The amount of Professional Fee Claims owing to the Retained Professionals on and after the Effective Date shall be paid in Cash to such Retained Professionals from funds held in the Professional Fee Escrow Account, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order.

When all Allowed Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Reorganized Debtors.

### c.    Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through and including the Effective Date, the Retained Professionals shall estimate their aggregate fees, costs and expenses accrued and incurred prior to and as of the Confirmation Date, along with an estimate of all fees, costs and expenses to be incurred through and including the Effective Date, and shall deliver such estimates to the Debtors no later than seven (7) days after the Confirmation Date; provided, however, that such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. If a Retained Professional does not provide such estimates, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional. The total amount so estimated as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

### d.    Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, Reorganized Maremont shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the legal, professional or other fees and expenses related to the implementation and Consummation of the Plan incurred by the Reorganized Debtors following the Effective Date. Upon the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Retained Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

From and after the Effective Date, Reorganized Maremont shall continue to be liable for any and all fees and expenses incurred by the Future Claimants' Representative, the Asbestos Claimants Committee, and their respective professionals that are incurred in connection with such parties' Professional Fee Claims and any post-confirmation appeals.

### 3.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees with the applicable Debtor(s) to a less favorable treatment, the Holder of each Allowed Priority Tax Claim shall receive, on account and in full satisfaction of such Allowed Priority Tax Claim, Cash in an aggregate amount equal to the Allowed amount of such Priority Tax Claim on or as soon as reasonably practicable following the Effective Date. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business or under applicable non-bankruptcy law as such obligations become due.

### C.    Classification and Treatment of Classified Claims and Interests

### 1.    Classification of Claims and Interests

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class for purposes of distribution only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code and as described in Article II of the Plan, the Debtors have not classified Administrative Expense Claims (including Professional Fee Claims) and Priority Tax Claims.

2.    **Summary of Classification**

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below.  The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, and the classification of Claims and Interests set forth herein shall apply separately to each Debtor, to the extent applicable.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have any Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section III.E of the Plan.

The following chart summarizes the classification of Claims and Interests pursuant to the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 4 | Asbestos Personal Injury Claims | Impaired | Entitled to Vote |
| 5 | Environmental Claims | Unimpaired | Presumed to Accept |
| 6 | Intercompany Claims | Impaired / Unimpaired | Presumed to Accept / Deemed to Reject |
| 7 | Maremont Equity Interests | Impaired | Deemed to Reject |
| 8 | Inter-Debtor Interests | Unimpaired | Presumed to Accept |

3.    **Treatment of Claims and Interests**

a.    **Class 1 – Priority Non-Tax Claims**

(i)    *Classification*: Class 1 consists of all Priority Non-Tax Claims.

(ii)    *Treatment*: Except to the extent a Holder of an Allowed Priority Non-Tax Claim has been paid prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction, settlement, and discharge of, and in exchange for such Priority Non-Tax Claim, Cash to be paid from the Reserve Funds in an amount equal to the unpaid portion of such Allowed Priority Non-Tax Claim on the later of: (a) the Effective Date; and (b) the date the Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as practicable.  All Allowed Priority Non-Tax Claims not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

(iii)    *Voting*: Class 1 is Unimpaired by the Plan, and each Holder of a Class 1 Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

b.    **Class 2 – Secured Claims**

(i)    *Classification*: Class 2 consists of all Secured Claims.

28

(ii)     *Treatment*: Except to the extent a Holder of an Allowed Secured Claim has been paid prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Secured Claim shall receive, in full satisfaction, settlement, and discharge of, and in exchange for such Secured Claim, Cash to be paid from the Reserve Funds in an amount equal to the unpaid portion of such Allowed Secured Claim on the later of: (a) the Effective Date and (b) the date the Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as practicable. All Allowed Secured Claims not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors in the ordinary course of business in accordance with the terms thereof.

(iii)    *Voting*: Class 2 is Unimpaired by the Plan, and each Holder of a Class 2 Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 2 Secured Claims are not entitled to vote to accept or reject the Plan.

**c.      Class 3 – General Unsecured Claims**

(i)      *Classification*: Class 3 consists of General Unsecured Claims.

(ii)     *Treatment*: Except to the extent a Holder of an Allowed General Unsecured Claim agrees to different treatment of that General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall be paid in full, in Cash from the Reserve Funds, on, or as soon as practicable after, the latest of: (a) the Effective Date, (b) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, (c) the date such General Unsecured Claim becomes due and payable according to its terms, or (d) such other date as mutually may be agreed to by and between the Holder of such General Unsecured Claim and the Debtors or the Reorganized Debtors, as applicable.

(iii)    *Voting*: Class 3 is Unimpaired by the Plan, and each Holder of a Class 3 General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 3 General Unsecured Claims are not entitled to vote to accept or reject the Plan.

**d.      Class 4 – Asbestos Personal Injury Claims**

(i)      *Classification*: Class 4 consists of Asbestos Personal Injury Claims.

(ii)     *Treatment*: As of the Effective Date, liability for all Asbestos Personal Injury Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Asbestos Personal Injury Trust in accordance with, and to the extent set forth in, Articles IV and VIII of the Plan, the applicable Plan Documents and the Confirmation Order. Each Asbestos Personal Injury Claim shall be resolved in accordance with the terms, provisions and procedures of the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures. The Asbestos Personal Injury Trust shall be funded in accordance with the provisions of Section IV.E of the Plan. The sole recourse of the Holder of an Asbestos Personal Injury Claim on account of such Asbestos Personal Injury Claim shall be to the Asbestos Personal Injury Trust, and each such Holder shall have

29

no right whatsoever at any time to assert its Asbestos Personal Injury Claim against any Protected Party.

(iii)     *Voting*: Class 4 is Impaired by the Plan, and each Holder of a Class 4 Asbestos Personal Injury Claim is entitled to vote to accept or reject the Plan.

e.     **Class 5 – Environmental Claims**

(i)     *Classification*: Class 5 consists of Environmental Claims.

(ii)     *Treatment*: Each Holder of an Allowed Environmental Claim shall have its Allowed Environmental Claim Reinstated in full.

(iii)     *Voting*: Class 5 is Unimpaired by the Plan, and each Holder of a Class 5 Environmental Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 5 Environmental Claims are not entitled to vote to accept or reject the Plan.

f.     **Class 6 – Intercompany Claims**

(i)     *Classification*: Class 6 consists of all Intercompany Claims.

(ii)     *Treatment*: On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, canceled, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or the Reorganized Debtors, as applicable.

(iii)     *Voting*: Holders of Class 6 Intercompany Claims are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code, respectively.  Therefore, Holders of Class 6 Intercompany Claims are not entitled to vote to accept or reject the Plan.

g.     **Class 7 – Maremont Equity Interests**

(i)     *Classification*: Class 7 consists of all Maremont Equity Interests.

(ii)     *Treatment*: On the Effective Date, the Maremont Equity Interests shall be cancelled, annulled and extinguished.

(iii)     *Voting*: Class 7 is Impaired.  Holders of Class 7 Maremont Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 7 Maremont Equity Interests are not entitled to vote to accept or reject the Plan.

h.     **Class 8 – Inter-Debtor Interests**

(i)     *Classification*: Class 8 consists of Inter-Debtor Interests.

(ii)     *Treatment*: On the Effective Date, Inter-Debtor Interests shall be Reinstated and the legal, equitable and contractual rights to which

Holders of Inter-Debtor Interests are entitled shall remain unaltered to the extent necessary to implement the Plan.

(iii)    *Voting*: Class 8 is Unimpaired.  Holders of Class 8 Inter-Debtor Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Inter-Debtor Interests are not entitled to vote to accept or reject the Plan.

*Notwithstanding that Holders of Maremont Equity Interests are deemed to reject the Plan as a matter of bankruptcy law, Meritor, as a Non-Debtor Affiliate and Holder of the Maremont Equity Interests, supports confirmation of the Plan and urges parties entitled to vote on the Plan to vote to accept the Plan.*

## ARTICLE VII.
## DESCRIPTION OF THE ASBESTOS PERSONAL INJURY TRUST, CONTRIBUTIONS BY MAREMONT AND MERITOR, AND THE ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES

### A.    The Asbestos Personal Injury Trust

#### 1.    Creation of the Asbestos Personal Injury Trust

On the Effective Date, the Asbestos Personal Injury Trust shall be established in accordance with the Plan Documents, the Asbestos Personal Injury Trust Documents, and section 524(g) of the Bankruptcy Code and managed pursuant to the terms and conditions of the Asbestos Personal Injury Trust Documents.  On the Effective Date, the Asbestos Records Cooperation Agreement shall become effective and the Debtors' asbestos records shall be treated in accordance therewith.  The purpose of the Asbestos Personal Injury Trust shall be to assume all liabilities and responsibility for all Asbestos Personal Injury Claims, and, among other things, to: (a) direct the processing, liquidation, and payment of all compensable Asbestos Personal Injury Claims in accordance with this Plan, the Asbestos Personal Injury Trust Agreement, the Asbestos Personal Injury Trust Distribution Procedures and the Confirmation Order; (b) preserve, hold, manage, and maximize the assets of the Asbestos Personal Injury Trust for use in paying and satisfying Asbestos Personal Injury Claims; and (c) qualify at all times as a "qualified settlement fund" pursuant to section 468B of the Internal Revenue Code.  The Asbestos Personal Injury Trust shall use the Asbestos Personal Injury Trust's assets and income to resolve Asbestos Personal Injury Claims in accordance with the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures in such a way that Holders of Asbestos Personal Injury Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such Claims, and shall otherwise comply in all respects with the requirements of a trust established pursuant to section 524(g)(2)(B) of the Bankruptcy Code.  On the Effective Date, all right, title, and interest in and to the Asbestos Personal Injury Trust Assets, and any proceeds thereof, will be transferred to, and vested in, the Asbestos Personal Injury Trust, free and clear of all Claims, Demands, Interests, Encumbrances, and other interests of any Entity, without any further action of the Bankruptcy Court or any Entity, but subject to the provisions of Section IV.E of the Plan.

#### 2.    Appointment of the Asbestos Personal Injury Trustee

Alan B. Rich, Esq. has been proposed as the initial Asbestos Personal Injury Trustee pursuant to the terms of the Asbestos Personal Injury Trust Agreement.  Mr. Rich's background and involvement with certain other asbestos trusts is included in <u>Exhibit I</u> to the Plan.  Mr. Rich is also the proposed trustee for the asbestos personal injury trusts in the Sepco Corporation and Duro Dyne National Corporation bankruptcy cases.  None of the representations or engagements of Mr. Rich presents a disqualifying conflict of interest that would prevent Mr. Rich from performing the duties of the Asbestos Personal Injury Trustee under the Asbestos Personal Injury Trust Agreement.  On the Effective Date, Mr. Rich shall be appointed as the Asbestos Personal Injury Trustee pursuant to the Plan, the Confirmation Order, and the Asbestos Personal Injury Trust Agreement.  All subsequent Asbestos Personal Injury Trustees shall be appointed in accordance with the terms of the Asbestos Personal Injury Trust Agreement.  For purposes of performing the duties and fulfilling the obligations under the Asbestos Personal Injury Trust Agreement and the Plan, the Asbestos Personal Injury Trustee shall be deemed to be a party or parties in interest within the meaning of section 1109(b) of the Bankruptcy Code.

### 3. Advising the Asbestos Personal Injury Trust

#### a. Appointment of the Post-Effective Date Future Claimants' Representative

Subject to approval of the Bankruptcy Court, on the Effective Date, James L. Patton, Jr. shall be appointed, pursuant to the Plan, the Confirmation Order, and the Asbestos Personal Injury Trust Agreement, as the Post-Effective Date Future Claimants' Representative. A full list of the asbestos trusts for which Mr. Patton serves as future claimants' representative is included in Exhibit I to the Plan. None of the representations or engagements of Mr. Patton present a disqualifying conflict of interest that would prevent him from performing the duties of the Post-Effective Date Future Claimants' Representative under the Asbestos Personal Injury Trust Agreement. The Post-Effective Date Future Claimants' Representative shall have the functions, duties, and rights provided in, and shall serve in accordance with, the Asbestos Personal Injury Trust Agreement. In addition to the foregoing, the Post-Effective Date Future Claimants' Representative also may, at his option, participate in any: (i) appeal of the Confirmation Order; (ii) hearing on a Professional Fee Claim; or (iii) adversary proceeding pending on the Effective Date to which the Future Claimants' Representative is a party as of the Effective Date. Successor Post-Effective Date Future Claimants' Representatives will be appointed as provided in the Asbestos Personal Injury Trust Agreement.

#### b. Appointment of Asbestos Personal Injury Trust Advisory Committee Members

On the Effective Date, the Asbestos Personal Injury Trust Advisory Committee (the "TAC") shall be established pursuant to the terms of the Asbestos Personal Injury Trust Agreement. The TAC shall have five (5) members and shall have the functions, duties, and rights provided in the Asbestos Personal Injury Trust Agreement. The initial members of the TAC are Beth Gori of Gori Julian & Associates, P.C., Perry Browder of Simmons Hanly Conroy LLC, Armand J. Volta, Jr. of the Law Offices of Peter Angelos, P.C., and John Cooney of Cooney & Conway. The fifth member of the TAC will be proposed at a later date. The respective backgrounds and involvement with certain other asbestos trusts of each member of the Asbestos Personal Injury Trust Advisory Committee is included in Exhibit I to the Plan. Beth Gori, Perry Browder and Armand Volta each served on the *ad hoc* pre-petition Asbestos Claimants Committee. Each of the members of the TAC and/or other members of their law firms have served as counsel to members of asbestos claimants committees in other asbestos chapter 11 cases and trust advisory committees of trusts formed at the conclusion of such cases. None of these representations or engagements presents a disqualifying conflict of interest that would prevent these individuals from serving on the TAC. The Confirmation Order shall constitute an order of the Bankruptcy Court appointing the initial members of the Asbestos Personal Injury Trust Advisory Committee. Successor members of the Asbestos Personal Injury Trust Advisory Committee will be appointed as provided in the Asbestos Personal Injury Trust Agreement. Upon termination of the Asbestos Personal Injury Trust, or as otherwise provided in the Asbestos Personal Injury Trust Agreement, the TAC shall be deemed dissolved and discharged of and from all further authority, duties, responsibilities, and obligations with respect to or in connection with the Asbestos Personal Injury Trust and the Chapter 11 Cases.

#### c. Appointment of Delaware Trustee

Wilmington Trust, N.A. will serve as the initial Delaware Trustee for the Asbestos Personal Injury Trust and will be identified in the Asbestos Personal Injury Trust Agreement and appointed pursuant to the Confirmation Order. As set forth in the Asbestos Personal Injury Trust Agreement, the Delaware Trustee's role is limited to (i) accepting legal process served on the Asbestos Personal Injury Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Delaware law (acting solely at the written direction of the Trustee). Accordingly, there is unlikely to be any disqualifying conflict of interest that prevents Wilmington Trust, N.A. from performing the Delaware Trustee's duties under the Asbestos Personal Injury Trust Agreement.

4.        **Transfers to the Asbestos Personal Injury Trust**

a.        **Transfer of Claims and Demands to the Asbestos Personal Injury Trust**

In consideration for the property transferred to the Asbestos Personal Injury Trust, on the Effective Date, all liabilities, obligations, and responsibilities relating to all present and future Asbestos Personal Injury Claims, including, without limitation, Demands, shall be transferred and channeled to the Asbestos Personal Injury Trust and shall be satisfied solely by the assets held by the Asbestos Personal Injury Trust.  The Asbestos Personal Injury Trust shall have no liability for any Claims and Demands other than Asbestos Personal Injury Claims and Asbestos Personal Injury Trust Expenses, and no Claims other than Asbestos Personal Injury Claims and Asbestos Personal Injury Trust Expenses shall be transferred and channeled to the Asbestos Personal Injury Trust.

b.        **Transfer of Rights and Defenses Related to Asbestos Personal Injury Claims**

With the exception of those claims released by the Debtors pursuant to Section VIII.E of the Plan, on the Effective Date all claims, defenses, rights and Causes of Action of the Debtors and of the Reorganized Debtors relating to Asbestos Personal Injury Claims, shall be transferred and assigned to the Asbestos Personal Injury Trust.  In accordance with section 1123(b) of the Bankruptcy Code, the Asbestos Personal Injury Trust shall retain and may enforce such claims, defenses, rights, and Causes of Action and shall retain and may enforce all defenses and counterclaims to all Claims or Demands asserted against the Asbestos Personal Injury Trust, including, but not limited to, setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code; provided, however, that no such claims, defenses, Causes of Action, or counterclaims may be asserted against any Protected Party.  The Asbestos Personal Injury Trust shall be deemed to be the appointed representative of the Debtors and the Reorganized Debtors, and may pursue, litigate, compromise, and settle any rights, claims, or Causes of Action transferred to it, as appropriate.

5.        **Asbestos Personal Injury Claimant Release**

In connection with the resolution of Asbestos Personal Injury Claims, the Asbestos Personal Injury Trust Distribution Procedures shall provide on the Effective Date, and shall not thereafter cease to provide, that all Holders of Asbestos Personal Injury Claims shall execute an Asbestos Personal Injury Claimant Release as a precondition to receiving payment on account of their Asbestos Personal Injury Claims from the Asbestos Personal Injury Trust.  The Asbestos Personal Injury Claimant Release shall be substantially in the form attached to the Plan as Exhibit B, and shall not be amended after the Effective Date without the consent of the Reorganized Debtors and Meritor.

The Asbestos Personal Injury Claimant Release includes a certification that the Holder of an Asbestos Personal Injury Claim has paid or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulation, or guidance, in connection with or relating to the Asbestos Personal Injury Claim.

6.        **Consideration for Asbestos Personal Injury Channeling Injunction**

The release of the Intercompany Claims by the Non-Debtor Affiliates, and the assignment, transfer, and conveyance of the other Asbestos Personal Injury Trust Assets to the Asbestos Personal Injury Trust on the Effective Date supports the imposition of the Asbestos Personal Injury Channeling Injunction in favor of all of the Protected Parties as of the Effective Date.

7.        **Termination of Meritor Obligation to Fund the Settlement Payment**

Notwithstanding any other provision of the Plan, the obligations of Meritor to support the Plan and to contribute the Settlement Payment, shall expire if (a) the Plan is not approved by the required number of voting claimants under the terms of the Bankruptcy Code, (b) the Confirmation Order is not entered by the Confirmation Order Outside Date or (c) the Effective Date does not occur by the Plan Effective Date Outside Date, unless Meritor, Maremont, the Asbestos Claimants Committee, and the Future Claimants' Representative otherwise agree in writing.

8.      **Institution and Maintenance of Legal and Other Proceedings**

From and after the Effective Date, the Asbestos Personal Injury Trust shall be empowered and entitled, in its sole and absolute discretion and at its own expense, to pursue, compromise or settle all legal actions and other proceedings related to any asset, liability, or responsibility of the Asbestos Personal Injury Trust that is not released pursuant to the Plan.

B.      **Description of the Consideration Contributed to the Asbestos Personal Injury Trust**

1.      **Meritor Contribution**

On or prior to the Effective Date, Meritor will contribute, or cause to be contributed, to Maremont the Intercompany Receivables, the Intercompany Loan Payment and the Settlement Payment.  In addition, effective automatically upon the occurrence of the Effective Date, (a) Meritor and the Non-Debtor Affiliates will release certain claims pursuant to the Meritor Release and (b) pursuant to and to the extent set forth in the Environmental Assumption and Indemnification Agreement, one or more Responsible Meritor Affiliates will assume Environmental Claims and Meritor HVS will indemnify the Reorganized Debtors and their affiliates from and against Environmental Claims as more fully set forth in the Environmental Assumption and Indemnification Agreement.  The Meritor Contribution will be made by the Meritor Related Parties in settlement of any and all causes of action the Debtors may have against one or more Meritor Related Parties.

As part of the Meritor Contribution, Meritor and the Non-Debtor Affiliates will waive, release, and discharge any and all Claims, suits, causes of action, controversies, demands, rights, Liens, indemnities, guarantees, and judgments held by one or more Non-Debtor Affiliates against any Debtor, the Asbestos Claimants Committee, the Future Claimants' Representative, and each of their respective predecessors, successors, assigns, and Affiliates and its and their respective parents, subsidiaries, heirs, executors, estates, servants, nominees and Representatives, in each case solely in its capacity as such (as defined in the Plan, the "Meritor Release").  The Meritor Release will be effectuated automatically upon the occurrence of the Effective Date.

2.      **Maremont Contribution**

On the Effective Date, the Debtors will transfer, or cause to be transferred, to the Asbestos Personal Injury Trust (or, if the Asbestos Personal Injury Trust determines it would be more beneficial, the Reorganized Debtors shall retain) the Maremont Insurance, the Maremont Contributed Cash, and, to the extent not included in the Maremont Contributed Cash, the Meritor Contribution (the "Maremont Contribution").  Also on the Effective Date, Maremont will contribute the Intercompany Receivables to the Maremont Subsidiaries, thereby cancelling them, or, alternatively, cause the Intercompany Receivables to be cancelled and discharged for no consideration.

On or prior to the Effective Date: (a) Maremont will contribute the Intercompany Receivables to AVM, FRCOC, and MEP, respectively, as the Entities from which such receivables are owed, thereby cancelling the Intercompany Receivables.

On the Effective Date: (a) all outstanding shares of Maremont will be cancelled; and (b) simultaneously with the cancellation of such shares, Maremont will issue the Reorganized Maremont Stock to the Asbestos Personal Injury Trust.  Each of AVM, FRCOC, and MEP shall remain wholly owned subsidiaries of Reorganized Maremont.

The sequence of the foregoing transactions and other Restructuring Transactions will be set forth in the Implementation Step Plan to be filed with the Bankruptcy Court not less than ten (10) days prior to the Effective Date.

C.      **Other Key Terms of the Asbestos Personal Injury Trust Agreement**

1.      **Asbestos Personal Injury Trust Expenses**

The Asbestos Personal Injury Trust shall pay all Asbestos Personal Injury Trust Expenses from the Asbestos Personal Injury Trust Assets.  None of the Plan Proponents, the Debtors' Estates, the Reorganized Debtors, nor any

other Protected Party shall have any obligation to pay any Asbestos Personal Injury Trust Expenses or any other liabilities of the Asbestos Personal Injury Trust. The Asbestos Personal Injury Trust shall promptly pay all Asbestos Personal Injury Trust Expenses incurred by the Reorganized Debtors for any and all liabilities, costs, or expenses as a result of taking any action on behalf of, and at the direction of, the Asbestos Personal Injury Trust.

### 2.    Investment Policy

Pursuant to the Asbestos Personal Injury Trust Agreement, all monies held in the Asbestos Personal Injury Trust shall be invested, subject to the investment limitations and provisions enumerated in the Asbestos Personal Injury Trust Agreement, and shall not be limited to the types of investments described in section 345 of the Bankruptcy Code.

### 3.    Excess Asbestos Personal Injury Trust Assets

To the extent there are any Asbestos Personal Injury Trust Assets remaining at such time as the Asbestos Personal Injury Trust is dissolved, such excess Asbestos Personal Injury Trust Assets shall be transferred to a charity or charities for such charitable purposes as the Asbestos Personal Injury Trustee, in his or her reasonable discretion, shall determine, provided that, if practicable, the charity or charities to which such excess Asbestos Personal Injury Trust Assets are transferred shall be related to the treatment of, research on, or the relief of suffering of individuals suffering from asbestos-related disorders.

### 4.    Dissolution of the Asbestos Personal Injury Trust

Upon dissolution of the Asbestos Personal Injury Trust: (a) the Asbestos Personal Injury Trustee, members of the Asbestos Personal Injury Trust Advisory Committee and the Post-Effective Date Future Claimants' Representative shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Cases; and (b) the Asbestos Personal Injury Trust Advisory Committee shall be dissolved and the Post-Effective Date Future Claimants' Representative shall be deemed terminated.

### 5.    Asbestos Personal Injury Trust Indemnity Obligations

The Asbestos Personal Injury Trust shall indemnify and hold harmless each of the Non-Debtor Affiliates, the Reorganized Debtors and their respective Representatives and each person serving as a director or officer of Maremont as of the Petition Date and thereafter (if any), other than a Non-Indemnified Party, against any liability, obligation, fee, judgment, settlement, or expense, including, without limitation, reasonable legal fees and expenses, arising from or incurred in connection with any action based upon, attributable to, or arising out of an Asbestos Personal Injury Claim or any violation of the Asbestos Personal Injury Channeling Injunction by any Entity, as and to the extent provided in the Asbestos Claims Indemnification Agreement.

### D.    Asbestos Personal Injury Trust Distribution Procedures

The goal of the Asbestos Personal Injury Trust is to treat all similarly situated present and future Holders of Asbestos Personal Injury Claims in substantially the same manner and in accordance with the requirements of section 524(g) of the Bankruptcy Code. To further that goal, the Asbestos Personal Injury Trust will resolve Asbestos Personal Injury Claims in accordance with the TDP, which is attached as <u>Exhibit D</u> to the Plan and is incorporated herein by reference. The Asbestos Personal Injury Trust Agreement provides that the Asbestos Personal Injury Trust will make payments to Holders of eligible Asbestos Personal Injury Claims pursuant to the TDP while maintaining sufficient resources to pay future Holders of eligible Asbestos Personal Injury Claims in substantially the same manner.

Historically, Debtors, Maremont and MEP have been subjected to thousands of personal injury and wrongful death claims asserting that they are liable for damages caused by exposure to asbestos-containing products that Maremont or its predecessor(s)-in-interest and certain successor-in-interest allegedly used, sold, manufactured, marketed, produced or distributed. As set forth above, Maremont manufactured, distributed, and sold aftermarket

automotive products, including friction products such as brake linings, disc pads, and clutch facings, and aftermarket mufflers.

Because of the nature of certain of the Debtor Product Lines, the vast majority of these asbestos-related claims asserted against Maremont and MEP were asserted by (1) professional auto mechanics allegedly exposed to the Debtor Product Lines while working as professional mechanics in the automotive industry (the "Occupationally Exposed Claims"); or (2) individual auto enthusiasts who worked on maintenance and upgrades to automobiles at home (the "Shade Tree Mechanic Claims").  Because of the nature of the claims pool and the limited resources of the Asbestos Personal Injury Trust, the TDP only provides for the payment of Asbestos Personal Injury Claims based on certain diseases as described below.  The Asbestos Personal Injury Trustee will supervise the review of filed Asbestos Personal Injury Claims with the goal of approving only those Asbestos Personal Injury Claims that provide evidence of the type of exposure that was required by Maremont for settlement of claims in the tort system.

The TDP establishes five (5) asbestos-related diseases eligible for potential compensation from the Asbestos Personal Injury Trust (the "Disease Levels"): Mesothelioma 2 (Shade Tree Mechanic Claim), Mesothelioma (Occupationally Exposed Claim), Lung Cancer, Other Cancer, and Severe Asbestosis.

To qualify for payment from the Asbestos Personal Injury Trust, claimants must submit specific medical and exposure evidence as provided in the TDP.  The Asbestos Personal Injury Trustee may review the governing documents of another asbestos trust or claims facility and, with the consent of the Asbestos Personal Injury Trust Advisory Committee and the Future Claimants' Representative, determine to accept the disease level classifications as found by such other asbestos trust or claims facility in lieu of the medical evidence claimants are required to submit under this TDP.  The TDP requires the Asbestos Personal Injury Trust, with the consent of the Asbestos Personal Injury Trust Advisory Committee and the Future Claimants' Representative, to develop and implement audit and other procedures to the ensure the reliability of medical and exposure evidence submitted to the Asbestos Personal Injury Trust.

The Asbestos Personal Injury Claim values for each Disease Level are set forth below.[7]

| Level | Disease Category | Scheduled Value |
|-------|------------------|-----------------|
| V | Mesothelioma 2 | $12,100 |
| IV | Mesothelioma | $111,500 |
| III | Lung Cancer | $25,400 |
| II | Other Cancer | $5,400 |
| I | Severe Asbestosis | $25,400 |

Asbestos Personal Injury Claims (except those involving Disease Level V Extraordinary Claims and all Foreign Claims (in each case as defined in the TDP), which shall only be liquidated pursuant to the Asbestos Personal Injury Trust's IR Process (as defined in the TDP)), will be processed through the Expedited Review Process (as defined in the TDP), which is designed to provide an expeditious, efficient, and inexpensive method for resolving and liquidating Asbestos Personal Injury Claims.

Claimants will be required to submit a filing fee of $100 to have an Asbestos Personal Injury Claim processed by the Asbestos Personal Injury Trust.  This fee will be refunded in full to claimants who receive and accept payment of a settlement offer from the Asbestos Personal Injury Trust.

After completing the Expedited Review Process, claimants will have the option of engaging in binding or nonbinding arbitration to resolve disputes concerning whether the Asbestos Personal Injury Trust's outright rejection or denial of a claim was proper, or whether the claimant's medical condition or exposure history meets the requirements of the TDP for purposes of categorizing a claim involving Disease Levels I-V.

---

[7] The figures presented here represent Disease Level claim values for Plan settlement purposes only.  The parties reserve all rights with respect to actual claim values in the event the Plan is not confirmed or is not consummated.

All arbitration will be conducted in accordance with Alternative Dispute Resolution Procedures (as defined in the TDP) that the Asbestos Personal Injury Trust is expected to adopt after the Effective Date. The arbitrator may return awards only in accordance with the values set forth in the TDP. Only if a claimant elects nonbinding arbitration and rejects the arbitration award may the claimant then litigate in court against the Asbestos Personal Injury Trust to establish its claim. Awards in litigation will be paid as specifically provided in the TDP.

As a condition to making payment to a claimant with respect to an Asbestos Personal Injury Claim, the Asbestos Personal Injury Trust will obtain, for the benefit of the Asbestos Personal Injury Trust and the Protected Parties, an Asbestos Personal Injury Claimant Release. The Asbestos Personal Injury Claimant Release, which is attached as Exhibit B to the Plan, will provide a general release of all Asbestos Personal Injury Claims against (a) the Reorganized Debtors, (b) the Non-Debtor Affiliates, (c) the Settling Insurers, and (d) the Representatives of each of the foregoing, and includes a Medicare Secondary Payer Certification.

Potential claimants should be aware (and will need to certify and acknowledge as much in the Asbestos Personal Injury Claimant Release) that any funds they recover from the Asbestos Personal Injury Trust, or against any "primary plan" as defined in the Medicare Secondary Payer Statute, 42 U.S.C. § 1395y(b) (the "MSPS"), could be subject to repayment obligations owing or potentially owing under the MSPS or related rules, regulations, or guidelines. Potential claimants should also be aware that, as a condition of receiving payment from the Asbestos Personal Injury Trust or any "primary plan" as defined by the MSPS, the claimants may be asked to certify that they will comply with any obligations owing or potentially owing under the MSPS or related rules, regulations, or guidelines. The TDP requires that to the extent required, the Asbestos Personal Injury Trust shall act as a reporting entity under 42 U.S.C. § 1395y(b) for any Protected Party.

There can be no certainty as to the precise amounts that will be distributed by the Asbestos Personal Injury Trust in any particular time period or when eligible Asbestos Personal Injury Claims will be paid by the Asbestos Personal Injury Trust. Payments that will be made on eligible Asbestos Personal Injury Claims will be determined under the TDP and will be based, on the one hand, on estimates of the number, types, and amount of current Asbestos Personal Injury Claims and expected future Demands, and on the other hand, on the value of the assets of the Asbestos Personal Injury Trust, the liquidity of the Asbestos Personal Injury Trust, the Asbestos Personal Injury Trust's expected future income and expenses, and other matters that are likely to affect the sufficiency of funds to pay all holders of Asbestos Personal Injury Claims.

All Asbestos Personal Injury Claims paid by the Asbestos Personal Injury Trust will be subject to a payment percentage. The initial payment percentage has been set at 29.1%.[8] The Asbestos Personal Injury Trust's projected assets and liabilities are based on a number of assumptions. Should any assumption from which a payment percentage is developed prove to be materially inaccurate based on the Asbestos Personal Injury Trust's actual experience, the Asbestos Personal Injury Trust may have to adjust the payment percentage upwards or downwards from time to time, pursuant to the Asbestos Personal Injury Trust Agreement and the TDP, to reflect updated estimates of the Asbestos Personal Injury Trust's assets and liabilities.

The Asbestos Trust will create two models of cash flow, principal and income year-by-year to be paid over its entire life to ensure that all present and future Holders of Occupationally Exposed Claims (the "Occupational Model") and Shade Tree Mechanic Claims (the "Shade Tree Model" and together with the Occupational Model, the "Models") are compensated at the payment percentage. In each year, based upon the Occupational Model of cash flow, the Asbestos Personal Injury Trust is empowered to pay out the portion of its funds payable for that year to Occupationally Exposed Claims according to the Occupational Model (the "Occupational Maximum Annual Payment"). In each year, based upon the Shade Tree Model of cash flow, the Asbestos Personal Injury Trust is empowered to pay out the portion of its funds payable for that year to Shade Tree Mechanic Claims according to the Shade Tree Model (the "Shade Tree Maximum Annual Payments" and together with the Occupational Maximum Annual Payments, the "Maximum Annual Payments"). The Asbestos Personal Injury Trust's distributions to Occupationally Exposed Claims and Shade Tree Mechanic Claims for that year will not exceed the applicable

---

[8] The current initial payment percentage assumes initial funding of not less than $58 million. Should the initial funding be between $58 million and $65 million, the initial payment percentage will increase proportionately. To the extent the trust is funded with less than $58 million or more than $65 million the initial payment percentage may be adjusted.

Maximum Annual Payment.  All approved Shade Tree Mechanic Claims will be paid at the end of each year and will be paid the lesser of the pro rata share of the Shade Tree Maximum Annual Payment or the liquidated values established by the Asbestos Personal Injury Trust, subject to the payment percentage.

A Claims Payment Ratio has been determined which will be set, as of the Effective Date, at 90% for Asbestos Personal Injury Claims involving mesothelioma (Disease Levels IV and V) ("Category A") and at 10% for Asbestos Personal Injury Claims involving all other diseases (Disease Levels I-III) ("Category B").  In each year, after the determination of the Occupational Maximum Annual Payment, 90% of that amount shall be available to pay Category A Asbestos Personal Injury Claims, and 10% shall be available to pay Category B Asbestos Personal Injury Claims that have been liquidated since the Effective Date.  Asbestos Personal Injury Claims for which there are insufficient funds allocated to the relevant Category shall be carried over for priority payment in the next year.

E.    **Environmental Claims**

No bar date has been established in these Chapter 11 Cases for the filing of Environmental Claims, and Holders of Environmental Claims are not required to file Proofs of Claim in these Chapter 11 Cases.  Pursuant to the Environmental Assumption and Indemnification Agreement and the Plan,  Environmental Claims will be assumed by and one or more Responsible Meritor Affiliates and Meritor HVS will indemnify, defend, pay the defense costs for, and hold harmless the Reorganized Debtors and their affiliates from and against any and all Environmental Claims and any and all associated costs, expenses, actions, Causes of Action, suits, controversies, damages, demands, debts, liabilities or obligations of any nature as set forth in and to the extent provided under the Environmental Assumption and Indemnification Agreement.  Each Environmental Claim shall pass through the Plan, and the Holder of such Environmental Claim shall retain all legal, equitable, and contractual rights to which such Environmental Claim entitles such Holder, subject to the rights of the Debtors, the Reorganized Debtors and (upon assumption of such Environmental Claims by one or more Responsible Meritor Affiliates) pursuant to the Environmental Assumption and Indemnification Agreement and the Plan, to contest or otherwise defend against such Environmental Claim when and if such Environmental Claim is sought to be enforced.

Pursuant to the Environmental Assumption and Indemnification Agreement, Meritor HVS and one or more Responsible Meritor Affiliates shall be responsible for any ongoing management or other costs and expenses related to any Environmental Claims at the Environmental Sites.  Without limiting the generality of the foregoing, in connection with such assumption and/or indemnity related to the Environmental Sites, Meritor HVS and one or more Responsible Meritor Affiliates shall manage and control any such environmental liabilities at the Environmental Sites and may fulfill their obligations under the Environmental Assumption and Indemnification Agreement by complying with the least stringent remediation requirements allowed by applicable law to the extent satisfactory to the relevant agency with jurisdiction or otherwise sufficient to resolve any such environmental liability.  In furtherance of and in connection with the assumption of liabilities and indemnification provided for by the Environmental Assumption and Indemnification Agreement, Maremont shall assign to one or more Responsible Meritor Affiliates and such Responsible Meritor Affiliate(s) shall assume all right, title, and ownership of the real property owned by Maremont in Paulding, Ohio.

**ARTICLE VIII.**
**OTHER ASPECTS OF THE PLAN**

A.    **Insurance Agreements**

Pursuant to Bankruptcy Rule 9019, and in consideration for the treatment of FFIC, Everest, Mt. McKinley, and Zurich, respectively, as Settling Insurers under the Plan, and other benefits provided under the Plan, the following treatment of the FFIC Agreement, the Zurich Agreement, and the Everest Agreement shall constitute a good faith compromise and settlement of such agreements, effective upon the occurrence of the Effective Date with no further action required:

1.    **FFIC Agreement.**  The FFIC Amendment shall become effective as of the Effective Date of the Plan with no further action required by FFIC or the Debtors.  The FFIC Amendment shall include the following terms:

    **a.**    FFIC shall acknowledge the remaining indemnity obligations under policies XLX 136 64 170 (June 30, 1980 – June 30, 1981) and XLX 143 63 10 (June 30, 1981 – June 30, 1982), which obligations were approximately $7.4 million at the time of the commencement of the Solicitation.

    **b.**    FFIC shall reimburse the Debtors for any invoices that remain outstanding under the FFIC Agreement as of the Effective Date and such amount shall be paid directly to the Asbestos Personal Injury Trust.

    **c.**    FFIC shall agree that Allocated Expenses (as defined in the FFIC Agreement) shall include (i) any and all Allowed Administrative Expense Claims and (ii) Asbestos Personal Injury Trust Expenses.

    **d.**    After the Effective Date, FFIC shall pay any and all invoices submitted by the Asbestos Personal Injury Trust within thirty (30) days of receipt of such invoices. The invoices shall include the following details: (i) the name of the holder of the Asbestos Personal Injury Claim; (ii) the last four digits of such claimant's social security number; (iii) such claimant's disease; and (iv) the applicable claim amount.  Upon request, the Asbestos Personal Injury Trust shall provide FFIC with copies of the releases evidencing the underlying indemnity payments.

    **e.**    FFIC shall have no further audit rights or right to information regarding Asbestos Personal Injury Claims with respect to the Debtor or Reorganized Debtor, and shall have no opportunity to audit any cost of or payment by the Asbestos Personal Injury Trust.

Notwithstanding any other provision of the Plan, the FFIC Agreement, as amended pursuant to the FFIC Amendment, shall be assumed by the Debtors and assigned to the Asbestos Personal Injury Trust effective automatically as of the Effective Date, without the need for any further action by any party.  Following such assumption and assignment, the Asbestos Personal Injury Trust shall have all of the benefits and obligations of the Debtors under the FFIC Agreement, as amended pursuant to the FFIC Amendment.  In exchange, the Debtors shall treat FFIC as a Settling Insurer under the Plan.  In the event that the FFIC Amendment is not approved as part of the Plan, FFIC shall not be a Settling Insurer under the Plan and the Debtors, with the consent of the Asbestos Claimants Committee and the Future Claimants' Representative, reserve the right to reject the FFIC Agreement.

    **2.**    **Everest Agreement.**  Notwithstanding any other provision of the Plan, the Everest Agreement shall be rejected by the Debtors effective automatically as of the Effective Date, without the need for any further action by any party.  In exchange for the treatment of Everest and Mt. McKinley as Settling Insurers under the Plan, Everest and Mt. McKinley shall agree to waive any and all claims they may have against the Debtors and the Asbestos Personal Injury Trust including, but limited to, any claims arising under the Everest Agreement, and shall fully release all rights, claims, and defenses available under the Everest Agreement, regardless of whether the Everest Agreement is ultimately determined by the Court to be an Executory Contract.  In the event that Everest and Mt. McKinley do not consent to such waiver and release, Everest and Mt. McKinley shall not be Settling Insurers under the Plan.

    **3.**    **Zurich Agreement.**  Notwithstanding any other provision of the Plan, the Zurich Agreement shall be rejected by the Debtors effective automatically as of the Effective Date, without the need for any further action by any party.  In exchange for the treatment of Zurich as a Settling Insurer under the Plan, Zurich shall agree to waive any and all claims it may have against the Debtors and the Asbestos Personal Injury Trust including, but not limited to, any claims arising under the Zurich Agreement for a refund payment or otherwise, and shall fully release all rights, claims, and defenses available under the Zurich Agreement, regardless of whether the Zurich Agreement is ultimately determined by the Court to be an Executory Contract.  In the event that Zurich does not consent to such waiver and release, Zurich shall not be a Settling Insurer under the Plan.

B.    **Distributions Under the Plan on Account of Claims Other than Asbestos Personal Injury Claims**

Other than with respect to payments to be made on account of Asbestos Personal Injury Claims and Asbestos Personal Injury Trust Expenses from the Asbestos Personal Injury Trust, the Reorganized Debtors shall make all Distributions required to be made under the Plan as provided under Article VI thereof.  All distributions to be made by the Asbestos Personal Injury Trust shall be made in accordance with the terms of the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures.

1.    **Timing and Condition of Distributions**

a.    **Record Date for Holders of Claims**

Except as otherwise provided in a Final Order, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

b.    **Timing of Distributions**

Except as otherwise provided in the Plan, any Distributions and deliveries to be made thereunder on account of Allowed Claims (other than Asbestos Personal Injury Claims) shall be made (i) on the Effective Date or as soon thereafter as is practicable for Claims that are Allowed as of the Effective Date or (ii) within thirty (30) days of the date on which a Claim becomes Allowed if such Claim becomes Allowed after the Effective Date. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on, or as soon as reasonably practicable after, the next succeeding Business Day, but shall be deemed to have been completed as of the required date, and no interest shall accrue or be payable on any such payment on the basis that such payment was not actually made on the required date.

c.    **Postpetition Interest on Claims**

Except as otherwise provided in this Plan, the Plan Documents or the Confirmation Order, Holders of Claims and Interests shall not be entitled to interest, dividends or accruals on the Distributions provided for herein, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

d.    **Fractional Cents**

No payment of fractional cents will be made pursuant to the Plan.  Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with fractions of more than half a penny being rounded up and fractions of half of a penny or less being rounded down.

2.    **Delivery of Distributions**

a.    **Delivery of Distributions in General**

All Distributions to any Holder of an Allowed Claim shall be made at the address of such Holder as set forth on (i) any Schedules filed with the Bankruptcy Court, (ii) a Proof of Claim filed by or on behalf of such Holder in the Chapter 11 Cases, or (iii) the books and records of the Debtors, unless the Debtors or the Reorganized Debtors, as applicable, have been notified in writing of a change of address.

If any Holder's Distribution is returned as undeliverable, then no further Distributions to such Holder shall be made unless and until the Reorganized Debtors are notified of such Holder's then-current address, at which time any missed Distribution shall be made to such Holder without interest.  A Cash Distribution that is not claimed by the

expiration of six (6) months from the date that such Distribution was made – along with any further Distributions withheld under this Section – shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in the Reorganized Debtors, and the Claim of any Holder to such Distributions or any further Distributions shall be discharged and forever barred. Nothing contained in the Plan shall require any of the Debtors or the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

### b.    Cash Distributions

At the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in any applicable agreement.

### c.    Time Bar to Cash Payments

Checks issued by the Reorganized Debtors in respect of Distributions on Allowed Claims shall be null and void if not presented for payment within ninety (90) days after the date of issuance thereof. Requests for reissuance of any check shall be made in writing to the Reorganized Debtors by the Holder of the Allowed Claim to whom such check originally was issued on or before thirty (30) days after the expiration of the ninety (90) day period following the date of issuance of such check. All funds held on account of a check voided in accordance with Section VI.E.2 of the Plan shall be returned to the Reorganized Debtors, and the Claim of any Holder to such Distributions shall be discharged and forever barred.

### 3.    Setoff and Recoupment

Any Debtor or Reorganized Debtor (or the Asbestos Personal Injury Trust to the extent it pertains to an Asbestos Personal Injury Claim) may, but shall not be required to, set off and/or recoup against any Claim (for purposes of determining the Allowed Amount of such Claim on which a Distribution shall be made), any claims of any nature whatsoever that any Debtor or Reorganized Debtor (or the Asbestos Personal Injury Trust to the extent it pertains to an Asbestos Personal Injury Claim) may have against the Holder of such Claim, and the failure to do so shall not constitute a waiver or release by any Debtor or Reorganized Debtor of any such claims that any Debtor or Reorganized Debtor may have against the Holder of such Claim.

### 4.    Procedures for Resolving and Treating Disputed Claims Other than Asbestos Personal Injury Claims and Professional Fee Claims

All Disputed Claims against the Debtors other than Asbestos Personal Injury Claims, Environmental Claims, and Professional Fee Claims shall be subject to the provisions of Article VII of the Plan.

### a.    Objection To and Estimation of Claims

Except as otherwise provided in the Plan, including in Sections VII.C and VII.D of the Plan, the Debtors or the Reorganized Debtors, as the case may be, shall be entitled to file objections to Claims that have been brought in the Bankruptcy Court or should properly have been brought in the Bankruptcy Court but were brought in other forums, on or before the date that is sixty (60) days after the Effective Date (unless such day is not a Business Day, in which case such deadline shall be the next Business Day thereafter), as the same may be extended from time to time by the Bankruptcy Court. In addition, the Debtors or the Reorganized Debtors, as the case may be, may, before the expiration of such period, request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim for any reason pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate such Claim at any time, including, without limitation, during the pendency of litigation concerning any objection to any Claim or of any appeal relating thereto. The Debtors and the Reorganized Debtors shall be authorized to settle, compromise, withdraw or litigate to judgment such objections without further approval of the Bankruptcy Court. The foregoing shall not apply to Asbestos Personal Injury Claims or Professional Fee Claims.

**b.**        **Payments and Distributions with Respect to Disputed Claims**

Notwithstanding any other provision of the Plan, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

**c.**        **Resolution of Asbestos Personal Injury Claims**

All Asbestos Personal Injury Claims shall be resolved by the Asbestos Personal Injury Trust in accordance with Section IV.E of the Plan, pursuant to the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures. Only the Asbestos Personal Injury Trust will have the right to object to and/or resolve Asbestos Personal Injury Claims. All Asbestos Personal Injury Claims must be submitted solely to the Asbestos Personal Injury Trust for payment, which shall be in accordance with the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures.

**d.**        **Resolution of Professional Fee Claims**

Professional Fee Claims shall be determined and, if Allowed, paid by Maremont or Reorganized Maremont in accordance with Section II.B of the Plan.

**C.**        **Means for Implementation of the Plan**

**1.**        **Generally**

On and after the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to implement the provisions of the Plan, including, without limitation, the creation of the Asbestos Personal Injury Trust and the preparations for the transfer of the Asbestos Personal Injury Trust Assets to the Asbestos Personal Injury Trust.

From and after the Effective Date, the Reorganized Debtors shall be governed pursuant to Reorganized Maremont's Bylaws, Reorganized Maremont's Certificate of Incorporation and any other formation documents. The Reorganized Debtors and their officers and directors shall be authorized to issue, execute, deliver, file, or record such agreements, instruments, releases, and other documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Restructuring Transactions, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan. The authorizations and approvals contemplated by Section IV.K of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**2.**        **Reorganized Maremont's Bylaws and Reorganized Maremont's Certificate of Incorporation**

On or promptly after the Effective Date, the Reorganized Debtors will file Reorganized Maremont's Certificate of Incorporation with the Secretary of State in Delaware. After the Effective Date, the Reorganized Debtors may amend and restate Reorganized Maremont's Bylaws, Reorganized Maremont's Certificate of Incorporation and any other constituent documents as permitted by the laws of Delaware.

**3.**        **Payment of Other Claims**

On the Effective Date, the Reorganized Debtors shall (a) with respect to each unpaid Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, Secured Claim and General Unsecured Claim, either pay the Allowed amount of such claim in full in Cash (collectively, the "Effective Date Payment") or reserve Cash sufficient for payment of the Allowed amount of such claim in full and (b) reserve Cash sufficient for payment of all legal fees and expenses reasonably likely to be incurred by the Reorganized Debtors through the closing of the Chapter 11 Cases, including all legal fees and expenses necessary to defend to final resolution any appeal of the Confirmation Order,

hearing on a Professional Fee Claim, and any adversary proceeding pending as of the Effective Date (the aggregate amount of such reserved Cash pursuant to clauses (a) and (b), the "Reserve Funds"). The Reorganized Debtors will transfer, or cause to be transferred, to the Asbestos Personal Injury Trust any Reserve Funds remaining following the Reorganized Debtors' payment in full of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims and Allowed General Unsecured Claims as well as all other post-Effective Date legal fees and expenses.

### 4.    The Reorganized Debtors' Corporate Existence

On the Effective Date, Reorganized Maremont shall issue the Reorganized Maremont Stock to the Asbestos Personal Injury Claims Trust. Each of the Reorganized Subsidiaries shall remain wholly owned subsidiaries of Reorganized Maremont. Except as otherwise provided in the Plan or as may be provided in the Plan Supplement or the Confirmation Order, the Reorganized Debtors will continue to exist after the Effective Date as separate corporate entities, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which the Reorganized Debtors are incorporated and pursuant to Reorganized Maremont's Bylaws, Reorganized Maremont's Certificate of Incorporation and any other formation documents in effect following the Effective Date, and such documents are deemed to be adopted pursuant to the Plan and require no further action or approval.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action in favor of any Debtor not otherwise waived, relinquished, exculpated, released, compromised, or settled under the Plan or any Final Order, and any property acquired by any of the Debtors pursuant to the Plan, except for the Professional Fee Escrow Account, shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court, or notice to any other Entity, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Without limiting the foregoing, the Reorganized Debtors may pay the charges they incur on or after the Effective Date for the fees, disbursements and expenses of Retained Professionals without application to the Bankruptcy Court.

### 5.    Directors and Officers of the Reorganized Debtors

On the Effective Date, the Reorganized Maremont Board, as well as the officers of Reorganized Maremont and the directors and officers of the Reorganized Subsidiaries, shall consist of those individuals that will be identified in the Plan Supplement.

### 6.    Operations of the Debtors Between Confirmation and the Effective Date

The Debtors shall continue to operate as debtors and debtors-in-possession during the period from the Confirmation Date through and until the Effective Date.

### 7.    Corporate Action

Upon the Effective Date, all actions contemplated by or necessary to effectuate the Plan shall be deemed authorized and approved in all respects, including: (a) rejection of Executory Contracts, except as otherwise provided in the Plan Supplement or any order of the Bankruptcy Court; (b) installation of the Reorganized Maremont Board and Reorganized Subsidiary Boards as set forth in the Plan Supplement; (c) execution and entry into the Asbestos Personal Injury Trust Documents; (d) implementation of the Restructuring Transactions contemplated by the Plan (including by way of (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the Plan and having other terms to which the applicable parties agree, and (iii) the filing of appropriate certificates of formation and memoranda and articles of association and amendments thereto, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law); and (e) all other

actions contemplated by the Plan (whether occurring before on or after the Effective Date). Except as expressly provided in Article IV of the Plan, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, manager(s), members, directors or officers of the Debtors or the Reorganized Debtors.

### D.    Treatment of Executory Contracts

#### 1.    General Treatment

As of the Effective Date, the Debtors shall be deemed to have rejected any and all Executory Contracts to which a Debtor is a party, except for (i) any Executory Contracts listed on the Assumed Executory Contract and Unexpired Lease List and (ii) any Executory Contracts specifically addressed pursuant to an order of the Bankruptcy Court that becomes a Final Order on or before the Effective Date. As of the Effective Date, the Debtors shall be deemed to have assumed any and all Executory Contracts on the Assumed Executory Contract and Unexpired Lease List. The Debtors shall provide notice of any amendment to the Assumed Executory Contracts and Unexpired Lease List to the counterparties affected by such amendment and to the parties on any master service list established by the Bankruptcy Court in the Chapter 11 Cases. The fact that any contract or lease is listed on the Assumed Executory Contract and Unexpired Lease List shall not constitute or be construed to constitute an admission that such contract or lease is an Executory Contract within the meaning of section 365 of the Bankruptcy Code or that any of the Debtors or any of their respective successors in interest (including the Reorganized Debtors) has any liability thereunder.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections or assumptions, as the case may be, pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, subject to the Debtors' right to amend the Assumed Executory Contract and Unexpired Lease List at any time prior to the Effective Date.

#### 2.    Cure of Defaults

On or as soon as reasonably practicable after the Effective Date, in accordance with section 365(b)(1) of the Bankruptcy Code, any monetary amounts by which each Executory Contract on the Assumed Executory Contract and Unexpired Lease List may be in default shall be satisfied in full by the payment of the proposed cure amount listed on the Assumed Executory Contract and Unexpired Lease List. In the event of a dispute regarding (i) the nature or amount of any cure payment, (ii) the ability of the Debtors or the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract to be assumed, or (iii) any other matter pertaining to the assumption, the payment of the cure amount, if any, shall occur following entry of a Final Order resolving the dispute.

#### 3.    Rejection Damages Claims

In the event that the rejection of an Executory Contract by any of the Debtors pursuant to the Plan results in damages to a non-Debtor counterparty to such Executory Contract, a claim for such damages shall be forever barred and shall not be enforceable against any of the Debtors or the Reorganized Debtors, any of their respective Affiliates, or any of their respective properties or interests in property, and the non-Debtor counterparty shall be barred from receiving any Distribution under the Plan on account of such Claim, unless a Proof of Claim with respect to such damages is filed with the Bankruptcy Court and served upon counsel for the Debtors on or before the Rejection Damages Bar Date. All Rejection Damages Claims shall remain Disputed, subject to the procedures for disputed claims set forth in Article VII of the Plan, unless and until, and only to the extent, such Rejection Damages Claim has become Allowed pursuant to (i) a Final Order of the Bankruptcy Court, (ii) the terms of an agreement by and among the Holder(s) of such Rejection Damages Claim and one or more of the Debtors (or Reorganized Debtors, as the case may be), or (iii) a provision of the Plan expressly allowing such Rejection Damages Claim.

E.    **Effect of Confirmation**

1.    **Dissolution of Asbestos Claimants Committee; Discharge of the Future Claimants' Representative**

Effective on the Effective Date, the Asbestos Claimants Committee shall be dissolved automatically, whereupon its members, Professionals, and agents shall be released and discharged from any further authority, duties, obligations and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code. Notwithstanding the foregoing, if the Effective Date occurs prior to the Confirmation Order becoming a Final Order, the Asbestos Claimants Committee may, at its option, continue to serve and function for the purposes of participating in any: (a) appeal of the Confirmation Order, but only until such time as the Confirmation Order becomes a Final Order; (b) hearing on a Professional Fee Claim; and (c) adversary proceeding pending on the Effective Date to which the Asbestos Claimants Committee was a party.

Effective on the Effective Date, the Future Claimants' Representative shall be discharged from his duties in such capacity, whereupon the Future Claimants' Representative and his professionals and agents shall be released and discharged from any further authority, duties, obligations and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code.

The Debtors shall, on or prior to the Effective Date, pay the accrued and unpaid reasonable and documented fees and expenses incurred prior to the Effective Date by the Asbestos Creditors Committee and the Future Claimants' Representative and their respective counsel, to the extent provided for under the Bankruptcy Code.

2.    **Preservation of Certain Causes of Action, Rights to Settle Claims and Compromise Controversies, and Defenses**

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Debtor Release), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action in their favor, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interest of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action. Except with respect to Causes of Action as to which the Debtors or Reorganized Debtors have expressly released any Person or Entity on or prior to the Effective Date (pursuant to the Debtor Release or otherwise), the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or consummation of the Plan.

3.    **Terms of Injunction and Automatic Stay**

All of the injunctions and/or stays in existence immediately prior to the Confirmation Date provided for or in connection with the Chapter 11 Cases, whether pursuant to section 105, 362, or any other provision of the Bankruptcy Code, the Bankruptcy Rules, or other applicable law, shall remain in full force and effect until the injunctions set forth in the Plan become effective pursuant to a Final Order, and shall continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms. For the avoidance of doubt, upon effectiveness of the injunctions set forth in the Plan, the automatic stay imposed by section 362 of the Bankruptcy Code shall be terminated. In addition, on and after the Confirmation Date, the Reorganized Debtors may seek such further orders as it may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

Each of the injunctions contained in the Plan or the Confirmation Order shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order.

### 4.    Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of any Security or other property pursuant to the Plan, as well as any sale transactions consummated by the Debtors in accordance with the Plan on and after the Confirmation Date through and including the Effective Date, shall not be subject to any stamp, real estate, transfer, mortgage recording or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (a) the creation of any mortgage, deed of trust, lien, or other security interest, (b) the making or assignment of any lease or sublease, (c) any Restructuring Transaction, or (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (i) any merger agreements; (ii) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (iii) deeds; (iv) bills of sale; or (v) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

### 5.    No Successor Liability

Except as otherwise expressly provided in the Plan, the Debtors, the Reorganized Debtors, the other Protected Parties, and the Asbestos Personal Injury Trust do not, nor shall they be deemed to, assume, agree to perform, pay, or indemnify creditors for any liabilities or obligations of the Debtors relating to or arising out of the operations of, or assets of, the Debtors or other predecessor entities whether arising prior to or resulting from actions, events, or circumstances occurring or existing at any time prior to the Confirmation Date. None of the Reorganized Debtors, the other Protected Parties, or the Asbestos Personal Injury Trust is, or shall be, a successor to the Debtors by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that the Reorganized Debtors and the Asbestos Personal Injury Trust shall assume the obligations specified expressly in the Plan and the Confirmation Order.

### F.    Releases, Injunctions, and Indemnification of Claims

### 1.    Discharge of Debtors and the Reorganized Debtors

Except as specifically provided in the Plan or in the Confirmation Order, pursuant to sections 524 and 1141(d)(1)(A) of the Bankruptcy Code, confirmation of the Plan shall discharge the Debtors and the Reorganized Debtors on the Effective Date from any and all Claims and Demands of any nature whatsoever, including, without limitation, all Claims and liabilities that arose before the Confirmation Date and all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code whether or not: (a) a Proof of Claim based on such Claim was filed under section 501 of the Bankruptcy Code, or such Claim was listed on any of the Debtors' Schedules; (b) such Claim is or was allowed under section 502 of the Bankruptcy Code; or (c) the Holder of such Claim has voted on or accepted the Plan. Except as otherwise specifically provided for in the Plan, as of the Effective Date, the rights provided in the Plan to Holders of Claims, Demands and Interests shall be in exchange for and in complete satisfaction, settlement and discharge of all Claims (including, without limitation, Asbestos Personal Injury Claims) and Demands against, Liens on, and Interests in the Debtors, the Reorganized Debtors and all of their respective assets and properties.

### 2.    Maremont Discharge Injunction

**Except as specifically provided in the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims or Demands against any Debtor are permanently enjoined, on and after the Effective Date, from:  (a) commencing or continuing in any manner any action or other proceeding of any kind against any Debtor, Reorganized Debtor, or their respective property with respect to such Claim or Demand; (b) enforcing,**

attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against any Debtor, Reorganized Debtor, or their respective property with respect to such Claim or Demand; (c) creating, perfecting, or enforcing any Encumbrance of any kind against any Debtor, Reorganized Debtor, or their respective property with respect to such Claim or Demand; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to any Debtor or against the property or interests in property of any Debtor, with respect to such Claim or Demand; and/or (e) commencing or continuing any action, in any manner and in any place in the world, against any Debtor, Reorganized Debtor, or their respective property that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. The foregoing injunction shall extend to the successors of the Debtors (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property. The discharge provided in this provision shall void any judgment obtained against any Debtor at any time, to the extent that such judgment relates to a discharged Claim or Demand.

       3.       **Asbestos Personal Injury Channeling Injunction**

       a.       <u>Terms</u>.  Pursuant to section 524(g) of the Bankruptcy Code, from and after the Effective Date, the sole recourse of any Holder of an Asbestos Personal Injury Claim on account of such Asbestos Personal Injury Claim shall be to the Asbestos Personal Injury Trust pursuant to Section VIII.C.1 of the Plan and the Asbestos Personal Injury Trust Distribution Procedures, and such Holder shall have no right whatsoever at any time to assert its Asbestos Personal Injury Claim against any Protected Party or any property or interest in property of any Protected Party.  On and after the Effective Date, all present and future Holders of Asbestos Personal Injury Claims shall be permanently and forever stayed, restrained, barred and enjoined from taking any of the following actions for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Personal Injury Claim other than from the Asbestos Personal Injury Trust pursuant to the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures:

       (i)       commencing, conducting, or continuing in any manner, directly, indirectly or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;

       (ii)       enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

       (iii)       creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;

       (iv)       setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

       (v)       proceeding in any manner in any place with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Asbestos Personal Injury Trust, except in conformity and compliance with the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures.

b. **Reservations.  The Asbestos Personal Injury Channeling Injunction shall not stay, restrain, bar, or enjoin:**

     (i)    **the rights of Holders of Asbestos Personal Injury Claims to assert Asbestos Personal Injury Claims against the Asbestos Personal Injury Trust in accordance with the Asbestos Personal Injury Trust Distribution Procedures; and**

     (ii)    **the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Asbestos Personal Injury Trust Expenses against the Asbestos Personal Injury Trust.**

4. **Exculpation**

**None of the Exculpated Fiduciaries and, solely to the extent provided by section 1125(e) of the Bankruptcy Code, non of the Section 1125(e) Parties shall have or incur any liability to any Entity for any act or omission in connection with, related to, or arising out of: (a) the Chapter 11 Cases; (b) the negotiation, formulation and preparation of the Plan and the other Plan Documents, and any of the terms and/or settlements and compromises reflected in the Plan and the other Plan Documents; (c) the solicitation of votes in favor of the Plan and pursuit of confirmation of the Plan; (d) the consummation of the Plan, or administration of the Plan or the property to be distributed under the Plan or the Asbestos Personal Injury Trust Distribution Procedures; (e) the releases and injunctions contained in the Plan; or (f) the management or operation of any Debtor, except for any liability that results primarily from such Entity's willful misconduct or gross negligence as determined by a Final Order, and, in all respects, the Debtors, the Reorganized Debtors, and each of the other Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities in and under the Chapter 11 Cases, the Plan and the Plan Documents.  Without limiting the generality of the foregoing, the Exculpated Parties shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.**

5. **Releases by Debtors and Estate and Related Injunction**

     (a)    **Except as otherwise expressly provided in the Plan or the Confirmation Order (including with respect to the treatment of the FFIC Agreement, the Zurich Agreement and the Everest Agreement), on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors, and any Entity seeking to exercise the rights of the Estates, in each case, whether individually or collectively, including, without limitation, any successor to any Debtor or any Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, shall, and shall be deemed to, completely and forever release, waive and discharge unconditionally the Non-Estate Representative Released Parties from any and all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action and liabilities which any of the Debtors, their respective Estates, or Reorganized Debtors is entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, whether direct, indirect, or derivative, based upon, attributable to, or arising out of, in whole or in part, any act or omission, transaction, or occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) (other than the rights under the Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder), including, without limitation, the Non-Estate Representative Released Party Claims.**

     (b)    **Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors, and any Entity seeking to exercise the rights of the Estates, in each case whether individually or collectively, including, without limitation, any successor to any Debtor or any Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, shall, and shall be deemed to, completely and forever release, waive and discharge unconditionally the Released Parties (other than the Non-Estate Representative Released Parties, which Parties are the subject of Section VIII.E.1 of the Plan) from any and all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights,**

Causes of Action and liabilities which any of the Debtors, their Estates, or Reorganized Debtors is entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, whether direct, indirect, or derivative, based upon, attributable to, arising out of, in whole or in part, any act or omission, transaction, or occurrence taking place on or prior the Effective Date (including prior to the Petition Date) (other than the rights under the Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder); provided, however, that nothing contained in Section VIII.E.2 of the Plan is intended to operate as a release of any liability based upon gross negligence or willful misconduct as determined by a Final Order

(c)        Except as provided in the Plan or the Confirmation Order, the Debtors, the Reorganized Debtors, and all Entities seeking to exercise the rights of any Debtor's Estate, in each case, whether individually or collectively, including, without limitation, any successor to any Debtor or any Debtor's Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, are permanently enjoined from taking any of the following actions on account of or based upon any and all Claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action and liabilities released pursuant to Section VIII.E of the Plan: (a) commencing or continuing any action or other proceeding against the Released Parties or the Non-Estate Representative Released Parties or their respective property; (b) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or the Non-Estate Representative Released Parties or their respective property; (c) creating, perfecting or enforcing any Encumbrance against the Released Parties or the Non-Estate Representative Released Parties or their respective property; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Released Parties or the Non-Estate Representative Released Parties or against their respective property; and (e) commencing or continuing any action, in any manner and in any place in the world, against the Released Parties or the Non-Estate Representative Released Parties that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  Notwithstanding the foregoing, the rights of the Debtors and the Reorganized Debtors, and any and all Entities seeking to exercise the rights of any Debtor's Estate, against FFIC under the FFIC Agreement shall not be released and shall be preserved as set forth in the Plan.

6.        Release by Holders of Claims and Interests

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim or Demand against, or Interest in, any of the Debtors who receives a Distribution pursuant to the Plan or who votes to approve the Plan shall be deemed to forever release, waive, and discharge all claims, obligations, suites, judgments, remedies, damages, Demands, debts, rights, Causes of Action and liabilities whatsoever against the Released Parties and the Non-Estate Representative Released Parties, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estate, the conduct of the Debtors' business, the Chapter 11 Cases, the Plan or the Reorganized Debtors (other than the rights under the Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder); including, for the avoidance of doubt, any and all Causes of Action that the Holder of an Asbestos Personal Injury Claim, the Asbestos Personal Injury Trust, or the Future Claimants Representative did or could have commenced against any officer or director of any of the Debtors (in such capacity) that is based upon or arising from any acts or omissions of such officer or director occurring prior to the Effective Date on account of such Asbestos Personal Injury Claim, to the fullest extent permitted under section 524(g) of the Bankruptcy Code and applicable law (as now in effect or subsequently extended); provided, however, that nothing contained in Section VIII.F.1 of the Plan is intended to (i) operate as a release of (a) any claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities of the United States or any enforcement or regulatory agency thereof; (b) any claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities of any State or any enforcement or regulatory agency of any State, under state or federal environmental laws; or (c) any criminal liability under the laws of the United States or any State, or (ii) affect the treatment of Asbestos Personal Injury Claims pursuant to the Plan and the channeling of Asbestos Personal Injury Claims pursuant to the Asbestos Personal Injury Channeling Injunction.

### 7.    Certain Waivers

Although the Debtors do not believe that California law is applicable to the Plan, nevertheless, in an abundance of caution, the Debtors hereby affirm that they understand and waive the effect of section 1542 of the California Civil Code to the extent that such section is applicable to any Debtor or any Debtor's Estate. Section 1542 of the California Civil Code provides:

§ 1542. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED THIS SETTLEMENT WITH THE DEBTOR.

THE DEBTORS AGREE TO ASSUME THE RISK OF ANY AND ALL UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS WHICH ARE RELEASED BY THE PLAN AND THE DEBTORS HEREBY WAIVE AND RELEASE ALL RIGHTS AND BENEFITS WHICH ANY DEBTOR OR ANY DEBTOR'S ESTATE MIGHT OTHERWISE HAVE UNDER THE AFOREMENTIONED SECTION 1542 OF THE CALIFORNIA CIVIL CODE WITH REGARD TO THE RELEASE OF SUCH UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS. TO THE EXTENT (IF ANY) ANY OTHER LAWS SIMILAR TO SECTION 1542 OF THE CALIFORNIA CIVIL CODE MAY BE APPLICABLE, THE DEBTORS HEREBY WAIVE AND RELEASE ANY BENEFIT, RIGHT OR DEFENSE WHICH ANY DEBTOR OR ANY DEBTOR'S ESTATE MIGHT OTHERWISE HAVE UNDER ANY SUCH LAW WITH REGARD TO THE RELEASE OF UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.

### 8.    Disallowed Claims

The Confirmation Order, except as otherwise provided therein or in the Plan, shall constitute an order: (a) disallowing all Claims (other than Asbestos Personal Injury Claims) to the extent such Claims are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims, and Claims for unmatured interest, and (b) disallowing or subordinating, as the case may be, any Claims, or portions of Claims, for penalties or non-compensatory damages. On and after the Effective Date, the Debtors and their Estates shall be fully and finally discharged from any liability or obligation on a Disallowed Claim, and any order creating a Disallowed Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

### 9.    Indemnification Obligations

#### a.    Indemnification of Maremont-Related Parties

As of the Effective Date, both the Reorganized Debtors and the Asbestos Personal Injury Trust will, pursuant to the Asbestos Claims Indemnification Agreement, indemnify, release and hold harmless each Non-Debtor Affiliate and all Representatives of the Debtors and the Non-Debtor Affiliates, in each case other than any Non-Indemnified Party, in respect of any liability, obligation, fee, judgment, settlement, or expense, including, without limitation, legal fees and expenses, arising from or incurred in connection with any action based upon, attributable to, or arising out of an Asbestos Personal Injury Claim, or any violation of the Asbestos Personal Injury Channeling Injunction by any Entity.

#### b.    Indemnification and Reimbursement of Certain Representatives

For purposes of the Plan, the obligations of Maremont or any Non-Debtor Affiliate to indemnify and reimburse persons who are, or were as of the Petition Date or at any time thereafter, directors, officers, or employees

of any Debtor against and for any obligations as provided in such Debtor's certificate of incorporation, by-laws, applicable state law, or other agreement, or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Petition Date; provided, however, that, pursuant to the Asbestos Claims Indemnification Agreement, such obligations (other than obligations owed to Non-Indemnified Parties) shall be assumed by the Asbestos Personal Injury Trust on the Effective Date and the Asbestos Personal Injury Trust shall agree to indemnify, defend, pay the defense costs for, and hold harmless the Reorganized Debtors, the Non-Debtor Affiliates, and the Debtors' current and former directors, officers and employees, and the respective Representatives of the foregoing (other than any Non-Indemnified Parties), from and against any and all Asbestos Personal Injury Claims and any and all associated costs, expenses, actions, Causes of Action, suits, controversies, damages, demands, debts, liabilities or obligations of any nature, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, liquidated or unliquidated, matured or not matured, contingent or direct, whether arising at common law, in equity or under any statute.

### G.    Miscellaneous Provisions

#### 1.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the documents and instruments contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts. The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e) and 7062. Upon Confirmation of the Plan, the Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

#### 2.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all Holders receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

#### 3.    FFIC Agreement and FFIC Amendment

Except in the event that the FFIC Amendment is not approved as part of the Plan, the terms and conditions of the FFIC Agreement, as amended pursuant to the FFIC Amendment, are expressly incorporated into the Plan.

#### 4.    Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at the Confirmation Hearing shall be paid on or prior to the Effective Date. On and after the Effective Date, each Reorganized Debtor (individually or collectively with the other Reorganized Debtors) shall pay all such fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, until that particular Reorganized Debtor's case has been closed, converted or dismissed, whichever occurs first.

#### 5.    Tax Reporting and Compliance

In connection with the Plan and all instruments issued in connection therewith and Distributions thereon, the Debtors and the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any

federal, state, local or foreign taxing authority and all Distributions pursuant to the Plan shall be subject to any such withholding and reporting requirements. No Holder of an Allowed Claim against the Debtors shall effectuate any withholding with respect to the cancellation or satisfaction of such Allowed Claim under the Plan. The Reorganized Debtors shall seek authorization under the Plan to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all taxable periods of Maremont ending after the Petition Date through and including the Effective Date of the Plan.

### 6.   Reservation of Rights

The Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

### 7.   Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of such Entity.

### 8.   Entire Agreement

Except as otherwise indicated in an order of the Bankruptcy Court, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which shall become merged and integrated into the Plan on the Effective Date.

### 9.   Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), or an Exhibit hereto, or an instrument, agreement or other document executed in connection with the Plan provides otherwise, the rights, duties and obligations arising under the Plan, and the instruments, agreements and other documents executed in connection with the Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Delaware without giving effect to the principles of conflicts of law thereof.

### 10.   Exhibits

All exhibits and documents included in the Plan (including the Plan Supplement and the documents incorporated therein) are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at www.donlinrecano.com/maremont or the Bankruptcy Court's website at http://www.deb.uscourts.gov.

### 11.   Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan and the other Plan Documents is: (1) valid and enforceable; (2) integral to the Plan and may not be amended, deleted, modified or supplemented except as provided therein and herein; and (3) non-severable and mutually dependent.

12.     **Closing of Chapter 11 Cases**

The Reorganized Debtors shall, promptly after the full administration of each Chapter 11 Case (which, for the avoidance of doubt, may occur at different times, including on the Effective Date), File with the Bankruptcy Court all documents required by Federal Bankruptcy Rule 3022 and a proposed form of any applicable order necessary to close the Chapter 11 Cases.

13.     **Conflicts**

In the event of an inconsistency between the Plan and any document or instrument Filed in the Plan Supplement, the terms of the relevant document or instrument in the Plan Supplement shall control unless otherwise specified in such document or instrument.  In the event of an inconsistency between the Plan and the Disclosure Statement, the Plan shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; provided, however, that if there is determined to be any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

14.     **Section 1125(e) Good Faith Compliance**

The Debtors, the Reorganized Debtors and each of the Exculpated Parties, and each of their respective current and former officers, directors, members (including *ex officio* members), managers, employees, partners, advisors, attorneys, professionals, accountants, investment bankers, investment advisors, actuaries, Affiliates, financial advisors, consultants and agents, shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

15.     **Further Assurances**

The Debtors, the Reorganized Debtors, all Holders of Claims and Interests receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

## ARTICLE IX.
## CONFIRMATION OF THE PLAN

A.     **Combined Hearing on Confirmation and Approval of Disclosure Statement and Solicitation**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  On the Petition Date, the Debtor will file a motion requesting that the Bankruptcy Court set a date and time approximately forty (40) days after the Petition Date for the Confirmation Hearing.  In this case, the Debtors will also request that the Bankruptcy Court approve this Disclosure Statement at the Confirmation Hearing.  The Confirmation Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the entities who have filed an objection to the Plan, if any, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  The Debtor, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file Plan objections.  Notice of the Confirmation Hearing will be provided to Holders of Claims and Interests or their agents or representatives as established in the order establishing the schedule for the Confirmation Hearing and related objections (the "Notice of Combined Disclosure

<u>Statement and Confirmation Hearing</u>").  All objections to the Disclosure Statement and the Plan must be filed with the Bankruptcy Court by the date set forth in the Notice of Combined Disclosure Statement and Confirmation Hearing and will be governed by Bankruptcy Rules 3020(b) and 9014 and the local rules of the Bankruptcy Court.  **UNLESS AN OBJECTION IS TIMELY FILED AND SERVED, IT WILL NOT BE CONSIDERED BY THE COURT**.

### B.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation are that the Plan is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of Holders of Claims and Interests that are Impaired under the Plan.  The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization.   The Plan fully complies with the statutory requirements for Confirmation listed below.

- The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Debtors (or any other Plan Proponent) or by a Person issuing Securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors have disclosed the identity and affiliations  of any individual proposed to serve, after Confirmation, as a director, or officer, of the Reorganized Debtors, any Affiliate of the Debtors reorganized under the Plan, or any successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and Holders of Interests and with public policies.

- The Debtors have disclosed the identity of any Insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such Insider.

- With respect to each Holder within an Impaired Class of Claims or Interests, each such Holder has (a) accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

- With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

- If a Class of Claims or Interests is Impaired under the Plan, at least one Class of Claims or Interests that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

- Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors, or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

C.     **Issuance of Asbestos Personal Injury Channeling Injunction Pursuant to Section 524(g) of the Bankruptcy Code**

The Bankruptcy Court shall be asked to issue the Asbestos Personal Injury Channeling Injunction if the Plan has been accepted by at least two-thirds (2/3) in amount of those Holders of Class 4 Claims actually voting on the Plan, in accordance with section 1126(c) of the Bankruptcy Code, and seventy-five percent (75%) in number of those Holders of Class 4 Claims actually voting on the Plan, in accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.  The amount of the Claim for each Class 4 Claim Holder for voting purposes shall be as set forth in the Solicitation Procedures Order.

If the Bankruptcy Court or the District Court does not enter the Asbestos Personal Injury Channeling Injunction, the Effective Date shall not occur.

D.     **Best Interests of Creditors / Liquidation Analysis**

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the Debtor were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if the Chapter 11 Cases were converted to a case under chapter 7 of the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a sale of the Debtors' assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the claims of any secured creditors to the extent of the value of their collateral, by the costs and expenses of liquidation, and by other administrative expenses and costs of both the chapter 7 case and the Chapter 11 Cases.  Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in the Chapter 11 Cases (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 case, litigation costs, and any claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, if any, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation.  If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

Two Classes of Claims or Interests (other than Intercompany Claims) are Impaired under the Plan: Asbestos Personal Injury Claims (Class 4) and Maremont Equity Interests (Class 7).  The Holders of Asbestos Personal Injury Claims, as the only Voting Class under the Plan, must accept the Plan in order for the Plan to be confirmed, thereby satisfying clause (a) above.  The Holders of Maremont Equity Interests would receive no distribution if the Debtor were liquidated under chapter 7 of the Bankruptcy Code for the reasons explained below.

Here, the Plan is in the best interests of claimants and Demand holders, and meets the requirements of section 1129(a)(7) of the Bankruptcy Code.  The Plan Proponents expect that there will be substantially more assets available to pay Holders of Claims under the Plan than would be the case if there were no Plan because of, among other reasons, the Meritor Contribution.  The Plan is the result of an extensively negotiated settlement, which avoids costly and time-consuming litigation that would deplete the funds available for creditors.  The Asbestos Claimants Committee and the Future Claimants' Representative conducted extensive diligence prior to the Petition Date, vetted and negotiated the settlement, and support Confirmation of the Plan.  All of these factors demonstrate that the Plan provides greater recoveries to creditors and Demand holders than would be realized in a chapter 7 liquidation, the costs of which would deplete much of the recoveries from the liquidation of the Debtors' assets.

E.    **Feasibility of the Plan**

In connection with Confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

To support their belief in the feasibility of the Plan, the Plan Proponents have relied upon the Financial Projections, which are attached to this Disclosure Statement as **Exhibit B**.

The Financial Projections indicate that the Reorganized Debtors should have sufficient cash flow to fund their operations. Accordingly, the Plan Proponents believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Financial Projections cover the operations of the Reorganized Debtors through fiscal year 2021. The Financial Projections are based on various assumptions, including Confirmation and Consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtors; no material adverse changes in general business and economic conditions; and other matters, some of which will be beyond the control of the Reorganized Debtors.

Although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates underlying the Financial Projections are subject to business and economic uncertainties, some of which will be beyond the control of the Reorganized Debtors. Accordingly, the Financial Projections are only estimates and are necessarily speculative in nature. It can be expected that actual results may vary from the Financial Projections, which variations may be material and may increase over time. The Debtors do not intend to update or otherwise revise the Financial Projections. In light of the foregoing, readers are cautioned not to place undue reliance on the Financial Projections. The Financial Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts. The Financial Projections have not been audited, reviewed, or compiled by the Debtors' independent public accountants. The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Plan Proponents, the Debtors' advisors, or any other Person that the Financial Projections can or will be achieved.

The Financial Projections should be read in conjunction with Article X below, entitled "Risk Factors," and with the assumptions, qualifications and footnotes to the tables containing the Financial Projections set forth in **Exhibit B** to the Disclosure Statement.

F.    **Conditions to Confirmation and Consummation of the Plan**

1.    **Conditions Precedent to Confirmation of the Plan**

The following are conditions precedent to Confirmation of the Plan that are designed, among other things, to ensure that the injunctions, releases and discharges set forth in Article VIII thereof shall be effective, binding and enforceable and that must be satisfied, unless waived in accordance with Section IX.C of the Plan:

a.    The Bankruptcy Court shall have entered an order, acceptable in form and substance to the Plan Proponents, approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

b.    The Confirmation Order shall be acceptable in form and substance to the Plan Proponents, the Asbestos Claimants Committee, and the Future Claimants' Representative.

c.    The Confirmation Order shall, among other things:

(i)      order that the Confirmation Order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

(ii)     provide that, except with respect to obligations specifically preserved in the Plan, the Debtors are discharged effective on the Effective Date (in accordance with the Plan) from any Claims and Demands, and the Debtors' liability in respect thereof, whether reduced to judgment or contingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, or known or unknown, that arose from any agreement of the Debtors entered into or obligation of the Debtors incurred before the Effective Date, or from any conduct of the Debtors prior to the Effective Date, whether such liability accrued before or after the Petition Date, is extinguished completely;

(iii)    authorize the implementation of the Plan in accordance with its terms;

(iv)     approve the Asbestos Personal Injury Channeling Injunction set forth in the Plan;

(v)      provide that the Asbestos Personal Injury Trust shall receive the Reorganized Maremont Stock as of the Effective Date;

(vi)     provide that the Asbestos Personal Injury Trust and the Reorganized Debtors shall execute and deliver the Asbestos Claims Indemnification Agreement;

(vii)    provide that the parties to the Environmental Assumption and Indemnification Agreement shall execute and deliver the Environmental Assumption and Indemnification Agreement;

(viii)   provide that all transfers of assets of the Debtors contemplated under the Plan shall be free and clear of all Claims and Encumbrances against or on such assets;

(ix)     except as otherwise provided in the Plan or Confirmation Order, provide that the assets revesting in the Reorganized Debtors shall be free and clear of all Claims and Encumbrances;

(x)      provide that any transfers effected or entered into, or to be effected or entered into, under the Plan shall be and are exempt under section 1146(a) of the Bankruptcy Code from any state, city or other municipal transfer taxes, mortgage recording taxes and any other stamp or similar tax;

(xi)     provide that the transfers of property by the Debtors to the Reorganized Debtors (A) are or will be legal, valid, and effective transfers of property; (B) vest or will vest the Reorganized Debtors with good title to such property; (C) do not and will not constitute avoidable transfers under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law; and (D) do not and will not subject the Reorganized Debtors to any liability by reason of such transfer under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, any laws affecting or effecting successor or transferee liability;

(xii) provide that all Executory Contracts assumed or assumed and assigned by the Debtors during the Chapter 11 Cases or under the Plan, if any, shall remain in full force and effect for the benefit of the Reorganized Debtors or any assignee thereof notwithstanding any provision in such contract (including those provisions described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease;

(xiii) approve the treatment of the Settling Insurers;

(xiv) require, as a condition to receiving any distributions of any kind from the Asbestos Personal Injury Trust, that each Holder of an Asbestos Personal Injury Claim execute the Asbestos Personal Injury Claimant Release; and

(xv) approve in all respects the other settlements, transactions and agreements to be effected pursuant to the Plan, including, without limitation, the Asbestos Personal Injury Trust Agreement, the Asbestos Personal Injury Trust Distribution Procedures, and the other Asbestos Personal Injury Trust Documents, and the releases of the Released Parties and Non-Estate Representative Released Parties contained in the Plan.

    d.    In addition to the foregoing, the Confirmation Order shall contain the following findings of fact and conclusions of law, among others:

(i) the Plan complies with all applicable provisions of the Bankruptcy Code, including, without limitation, those requiring that the Plan be proposed in good faith and that the Confirmation Order not be procured by fraud;

(ii) the Plan and its acceptance otherwise comply with sections 524(g) and 1126 of the Bankruptcy Code, and confirmation of the Plan is in the best interests of all creditors;

(iii) the Plan does not provide for the liquidation of all or substantially all of the property of the Debtors, the Reorganized Debtors will operate as an ongoing business and continue in business as separate corporate entities, and confirmation of the Plan is not likely to be followed by the liquidation of any of the Reorganized Debtors or the need for further financial reorganization;

(iv) as of the Petition Date, the Debtors had been named as defendants in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(v) upon the Effective Date, the Asbestos Personal Injury Trust shall assume the liabilities of the Debtors with respect to Asbestos Personal Injury Claims;

(vi) the Asbestos Personal Injury Trust is to be funded by contribution of the Asbestos Personal Injury Trust Assets, including the Maremont Contribution and the Meritor Contribution;

(vii) the Asbestos Personal Injury Trust will on the Effective Date own one hundred percent (100%) of the Reorganized Maremont Stock and all

rights to receive dividends or other distributions on account of such stock;

(viii)    the Asbestos Personal Injury Trust is to use its assets and income to pay Asbestos Personal Injury Claims and Asbestos Personal Injury Trust Expenses;

(ix)    the Debtors are likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Personal Injury Claims, and all such Demands are subject to the Asbestos Personal Injury Channeling Injunction;

(x)    the actual amounts, numbers, and timing of Demands cannot be determined;

(xi)    pursuit of Demands outside the procedures prescribed by the Plan and the Asbestos Personal Injury Trust Distribution Procedures is likely to threaten the Plan's purpose to deal equitably with Asbestos Personal Injury Claims;

(xii)    the Plan separately classifies Asbestos Personal Injury Claims in Class 4, and at least two-thirds (2/3) in amount and seventy-five percent (75%) of the members in such Class that actually voted on the Plan have voted to accept the Plan;

(xiii)    the Asbestos Personal Injury Trust will have the sole and exclusive authority as of the Effective Date to satisfy or defend against all Asbestos Personal Injury Claims;

(xiv)    pursuant to:  (a) the Asbestos Personal Injury Trust Distribution Procedures; (b) court order; or (c) otherwise, the Asbestos Personal Injury Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Asbestos Personal Injury Trust will value, and be in a financial position to pay, current and future Asbestos Personal Injury Claims in substantially the same manner regardless of the timing of the assertion of such Asbestos Personal Injury Claims;

(xv)    the Future Claimants' Representative was appointed by the Bankruptcy Court pursuant to section 524(g) of the Bankruptcy Code as part of the proceedings leading to the issuance of the Asbestos Personal Injury Channeling Injunction for the purpose, among other things, of protecting the interests of Future Demand Holders;

(xvi)    the Asbestos Personal Injury Channeling Injunction is to be implemented in accordance with the Plan and the Asbestos Personal Injury Trust;

(xvii)    the Asbestos Personal Injury Channeling Injunction is essential to the Plan and the Debtors' reorganization efforts;

(xviii)    the terms of the Asbestos Personal Injury Channeling Injunction and the other injunctions contained in the Plan, including any provisions barring

actions against third parties, are set forth in the Plan and the Disclosure Statement;

(xix)     the Meritor Contribution is essential to the feasibility of the Plan and the successful reorganization of Maremont;

(xx)      the Maremont Contribution and Meritor Contribution collectively constitute a sufficient basis upon which to provide the Protected Parties with the protections afforded to them under the Plan, Plan Documents and Confirmation Order;

(xxi)     in light of the benefits provided, or to be provided, to the Asbestos Personal Injury Trust by or on behalf of each Protected Party, the Asbestos Personal Injury Channeling Injunction is fair and equitable to all Holders of Asbestos Personal Injury Claims (including Demands);

(xxii)    the release received by Maremont, Representatives of Maremont, and the Non-Estate Representative Released Parties in exchange for the Maremont Contribution and Meritor Contribution is essential to the global settlement of Asbestos Personal Injury Claims arising from the conduct or products of the Debtors reflected in the Plan; and

(xxiii)   any and all claims that Everest, Mt. McKinley, and Zurich (in each case to the extent such Entity is a Settling Insurer) may have against the Debtors, including, but not limited to, claims arising under the Everest Agreement or the Zurich Agreement (as applicable), are released in consideration for the benefits provided to such Settling Insurer under the Plan.

**2.      Conditions Precedent to the Effective Date of the Plan**

The following are conditions precedent to occurrence of the Effective Date of the Plan that must be satisfied, unless waived in accordance with Section IX.C of the Plan:

a.      all conditions precedent to the Confirmation Date shall have been satisfied or waived and shall continue to be satisfied or waived, and the Confirmation Date shall have occurred on or before the Confirmation Order Outside Date unless otherwise mutually agreed by the Debtors, Meritor, the Asbestos Claimants Committee, and the Future Claimants' Representative;

b.      the Confirmation Order, in form and substance acceptable to the Plan Proponents, the Asbestos Claimants Committee, and the Future Claimants' Representative, shall have been entered by the Bankruptcy Court and affirmed by the District Court or issued by the District Court;

c.      no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending;

d.      no fact or circumstance shall exist that would prevent the Asbestos Personal Injury Channeling Injunction from coming into full force and effect immediately upon the occurrence of the Effective Date;

e.      the Asbestos Claims Indemnification Agreement shall have been executed and delivered, and no fact or circumstance shall exist that prevents the Asbestos Claims Indemnification Agreement from being in full force and effect immediately upon the occurrence of the Effective Date;

f.      the Environmental Assumption and Indemnification Agreement shall have been executed and delivered, and no fact or circumstance shall exist that prevents the Asbestos Claims Indemnification Agreement from being in full force and effect immediately upon the occurrence of the Effective Date;

g.      no fact or circumstance shall prevent the Asbestos Personal Injury Trust from being funded by the Maremont Contribution and the Meritor Contribution upon occurrence of the Effective Date;

h.      all Plan Documents shall have been executed and delivered; and

i.      all other actions, documents and agreements necessary to implement those provisions of the Plan to be effectuated on or prior to the Effective Date, in form and substance satisfactory to the Plan Proponents, shall have been effected or executed and delivered.

### 3.      Waiver of Conditions Precedent

To the fullest extent permitted by law, any of the conditions precedent set forth in Sections IX.A and IX.B of the Plan above may be waived or modified, in whole or in part, by the Plan Proponents with the consent of the Asbestos Claimants Committee and Future Claimants' Representative (which consent shall not be unreasonably withheld).  Any such waiver or modification may be effected at any time without leave or order of the Bankruptcy Court or District Court, and without any other formal action.

### 4.      Failure to Achieve the Effective Date

If each of the conditions to the Effective Date is not met or duly waived in accordance with Section IX.C of the Plan, then upon motion by the Plan Proponents, with the consent of the Asbestos Claimants Committee and Future Claimants' Representative, which consent shall not be unreasonably withheld, and notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court.  If (a) the Plan Proponents revoke or withdraw the Plan, (b) the Confirmation Order is vacated, (c) the Plan is otherwise not confirmed by a Final Order, or (d) the Plan is confirmed and does not become effective for any other reason, then the rights of all parties in interest in the Chapter 11 Cases are and shall be reserved in full.  In any such event, the Plan shall become null and void in all respects; any settlement or compromise embodied in the Plan, any assumption or rejection of Executory Contracts effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and nothing contained in the Plan or the Confirmation Order, if previously entered, and no acts taken in preparation for consummation of the Plan, shall:  (a) constitute or be deemed to constitute a waiver, release or settlement of any Claims by or against, or any Interests in, any of the Debtors or any other Entity, (b) prejudice in any manner the rights of any Debtor or any Entity in any further proceedings involving one or more the Debtors; or (c) constitute an admission of any sort by a Debtor or any other Entity.

## ARTICLE X.
## RISK FACTORS

**HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE RISK FACTORS ARE NOT EXHAUSTIVE AND SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE MATERIALLY DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENT.**

A.      **Overall Risks to Recovery by Holders of Claims and Interests**

The ultimate recoveries under the Plan to Holders of Claims depend upon a number of factors.  Prior to voting on the Plan, each Holder of a Claim should consider carefully the risk factors specified or referred to below, including the exhibits annexed hereto, as well as all of the information contained in the Plan.

B.      **Certain Bankruptcy Considerations**

Although the Plan Proponents believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no guarantee that the Bankruptcy Court will reach the same conclusion, or that the Confirmation Order, if challenged on appeal, will be affirmed.  There also can be no assurance that the Plan as proposed will be accepted by the requisite number of Holders or amounts of Claims, that modifications to the Plan will not be required for confirmation, that any such modifications will not necessitate the re-solicitation of votes, or that the Bankruptcy Court will enter an order confirming the Plan containing the findings of fact and conclusions of law that are conditions precedent to Confirmation of the Plan.  In addition, although the Plan Proponents believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.  There can also be no assurance that the District Court will accept and affirm or issue the order confirming the Plan, that such acceptance and affirmance or issuance will become a Final Order and that the Asbestos Personal Injury Channeling Injunction will therefore become valid and enforceable.

If the Plan is not confirmed or the Chapter 11 Cases become protracted, there is no assurance that the Asbestos Personal Injury Trust Contributions will be made.  In addition, if the Plan is not confirmed and consummated, it is possible that the Chapter 11 Cases could be converted to a liquidation.  Any alternative plan of reorganization might not be on terms as favorable to the Holders of Claims as the terms of the Plan given the Restructuring Transactions and Settlement Payment that are contemplated pursuant to the Plan.  If a liquidation or protracted reorganization were to occur, there is a substantial risk that the value of the Debtors' assets would be substantially eroded to the detriment of all stakeholders.

C.      **Objections to the Plan's Classification or Amounts of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that parties in interest will not object to the classification or amounts of Claims and Interests under the Plan, or that the Bankruptcy Court will approve such classification or amounts.

D.      **Conditions Precedent to the Effective Date of the Plan**

As more fully set forth in Section IX.B of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not satisfied or waived, the Effective Date will not occur.

E.      **Voting Requirements**

If sufficient votes are received to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation.  If sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

F.      **Proposal of Alternative Plans**

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization.  Under the Bankruptcy Code, a debtor-in-possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from filing, subject to extension not greater

than eighteen (18) months after the Petition Date.  However, the Bankruptcy Court has the authority to reduce or terminate the exclusivity period, in which case other parties in interest would then have the opportunity to propose one or more alternative plans of reorganization.

G.     **Conversion to Chapter 7**

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to a liquidation under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to sell the Debtors' assets and distribute the sale proceeds in accordance with the priorities established by the Bankruptcy Code.  See the description of the liquidation analysis in Section IX.D of this Disclosure Statement for a discussion of the effects that a chapter 7 liquidation could have on the recoveries of Holders of Claims and Interests.

H.     **Non-Consensual Confirmation**

The Debtors shall seek Confirmation notwithstanding the deemed rejection of the Plan by any rejecting Class of Interests.  The Bankruptcy Court may confirm the Plan pursuant to the "cram-down" provisions of the Bankruptcy Code if the Plan satisfies section 1129(b) of the Bankruptcy Code.  To confirm a plan over the objection of a dissenting class, the Bankruptcy Court also must find that at least one Impaired Class (which cannot be an "insider" class) has accepted the Plan.

I.     **Projected Financial Information**

The Financial Projections depend upon numerous assumptions, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors.  Accordingly, there can be no assurance that such assumptions will prove to be valid.  In addition, unanticipated and unforeseeable future events and/or circumstances may affect the actual financial results of the Reorganized Debtors.  Although the Debtors believe that the Financial Projections are reasonable and attainable, variations between the actual financial results and those projected may be material.

J.     **Maremont Insurance**

A discussion of Maremont's remaining settled insurance coverage is provided in Section III.A.7 of this Disclosure Statement – "Remaining Maremont Insurance."  Estimating the value of the insurance assets is inherently uncertain and depends on a number of factors, including the potential for disputes over coverage or settlement issues with the insurers, the principles of law which would be likely to apply in resolving such disputes, the timing and amount of the Asbestos Personal Injury Claims channeled to the Asbestos Personal Injury Trust that may be paid, in whole or in part, by the insurance assets, the financial solvency of the underlying insurers, and the amount which may be paid to settle or otherwise dispose of any claims or disputes involving the insurers.  These factors are beyond the control of the Debtors and changes in these factors could material affect the value of the insurance assets available to the Asbestos Personal Injury Trust.  As set forth in Section IV.D of the Plan and as described in Section VIII.A of this Disclosure Statement, the Plan proposes certain settlements with each of FFIC, Zurich, and Everest and Mt. McKinley pursuant to Bankruptcy Rule 9019.  FFIC, Zurich, and Everest and Mt. McKinley may not consent to their respective settlements.  If FFIC does not consent to the FFIC Amendment, the value of the insurance assets available to the Asbestos Personal Injury Trust may be affected, and FFIC will not be treated as a Settling Insurer under the Plan.  If Zurich or Everest and Mt. McKinley do not consent to their respective settlements, such parties may assert claims against the Debtors arising from the rejection of their respective agreements, and such parties will not be treated as Settling Insurer under the Plan.

K.     **Appointment of a Different Future Claimants' Representative**

Once the Chapter 11 Cases are filed, the Debtors will request that James L. Patton, Jr., the acting Future Claimants' Representative, be formally appointed as the official Future Claimants' Representative to represent the interests of persons who might in the future assert asbestos-related Demands.  However, the Bankruptcy Court may

decline to appoint Mr. Patton. In that event, a different Future Claimants' Representative would need to be selected, which may result in a delay of the Chapter 11 Cases and create a risk that the value of the Debtors' assets would be eroded to the detriment of all stakeholders. The appointment of a different Future Claimants' Representative could adversely affect the Debtors' ability to implement the Plan.

### L.    Appointment of a Different Asbestos Personal Injury Trustee and/or Different Members of the Asbestos Personal Injury Trust Advisory Committee for the Asbestos Personal Injury Trust

The Asbestos Claimants Committee and the Future Claimants' Representative have identified Alan B. Rich as the initial Asbestos Personal Injury Trustee of the Asbestos Personal Injury Trust, and the Asbestos Claimants Committee has proposed Beth Gori of Gori Julian & Associates, P.C., Perry Browder of Simmons Hanly Conroy LLC, Armand J. Volta, Jr. of Law Offices of Peter Angelos, P.C., and John Cooney of Cooney & Conway, as the initial members of the Asbestos Personal Injury Trust Advisory Committee. The fifth member of the Asbestos Personal Injury Trust Advisory Committee will be proposed at a later date. The Bankruptcy Court, however, may reject or otherwise decline to approve the appointment of such proposed Asbestos Personal Injury Trustee, or one or more of the proposed members of the Asbestos Personal Injury Trust Advisory Committee. In that case, an alternate Asbestos Personal Injury Trustee and/or alternative proposed members of the Asbestos Personal Injury Trust Advisory Committee would have to be nominated, potentially resulting in significant delays in the occurrence of the Confirmation Date and Effective Date. The selection of a different Asbestos Personal Injury Trustee or different Asbestos Personal Injury Trust Advisory Committee members also could materially affect administration of the Asbestos Personal Injury Trust.

### M.    Distributions Under the Asbestos Personal Injury Trust Distribution Procedures

Payments that will be made on Asbestos Personal Injury Claims will be determined under the Asbestos Personal Injury Trust Distribution Procedures and will be based, on the one hand, on estimates of the number, types, and amount of current and expected future Asbestos Personal Injury Claims, and on the other hand, on the value of the assets of the Asbestos Personal Injury Trust, the liquidity of the Asbestos Personal Injury Trust, the Asbestos Personal Injury Trust's expected future income and expenses, among other matters. There can be no certainty as to the precise amounts that will be distributed by the Asbestos Personal Injury Trust in any particular time period or when Asbestos Personal Injury Claims will be paid by the Asbestos Personal Injury Trust. Subject to the exceptions set forth in Section IV.E.8 of the Plan, the Asbestos Personal Injury Trust retains and may assert all defenses to Asbestos Personal Injury Claims that would be available the Debtors in the tort system.

Holders of Asbestos Personal Injury Claims who (a) are Medicare beneficiaries and (b) receive a distribution from the Asbestos Personal Injury Trust may be required to reimburse Medicare for medical expenses paid on behalf of such Holder. See 42 U.S.C. § 1395y(b)(2)(B)(ii); 42 C.F.R. § 411.22. Additionally, excessive legal fees may not qualify as a "procurement cost" within the meaning of 42 C.F.R. § 411.37(a)(1)(i), which may affect of a Holder of an Asbestos Personal Injury Claim's reimbursement obligations.

### N.    The Asbestos Personal Injury Channeling Injunction

The Asbestos Personal Injury Channeling Injunction, which, among other things, bars the assertion of any current and future Asbestos Personal Injury Claims against the Debtors and the other Protected Parties, is a necessary element of the Plan. In 1994, Congress added subsections (g) and (h) to section 524 of the Bankruptcy Code in order to confirm the authority of the Bankruptcy Court, subject to the conditions specified therein, to issue injunctions such as the Asbestos Personal Injury Channeling Injunction with respect to present and future asbestos-related personal injury, wrongful death and related Claims and Demands. Although the Plan, the Asbestos Personal Injury Trust Agreement, and the Asbestos Personal Injury Trust Distribution Procedures all have been drafted with the intention of complying with sections 524(g) and (h) of the Bankruptcy Code, and satisfaction of the conditions imposed by sections 524(g) and (h) is a condition precedent to confirmation of the Plan, there is no guarantee that the validity and enforceability of the Asbestos Personal Injury Channeling Injunction or sections 524(g) and (h) or the application of the Asbestos Personal Injury Channeling Injunction to Asbestos Personal Injury Claims will not be challenged, either before or after Confirmation of the Plan.

## ARTICLE XI.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan Proponents believe that the Plan affords Holders of Claims the greatest opportunity for recovery on account of their Claims and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, however, the hypothetical alternatives include (a) liquidation of the Debtors under chapter 7 of the Bankruptcy Code, or (b) an alternative plan of reorganization.

### A.        Liquidation Under Chapter 7 or Chapter 11

If no plan can be confirmed, the Chapter 11 Cases could be converted to a case under chapter 7 of the Bankruptcy Code in which a trustee would be appointed to liquidate the remaining assets of the Debtors for distribution to the creditors in accordance with the priorities established by the Bankruptcy Code. The trustee would retain professionals and liquidate the Debtors' remaining assets, and if necessary, investigate and pursue Causes of Action. The Plan Proponents believe that the conversion of the case to chapter 7 would increase the costs of administration, and reduce and delay the distribution to Holders of Allowed Claims. Any proceeds available to satisfy Claims would be paid in the priority established in the Bankruptcy Code. Under a chapter 7 liquidation, the Debtors believe that any recovery to the Holders of Asbestos Personal Injury Claims would be less than that provided for under the Plan. For these reasons, the Debtors have concluded that Holders of Allowed Claims are more likely than not to receive an amount under the Plan that is more than the amount such Holder would receive under a chapter 7 liquidation.

### B.        Alternative Plan(s) of Reorganization

If the Plan is not confirmed, the Debtors or another party-in-interest could attempt to formulate a different plan. Such a plan might involve a reorganization, an orderly liquidation of assets, or some combination of both.

The Plan Proponents believe that the Debtors remaining as debtors-in-possession during a lengthy chapter 11 process while trying to further negotiate a plan will erode assets to be used for distribution to Holders of Allowed Claims. The Plan Proponents believe that the Plan, which is the result of extensive negotiations among the Plan Proponents, the Asbestos Claimants Committee, the Future Claimants' Representative and their advisors, enables Holders of Claims to realize the greatest possible value under the circumstances and that, compared to any later alternative plan of reorganization, the Plan has the greatest chance to be confirmed and consummated.

## ARTICLE XII.
## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN TO HOLDERS OF ASBESTOS PERSONAL INJURY CLAIMS. THE FOLLOWING SUMMARY DOES NOT DISCUSS THE FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS WHOSE CLAIMS ARE ENTITLED TO PAYMENT IN FULL IN CASH OR ARE OTHERWISE UNIMPAIRED UNDER THE PLAN OR TO HOLDERS OF EQUITY INTERESTS OR INTERCOMPANY CLAIMS.

THE FOLLOWING SUMMARY IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "INTERNAL REVENUE CODE"), TREASURY REGULATIONS PROMULGATED THEREUNDER, JUDICIAL DECISIONS AND PUBLISHED ADMINISTRATIVE RULES AND PRONOUNCEMENTS OF THE INTERNAL REVENUE SERVICE AS IN EFFECT ON THE DATE HEREOF. CHANGES IN SUCH RULES OR NEW INTERPRETATIONS THEREOF MAY HAVE RETROACTIVE EFFECT AND COULD SIGNIFICANTLY AFFECT THE FEDERAL INCOME TAX CONSEQUENCES DESCRIBED BELOW.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND ARE SUBJECT TO SIGNIFICANT UNCERTAINTIES. THE PLAN PROPONENTS DO NOT INTEND TO SEEK A RULING FROM THE INTERNAL REVENUE SERVICE CONCERNING ANY OF THE TAX ASPECTS OF THE PLAN. IN ADDITION, THIS SUMMARY DOES NOT ADDRESS FOREIGN, STATE, OR LOCAL

TAX CONSEQUENCES OF THE PLAN, NOR DOES IT PURPORT TO ADDRESS THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN TAXPAYERS, BROKER-DEALERS, BANKS, MUTUAL FUNDS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, THRIFTS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, REAL ESTATE INVESTMENT COMPANIES, TAX-EXEMPT ORGANIZATIONS, TRADERS IN SECURITIES THAT ELECT TO USE A MARK-TO-MARKET METHOD OF ACCOUNTING, AND PASS-THROUGH ENTITIES).

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A CLAIMHOLDER. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE TO THEM UNDER THE PLAN.

### A.      Treatment of the Asbestos Personal Injury Trust

It is intended that the Asbestos Personal Injury Trust will be treated as a qualified settlement fund within the meaning of section 468B of the Internal Revenue Code and the Treasury regulations promulgated thereunder. The applicable Treasury regulations provide that to be treated as a qualified settlement fund, a fund, account, or trust must be (i) established pursuant to an order of, or be approved by, a governmental authority, including a court, and must be subject to the continuing jurisdiction of that governmental authority; (ii) established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting, among other things, liability arising out of a tort, breach of contract or violation of law; and (iii) a trust under applicable state law or have its assets physically segregated from the other assets of the transferor and persons related to the transferor.

Provided that the Asbestos Personal Injury Trust is treated as a qualified settlement fund, the Asbestos Personal Injury Trust will generally be subject to an entity level tax at the maximum rate applicable to trusts and estates, and, in determining the taxable income of the Asbestos Personal Injury Trust, (i) any amounts transferred by the Debtors or Meritor to the Asbestos Personal Injury Trust to resolve or satisfy a liability for which the Asbestos Personal Injury Trust is established generally will be excluded from the Asbestos Personal Injury Trust's income; (ii) any dividends, interest and payments received as compensation for delayed transfers generally will constitute taxable income to the Asbestos Personal Injury Trust; (iii) any sale, exchange or distribution of property by the Asbestos Personal Injury Trust generally will result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of disposition and the adjusted tax basis of such property; and (iv) administrative costs (including state and local taxes) incurred by the Asbestos Personal Injury Trust generally will be deductible. In general, the adjusted tax basis of property received (or treated as received for federal income tax purposes) by a qualified settlement fund from a transferor will be the fair market value of such property at the time of receipt.

### B.      Consequences to Holders of Asbestos Personal Injury Claims

Each Asbestos Personal Injury Claim will be liquidated and resolved by the Asbestos Personal Injury Trust in accordance with the Asbestos Personal Injury Trust Distribution Procedures. The federal income tax treatment of the receipt of payments from the Asbestos Personal Injury Trust by a Holder of such an Asbestos Personal Injury Claim generally will depend upon the nature of the Asbestos Personal Injury Claim. Because the amounts received by a Holder of an Asbestos Personal Injury Claim (other than an Indirect Asbestos Personal Injury Claim or Asbestos Personal Injury Trust Expenses) generally will be attributable to, and compensation for, such Holder's personal physical injuries or sickness, within the meaning of section 104 of the Internal Revenue Code, any such amounts received by the Holder generally should be nontaxable. However, to the extent payments from the Asbestos Personal Injury Trust to a Holder of an Asbestos Personal Injury Claim are attributable to medical expense deductions allowed under section 213 of the Internal Revenue Code for a prior taxable year, such payments will be taxable as ordinary income to the recipient. To the extent that the payments from the Asbestos Personal Injury Trust to Holders of Asbestos Personal Injury Claims constitute amounts received on account of claims other than personal injury or sickness, such payments generally will be includable in the gross income of such Holders.

C.        **Information Reporting and Withholding**

All distributions to Holders of Asbestos Personal Injury Claims under the Plan are subject to applicable information reporting and withholding.  Under federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable rate.  Backup withholding generally applies if the Holder (i) fails to furnish his or her social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his or her correct number and that he or she is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent that it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

D.        **Reservation of Rights**

The foregoing discussion is subject to change (possibly substantially) based on, among other things, subsequent changes to the Plan and events that may subsequently occur that may impact the timeline for the transactions contemplated by the Plan. The Debtors and their advisors reserve the right to further modify, revise or supplement this Article XII and the other tax related sections of the Plan and Disclosure Statement in accordance with the terms of the Plan and the Bankruptcy Code.

### ARTICLE XIII.
### CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will result in the greatest and most certain recoveries to Holders of Claims and Maremont Equity Interests.  Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.

In the opinion of the Plan Proponents, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result from any other scenario.  Any alternative to Confirmation of the Plan, moreover, could result in extensive delays and increased administrative expenses.  Accordingly, the Plan Proponents urge all Holders of Asbestos Personal Injury Claims and their attorneys of record in the Voting Class to evidence their acceptance of the Plan by returning their Ballots and/or Master Ballots so that they are actually received by the Claims, Notice and Balloting Agent on or before the Voting Deadline of **January 18, 2019 at 4:00 p.m. (ET)**.

Dated:  December 4, 2018
Wilmington, Delaware

Respectfully submitted,

**MAREMONT CORPORATION**
(On behalf of itself and each of the Debtors)


*/s/ Carl D. Anderson, II*

Carl D. Anderson, II
Title: Chairman and Sole Officer


**SIDLEY AUSTIN LLP**
James F. Conlan
Andrew F. O'Neill
Allison Ross Stromberg
Blair M. Warner
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile:  (312) 853-7036

-and-

**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile:  (302) 652-3117

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**Exhibit A**

**Plan of Reorganization**

**Exhibit B**

**Financial Projections**

## FINANCIAL PROJECTIONS

The Financial Projections set forth below should be read in connection with the assumptions and qualifications as described herein, including in the footnotes below.

The Debtors used accounting policies generally employed in the preparation of historical financial statements to prepare the projected pro forma statement of income. The below projected financial information was not, however, prepared with a view toward compliance with guidelines established by the American Institute of Certified Public Accountants, the Financial Accounting Standards Board or the rules and regulations of the Securities & Exchange Commission. The below projected financial information has not been examined or compiled by independent accountants.

The Financial Projections represent management's estimate of the expected Statement of Income of Reorganized Maremont. Accordingly, the Financial Projections reflect management's reasonable, good faith judgment of expected future operating and business conditions, which are subject to change. The assumptions discussed and disclosed herein are those considered by management to be significant to the below projected financial information.

| FINANCIAL PROJECTIONS REORGANIZED MAREMONT PRO FORMA STATEMENT OF INCOME FOR THE YEAR ENDED | | | |
|---|---|---|---|
| Currency: USD | 12/31/2019 Year 1 | 12/31/2020 Year 2 | 12/31/2021 Year 3 |
| General & Administrative | ($50,000) | ($50,000) | ($50,000) |
| Other G&A Costs | - | - | - |
| Operating Income GAAP | ($50,000) | ($50,000) | ($50,000) |
| | | | |
| Other Income (Expense) | | | |
| Income/Loss from Equity Investment - Other | $91,138 | $91,138 | $91,138 |
| Total Other Income/(Expense) GAAP | $91,138 | $91,138 | $91,138 |
| Pretax Income/(Loss) from Continuing Ops | $91,138 | $91,138 | $91,138 |
| | | | |
| Net Income | $41,138 | $41,138 | $41,138 |

Notes to Financial Projections:

1. Section IV.G of the Plan provides that various Allowed Claims, not otherwise paid in full in Cash on or before the Effective Date, be paid from the Reserve Funds to be set aside on the Effective Date and that the Reorganized Debtors will transfer, or cause to be transferred, to the Asbestos Personal Injury Trust any Reserve Funds remaining following the Reorganized Debtors' payment in full of all such Allowed Claims. It is not anticipated that the Reorganized Debtors will have a material surplus of Reserve Funds remaining after the satisfaction of such Allowed Claims, and as a result, the Financial Projections do not include any anticipated Reserve Fund remainder.

2. Pursuant to the Plan, the Asbestos Personal Injury Trust will own Reorganized Maremont in its entirety on and after the Effective Date. The Future Claimants' Representative and the Asbestos Claimants Committee estimate that Reorganized Maremont will incur $50,000 of General & Administrative operating expenses annually, which estimate is included in these Financial Projections.

3. These Financial Projections for Reorganized Maremont assume that Maremont closes its purchase of the Commercial Property (as defined in the Disclosure Statement) prior to the Effective Date. Maremont expects

1

to close such purchase prior to the Voting Deadline, as discussed in Section III.A.1 of the Disclosure Statement.

4.  Reorganized Maremont will retain a 100% ownership interest in the Commercial Property on and after the Effective Date, to the extent the acquisition of such property closes prior to the Effective Date. The projection for "Income/Loss from Equity Investment – Other" is based entirely on Reorganized Maremont's assumed ownership of the Commercial Property, including on the following:

   a.  Anticipated net operating income based on monthly net rent amounts to be received by Reorganized Maremont.

   b.  Amounts are not discounted and no growth is assumed.

**Exhibit C**

**Financial Statements**

| Balance Sheet (in thousands) | Maremont Corporation | Maremont Corporation | Maremont Corporation |
|---|---|---|---|
| | **M12 FY16** | **M12 FY17** | **M12 FY18** |
| | USD | USD | USD |
| **ASSETS** | | | |
| Current Assets: | | | |
| Cash and Cash Equivalents | 1,977 | 1,052 | 1,290 |
| Other Current Assets | 7,893 | 10,478 | 7,930 |
| Prepaid Taxes Federal Income Tax | - | - | - |
| **Total Current Assets** | **9,870** | **11,530** | **9,220** |
| Long-term Assets: | | | |
| Other Long Term assets | 23,689 | 14,050 | 16,011 |
| Intercompany Loans Rec LT | 29,680 | 26,585 | 24,259 |
| Intercompany Interest Rec LT | 609 | 904 | 843 |
| AR_Interco_Notes_LT | **30,289** | **27,489** | **25,102** |
| **Total Long Term Assets** | **53,978** | **41,539** | **41,113** |
| **Total Assets** | **63,848** | **53,069** | **50,333** |
| **LIABILITIES AND EQUITY (DEFICIT)** | | | |
| Current Liabilities: | | | |
| Accounts Payable | - | 344 | 554 |
| Misc General Current Liabilities | 2,091 | 1,845 | 1,783 |
| Special Items Reserve | 9,868 | 9,682 | 8,921 |
| Environmental Remediation Reserve | 2,361 | 2,034 | 1,026 |
| Res for Est Exp Special Items | 12,229 | 11,716 | 9,948 |
| Total Other Current Liabilities | 14,320 | 13,561 | 11,731 |
| **Total Current Liabilities** | **14,320** | **13,905** | **12,285** |
| Other Liabilities | 62,562 | 58,649 | 98,414 |
| **Total Long Term Liabilities** | **62,562** | **58,649** | **98,414** |
| **Total Liabilities** | **76,882** | **72,553** | **110,699** |
| **Equity (Deficit):** | | | |
| Consolidating Eliminations Total | (12,947) | (12,947) | (12,947) |
| Retained Earnings Total | 2,080 | (4,371) | (45,252) |
| **Total Equity Attributable to Meritor** | **(10,867)** | **(17,318)** | **(58,199)** |
| Accumulated Other Comp Income | (2,167) | (2,167) | (2,167) |
| **Total Equity** | **(13,034)** | **(19,485)** | **(60,366)** |
| **Total Liabilities and Equity** | **63,848** | **53,069** | **50,333** |

| Balance Sheet (in thousands) | Maremont Exhaust Products, Inc. | Maremont Exhaust Products, Inc. | Maremont Exhaust Products, Inc. |
|---|---|---|---|
| | **M12 FY16** | **M12 FY17** | **M12 FY18** |
| | USD | USD | USD |
| **ASSETS** | | | |
| Current Assets: | | | |
| **Total Current Assets** | - | - | - |
| Long-term Assets: | | | |
| **Total Long Term Assets** | - | - | - |
| **Total Assets** | - | - | - |
| | | | |
| **LIABILITIES AND EQUITY (DEFICIT)** | | | |
| Current Liabilities: | | | |
| Total Other Current Liabilities | - | - | - |
| Interco_Cash_Pool_Domestic | 33,638 | 30,110 | 30,110 |
| Oracle Balancing (Troy Corporate) | (3,528) | - | - |
| Intercompany Cash Pool | **30,110** | **30,110** | **30,110** |
| **Total Current Liabilities** | **30,110** | **30,110** | **30,110** |
| **Total Long Term Liabilities** | - | - | - |
| **Total Liabilities** | **30,110** | **30,110** | **30,110** |
| | | | |
| **Equity (Deficit):** | | | |
| RE Meritor Opening Balance | (33,290) | (33,314) | (33,314) |
| RE Meritor Net Income Current Year | (24) | - | - |
| Retained Earnings Total | (33,314) | (33,314) | (33,314) |
| **Total Equity Attributable to Meritor** | **(33,314)** | **(33,314)** | **(33,314)** |
| FCTA | (1,214) | (1,214) | (1,214) |
| FCTA Cash Interco LT Debt | 4,417 | 4,417 | 4,417 |
| Accumulated Other Comp Income | 3,204 | 3,204 | 3,204 |
| **Total Equity** | **(30,110)** | **(30,110)** | **(30,110)** |
| **Total Liabilities and Equity** | **(0)** | **-** | **-** |

| | AVM, Inc. | AVM, Inc. | AVM, Inc. |
|---|---|---|---|
| **Balance Sheet** | | | |
| **(in thousands)** | | | |
| | **M12 FY16** | **M12 FY17** | **M12 FY18** |
| | USD | USD | USD |
| **ASSETS** | | | |
| Current Assets: | | | |
| **Total Current Assets** | - | - | - |
| Long-term Assets: | | | |
| **Total Long Term Assets** | - | - | - |
| **Total Assets** | - | - | - |
| | | | |
| **LIABILITIES AND EQUITY (DEFICIT)** | | | |
| Current Liabilities: | | | |
| Current Portion of LT Liabilities | - | - | - |
| Shortterm Debt | - | - | - |
| AP Trade | - | - | 14 |
| Accounts Payable | - | - | 14 |
| Environmental Remediation Reserve | 429 | 834 | 871 |
| Total Other Current Liabilities | 429 | 834 | 871 |
| Intercompany Cash Pool Domestic | - | 200 | 265 |
| Intercompany Cash Pool | **201** | **200** | **265** |
| **Total Current Liabilities** | **630** | **1,033** | **1,149** |
| **Total Long Term Liabilities** | - | - | - |
| **Total Liabilities** | **630** | **1,033** | **1,149** |
| | | | |
| **Equity (Deficit):** | | | |
| Retained Earnings Subs | (26,033) | (26,033) | (26,033) |
| Consolidating Eliminations Total | (26,033) | (26,033) | (26,033) |
| RE Meritor Opening Balance | 25,403 | 25,403 | 24,999 |
| RE Meritor Net Income Current Year | - | (404) | (116) |
| Retained Earnings Total | 25,403 | 24,999 | 24,883 |
| **Total Equity Attributable to Meritor** | **(630)** | **(1,033)** | **(1,149)** |
| **Total Equity** | **(630)** | **(1,033)** | **(1,149)** |
| **Total Liabilities and Equity** | **0** | **0** | **(0)** |

**Balance Sheet**
**(in thousands)**

| | Former Ride Control Operating Company | Former Ride Control Operating Company | Former Ride Control Operating Company |
|---|---|---|---|
| | **M12 FY16** | **M12 FY17** | **M12 FY18** |
| | USD | USD | USD |
| **ASSETS** | | | |
| Current Assets: | | | |
| Cash Commercial Bank | - | - | - |
| **Total Current Assets** | **-** | **-** | **-** |
| Long-term Assets: | | | |
| **Total Long Term Assets** | **-** | **-** | **-** |
| **Total Assets** | **-** | **-** | **-** |
| | | | |
| **LIABILITIES AND EQUITY (DEFICIT)** | | | |
| Current Liabilities: | | | |
| Environmental Remediation Reserve | 1,075 | 587 | 544 |
| Total Other Current Liabilities | 1,075 | 587 | 544 |
| Intercompany Cash Pool Domestic | 127,788 | 134,306 | 134,348 |
| Oracle Balancing (Troy Corporate) | 6,475 | - | - |
| Intercompany Cash Pool | **134,263** | **134,306** | **134,348** |
| **Total Current Liabilities** | **135,338** | **134,892** | **134,892** |
| Long-term Liabilities: | | | |
| **Total Long Term Liabilities** | **-** | **-** | **-** |
| **Total Liabilities** | **135,338** | **134,892** | **134,892** |
| | | | |
| **Equity (Deficit):** | | | |
| Investment Consolidated Subsidiary | (9) | (9) | (9) |
| Common Stock Subsidiaries | 1 | 1 | 1 |
| Additional Paid in Capital Subsidiaries | 28,307 | 28,307 | 28,307 |
| Consolidating Eliminations Total | 28,317 | 28,317 | 28,317 |
| Stkhldrs Equity Comm Stk One Dollar Par | (8,504) | (8,504) | (8,504) |
| Addl Capital Meritor Common Stock | (877) | (877) | (877) |
| Retained Earnings Total | (154,274) | (153,828) | (153,828) |
| **Total Equity Attributable to Meritor** | **(135,338)** | **(134,892)** | **(134,892)** |
| **Total Equity** | **(135,338)** | **(134,892)** | **(134,892)** |
| **Total Liabilities and Equity** | **0** | **(0)** | **(0)** |