**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 19-10118 (KJC) |
| MAREMONT CORPORATION, *et al.,*[1] | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) **Hearing Date: March 18, 2019 at 1:00 pm** |
| | ) **Objection Due: March 4, 2019 at 4:00 p.m.** |

**OBJECTION OF THE ACTING UNITED STATES TRUSTEE**
**TO THE DISCLOSURE STATEMENT AND JOINT PREPACKAGED**
**PLAN OF REORGANIZATION OF MAREMONT CORPORATION**
**AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF**
**THE BANKRUPTCY CODE (D.I. 10, 11)**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Maremont Corporation (6138); Maremont Exhaust Products, Inc. (9284); AVM, Inc. (9285); and Former Ride Control Operating Company, Inc. (f/k/a ArvinMeritor, Inc., a Delaware corporation) (9286) (collectively, the "Debtors"). The mailing address for each Debtor for purposes of these chapter 11 cases is 2135 West Maple Road, Troy, MI 48084.

Table of Contents

PRELIMINARY STATEMENT .............................................................................1

JURISDICTION...................................................................................................2

BACKGROUND ..................................................................................................3

A.    Procedural Posture of this Bankruptcy Case ......................................3

B.    The Section 524(g) Asbestos Injunction is Extraordinary .................5

C.    The *Garlock* Court Found a "Startling Pattern of Misrepresentation" by
       Trust Claimants..................................................................................6

D.    The Plan and TDP Are Consistent with Pre-*Garlock* Trusts, If Not Less
       Transparent ........................................................................................8


OBJECTIONS....................................................................................................10

A.    The Plan Cannot Be Confirmed Under 11 U.S.C. § 1129(A)(3)'s Good
       Faith Requirement Because the TDP Contains Numerous Provisions With
       No Legitimate Purpose That Will Facilitate Fraud and Abuse While It
       Lacks Safeguards to Prevent Fraud and Abuse ...............................10

          Claim Secrecy Provisions..........................................................12

          Limitations on Discovery ..........................................................14

          Claim refiling permitted regardless of statute of limitations......................16

          Discretionary vs. Mandatory Third-Party Audits......................................16

          Release of information................................................................17

          Attorney fee caps .......................................................................17

B.    Because the TDP Lacks Basic Safeguards Against Fraud and Abuse, the
       Plan Also Fails to Satisfy 11 U.S.C. § 524(G)(2)(B)(V) Because It Will
       Not Be Able to Pay Present and Future Claimants in the Same Manner ........18

C.    The Effective Date is Open Ended, and the Plan Risks Not Going
       Effective................................................................................................19

D.    The Exculpation Provision is Impermissibly Broad Under Applicable Law and Extends Exculpation to Non-Fiduciaries ................................................. 19

Andrew R. Vara, the Acting United States Trustee for Region 3 ("United States Trustee") objects ("Objection") to the Disclosure Statement and Joint Pre-Packaged Plan of Reorganization of Maremont Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan"). *See* D.I. 10, 11.[2]

## PRELIMINARY STATEMENT

1.    It is now more than five years since the landmark *Garlock Sealing Technologies* decision, which exposed what a bankruptcy court described as a "startling pattern of misrepresentation" in asbestos litigation by claimants to trusts established under section 524(g) of the Bankruptcy Code.  *In re Garlock Sealing Technologies, LLC*, 504 B.R. 71, 86 (Bankr. W.D.N.C. 2014).  Apart from the serious misconduct it identified in state court asbestos litigation, *Garlock* raised troubling questions about the integrity of the bankruptcy process itself. Much of the misconduct identified in *Garlock* was made possible by the plans confirmed in earlier asbestos bankruptcy cases, which contained few effective safeguards to prevent misconduct by claimants—and which instead contained overarching secrecy provisions that inhibit the detection or prevention of fraud.  *See* Lester Brickman, *Fraud and Abuse in Mesothelioma Litigation*, 88 Tul. L. Rev. 1071, 1104 (2014).  And as several studies since *Garlock* have demonstrated, this same lack of safeguards means that the trusts created as part of those cases are themselves at risk of being depleted through fraud or mismanagement.  *See id.* at 1126 (2014) (noting "numerous apparent anomalies" in a study of asbestos claims to one trust); U.S. Chamber Inst. for Legal Reform, *Insights & Inconsistencies: Lessons from the Garlock*

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Disclosure Statement and Plan.

*Trust Claims* (Feb. 2016) ("*Insights & Inconsistencies*") (discussing facially inconsistent representations made in a sample of trust claims unsealed as part of *Garlock* litigation).

2.      At a minimum, *Garlock* should have led to a fundamental reexamination of how asbestos bankruptcy cases are conducted and asbestos trusts are established.  But despite this, the Plan proposed in this case follows the same troubling template as the pre-*Garlock* cases that have led to widespread abuse.  And in those few instances where the Plan deviates from earlier templates, it does so by providing *less* transparency to the claims process and *less* accountability for the trust and its fiduciaries by making the claims process susceptible to manipulation.  The Plan even preemptively shields wrongdoers from the consequences of their actions by limiting discovery in future litigation between nondebtors—relief that is well outside the scope of a chapter 11 plan and that serves no purpose for the estate or for its legitimate creditors.

3.      Among other requirements, the Court may confirm a plan only if it "has been proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  A plan with provisions that facilitate abuse and misconduct is not one filed "in good faith"—particularly where those provisions are for the benefit of attorneys and other non-creditors, and the Court should not allow its powers to be used to further such abuse.  The Plan also may not be confirmed under section 524(g) unless it will pay present and future claims in the same manner—a requirement that, if not satisfied, will disproportionately harm future claimants due to the potential for unchecked fraud.  For these and other reasons, the Plan cannot be confirmed.

## **JURISDICTION**

4.      This Court has jurisdiction to hear and determine this Objection.

5.      Under 28 U.S.C. § 586, the United States Trustee is generally charged with monitoring the federal bankruptcy system.  *See United States Trustee v. Columbia Gas Sys., Inc.*

*(In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that United States

Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary

interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir.

1990) (describing the United States Trustee as a "watchdog").

6.       Under section 307 of title 11 of the United States Code (the "Bankruptcy Code"),

the United States Trustee has standing to be heard on the Plan and the issues raised in this

Objection.

## BACKGROUND

**A. Procedural Posture of this Bankruptcy Case**

7.       On January 22, 2019, (the "Petition Date"), the Debtors filed voluntary Chapter

11 petitions,[3] a Joint Pre-Packaged Plan of Reorganization of Maremont Corporation and its

Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan"), and a Disclosure

Statement for the Joint Pre-Packaged Plan of Reorganization of Maremont Corporation and its

Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Disclosure Statement").

*See* D.I. 10 and 11.[4]

8.       In addition, on January 22, 2019, the Debtors filed a Motion for Entry of an Order

(I) Scheduling Combined Hearing to Consider Approval of Disclosure Statement and

Confirmation of Prepackaged Plan, (II) Establishing the Plan and Disclosure Statement

Objection Deadline and Related Procedures, (III) Approving the Solicitation Procedures and

---

[3] *See* Case No. 19-10119-KJC at D.I. 1; Case No. 19-10120-KJC at D.I. 1 and Case No. 19-10121-KJC at D.I. 1.

[4] On February 15, 2019, the Debtors filed the Plan Supplement and a Redline of Exhibit I to the Plan Supplement (D.I. 65, 66).

Forms of Ballots, (IV) Approving the Form and Manner of Notice of the Combined Hearing, Objection Deadline, and Notice of Commencement, (V) Conditionally Directing that a Meeting of Creditors Not Be Convened, (VI) Conditionally Extending Deadline to File Schedules and Statements, and (VII) Granting Related Relief (the "Scheduling Order"). *See* D.I. 9.

9.     On January 23, 2019, the Court entered the Scheduling Order and set the date for confirmation of the Plan for March 18, 2019, with objections due on or before March 4, 2019. *See* D.I. 30.

10.     On February 4, 2019, the United States Trustee appointed an Official Committee of Asbestos Personal Injury Claimants (the "Committee"). *See* D.I. 48.

11.     Since the Petition Date, the Debtors have remained in possession of their property and management of their affairs.

12.     On January 31, 2019, the Debtors filed a motion seeking the appointment of James L. Patton as Legal Representative for Future Asbestos Claimants ("Mr. Patton") to represent the interests of future asbestos personal injury claimants in the Debtors' chapter 11 cases (the "Debtors' FCR Motion"). *See* D.I. 44.

13.     On February 14, 2019, the United States Trustee filed an objection to the Debtors' FCR Motion. *See* D.I. 63.

14.     On February 20, 2019, the United States Trustee filed a Motion to Appoint a Legal Representative for Future Asbestos Claimants (the U.S. Trustee's FCR Motion") along with a Motion to Shorten Hearing and Objection Deadline (the "Motion to Shorten"). *See* D.I. 68 and 69.

15.     The Debtor and the Committee filed objections to the Motion to Shorten on February 21, 2019. S*ee* D.I. 79 & 82.

4

16.     On February 21, 2019, the Court entered an order (i) denying the Motion to Shorten, (ii) setting March 1, 2019, at 4:00 p.m. as the deadline for parties to object or otherwise respond to the U.S. Trustee's FCR Motion, (iii) scheduling a hearing on March 8, 2019, to consider the Debtors' FCR Motion, U.S. Trustee's FCR Motion as well as the Applications to Retain and Employ Young Conaway Stargatt & Taylor, LLP as Counsel to the Future Claimants' Representative and the Application Retain and Employ Ankura Consulting Group, LLC as Claims Evaluation Consultants to the Future Claimants' Representative.[5]  *See* D.I. 92; s*ee also* D.I. 49 and 50.

## B. The Section 524(g) Asbestos Injunction is Extraordinary

17.     This is a "pre-packaged" chapter 11 case, the result of a prepetition negotiation between the Debtors and a consortium of law firms representing large numbers of asbestos personal injury plaintiffs.[6]  The centerpiece of the Plan will be an injunction under 11 U.S.C. § 524(g), a unique provision of the Bankruptcy Code that is available only to debtors who face substantial asbestos liabilities.

18.     A section 524(g) bankruptcy case differs from a traditional chapter 11 case in three major ways.  First, the section 524(g) injunction can be used to discharge not only the debtors themselves, but also non-debtor parties who share their asbestos liabilities—often including affiliates, predecessors and successors, and settling insurers.  Second, the injunction is not limited to claims that exist as of the bankruptcy, but it also extends to future "demands"—

_____

[5] By this Order, the Court also scheduled a telephonic status hearing for February 25, 2019, to consider any pre-hearing needs of the Parties in advance of the March 8, 2019, Hearing.  *See* D.I. 92

[6] Also participating in a portion of the prepetition negotiations was Mr. Patton, who was retained by the Debtors to purportedly represent the interests of future claimants.

including claims for injuries that may not manifest themselves until years or decades after the plan has been confirmed.  Third, both present and future asbestos claims are resolved and paid outside the bankruptcy court by a trust, which may often operate for several decades after the bankruptcy case has concluded.  The initial operating documents for the trust are approved as part of the bankruptcy plan, but the trust usually will operate thereafter without supervision by the bankruptcy court.

### C. The *Garlock* Court Found a "Startling Pattern of Misrepresentation" by Trust Claimants

19.    Asbestos trusts created under section 524(g) have increasingly been criticized for their lack of transparency.  *See* Dixon, McGovern, and Coombe, *Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts,* RAND Institute for Civil Justice, 2010 at xvi-xvii (discussing lack of publicly available data on asbestos trust payments).  Unlike lawsuits in the tort system, claims against asbestos trusts are not filed publicly.  And unlike debtors in bankruptcy, asbestos trusts do not maintain public claims registers or disclose the recipients and amounts of their distributions.  In addition, trusts are often prohibited from sharing information with each other, even when they face claims from the same individuals.  For these reasons, it is often impossible to determine whether a claimant has sought compensation from or been paid by multiple trusts and whether the allegations and work histories the claimant has submitted to different trusts are consistent.  *See id.* at xvii (noting that "perhaps the most significant limitation of the publicly available data is the inability to link payments across trusts to the same individual").

20.    Although the *potential* for fraud caused by this lack of transparency is apparent, the *actual* incidence of fraud was a matter of debate—until *Garlock*.  *Garlock* was unusual

6

because the debtor (a previously minor asbestos defendant) disputed the amount of its true asbestos liability, arguing that many of the judgments and settlements it had paid before the bankruptcy were tainted by fraud.  *Garlock,* 504 B.R. at 73.  To prove its case, Garlock sought discovery of claims records from various section 524(g) trusts—a request that was vigorously resisted over a period of several years by nearly all established asbestos trusts and their fiduciaries.  When Garlock eventually obtained limited discovery of the trust submissions by a sample of plaintiffs, the results were "startling."  In every single case studied, plaintiffs were found to have concealed or misrepresented their trust claims, resulting in inflated judgments and settlements.  *See id.* at 84.

21.    *Garlock* involved an investigation of misrepresentations and improprieties by trust claimants against a defendant in the tort system—and not misrepresentations and improprieties against the post-bankruptcy trusts themselves.  But it is significant that in many of those cases, the misconduct against Garlock was made possible by the trusts' lack of transparency.  The claimants and attorneys who submitted inaccurate discovery responses and who falsely denied the existence of their trust claims in state court presumably did so because they knew that Garlock had no ability to verify easily the truth of their responses.  And they did not need to worry about submitting contradictory work histories to different defendants because the work histories submitted as part of their trust claims would remain confidential.

22.    There is no reason to believe that trust claims are immune to the same deceit and misrepresentation that *Garlock* found in the tort system—and there is a growing body of evidence that the problem of fraud in the trust system is just as prevalent, if not more so.  Thus, in *Kananian v. Lorillard Tobacco Company*, No. CV-442750, 2007 WL 4913164 (Ohio Ct. Comm. Pl. Cuyahoga Cty., Jan. 18, 2007), discovery of a claimant's asbestos trust claims—

which discovery, as in *Garlock*, was resisted by the trusts—revealed not only that the claimant's attorney had falsely denied the existence of the trust claims in order to secure a greater recovery from a tobacco defendant, but also that many of the trust claims themselves were based on contradictory and essentially fictional work histories. *Id.* Even the plaintiff's attorneys themselves privately characterized the work histories as a "fabrication by lawyers." *Id.* Similar results were found in the only in-depth analysis conducted to date of the trust claims unsealed in *Garlock.* Among other findings, that study found that 21% of the claims studied contained major factual inconsistencies (such as job histories which allege that the claimant was simultaneously employed in different professions and in different parts of the country) or facially implausible allegations (such as alleging secondary exposure from a spouse at a time when the claimant was eight years old). *See Insights & Inconsistencies* at 9-10.

### D. The Plan and TDP Are Consistent with Pre-*Garlock* Trusts, If Not Less Transparent

23.    The Debtors filed the Plan and Disclosure Statement with their petitions on January 22, 2019. *See* D.I. 10, 11. The Plan is generally typical of those filed in asbestos-related chapter 11 cases. It provides that the Debtors will receive a section 524(g) injunction and that all present and future asbestos claims will be channeled to a trust (the "Trust") for processing and payment. The operative documents for the Trust are in exhibits to the Plan: (i) the Asbestos Personal Injury Trust Agreement (Exhibit C to the Plan) provides that the Trust will be managed by a trustee appointed and overseen by a Trust Advisory Committee ("TAC"), consisting of representatives of some of the same law firms with whom the Debtors negotiated the Plan pre-petition; and (ii) the Asbestos Personal Injury Trust Distribution Procedures (Exhibit D) ("TDP") set forth the specific procedures that the Trust will employ when processing, reviewing, and

paying claims, including the evidence that each claimant must submit and the formulas that will

determine the actual payment to be made to each claimant.

24.     In most respects, the TDP contains procedures identical to those adopted in most

pre-*Garlock* section 524(g) cases, although they differ significantly from the procedures adopted

in *Garlock* itself.[7]  *Garlock*'s insights were a "game changer," and as a result of the findings of

misrepresentations, the trust procedures adopted there differed markedly from earlier TDPs in an

effort to deter fraud and abuse in the operations of *Garlock*'s asbestos trust.  Among other things,

the TDP here resembles earlier, pre-*Garlock* models in that it: (i) declares claim submissions to

be confidential in their entirety and asserts that all claims materials are subject to a "settlement

privilege," *see* TDP § 6.5; (ii) affirmatively obligates the Trust to resist discovery requests and

requires the Trust to obey subpoenas only from certain specified courts, *id.* § 6.5; (iii) prohibits

the Trust from denying a claim even if the claimant had previously denied or misrepresented his

exposure to the Debtors' products, *id.* § 5.7(b)(3); and (iv) allows claimants to strategically

withdraw and refile claims even if the refiling would otherwise have been barred by the statute of

limitations, *id.* § 6.3.[8]  In addition, although the TDP requires claimants to provide evidence that

they were exposed to the Debtors' products, the Trust is precluded from considering evidence

---

[7] In order to illustrate the similarities between the TDP in this case and earlier, pre-*Garlock* templates, attached as Exhibit A is a comparison between selected provisions of the TDP here and the original TDP approved in *In re Pittsburgh Corning, Inc.*, Case No. 00-22876-TPA (Bankr. W.D. Pa.) (Third Amended Plan of Reorganization, dated January 29, 2009), attached as Exhibit B.  Pittsburgh Corning was one of the last major asbestos bankruptcy cases confirmed prior to the *Garlock* decision.  Exhibit A also includes selected provisions from the TDP approved in *Garlock* itself, attached as Exhibit C, which contained several important innovations relative to past models.

[8] Allowing the strategic withdrawal and re-filing of claims permits claimants to make inconsistent statements in different proceedings to increase recoveries against other defendants and shelters claimants from the consequences of their misconduct.  It is an invitation to fraud.

that the claimant's injuries may have been caused by a different defendant.  *Id.* § 5.7(b)(3); §

5.7(a)(2).  Although the Trust is authorized to audit itself, audits by independent third-parties are

discretionary.  *Id.* § 5.8.  The TDP also contains no limitations on the amount of attorney fees

that may be charged against a payment to claimants, even when the payment is uncontested.

## OBJECTIONS

**A.  The Plan Cannot Be Confirmed Under 11 U.S.C. § 1129(A)(3)'s Good Faith Requirement Because the TDP Contains Numerous Provisions With No Legitimate Purpose That Will Facilitate Fraud and Abuse While It Lacks Safeguards to Prevent Fraud and Abuse[9]**

25.      Under section 1129 of the Bankruptcy Code, a plan may be confirmed only if the

Court finds that it "has been proposed in good faith and not by any means forbidden by law."  11

U.S.C. § 1129(a)(3).  In making this determination, the Court's role is "not merely . . .

ministerial," but rather involves close "scrutiny of the circumstances" surrounding a plan.

*American United Mut. Life Ins. Co. v. City of Avon Park*, 311 U.S. 138, 146 (1940); *accord In re*

*Sylmar Plaza, L.P.*, 314 F.3d 1070, 1074 (9th Cir. 2002) (explaining that the court's section

---

[9] This Objection is also an objection to the adequacy of the Disclosure Statement (D.I. 11) because the Disclosure Statement fails to provide creditors with adequate information—especially by not disclosing or explaining the Plan's lack of safeguards against fraud and abuse and by not explaining or justifying the TDP's multiple provisions that appear to have no purpose other than to facilitate the misrepresentations and abuse discussed in *Garlock*. The "adequate information" requirement is designed to help creditors in their negotiations with Debtors over the plan. *See Century Glove, Inc. v. First Am. Bank,* 860 F.2d 94 (3d Cir. 1988). Section 1129(a)(2) conditions confirmation upon compliance with applicable Code provisions.  The disclosure requirement of section 1125 is one of those provisions.  *See* 11 U.S.C. 1129(a)(2); *In re PWS Holding Corp.,* 228 F.3d 224, 248 (3d Cir. 2000).  Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan.  11 U.S.C. § 1125; *see also In re Quigley Co.,* 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).  If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied.  *Id.* (citing *In re Beyond.com Corp.,* 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (collecting cases); *In re 266 Washington Assocs.,* 141 B.R. 275, 288 (Bankr. E.D.N.Y.) *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992).

1129(a)(3) determination "is based on the totality of the circumstances"). Relevant facts include

any potential impropriety of which the court is aware, no matter whether it appears on the face of

the plan. *See, e.g., In re Mann Farms, Inc.*, 917 F.2d 1210, 1215 (9th Cir. 1990) (considering

and rejecting claim that a plan violated section 1129(a)(3) because "the bankruptcy court action

is a ploy" to prolong a state tort suit).

26.    In particular, a bankruptcy court should refuse to confirm a plan under section

1129(a)(3) if it concludes that the plan is intended to facilitate improper conduct, including

litigation abuse in other proceedings. *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 158 (3d

Cir. 2012) (plan which created resolution procedure for asbestos claims under which debtor

would be "financially incentivized to sabotage its own defense" could not be confirmed, due to

inherent conflict of interest it created); *see also In re Paige*, 685 F.3d 1160, 1179 (10th Cir.

2012) (considering a debtor's "actions or relationships" and declining to "rule out the possibility

that a plan could be unconfirmable under § 1129(a)(3) because of the proponent's conflicts of

interest or improper conduct"); *In re Coastal Cable TV, Inc.*, 709 F.2d 762, 764-65 (1st Cir.

1983) (Breyer, J.) (concluding that the bankruptcy court had failed to sufficiently investigate

allegations of fraud "closely enough related" to the case to merit scrutiny and thus vacating the

court's order).

27.    For the same reasons, the Court should refuse to confirm a plan that seeks relief

unrelated to any "result consistent with the objectives and purposes of the Bankruptcy Code." *In

re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004), as amended (Feb. 23, 2005).

28.    The Court may also deny confirmation under section 1129(a)(3) if the plan

contains terms designed to further the interests of non-parties—including attorneys—with no

corresponding economic justification for the debtor, its creditors, or the estate. *See, e.g., In re*

11

*Davis Heritage GP Holdings, LLC*, 443 B.R. 448, 461 (Bankr. N.D. Fla. 2011) (plan proposed

for "sole and exclusive benefit" of debtors' insiders did not satisfy good faith test); *In re Bush*

*Indus., Inc.*, 315 B.R. 292, 307 (Bankr. W.D.N.Y. 2004) (denying confirmation of plan that

included terms for benefit of departing senior management for which there was no economic

justification for the estate).

29.     In this case, the Court should determine that the Plan lacks good faith because the

TDP contains multiple provisions that appear to have no purpose other than to facilitate fraud

and abuse—including fraud against the Trust itself—and that serve no valid purpose for the

Debtors or for honest creditors.  These provisions are all the more indefensible because they are

the very same TDP provisions that have been shown to enable abuse by the dishonest claimants

discussed in *Garlock*.  And in those few instances where the TDP has deviated from earlier

templates, it has done so by making the TDP provisions even *less* transparent and even *more*

susceptible to abuse.

Claim Secrecy Provisions

30.     Section 6.5 of the TDP provides that:

> All submissions to the Asbestos Trust by a holder of an Asbestos Claim, including a
> proof of claim form and materials related thereto, shall be treated as made in the course
> of settlement discussions between the holder and the Asbestos Trust, and intended by the
> parties to be confidential and to be protected by all applicable state and federal privileges
> and protections, including but not limited to those directly applicable to settlement
> discussions. The Asbestos Trust will preserve the confidentiality of such  claimant
> submissions, and shall disclose the contents thereof only, with the permission of the
> holder, to another trust established for the benefit of asbestos personal injury claimants
> pursuant to section 524(g) of the Bankruptcy Code or other applicable law, to such other
> persons as authorized by the holder, or in response to a valid subpoena of such materials
> issued by the Bankruptcy Court, a Delaware State Court, or the United States District
> Court for the District of Delaware. Furthermore, the Asbestos Trust shall provide counsel
> for the holder a copy of any such subpoena immediately upon being served; provided,

12

however, that if a subpoena seeks records or information pertaining to more than fifty (50) claimants, the Asbestos Trust may instead first provide a copy of the subpoena to counsel for the TAC and the FCR and delay providing a copy of the subpoena to counsel for individual holders of Asbestos Claims until, in the Trustee's judgment, it appears likely that information or records relating to the holders may have to be produced in response to the subpoena. In such a case, the Asbestos Trust shall ensure that the notice that is provided to counsel for the holders allows such counsel sufficient time to object to the production. The Asbestos Trust shall on its own initiative or upon request of the claimant in question take all necessary and appropriate steps to preserve said privileges before the Bankruptcy Court, a Delaware State Court, or the United States District Court for the District of Delaware and before those courts having appellate jurisdiction related thereto. . . .

TDP § 6.5.

31.     The foregoing claim secrecy provisions are substantially identical to those in most pre-*Garlock* TDPs, and their effect is to prevent the Trust from disclosing any facts whatsoever about the particular claims it has received or paid, including disclosure to other asbestos trusts. There does not appear to be any legitimate basis for such far-reaching confidentiality protections. Although there is little question that personally identifiable information and medical information may be appropriately protected, the claim secrecy provisions of the TDP go well beyond this by preventing disclosure of non-sensitive information as well—including the very existence of the trust claim.  This allows trust claimants to file claims in complete anonymity, something that would not be possible outside the trust system.

32.     By contrast, the assertion of a personal injury claim in the civil tort system is a public act, and claims filed with a judicially established trust pursuant to 11 U.S.C. § 524(g) should be a matter of public record.  The ability to file claims in secret also stands in contrast to the obligations of creditors in other chapter 11 cases, in which claims become part of the public claims register.  *See, e.g., Maine, Montreal, & Atlantic Rwy.*, No. 13-10670 (Bankr. D. Me.) (public claims register with mass tort victims); *New England Compounding Pharmacy, Inc.*, No.

12-19882 (Bankr. D. Mass.) (public claims register with mass tort victims).  Like any filing with

a bankruptcy court, proof of claim submissions may be sealed only if such relief is specifically

granted by the court by a legally supported motion under 11 U.S.C. § 107.

33.    The Maremont TDP contains the same standard provisions that enabled the

misconduct and gamesmanship identified in *Garlock*.  Moreover, because asbestos trusts are not

even permitted to share claims information with each other and because the TDP does not

require trust claimants to execute a release authorizing disclosures from other trusts, these

provisions will deprive the Trust of a valuable tool to prevent fraud against itself and to perform

meaningful audits of claims.  These secrecy provisions facilitate the filing of fraudulent or

unmeritorious claims, which can lead to depletion of trust assets and reduced recoveries for

future claimants and legitimately sick current claimants.  Because *Garlock* makes clear what the

consequences of these excessive secrecy provisions will be, it can only be presumed that those

consequences are intentional.

<u>Limitations on Discovery</u>

34.    Section 6.5 of the TDP also appears designed to impede future discovery of Trust

claims, even in cases to which the Trust is not a party.  In particular, it purports to subject all

Trust claims to a "settlement privilege," provides that the Trust will only be required to obey

subpoenas from certain specified courts, and apparently obligates the Trust to contest discovery

in all instances, regardless of the merits.  *Id.*  Notably, the list of actions that the Trust is

obligated to take in order to facilitate objections to discovery appears to be significantly longer

than in prior TDPs.  *See* Ex. A.

35.    Like the claim secrecy provisions generally, these provisions appear designed to

forestall discovery of claimants in other proceedings who may have alleged facts inconsistent

14

with their claims against the Trust.  But it is unclear why the Trust would have any interest in the

outcome of such litigation.  It is even less clear why this Court, through the TDP, should dictate

the results of discovery disputes in future proceedings before other courts, rather than leaving

questions of privilege and discovery to the courts before whom those disputes actually arise.

Finally, there can be no legitimate purpose to a TDP provision that seemingly requires the Trust

to resist discovery in every instance—even where doing so would be legally unsound, futile, or

wasteful, all of which are detrimental to deserving claimants, present and future.

<u>Allowance of claims notwithstanding denial of exposure</u>

36.     With respect to the particular form of misrepresentation discussed in *Garlock*—

where claimants file trust claims after denying exposure to that company's products in another

litigation—the TDP expressly provides that such claimants may *not* be penalized by the Trust:

> [F]ailure to identify Debtor Product Lines in the claimant's underlying tort
> action, or to other bankruptcy trusts, does not preclude the claimant from
> recovering from the Asbestos Trust, provided the claimant otherwise satisfies
> the medical and exposure requirements of this TDP.

TDP § 5.7(b)(3).

37.     The significance of this provision is that it appears to prevent the Trust from

asserting an affirmative defense based on estoppel against a claimant who has engaged in

dishonest or deceptive conduct in other proceedings.  This provision does not appear to have

been included in the *Pittsburgh Corning* TDP.  *See* Exhibit B.

38.     Likewise, the final paragraph of 5.7(a)(2) states that:

> In addition, claimants who otherwise meet the requirements of this TDP for
> payment of an Asbestos Claim shall be paid irrespective of the results in any
> litigation at any time between the claimant and any other defendant in the tort
> system.  However, any relevant evidence submitted in a proceeding in the tort
> system, other than any findings of fact, a verdict, or a judgment, involving

another defendant may be introduced by either the claimant or the Asbestos
Trust in any Arbitration proceeding conducted pursuant to 5.9.

39.    This provision seemingly prevents the Trust from raising any kind of a defense against the claimant based on a claim/issue preclusion theory and suffers from the same "failure to identify" infirmities discussed in paragraph 36, *supra*.

### Claim refiling permitted regardless of statute of limitations

40.    Under the TDP, "[a] claimant can withdraw an Asbestos Claim at any time upon written notice to the Asbestos Trust and file another claim subsequently without affecting the status of the claim for statute of limitations purposes, . . ." TDP § 6.3.  There does not appear to be any valid purpose for this provision, which could be exploited by a dishonest attorney, who could strategically withdraw and refile a Trust claim to avoid disclosing the existence of that claim in discovery in non-Trust proceedings.  As with the previous example, this provision may abandon an otherwise meritorious affirmative defense for the Trust.

41.    In addition to containing numerous provisions that affirmatively enable abuse, the TDP is also deficient because it lacks other basic safeguards, some of which have appeared in other TDPs, which could discourage fraud at little additional burden to the Trust or to its claimants.  These include mandatory audits, release of other claim information, and attorney fee caps.

### Discretionary vs. Mandatory Third-Party Audits

42.    Although the Trust is authorized to conduct audits, *see* TDP § 5.8, those audits are subject to certain important limitations.  First, there is no requirement that the audits be performed by an independent auditor—which is a particular concern where, as here, the attorneys for the claimants being audited may also be involved in the management or supervision

of the Trust.  Additionally, the audits themselves appear limited to testing the "reliability of evidence" and not the accuracy or consistency of the claimants' factual allegations.

## Release of information

43.     For certain claims, the *Garlock* TDP required that the claimant execute a release authorizing the trust to receive copies of any submissions that claimant had made to other asbestos trusts.  *See* Garlock TDP § 6.8(c).  Such releases would be an important disincentive to fraud with little burden to the Trust or claimants, and they would presumably be essential for any effective audit of claims.  There is no justification for the failure to include a similar provision in the Debtors' TDP.

44.     The failure to include such a provision is especially questionable given that the TDP authorizes enhanced payment for "extraordinary claimants," who are defined as claimants who allege that their injuries were predominantly caused by Maremont-related products, and who do not have a prospect of recovery from other defendants.  *See* TDP § 5.4(a).  For such claimants, the existence and content of other trust claims is of immediate relevance for confirming or refuting the claimant's allegations.  Despite this, nothing in the TDP affirmatively requires a purported extraordinary claimant to disclose other trust or tort claims, and the absence of a release requirement may mean that the trust will have no means obtaining that information or of verifying the claimant's representations absent costly and time-consuming discovery.

## Attorney fee caps

45.     Under the TDP, most claims will not be paid through traditional litigation, but through an expedited process that provides fixed payments to qualifying claimants meeting specified criteria.  *See* TDP § 5.3(a)(2).  Despite the fact that such procedures require very little effort by the claimant's attorney, the TDP appears to allow the attorney to charge the same

17

percentage fee against the recovery as would have been charged if the claim had been resolved through traditional litigation.  Unlike the procedures in certain other asbestos trusts, the TDP does not cap or limit the amount of the attorney fee that can be charged in the event of an uncontested claim.

## B. Because the TDP Lacks Basic Safeguards Against Fraud and Abuse, the Plan Also Fails to Satisfy 11 U.S.C. § 524(G)(2)(B)(V) Because It Will Not Be Able to Pay Present and Future Claimants in the Same Manner

46.     Among other requirements, a plan containing a section 524(g) injunction may not be confirmed unless it provides "reasonable assurance that the trust . . . will be in a financial position to pay . . . present claims and future demands that involve similar claims in substantially the same manner."  11 U.S.C. § 524(g)(2)(B)(V).

47.     A fundamental difference between present claimants and future claimants is that they face different levels of risk that the Trust will be depleted through fraud.  Because the TDP does not provide any mechanism for clawback of payments if initial payments are too high, first-in-line claimants face little risk that their payments will be affected as a result of fraud by other claimants (provided, of course, that they can be paid before the Trust is depleted).  Future claimants, on the other hand, are the parties most affected by depleted trusts and shrinking trust payouts—as has indeed already occurred for many of the trusts that followed the pre-*Garlock* model.  *See* S. Todd Brown, *How Long is Forever This Time?  The Broken Promise of Bankruptcy Trusts*, 61 BUFF. L. REV. 537, 538-39 (2013) ("[t]he bankruptcy trust system is long past the point where participants can look at the rapid depletion of newly established trusts as unanticipated and unintended consequences of generous compensation criteria. . . . If we can be reasonably assured of anything, it is that a trust that employs the same criteria and follows the same practices as its predecessors is extremely unlikely to "value, and be in a financial position

to pay, present claims and future demands that involve similar claims in substantially the same manner" as required by section 524(g)"); Peter Kelso and Marc Scarcella, *Dubious Distribution: Asbestos Bankruptcy Trust Assets and Compensation,* U.S. Chamber of Commerce, March 2018, at 9 (describing average 46% decrease in claim value due to trust depletion over a decade).  For this reason, the failure to protect future claimants against fraudulent claims means that the Plan does not satisfy the requirements of section 524(g).

**C. The Effective Date is Open Ended, and the Plan Risks Not Going Effective**

48.     Pursuant to the Section 1.01(54) of the Plan, the Debtors provide that the date the Plan would be effective is the Business Day "selected by the Debtors as of which all conditions precedent to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX hereof."  *See* Plan at p. 6.

49.     Based on this definition, the Effective Date could be any date selected by the Plan Proponents at any time on or after certain conditions are achieved.  The Effective Date should either be a date certain or the date by which certain conditions are achieved.  The Effective Date should not be as open-ended as the Debtors seek here.

**D. The Exculpation Provision is Impermissibly Broad Under Applicable Law and Extends Exculpation to Non-Fiduciaries**

50.     As stated by the Court in *In re Washington Mutual, Inc*., 442 B.R. 314 (Bankr. D. Del. 2011) (Walrath, J.), an "exculpation clause must be limited to the *fiduciaries who have served during the chapter 11 proceeding*: estate professionals, the Committees and their

19

members, and the Debtors' directors and officers."   *Id.* at 350-51 (emphasis added).[10]  This

Court in *In re Tribune Company*, 464 B.R. 126 (Bankr. D. Del. 2011)(Carey, J.), agreed with the

holding in *Washington Mutual* relating to exculpated parties and held that the exculpation clause

in Tribune "must exclude non-fiduciaries."   *Id*. at 189 (quoting *Washington Mutual*, 422 B.R. at

350 -51); *accord In re Indianapolis Downs*, *LLC*, 486 B.R. 286 (Bankr. D. Del. 2013).

51.    In *In re PTC Holdings, LLC,* 55 Bankr. Ct. Dec 206, 2011 Bankr. LEXIS 4436,

*38 (Bankr. D. Del. Nov. 10, 2011) (Shannon, J.), the Court sustained the United States

Trustee's objection to the exculpation clause, stating that such clause "must be reeled into

include only those parties who have acted as estate fiduciaries and their professionals." *Id.* at *

38.  In reaching this conclusion, the Court reviewed the *Washington Mutual* decision, as well as

the decision of the Third Circuit Court of Appeals in  *In re PWS Holding Corp*., 228 F.3d 224,

246 (3d Cir. 2000), on which *Washington Mutual* relied.  The issue in *PWS* was whether an

official committee of unsecured creditors could receive exculpation.  As described by this Court

in *PTC Holdings*:

> In reaching its conclusion, the PWS court examined § 1103(c) and
> noted that the section "has been interpreted to imply both a
> fiduciary duty to committee constituents and a limited grant of
> immunity to committee members."  "This immunity," the court
> found, "covers committee members for actions within the scope of
> their duties."  The PWS court's reasoning thus implies that a party's

---

[10] Article I Section 65 of the Plan defines "Exculpated Fiduciaries" to mean each of: (a) the
Debtors; (b) the Reorganized Debtors; (c) the Asbestos Claimants Committee; (d) the Future
Claimants' Representative; and (e) to the fullest extent permitted by applicable law, with respect
to each of the foregoing Entities in clauses (a) through (d), each such Entity's Representatives, in
each case solely in its capacity as such. Article I Section 66 of the Plan defines "Exculpated
Parties" to means, collectively, the Exculpated Fiduciaries and the Section 1125(e) Parties.
Finally, Article I Section 147 of the Plan defines "Section 1125(e) Parties" to mean the Non-
Debtor Affiliates and each of the Exculpated Fiduciaries' and Non-Debtor Affiliates'
Representatives, in each case solely in its capacity as such.

> exculpation is based upon its role or status as a fiduciary.  That is
> why, as the Washington Mutual court pointed out, courts have
> permitted exculpation clauses insofar as they "merely state[] the
> standard to which ... estate fiduciaries [a]re held in a chapter 11
> case."   That fiduciary standard, however, applies only to estate
> fiduciaries, "no one else."

*PTC Holdings* at *37-38 (citations omitted).

52.     The exculpation clause in the Plan covers both pre-petition and post-confirmation

should not be impermissibly broad and it should be limited to actions taking place during the

bankruptcy case and not pre-petition or post-confirmation activity.[11]  *See Washington Mutual*,

442 B.R. at 350 (exculpations cover "actions in the bankruptcy case")(citing *PWS*, 228 F.3d at

246).

53.     In summary, the exculpation provision in the Plan should benefit only fiduciaries

of the Debtors' estates and should be limited to acts and omissions during the course of the

bankruptcy cases, and in addition, the exculpation clause should not include a "reliance upon

counsel" provision.

---

[11] Article VIII D. entitled "Exculpation" states that:

None of the Exculpated Fiduciaries and, solely to the extent provided by section 1125(e) of the
Bankruptcy Code, none of the Section 1125(e) Parties shall have or incur any liability to any
Entity for any act or omission in connection with, related to, or arising out of: (1) the Chapter 11
Cases; (2) negotiation, formulation and preparation of the Plan and the other Plan Documents,
and any of the terms and/or settlements and compromises reflected in the Plan and the other Plan
Documents; (3) solicitation of votes in favor of the Plan and pursuit of confirmation of the Plan;
(4) consummation of the Plan, or administration of the Plan or the property to be distributed
under the Plan or the Asbestos Personal Injury Trust Distribution Procedures; (5) the releases and
injunctions contained in the Plan; or (6) the management or operation of any Debtor, except for
any liability that results primarily from such Entity's willful misconduct or gross negligence as
determined by a Final Order, and, in all respects, the Debtors, the Reorganized Debtors, and each
of the other Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to
their duties and responsibilities in and under the Chapter 11 Cases, the Plan and the Plan
Documents. Without limiting the generality of the foregoing, the exculpated Parties shall be
entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.

WHEREFORE, the United States Trustee requests that this Court issue an order denying confirmation of the Plan and grant such other relief as this Court deems fair, just and appropriate.

Respectfully submitted,

**ANDREW R. VARA**
**ACTING UNITED STATES TRUSTEE**
**REGION 3**

By:      */s/Richard L. Schepacarter*
         Richard L. Schepacarter
         Trial Attorney
         United States Department of Justice
         Office of the United States Trustee
         844 N. King Street, Room 2207
         Lockbox 35
         Wilmington, DE 19801
         (302) 573-6491
         (302) 573-6497 (fax)
         Richard.Schepacarter@usdoj.gov

Dated:  March 4, 2019