**Exhibit A**

**Plan**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MAREMONT CORPORATION, et al.,[1] | Case No. 19-10118 (KJC) |
| Debtors. | (Jointly Administered) |

## MODIFIED JOINT PREPACKAGED PLAN OF REORGANIZATION OF MAREMONT CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**SIDLEY AUSTIN LLP**
James F. Conlan
Andrew F. O'Neill
Allison Ross Stromberg
Blair M. Warner
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Co-Counsel to the Debtors*

**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

*Co-Counsel to the Debtors*

**Dated: May 14, 2019**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal taxpayer identification number, are: Maremont Corporation (6138); Maremont Exhaust Products, Inc. (9284); AVM, Inc. (9285); and Former Ride Control Operating Company, Inc. (f/k/a ArvinMeritor, Inc., a Delaware corporation) (9286).  The mailing address for each Debtor for purposes of these chapter 11 cases is 2135 West Maple Road, Troy, MI 48084.

ACTIVE 242328210

**TABLE OF CONTENTS**

**Page**

ARTICLE I. DEFINITIONS AND RULES OF INTERPRETATION ........................................................1

    A.    Definitions ........................................................................................1
    B.    Rules of Interpretation ................................................................16
    C.    Computation of Time....................................................................16
    D.    Reference to Monetary Figures....................................................16

ARTICLE II. ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS, AND
            PRIORITY TAX CLAIMS.................................................................16

    A.    Administrative Expense Claims Other Than Professional Fee Claims...................16
    B.    Professional Fee Claims................................................................17
    C.    Priority Tax Claims.......................................................................18

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS....................18

    A.    Classification of Claims and Interests.........................................18
    B.    Summary of Classification...........................................................18
    C.    Treatment of Claims and Interests ..............................................18
    D.    Special Provision Governing Claims ...........................................21
    E.    Elimination of Vacant Classes .....................................................21
    F.    Acceptance or Rejection of the Plan.............................................21

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN..................................................22

    A.    Settlement of Claims and Interests ..............................................22
    B.    Plan Contributions .......................................................................22
    C.    Restructuring................................................................................23
    D.    Insurance Agreements...................................................................23
    E.    Asbestos Personal Injury Trust ....................................................24
    F.    Environmental Claims ..................................................................26
    G.    Payment of Other Claims.............................................................27
    H.    Timing of Effective Date Transactions.........................................27
    I.    The Reorganized Debtors' Corporate Existence...........................28
    J.    Asbestos Creditors Committee and Future Claimants' Representative
         Professional Fees ........................................................................28
    K.    Effectuating Documents; Further Transactions............................28
    L.    Reorganized Maremont's Bylaws and Reorganized Maremont's Certificate
         of Incorporation .........................................................................29
    M.    Director and Officer of the Reorganized Debtors.........................29
    N.    Corporate Action .........................................................................29
    O.    Exemption from Certain Taxes and Fees......................................29
    P.    Preservation of Causes of Action.................................................29

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............30

    A.    General Treatment ........................................................................30
    B.    Cure of Defaults...........................................................................30
    C.    Rejection Damages Claims ...........................................................30

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ........................................................31

    A.    Distributions Generally.................................................................31

**TABLE OF CONTENTS**
(Continued)

| | | |
|---|---|---|
| B. | Record Date for Holders of Claims | 31 |
| C. | Timing of Distributions | 31 |
| D. | Postpetition Interest on Claims | 31 |
| E. | Delivery of Distributions | 31 |

ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS OTHER THAN ASBESTOS PERSONAL INJURY CLAIMS AND PROFESSIONAL FEE CLAIMS............................32

| | | |
|---|---|---|
| A. | Objection to and Estimation of Claims Other than Asbestos Personal Injury Claims and Professional Fee Claims | 32 |
| B. | Payments and Distributions with Respect to Disputed Claims | 33 |
| C. | Resolution of Asbestos Personal Injury Claims | 33 |
| D. | Resolution of Professional Fee Claims | 33 |

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...............................33

| | | |
|---|---|---|
| A. | Discharge of Debtors and Reorganized Debtors | 33 |
| B. | Maremont Discharge Injunction | 33 |
| C. | Asbestos Personal Injury Channeling Injunction | 34 |
| D. | Exculpation and Section 1125(e) Protection | 35 |
| E. | Releases by Debtors and Estate and Related Injunction | 35 |
| F. | Release by Holders of Claims and Interests | 36 |
| G. | Certain Waivers | 37 |
| H. | Disallowed Claims | 37 |
| I. | Indemnification Obligations | 37 |

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN............................38

| | | |
|---|---|---|
| A. | Conditions Precedent to the Confirmation of the Plan | 38 |
| B. | Conditions Precedent to the Effective Date | 41 |
| C. | Waiver of Conditions | 42 |
| D. | Failure to Achieve the Effective Date | 42 |

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .......................43

| | | |
|---|---|---|
| A. | Modification and Amendments | 43 |
| B. | Effect of Confirmation on Modifications | 43 |
| C. | Revocation or Withdrawal of Plan | 43 |

ARTICLE XI. RETENTION OF JURISDICTION ..........................43

| | | |
|---|---|---|
| A. | Retention of Jurisdiction | 43 |
| B. | Post-Confirmation Modification of Plan | 46 |
| C. | Consent to Jurisdiction | 46 |

ARTICLE XII. MISCELLANEOUS PROVISIONS ..........................46

| | | |
|---|---|---|
| A. | Immediate Binding Effect | 46 |
| B. | Additional Documents | 46 |
| C. | FFIC Settlement Agreement | 47 |
| D. | Payment of Statutory Fees | 47 |
| E. | Tax Reporting and Compliance | 47 |
| F. | Reservation of Rights | 47 |
| G. | Successors and Assigns | 47 |

**TABLE OF CONTENTS**
(Continued)

| | | |
|---|---|---|
| H. | Notices | 47 |
| I. | Entire Agreement | 49 |
| J. | Governing Law | 49 |
| K. | Exhibits | 49 |
| L. | Nonseverability of Plan Provisions | 49 |
| M. | Closing of Chapter 11 Cases | 50 |
| N. | Conflicts | 50 |
| O. | Further Assurances | 50 |

**EXHIBITS**

Exhibit A        Asbestos Claims Indemnification Agreement
Exhibit B        Asbestos Personal Injury Claimant Release
Exhibit C        Asbestos Personal Injury Trust Agreement
Exhibit D        Asbestos Personal Injury Trust Distribution Procedures
Exhibit E        Asbestos Records Cooperation Agreement
Exhibit F        List of Debtor Product Lines
Exhibit G        Environmental Assumption and Indemnification Agreement
Exhibit H        List of Non-Debtor Affiliates
Exhibit I        Names and Affiliations of Future Claimants' Representative, Asbestos Personal Injury Trustee, and
                 Members of the Asbestos Personal Injury Trust Advisory Committee
Exhibit J        Assumed Executory Contract and Unexpired Lease List
Exhibit K        Reorganized Maremont's Bylaws
Exhibit L        Reorganized Maremont's Certificate of Incorporation
Exhibit M        List of Members of Reorganized Maremont Board and Reorganized Subsidiary Board, and List of
                 Officers of Reorganized Maremont and Reorganized Subsidiaries
Exhibit N        FFIC Settlement Agreement

**INTRODUCTION**

Maremont Corporation and its Debtor affiliates, as debtors and debtors in possession, together with Meritor, Inc., propose this joint prepackaged plan of reorganization for the resolution of the Claims against and Interests in each of the Debtors pursuant to section 1121(a) of Title 11 of the United States Code.

Holders of Claims and Interests should refer to the Disclosure Statement (as defined below) for a discussion of the Debtors' history, assets, and financial information, as well as a summary and description of the Plan.

**ARTICLE I.**
**DEFINITIONS AND RULES OF INTERPRETATION**

*A.    Definitions*

Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth below:

1.    *"Administrative Expense Claim"* means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases incurred on or prior to the Effective Date and allowable under section 327, 328, 330, or 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(2) or 507(b) of the Bankruptcy Code, including, without limitation: (a) any actual and necessary post-petition costs and expenses of preserving the Debtors' Estates; (b) any indebtedness or obligation incurred or assumed by any of the Debtors as a debtor in possession during the Chapter 11 Cases; (c) any Professional Fee Claims; (c) all fees and charges assessed against the Estates pursuant to sections 1911-1932 of chapter 123 of Title 28 of the United States Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to section 503(b)(3), (4) and (5) of the Bankruptcy Code.

2.    *"Administrative Expense Claims Bar Date"* means the deadline to file a request for payment of an Administrative Expense Claim, which shall be the first Business Day that is sixty (60) days after the Effective Date.

3.    *"Affiliate"* has the meaning set forth in section 101(2) of the Bankruptcy Code and shall include non-Debtor entities.

4.    *"Allowed"* means, when used with respect to any Claim against any of the Debtors, including Administrative Expense Claims but excluding Asbestos Personal Injury Claims, such Claim or portion thereof: (a) as to which no objection to allowance, priority or secured status and no request for estimation or other challenge has been interposed and that is not otherwise subject to continuing dispute by any of the Debtors or Reorganized Debtors in accordance with applicable law (and as to which proof of such Claim or application for payment of a Professional Fee Claim has been properly and timely filed to the extent required by the Plan or any order of the Bankruptcy Court); (b) as to which any objection or request for estimation that has been filed has been settled, waived, withdrawn or denied by a Final Order; or (c) that is allowed (i) pursuant to the terms of a Final Order, (ii) pursuant to the terms of an agreement by and among the Holder(s) of such Claim and one or more of the Debtors (or Reorganized Debtors, as the case may be), or (iii) expressly under the terms of the Plan; provided, however, that for the purposes of determining the status (i.e., Allowed, Disputed or Disallowed) of a particular Claim prior to the expiration of the period fixed for filing objections to the allowance or disallowance of such Claim, any such Claim which has not been previously allowed or disallowed by a Final Order shall be deemed a Disputed Claim, unless such Claim is specifically identified by the Debtors in the Plan or other filing with the Bankruptcy Court as being an Allowed Claim; provided further, however, that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan (including, for the avoidance of doubt, Administrative Expense Claims not paid prior to the Effective Date). Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the applicable Debtor(s) or Reorganized Debtor. "Allow" and "Allowance" shall have correlative meanings.

5.  *"Allowed Amount"* means, with respect to any Claim, including Administrative Expense Claims but excluding Asbestos Personal Injury Claims, the Allowed dollar amount of such Claim. Unless otherwise provided in the Plan or a Final Order, the Allowed Amount of a Claim shall not include interest or penalties accruing on such Claim from and after the Petition Date.

6.  *"Asbestos Claimants Committee"* means both (i) the official committee of asbestos personal injury claimants appointed in the Chapter 11 Cases, as such committee may be reconstituted from time to time, and its members (solely in their respective capacities as such) and (ii) the *ad hoc* committee of Asbestos Claimants that served as the predecessor to the official committee of asbestos personal injury claimants prior to the Petition Date and its members (solely in their respective capacities as such), except where the context expressly applies to one or the other.

7.  *"Asbestos Claims Indemnification Agreement"* means that certain agreement, in substantially the form attached as Exhibit A hereto, pursuant to which the Reorganized Debtors and Asbestos Personal Injury Trust shall indemnify and hold harmless each Non-Debtor Affiliate and all Representatives of the Debtors and the Non-Debtor Affiliates in respect of any liability, obligation, fee, judgment, settlement, or expense, including, without limitation, reasonable legal fees and expenses, arising from or incurred in connection with any action based upon, attributable to, or arising out of an Asbestos Personal Injury Claim or any violation of the Asbestos Personal Injury Channeling Injunction by any Entity all as more specifically set forth in such Asbestos Claims Indemnification Agreement; provided, however, that the Asbestos Claims Indemnification Agreement shall not indemnify any Non-Indemnified Party.

8.  *"Asbestos Personal Injury Channeling Injunction"* means the injunction provided for in Section VIII.C of this Plan.

9.  *"Asbestos Personal Injury Claim"* means each of (a) a General Asbestos Personal Injury Claim, and (b) an Indirect Asbestos Personal Injury Claim.

10.  *"Asbestos Personal Injury Claimant Release"* means a general release of all Asbestos Personal Injury Claims against (a) the Reorganized Debtors, (b) the Non-Debtor Affiliates, (c) the Settling Insurers, and (d) the Representatives of each of the foregoing, in each case that is not a Non-Indemnified Party, which shall (i) include a Medicare secondary payer certification and (ii) be in substantially the form attached as Exhibit B to this Plan and, with respect to any departures from Exhibit B, acceptable to the Debtors, Meritor, the Asbestos Claimants Committee and the Future Claimants' Representative.

11.  *"Asbestos Personal Injury Trust"* means the asbestos personal injury trust established pursuant to section 524(g) of the Bankruptcy Code and in accordance with the Plan, the Confirmation Order, and the Asbestos Personal Injury Trust Agreement, which trust shall constitute a "qualified settlement fund" under section 468B of the Internal Revenue Code.

12.  *"Asbestos Personal Injury Trust Advisory Committee"* means the Asbestos Personal Injury advisory committee established pursuant to the Plan and the Asbestos Personal Injury Trust Agreement and identified in the Asbestos Personal Injury Trust Agreement.

13.  *"Asbestos Personal Injury Trust Agreement"* means the agreement, to be dated as of the Effective Date, by and among the Reorganized Debtors, the Asbestos Personal Injury Trustee, the Future Claimants' Representative, and the Asbestos Personal Injury Trust Advisory Committee, governing the creation and the terms of the Asbestos Personal Injury Trust, which shall be substantially in the form attached as Exhibit C hereto and, with respect to any departures from Exhibit C, reasonably acceptable to the Debtors, Meritor, the Asbestos Claimants Committee and the Future Claimants' Representative.

14.  *"Asbestos Personal Injury Trust Assets"* means, collectively: (a) the Asbestos Personal Injury Trust Contributions; (b) all other assets, rights, and benefits assigned, transferred or conveyed to the Asbestos Personal Injury Trust in connection with the Plan or any Plan Documents; and (c) all proceeds of the foregoing.

15.    *"Asbestos Personal Injury Trust Contributions"* means, collectively, the Maremont Contribution and the Meritor Contribution.

16.    *"Asbestos Personal Injury Trust Distribution Procedures"* means the trust distribution procedures for the Asbestos Personal Injury Trust proposed by the Asbestos Claimants Committee and the Future Claimants' Representative, which shall be substantially in the form attached as Exhibit D hereto (and, with respect to any departures from Exhibit D, reasonably acceptable to the Debtors and Meritor), and such additional procedures as may subsequently be adopted by the Asbestos Personal Injury Trust, which provide for the resolution, liquidation, and satisfaction of Asbestos Personal Injury Claims.

17.    *"Asbestos Personal Injury Trust Documents"* means, collectively: (a) the Asbestos Personal Injury Trust Agreement; (b) the Asbestos Personal Injury Trust Distribution Procedures; and (c) any other agreements, instruments and documents governing the establishment and administration of the Asbestos Personal Injury Trust, which shall be materially consistent with the terms of the Plan and the Asbestos Personal Injury Trust Agreement, and the Asbestos Personal Injury Trust Distribution Procedures, as the same may be amended or modified from time to time, in accordance with the terms thereof.

18.    *"Asbestos Personal Injury Trust Expenses"* means any of the liabilities, costs, or expenses incurred by or on behalf of the Asbestos Personal Injury Trust (other than liabilities to Holders of Asbestos Personal Injury Claims in respect of such Claims), in carrying out the terms of the Asbestos Personal Injury Trust Agreement.

19.    *"Asbestos Personal Injury Trustee"* means the individual set forth in the Asbestos Personal Injury Trust Agreement and appointed pursuant to the Confirmation Order to serve as the trustee for the Asbestos Personal Injury Trust in accordance with the terms of the Plan and the Asbestos Personal Injury Trust Agreement, and any successor trustee thereto appointed in accordance with the Asbestos Personal Injury Trust Agreement.

20.    *"Asbestos Records Cooperation Agreement"* means the cooperation agreement with respect to asbestos records entered into as of the Effective Date, which shall be in form and substance reasonably acceptable to the Debtors, the Asbestos Claimants Committee and the Future Claimants' Representative and be included in the Plan Supplement and, thereafter, attached as Exhibit E hereto.

21.    *"Assumed Executory Contract and Unexpired Lease List"* means the list that shall be included in the Plan Supplement and, thereafter, attached as Exhibit J hereto, of Executory Contracts (including any amendments or modifications thereto), if any, that will be assumed by the Debtors pursuant to the provisions of Article V of the Plan, which list (a) shall be determined by the Debtors with the consent of the Future Claimants' Representative and the Asbestos Claimants Committee, and (b) may be amended at any time prior to the Effective Date pursuant to the terms of the Plan.

22.    *"AVM"* means AVM, Inc.

23.    *"Avoidance Action"* means any actual or potential claim or cause of action to avoid, pursuant to any of sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code, or applicable state or federal statutes and common law, a transfer of property or an obligation incurred by one or more the Debtors, whether or not litigation has been commenced with respect to such claim or cause of action as of the Effective Date.

24.    *"Ballot"* means the form of ballot distributed to Holders of Claims in Class 4 entitled to vote on the Plan by which such Holders may indicate acceptance or rejection of the Plan pursuant to the terms and instructions set forth in the Solicitation Materials.

25.    *"Bankruptcy Code"* means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as in effect on the Petition Date, together with all amendments, modifications, and replacements of the foregoing that are made retroactive to the Petition Date, as the same may exist on any relevant date to the extent applicable to the Chapter 11 Cases.

26.     *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases.

27.     *"Bankruptcy Rules"* means the Federal Bankruptcy Rules, as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code, 28 U.S.C. § 2705, and the general, local, and chambers rules of the Bankruptcy Court, in each case as applicable to the Chapter 11 Cases and as amended from time to time.

28.     *"Business Day"* means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Federal Bankruptcy Rule 9006(a)(6)).

29.     *"Cash"* means the legal tender of the United States of America.

30.     *"Cause of Action"* means any action, Claim, cause of action, controversy, demand, right, Lien, indemnity, guaranty, suit, obligation, liability, loss, suit, debt, damage, remedy, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, Secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claim under any state or foreign law, including any fraudulent transfer or similar claim.

31.     *"Chapter 11 Cases"* means (a) when used with reference to a particular Debtor, the case filed for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases for all of the Debtors.

32.     *"Claim"* has the meaning assigned to that term in section 101(5) of the Bankruptcy Code, against any Debtor.

33.     *"Claims, Notice and Balloting Agent"* means Donlin, Recano and Company, Inc., in its capacity as claims, noticing, solicitation, and balloting agent for the Debtors.

34.     *"Claims Register"* means the official register of Claims and Interests maintained by the Claims, Notice and Balloting Agent.

35.     *"Class"* means a category of Claims or Interests classified under Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

36.     *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

37.     *"Confirmation Date"* means the date on which the order of the Bankruptcy Court confirming the plan under section 1129 of the Bankruptcy Code is affirmed by the District Court.

38.     *"Confirmation Hearing"* means the hearing to be held by the Bankruptcy Court and/or District Court pursuant to section 1128(a) of the Bankruptcy Code to consider Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

39.     *"Confirmation Order"* means (a) the order of the District Court confirming the Plan under section 1129 of the Bankruptcy Code or (b) collectively, the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code and the order of the District Court affirming such order, which in either case

shall contain the Asbestos Personal Injury Channeling Injunction and be in form and substance reasonably satisfactory to the Debtors, Meritor, the Asbestos Claimants Committee, and the Future Claimants' Representative.

40.    *"Confirmation Order Outside Date"* means July 15, 2019.

41.    *"Consummation"* means the occurrence of the Effective Date.

42.    *"Cure Claim"* means a Claim based on one or more of the Debtors' monetary default(s) under an Executory Contract existing as of the time such Executory Contract is assumed by one or more of the Debtors pursuant to section 365 of the Bankruptcy Code.

43.    *"Debtor Product Lines"* means all asbestos-containing products (including those product lines listed on <u>Exhibit F</u> hereto), equipment, components, parts, improvements to real property, or materials engineered, designed, marketed, manufactured, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, or branded with the name of or under a license granted by (a) any of the Debtors or any predecessor thereof or any subsidiary or business line of any of the foregoing and/or (b) Nuturn Corporation or Ferodo America, Inc. as successors-in-interest to Maremont's Friction Products Business. For the avoidance of doubt, no Rockwell Entity is or shall be deemed to be, for purposes of this definition, a predecessor of any Debtor or a subsidiary of any Debtor or Debtor predecessor.

44.    *"Debtor Release"* means the releases of the Released Parties and the Non-Estate Representative Released Parties, respectively, provided for in Section VIII.E below.

45.    *"Debtor(s)"* means, individually or collectively, Maremont, AVM, MEP and FRCOC.

46.    *"Debtor Sites"* means a property, facility, factory or building owned, leased, operated or otherwise used by any of the Debtors or any other Entity for whose acts, omissions, business, operations, or products any of the Debtors has liability or is alleged to have liability (including, without limitation, any of the Debtors' direct or indirect predecessors) including, without limitation, the Environmental Sites.

47.    *"Demand"* means any demand for payment, present or future, within the meaning of section 524(g) of the Bankruptcy Code.

48.    *"Disallowed"* means, when used with respect to a Claim against one or more of the Debtors, other than an Asbestos Personal Injury Claim, a Claim that: (a) is denied, dismissed, expunged, overruled, or disallowed in whole or in part (but solely to the extent of such disallowance) by Final Order; or (b) has been withdrawn, in whole or in part (but solely to the extent of such withdrawal), by the Holder thereof.

49.    *"Disclosure Statement"* means the Disclosure Statement for the Joint Prepackaged Plan of Reorganization of Maremont Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, dated December 4, 2018, as amended, supplemented, or modified from time to time (as agreed to by the Debtors, Meritor, the Asbestos Claimants Committee, and the Future Claimants' Representative), including all exhibits and schedules thereto, that is prepared and distributed in accordance with sections 1125, 1126(b) and 1145 of the Bankruptcy Code, the Bankruptcy Rules and any other applicable law.

50.    *"Disputed"* means, with respect to any Claim or Interest or any portion thereof, other than Asbestos Personal Injury Claims, that is neither Allowed nor Disallowed or that is contingent or unliquidated.

51.    *"Distribution"* means any: (a) Cash; (b) property; or (c) interest in property to be paid or distributed hereunder to the Holders of Allowed Claims, other than Asbestos Personal Injury Claims, on account of such Claims.

52.    *"Distribution Record Date"* means the record date for determining an entitlement to receive a Distribution under the Plan on account of an Allowed Claim, other than an Asbestos Personal Injury Claim, which date shall be the Confirmation Date.

53. *"District Court"* means the United States District Court for the District of Delaware.

54. *"Effective Date"* means the Business Day selected by the Debtors as of which all conditions precedent to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX hereof, which shall be agreed upon by the Debtors, the Asbestos Claimants Committee and the Future Claimants' Representative, and shall occur within ten (10) Business Days after all conditions precedent to occurrence of the Effective Date of the Plan have been satisfied pursuant to Section IX.B hereof, unless waived in accordance with Section IX.C.

55. *"Effective Date Payment"* has the meaning assigned to that term in Section IV.G below.

56. *"Effective Date Working Capital"* means cash in a dollar amount to be agreed on by the Debtors, the Asbestos Claimants Committee and the Future Claimants' Representative, and which represents the amount of capital that the Reorganized Debtors will reasonably need to have on hand on the Effective Date in order to adequately capitalize and operate their businesses in the ordinary course.

57. *"Encumbrance"* means, with respect to any property (whether real or personal, tangible or intangible), any mortgage, Lien, pledge, charge, security interest, assignment, or encumbrance of any kind or nature in respect of such property, including, without limitation, any conditional sale or other title retention agreement, any security agreement, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction, to secure payment of a debt or performance of an obligation.

58. *"Entity"* has the meaning assigned to that term in section 101(15) of the Bankruptcy Code.

59. *"Environmental Claim"* means any Claim or other legal obligation, including any investigatory, remedial, or corrective obligation as well as any liability for response costs or natural resources damages, fines, fees, or penalties, against any of the Debtors arising under any applicable federal, state, local or foreign statute, regulation or similar requirement having the force and effect of law, or judicial or administrative order or determination or common law, concerning public health or safety, workplace health and safety, or pollution or protection of the environment (including all those pertaining to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any hazardous materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, polychlorinated biphenyls, noise or radiation and all those pertaining to, or asserting liability on the part of one or more Debtors related to, the Environmental Sites), provided that no Claim qualifying as an Asbestos Personal Injury Claim or that is related to the post-Effective Date operations or assets of the Reorganized Debtors shall be an Environmental Claim.

60. *"Environmental Assumption and Indemnification Agreement"* means the Environmental Assumption and Indemnification Agreement by and among the Reorganized Debtors, on the one hand, and Meritor HVS and one or more additional Responsible Meritor Affiliates, on the other hand, and effective automatically as of the Effective Date, pursuant to which (a) one or more Responsible Meritor Affiliates agrees to assume Environmental Claims against the Debtors and (b) Meritor HVS agrees to indemnify, defend, pay the defense costs for, and hold harmless the Reorganized Debtors and their affiliates from and against Environmental Claims and associated costs, expenses, actions, Causes of Action, suits, controversies, damages, demands, debts, liabilities or obligations of any nature, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, liquidated or unliquidated, matured or not matured, contingent or direct, whether arising at common law, in equity or under any statute, all as more specifically and to the extent set forth in such Environmental Assumption and Indemnification Agreement, which shall be substantially in the form attached as <u>Exhibit G</u> hereto and, with respect to any departures from <u>Exhibit G</u>, acceptable to the Debtors, Meritor HVS and the other applicable Responsible Meritor Affiliate(s), the Asbestos Claimants Committee and the Future Claimants' Representative, and consistent with the terms of this Plan.

61. *"Environmental Sites"* means real property locations historically used or owned by the Debtors, including those located in (a) Easley, South Carolina; (b) Paulding, Ohio; (c) Capetown, South Africa; (d) Marion/Zion, South Carolina; (e) Chickasha, Oklahoma; and (f) the third party disposal site known as the Hardage-Criner site, in Hardage, Oklahoma.

62.     *"Estate"* means, with respect to each Debtor, the estate created as to such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

63.     *"Everest"* means Everest Reinsurance Company.

64.     *"Everest Agreement"* means that certain Confidential Settlement Agreement and Release, dated as of September 1, 2005, by and between Maremont Corporation and Mt. McKinley Insurance Company and Everest Reinsurance Company.

65.     *"Exculpated Fiduciaries"* means each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the official committee of asbestos personal injury claimants appointed in the Chapter 11 Cases, and its members, solely in their respective capacities as such; (d) the Future Claimants' Representative; and (e) with respect to each of the foregoing Entities in clauses (a) through (d), each such Entity's directors, officers, and professionals, in each case solely in its capacity as such.

66.     *"Executory Contract"* means any unexpired lease or executory contract to which one or more of the Debtors is a party and that is subject to assumption or rejection pursuant to section 365 of the Bankruptcy Code.

67.     *"FFIC"* means Fireman's Fund Insurance Company.

68.     *"FFIC Agreement"* means that certain Settlement Agreement and Release, dated November 15, 2010, by and among Maremont, Fireman's Fund Insurance Company, and certain of their respective parents, subsidiaries, affiliates, divisions, predecessors, successors, directors, officers, agents, employees and assigns.

69.     *"FFIC Settlement Agreement"* means that certain Permanent Settlement Agreement and Release entered into on March 15, 2019 between Maremont and FFIC, which agreement is attached hereto as <u>Exhibit N</u>.

70.     *"File," "Filed"* or *"Filing"* means file, filed, or filing with the Bankruptcy Court or the District Court in the Chapter 11 Cases.

71.     *"Final Order"* means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, which has not been reversed, vacated, stayed, modified, or amended, and as to (a) which the time to appeal, petition for *certiorari*, or motion for a new trial, reargument or rehearing has expired, and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing is pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari*, a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order or judgment, or such appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have otherwise been dismissed with prejudice, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; <u>provided</u>, <u>however</u>, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment.

72.     *"FRCOC"* means Former Ride Control Operating Company, Inc., formerly known as ArvinMeritor, Inc.

73.     *"Friction Products Business"* means the manufacture, distribution, and sale by one or more of the Debtors and/or their predecessors of aftermarket friction products, including brake linings, disc pads, and clutch facings.

74.     *"Future Claimants' Representative"* means James L. Patton, Jr. (or any court-appointed alternative or successor), in his capacity as the court-appointed legal representative for all Future Demand Holders pursuant to section 524(g) of the Bankruptcy Code.

75.     *"Future Demand Holder"* means an Entity that holds or might subsequently hold a Demand.

76.     *"General Asbestos Personal Injury Claim"* means any Claim, Demand, or Cause of Action or any portion thereof against, or any debt, liability, or obligation of, any Protected Party, arising in any jurisdiction around the world, whether now existing or hereafter arising, whether a single disease or injury, combination of diseases or injuries, or separately or subsequently arising disease or injury, whether in the nature of or sounding in tort, or under contract, warranty, employer liability, or any other theory of law, equity, or admiralty, whether based on statute, treaty, regulation, restatement or common law, whatsoever (including, without limitation, any Claim, Demand, or Cause of Action, whether direct, indirect or derivative, based upon (a) a legal or equitable theory of liability in the nature of veil piercing, alter ego, successor liability, vicarious liability, mere continuation, fraudulent transfer or conveyance, or conspiracy, upon which any of the Non-Debtor Affiliates are liable or are alleged to be liable, to the extent arising, directly, indirectly or derivatively, from (i) acts, omissions, business, or operations of any of the Debtors or their respective direct or indirect predecessors, and/or (ii) acts, omissions, business, or operations of any other Entity for whose products or operations any of the Debtors has liability or is alleged to have liability (including, without limitation, any of the Debtors' direct or indirect predecessors), to the extent any Debtor has or is alleged to have liability for such acts, omissions, business, operations, or products; and (b) (i) the manufacture, sale or distribution of Debtor Product Lines by any Seller or (ii) exposure to asbestos at any of the Debtor Sites) for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to, the manufacture, storage, sale, or distribution of Debtor Product Lines, or for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to asbestos at any of the Debtor Sites. For the avoidance of doubt, "General Asbestos Personal Injury Claim" shall include, but shall not be limited to, any Claim, Demand, Cause of Action, allegation, debt, liability, or obligation described in the immediately preceding sentence that, directly, indirectly or derivatively, arises from or is based upon any acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of any of the Debtors or any other Entity for whose acts, omissions, business, operations, or products any of the Debtors has liability or is alleged to have liability (including, without limitation, any of the Debtors' direct or indirect predecessors), and any conduct for which any of the Debtors, or any other Entity for whose acts, omissions, business, operations, or products any of the Debtors has liability or is alleged to have liability (including, without limitation, any of the Debtors' direct or indirect predecessors), may be deemed to have strict liability under any applicable law, including claims, debts, obligations, or liabilities for compensatory damages (such as loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages, but only to the extent any such liability or alleged liability is (a) for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to, Debtor Product Lines or (b) for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to asbestos at any of the Debtor Sites. For purposes of this definition, "veil piercing, alter ego, successor liability, vicarious liability, mere continuation, fraudulent transfer or conveyance, or conspiracy" claims shall include, but shall not be limited to, (a) fraudulent transfer or fraudulent conveyance claims, or claims seeking to avoid and/or recover any transfers of property, under applicable state or federal law; (b) denuding the corporation claims; (c) single business enterprise or common enterprise claims; (d) claims that any Debtor was the predecessor to any Non-Debtor Affiliate; (e) claims that any Debtor was the mere instrumentality, agent, dominated or controlled party, or alter ego of any of Non-Debtor Affiliate, or that any Non-Debtor Affiliate was the mere instrumentality, agent, dominated or controlled party, or alter ego of any Debtor; (f) claims that any Non-Debtor Affiliate was the mere continuation of any Debtor; (g) negligent provision of services claims; (h) claims that any Non-Debtor Affiliate, on the one hand, and any Debtor, on the other hand, conspired with one another, aided and abetted one another, or acted in concert with one another; and (i) any other Claims, Demands, or Causes of Action asserted derivatively against any of the Non-Debtor Affiliates that belong to, or may be brought on behalf of, any Debtor, whether or not included in the foregoing list, including, without limitation, any other such claim or cause of action against a Non-Debtor Affiliate. Notwithstanding the foregoing, the term "General Asbestos Personal Injury Claim" shall not include (a) any Claim by any present or former employee of any Debtor for benefits under a policy of workers' compensation insurance or for benefits under any state or federal

workers' compensation statute or other statute providing compensation to an employee from an employer; (b) any Claim arising out of the Rockwell Product Lines; or (c) any Indirect Asbestos Personal Injury Claim.

77.     *"General Unsecured Claim"* means a Claim against one or more of the Debtors that is not secured by a valid and enforceable Lien against property of the Debtors and that is not an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, an Intercompany Claim, an Asbestos Personal Injury Claim, or an Environmental Claim.

78.     *"Governmental Unit"* has the meaning assigned to that term in section 101(27) of the Bankruptcy Code.

79.     *"Holder"* means an Entity holding a Claim or an Interest, as applicable.

80.     *"Impaired"* means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

81.     *"Implementation Step Plan"* means that certain Implementation Step Plan to be filed with the Bankruptcy Court not less than ten (10) days prior to the Effective Date, which Implementation Step Plan shall set forth the restructurings, transfers, and other transactions that the Plan Proponents determine to be necessary or appropriate to effectuate the Plan, including, without limitation, the Meritor Contribution and the Maremont Contribution to the Asbestos Personal Injury Trust in compliance with the Bankruptcy Code and other applicable law and, to the maximum extent possible, in a tax efficient manner.

82.     *"Indirect Asbestos Personal Injury Claim"* means any cross-claim, contribution claim, subrogation claim, reimbursement claim, indemnity claim, guaranty claim, or other similar indirect Claim, Demand, or Cause of Action, arising in any jurisdiction around the world, against any Protected Party, whether or not such Claim, Demand, or Cause of Action is or has been reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, and whether in the nature of or sounding in tort, or under contract or implied by law (as governed by the applicable non-bankruptcy law), statutory right, warranty, guaranty, contribution, joint liability, joint and several liability, subrogation, reimbursement, or indemnity, or any other theory of law, equity, or admiralty, whether based on statute, treaty, regulation, restatement or common law, whatsoever (a) for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to, Debtor Product Lines, or (b) for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to asbestos at any of the Debtor Sites. For the avoidance of doubt, "Indirect Asbestos Personal Injury Claim" shall include, but shall not be limited to, any Claim, Demand, or Cause of Action described in the immediately preceding sentence that, directly, indirectly or derivatively, arises from or is based upon any acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of any Debtor or any other Entity for whose acts, omissions, business, operations, or products any Debtor has liability or is alleged to have liability (including, without limitation, any of the Debtors' direct or indirect predecessors), and any conduct for which any Debtor, or any other Entity for whose acts, omissions, business, operations, or products any Debtor has liability or is alleged to have liability (including, without limitation, any of the Debtors' direct or indirect predecessors), may be deemed to have strict liability under any applicable law, including claims, debts, obligations, or liabilities for compensatory damages (such as loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages, but only to the extent any such liability or alleged liability is (a) for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to, Debtor Product Lines, or (b) for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to asbestos at any of the Debtor Sites. Notwithstanding the foregoing, the term "Indirect Asbestos Personal Injury Claim" shall not include any cross-claim, contribution claim, subrogation claim, reimbursement claim, indemnity claim, guaranty claim, or other similar indirect Claim, Demand, or Cause of Action arising out of the Rockwell Product Lines.

83.    *"Intercompany Claim"* means any Claim against a Debtor held by another Debtor or an Affiliate of a Debtor.

84.    *"Intercompany Loan Agreement"* means that certain Loan Agreement by and between Maremont, as Lender, and Meritor, as Borrower, dated September 26, 2008, as amended by that certain First Amendment to Loan Agreement between Maremont, as Lender, and Meritor, as Borrower, dated as of May 1, 2014, and that certain Amended and Restated Loan Agreement between Maremont, as Lender, and Meritor, as Borrower, dated as of January 12, 2016 (and as further amended from time to time).

85.    *"Intercompany Loan Payment"* means payment in Cash of the entire outstanding amount owing by Meritor to Maremont under the Intercompany Loan Agreement on the date of such payment.

86.    *"Intercompany Receivables"* means all intercompany receivables owed to Meritor or any of the Non-Debtor Affiliates by any of the Debtors.

87.    *"Interest"* means any equity security (as defined in section 101(16) of the Bankruptcy Code) of any Debtor, including all issued, unissued, authorized, or outstanding shares or common stock, preferred stock, or other instruments, including restricted stock units, evidencing any fixed or contingent ownership interest in any Debtor together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto, as well as any partnership, limited liability company, or similar interest of any Debtor, as applicable.

88.    *"Internal Revenue Code"* means the Internal Revenue Code of 1986, as amended from time to time.

89.    *"Lien"* has the meaning assigned to that term in section 101(37) of the Bankruptcy Code.

90.    *"Maremont"* means Maremont Corporation.

91.    *"Maremont Contributed Cash"* means all Cash and cash equivalents held by the Debtors as of the Effective Date after giving effect to the Intercompany Loan Payment and the Settlement Payment *less* (a) the Effective Date Payment, (b) the Reserve Funds and (c) the Effective Date Working Capital.

92.    *"Maremont Contribution"* has the meaning assigned to that term in Section IV.B.2 below.

93.    *"Maremont Equity Interest"* means the Interests of Maremont.

94.    *"Maremont Insurance"* means all insurance proceeds and obligations owed to the Debtors by FFIC, Zurich, Everest and Mt. McKinley.

95.    *"Master Ballot"* means the form of ballot distributed to attorneys of record representing the Holders of Claims in Class 4 entitled to vote on the Plan by which such parties may indicate acceptance or rejection of the Plan on behalf of Holders of Claims in Class 4 that they represent pursuant to the terms and instructions set forth in the Solicitation Materials.

96.    *"MEP"* means Maremont Exhaust Products, Inc.

97.    *"Meritor"* means Meritor, Inc.

98.    *"Meritor Contribution"* means, in the aggregate, (a) the Meritor Release, (b) the contribution to Maremont, on or prior to the Effective Date, of the Intercompany Receivables, the Intercompany Loan Payment and the Settlement Payment, by Meritor or one or more of its Affiliates, on behalf of Meritor and the other Non-Debtor Affiliates, and (c) one or more Responsible Meritor Affiliates' assumption of Environmental Claims and Meritor HVS's agreement to indemnify the Reorganized Debtors and their affiliates from and against Environmental

Claims, in each case pursuant to and to the extent set forth in the Environmental Assumption and Indemnification Agreement, and in the case of clause (a) and clause (b) as set forth in Section IV.B.1 below.

99.    *"Meritor HVS"* means Meritor Heavy Vehicle Systems, LLC, which is and shall be deemed to be, on its own accord, a Responsible Meritor Affiliate.

100.    *"Meritor-Indemnified Representative"* means any Representative of any Debtor either entitled to indemnification by Meritor or any other Non-Debtor Affiliate for which Meritor or any other Non-Debtor Affiliate provides insurance coverage.

101.    *"Meritor Related Parties"* means the Non-Debtor Affiliates and their respective officers, directors, shareholders, employees, professionals, and consultants, and the assignees and successors of any of the foregoing (in their respective capacities as such).

102.    *"Meritor Release"* has the meaning assigned to that term in section IV.B.1 of the Plan.

103.    "*Mt. McKinley*" means Mt. McKinley Insurance Company.

104.    *"Non-Debtor Affiliates"* means (a) Meritor and all current and former affiliates of Meritor other than the Debtors and (b) all former affiliates and predecessors of the Debtors, including those set forth on Exhibit H hereto, and their respective successors and assigns, solely in their respective capacities as such.

105.    *"Non-Estate Representative Released Parties"* means (a) Meritor and the other Non-Debtor Affiliates, (b) the Settling Insurers, solely in their capacity as such, (c) any Representative of the Entities set forth in clauses (a) and (b) of this definition, and (d) any Meritor-Indemnified Representative.

106.    *"Non-Estate Representative Released Party Claims"* means any claim of any of the Debtors against any Non-Estate Representative Released Party relating to, associated with, arising from or on account of: (a) Asbestos Personal Injury Claims and any other Claims related to or arising from, directly or indirectly, the manufacture, sale, distribution or related activity of any asbestos-containing product historically manufactured, sold, or distributed by, or branded with the name of or under a license granted by any Debtor (or Nuturn Corporation or Ferodo America, Inc., as successors-in-interest to Maremont's Friction Products Business), (b) any amounts due or allegedly due to the Debtors from any Meritor Related Party for any reason whatsoever, including, without limitation, amounts related to (i) payments made to the Meritor Related Parties by or on behalf of any Settling Insurer and (ii) payments made by any of the Meritor Related Parties on behalf of any of the Debtors; (c) payments made by the Meritor Related Parties on behalf of the Debtors for legacy operational, pension and employee benefit obligations, (d) any dividends made by the Debtors to the Meritor Related Parties, or (e) any other claim, including, without limitation, any amounts due to any of the Debtors by the Non-Estate Representative Released Parties for any reason whatsoever, including, without limitation, any amounts due with respect to any acts, omissions, events, or occurrences in connection with the Chapter 11 Cases, including, without limitation, any acts, omissions, events or occurrences in connection with the formulation, negotiation, solicitation, confirmation, Consummation, administration and implementation of the Plan, and the transactions and other matters contemplated in the Plan.

107.    *"Non-Indemnified Party"* means a former affiliate of Meritor or Representative of a former affiliate of Meritor (solely in such Representative's capacity as such) that neither Meritor nor any current affiliate of Meritor is obligated to indemnify pursuant to a valid contractual obligation.

108.    *"Notice of Effective Date"* means the notice that all conditions precedent to the Effective Date have been satisfied or waived in accordance with Article IX hereof.

109.    *"Opt-Out Election Form"* means that certain form by which a Holder of a Claim against, or Interest in, any of the Debtors who receives a Distribution pursuant to the Plan or who votes to approve the Plan may "opt out" of the release set forth in Section VIII.F, in substantially the form approved by the Bankruptcy Court, to be served on all Holders of Claims and Interests with the Notice of Effective Date.

110. *"Person"* has the meaning assigned to that term in section 101(41) of the Bankruptcy Code.

111. *"Petition Date"* means the date on which each of the Debtors commenced the Chapter 11 Cases.

112. *"Plan"* means this Joint Prepackaged Plan of Reorganization of Maremont Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, including the Plan Supplement, which is incorporated herein by reference, and any other supplements and exhibits hereto, either in its present form or as the same may be modified, amended or supplemented from time to time in accordance with the terms hereof.

113. *"Plan Documents"* means, collectively, (a) the Plan, (b) the Disclosure Statement, (c) the Asbestos Personal Injury Trust Documents, and (d) any other document necessary to implement the Plan.

114. *"Plan Effective Date Outside Date"* means July 31, 2019.

115. *"Plan Proponents"* means, collectively, the Debtors and Meritor.

116. *"Plan Supplement"* means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, including the Asbestos Records Cooperation Agreement, the Assumed Executory Contract and Unexpired Lease List, Reorganized Maremont's Bylaws, Reorganized Maremont's Certificate of Incorporation, and a list identifying the initial member of the Reorganized Maremont Board, the initial member of the Reorganized Subsidiary Boards, and the officer of Reorganized Maremont and the Reorganized Subsidiaries, in each case in form and substance reasonably acceptable to the Plan Proponents, the Asbestos Claimants Committee, and the Future Claimants' Representative.

117. *"Plan Supplement Filing Date"* means the date that is ten (10) Business Days prior to the deadline scheduled for the filing of objections to entry of the Confirmation Order.

118. *"Post-Effective Date Future Claimants' Representative"* means, subject to approval of the Bankruptcy Court, on and after the Effective Date, James L. Patton, Jr., in his capacity as the post-Effective Date legal representative for all Future Demand Holders, or any successor thereto appointed pursuant to the Asbestos Personal Injury Trust Agreement.

119. *"Priority Non-Tax Claim"* means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code.

120. *"Priority Tax Claims"* means any Claim of a Governmental Unit entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

121. *"Professional Fee Claim"* means any Claim of a (a) Retained Professional seeking an award by the Bankruptcy Court of compensation for services rendered and/or reimbursement of expenses pursuant to sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code or (b) member representative of the Asbestos Claimants Committee for reimbursement of costs and expenses, in each case incurred in the Chapter 11 Cases on or before the Effective Date.

122. *"Professional Fee Claims Bar Date"* means the date that is thirty (30) days after the Effective Date.

123. *"Professional Fee Escrow Account"* means an interest-bearing escrow account in an amount equal to the Professional Fee Reserve Amount funded and maintained by Reorganized Maremont on and after the Effective Date solely for the purpose of paying all Allowed and unpaid Professional Fee Claims and all Allowed and unpaid fees and expenses of the Claims, Notice and Balloting Agent under section 156 of the Bankruptcy Code.

124. *"Professional Fee Reserve Amount"* means the aggregate amount of all fees, costs and expenses accrued and incurred by (a) Retained Professionals and (b) the Claims, Notice and Balloting Agent under

section 156 of the Bankruptcy Code through the Effective Date as estimated in good faith and in accordance with Article II.B by the Retained Professionals and approved by the Debtors, in consultation with Meritor, the Asbestos Claimants Committee and the Future Claimants' Representative.

125.    *"Proof of Claim"* means a written proof of claim Filed with the Bankruptcy Court or submitted to the Claims, Notice and Balloting Agent pursuant to section 501 of the Bankruptcy Code and Federal Bankruptcy Rule 3001 or 3002 and in accordance with any procedures approved by the Court against any of the Debtors.

126.    *"Protected Party"* means any (i) Debtor, (ii) Reorganized Debtor, (iii) Meritor Related Party, (iv) Settling Insurer, or (v) Representative of any of the parties included in (i) through (iv) or successor-in-interest of any of the parties included in (i) through (iv), in each case that is not a Non-Indemnified Party.

127.    *"Reinstated"* means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

128.    *"Rejection Damages Claim"* means a Claim arising from the rejection of an Executory Contract pursuant to section 365 of the Bankruptcy Code.

129.    *"Rejection Damages Claims Bar Date"* means, with respect to any given Rejection Damages Claim, the date that is thirty (30) days after the Effective Date.

130.    *"Released Parties"* means each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the Asbestos Claimants Committee, solely in its capacity as such; (d) the Future Claimants' Representative, solely in his capacity as such; and (e) to the fullest extent permitted by applicable law, with respect to each of the foregoing Entities in clauses (a) through (d), each such Entity's Representatives (other than the Meritor-Indemnified Representatives).

131.    *"Reorganized Debtors"* means, collectively, Reorganized Maremont and the Reorganized Subsidiaries.

132.    *"Reorganized Maremont's Bylaws"* means the bylaws for Reorganized Maremont, which shall be included in the Plan Supplement and, thereafter, attached as Exhibit K hereto.

133.    *"Reorganized Maremont's Certificate of Incorporation"* means the Delaware certificate of incorporation filed for Reorganized Maremont, which shall be included in the Plan Supplement and, thereafter, attached as Exhibit L hereto.

134.    *"Reorganized Maremont"* means Maremont, as reorganized pursuant to and under the Plan, or any successor thereto, on or after the Effective Date.

135.    *"Reorganized Maremont Board"* means the board of directors of Reorganized Maremont, the initial composition of which shall be disclosed in the Plan Supplement and, thereafter, attached as Exhibit M hereto.

136.    *"Reorganized Maremont Stock"* means one hundred percent (100%) of the shares of common stock of Reorganized Maremont to be deemed authorized and issued on the Effective Date as described in Section IV.C of the Plan.

137.    *"Reorganized Subsidiaries"* means, collectively, (a) Maremont Exhaust Products, Inc., as reorganized pursuant to and under the Plan, or any successor thereto, on or after the Effective Date, (b) AVM, Inc., as reorganized pursuant to and under the Plan, or any successor thereto, on or after the Effective Date, and (c) Former Ride Control Operating Company, Inc., as reorganized pursuant to and under the Plan, or any successor thereto, on or after the Effective Date.

138. *"Reorganized Subsidiary Boards"* means the boards of directors of the Reorganized Subsidiaries, the initial composition of which shall be disclosed in the Plan Supplement and, thereafter, attached as Exhibit M hereto.

139. *"Representative"* means with respect to any specified Entity, any current or former principal, equity holder, member, partner, manager, officer, director, controlling person, employee, agent, attorney, accountant, financial advisor, investment banker, consultant, management company, fund advisor, advisory board member any other professional, and any other representative or any person who controls any of these within the meaning of the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, solely in their capacities as such, as well as any of the successors and assigns of the foregoing.

140. *"Reserve Funds"* has the meaning assigned to that term in Section IV.G below.

141. *"Responsible Meritor Affiliate"* means an affiliate of Meritor reasonably acceptable to the Asbestos Claimants Committee and the Future Claimants' Representative that, by itself or together with other Responsible Meritor Affiliates party to the Environmental Assumption and Indemnification Agreement has the financial wherewithal to satisfy Environmental Claims and perform any and all environmental liabilities assumed and/or indemnified pursuant to the Environmental Assumption and Indemnification Agreement.

142. *"Restructuring Transaction"* means each action by the Reorganized Debtors necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation, certificates of incorporation, operating agreements, by-laws, or other documents containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) the execution and delivery of the applicable documents and instruments included in the Plan Supplement; and (e) all other actions the Debtors or Reorganized Debtors determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

143. *"Retained Professional"* means an Entity: (a) retained in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been awarded by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

144. *"Rockwell Entity"* means Rockwell International or any of its affiliates or any predecessor thereof or any subsidiary or business line of any of the foregoing that manufactured, sold or distributed products containing asbestos. For the avoidance of doubt, no Debtor, direct or indirect predecessor of a Debtor, or Non-Debtor Affiliate is or shall be deemed to be, for purposes of this definition, a "Rockwell Entity".

145. *"Rockwell Product Lines"* means all asbestos-containing products, equipment, components, parts, improvements to real property, or materials engineered, designed, marketed, manufactured, constructed, sold, supplied, produced, released, distributed, or branded with the name of or under a license granted by any Rockwell Entity. For the avoidance of doubt, no Debtor Product Line is or shall be deemed to be, for purposes of this definition, a Rockwell Product Line.

146. *"Schedules"* means the schedules of assets and liabilities and the statements of financial affairs of the Debtors, if any, as filed with the Bankruptcy Court by the Debtors in accordance with section 521 of the Bankruptcy Code, as such schedules and statements may be amended or supplemented from time to time.

147. *"Section 1125(e) Protected Parties"* means (a) the Exculpated Fiduciaries, (b) Meritor, (c) James L. Patton, Jr., in his capacity as the pre-petition legal representative for future claimants, (d) the *ad hoc*

committee of asbestos personal injury claimants that served as the predecessor to the official committee of asbestos personal injury claimants prior to the Petition Date and its members, solely in their respective capacities as such, and (e) with respect to each of the foregoing Entities in clauses (b) through (d), such Entity's directors, officers and professionals, in each case solely in their capacity as such.

148.    *"Secured Claim"* means a Claim or any portion thereof: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, to the extent of the value of the creditor's interest in the Estate's interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code, (b) subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff as determined pursuant to section 506(a) of the Bankruptcy Code, or (c) Allowed as secured pursuant to the Plan or any Final Order as a secured Claim.

149.    *"Securities Act"* means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as amended, together with the rules and regulations promulgated thereunder.

150.    *"Securities Exchange Act"* means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78nn, as amended.

151.    *"Security"* has the meaning assigned to that term in section 2(a)(1) of the Securities Act.

152.    *"Seller"* means any Entity that has, prior to the Effective Date of the Plan, manufactured, distributed or sold any Debtor Product Line.

153.    *"Settlement Payment"* means a settlement payment, in Cash, by Meritor to Maremont in the amount of $28,000,000.00.

154.    *"Settling Insurers"* means each of FFIC, Zurich, Everest, and Mt. McKinley, solely to the extent that each party's respective agreement and settlement is treated as set forth in Section IV.D of this Plan as confirmed.

155.    *"Solicitation"* means the prepetition solicitation of votes on the Plan.

156.    *"Solicitation Materials"* means the Disclosure Statement, the Plan, the letters of transmittal, the Ballots, the Master Ballots, and other documents required to solicit votes from Holders of Claims in Class 4.

157.    *"Subordinated Claim"* means a Claim that is subordinated pursuant to section 510(b) of the Bankruptcy Code or any other applicable law.

158.    *"Subsidiary Equity Interests"* means an Interest in a Debtor held by another Debtor.

159.    *"Unclaimed Distribution"* means any Distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular Distribution or, in the case of Distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular Distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular Distribution; or (d) taken any other action necessary to facilitate such Distribution.

160.    *"Unimpaired"* means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

161.    *"U.S. Trustee"* means the United States Trustee for the District of Delaware.

162.    *"Zurich"* means Zurich Insurance Company, Ltd. (f/k/a Zurich Insurance Company) and Zurich American Insurance Company.

163.    *"Zurich Agreement"* means that certain Confidential Settlement Agreement and Release of Asbestos Claims, dated December 1, 2015, by and among Maremont, Zurich Insurance Company, Ltd. (f/k/a Zurich Insurance Company) and Zurich American Insurance Company.

B.    *Rules of Interpretation*

Unless otherwise specified, all article, section or exhibit references in the Plan are to the respective article, section in or exhibit to the Plan, as the same may be amended or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained herein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively. The words "includes" and "including" are not limiting. The headings in the Plan are for convenience of reference only and shall not limit, expand or otherwise affect the provisions hereof. For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (3) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Federal Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II.
### ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims (including Professional Fee Claims and Cure Costs) and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.    *Administrative Expense Claims Other Than Professional Fee Claims*

Except as provided below with respect to Administrative Expense Claims that are Professional Fee Claims or Cure Costs, and except to the extent that a Holder of an Allowed Administrative Expense Claim agrees with the applicable Debtor(s) to a less favorable treatment with respect to such Holder, each Holder of an Allowed Administrative Expense Claim that is unpaid as of the Effective Date shall receive, on account and in full satisfaction of such Allowed Administrative Expense Claim, Cash in an amount equal to the Allowed amount of such Administrative Expense Claim, to be paid on or as soon as is reasonably practicable after the latest of (1) the Effective Date, (2) the date that such Allowed Administrative Expense Claim becomes Allowed, and (3) the date that such Allowed Administrative Expense Claim becomes due and owing in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

Except as provided in Section II.B of the Plan, requests for payment of Administrative Expense Claims that are not Professional Fee Claims or Cure Costs that are required to file a request for payment of such Claims and that do not file such requests by the Administrative Expense Claims Bar Date (or, in the case of tax claims, such later date

as may be applicable pursuant to Section II.C below) shall be forever barred from asserting such Claims against the Debtors, the Reorganized Debtors, any of their Affiliates, or any of their respective property.

*B.    Professional Fee Claims*

1.    Final Fee Applications

Retained Professionals asserting a Professional Fee Claim for services rendered or expenses incurred on or before the Effective Date must File and serve on Reorganized Maremont and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or any other applicable order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim no later than the Professional Fee Claims Bar Date. Any objections to Professional Fee Claims must be Filed and served on Reorganized Maremont and the requesting party no later than twenty-one (21) days after the Professional Fee Claims Bar Date. To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Professional Fee Claims. All Allowed Professional Fee Claims shall be paid in full in Cash on or prior to the Effective Date or, if after the Effective Date, from the Reserve Funds.

2.    Professional Fee Escrow Account

On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Retained Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Retained Professionals. Such funds in the Professional Fee Escrow Account shall not constitute property of the Debtors' Estates or property of the Reorganized Debtors. The amount of Professional Fee Claims owing to the Retained Professionals on and after the Effective Date shall be paid in Cash to such Retained Professionals from funds held in the Professional Fee Escrow Account, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order. When all Allowed Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Reorganized Debtors.

3.    Professional Fee Reserve Amount

To receive payment for unbilled fees and expenses incurred through and including the Effective Date, the Retained Professionals shall estimate their aggregate fees, costs and expenses accrued and incurred prior to and as of the Confirmation Date, along with an estimate of all fees, costs and expenses to be incurred through and including the Effective Date, and shall deliver such estimates to the Debtors no later than seven (7) days after the Confirmation Date; provided, however, that such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. If a Retained Professional does not provide such estimates, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional. The total amount so estimated as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

4.    Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, Reorganized Maremont shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the legal, professional or other fees and expenses related to the implementation and Consummation of the Plan incurred by Reorganized Maremont following the Effective Date. Upon the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Reorganized Maremont may employ and pay any Retained Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

From and after the Effective Date, Reorganized Maremont shall continue to be liable for any and all fees and expenses incurred by the Future Claimants' Representative, the Asbestos Claimants Committee, and their respective

professionals that are incurred in connection with such parties' Professional Fee Claims and any post-confirmation appeals.

### C.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees with the applicable Debtor(s) to a less favorable treatment, the Holder of each Allowed Priority Tax Claim shall receive, on account and in full satisfaction of such Allowed Priority Tax Claim, Cash in an aggregate amount equal to the Allowed amount of such Priority Tax Claim on or as soon as reasonably practicable following the Effective Date. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business or under applicable non-bankruptcy law as such obligations become due.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.    Classification of Claims and Interests

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class for purposes of distribution only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. In accordance with section 1123(a)(1) of the Bankruptcy Code and as described in Article II, the Debtors have not classified Administrative Expense Claims (including Professional Fee Claims) and Priority Tax Claims.

### B.    Summary of Classification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below. The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, and the classification of Claims and Interests set forth herein shall apply separately to each Debtor, to the extent applicable. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have any Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section III.E hereof.

The following chart summarizes the classification of Claims and Interests pursuant to the Plan:

| Class | Designation | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 4 | Asbestos Personal Injury Claims | Impaired | Entitled to Vote |
| 5 | Environmental Claims | Unimpaired | Presumed to Accept |
| 6 | Intercompany Claims | Impaired / Unimpaired | Deemed to Reject / Deemed to Accept |
| 7 | Maremont Equity Interests | Impaired | Deemed to Reject |
| 8 | Subsidiary Equity Interests | Unimpaired | Presumed to Accept |

### C.    Treatment of Claims and Interests

1.    Class 1 - Priority Non-Tax Claims

(a)    Classification: Class 1 consists of all Priority Non-Tax Claims.

18

(b) *Treatment:* Except to the extent a Holder of an Allowed Priority Non-Tax Claim has been paid prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction, settlement, and discharge of, and in exchange for such Priority Non-Tax Claim, Cash to be paid from the Reserve Funds in an amount equal to the unpaid portion of such Allowed Priority Non-Tax Claim on the later of: (i) the Effective Date; and (ii) the date the Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as practicable. All Allowed Priority Non-Tax Claims not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

(c) *Voting:* Class 1 is Unimpaired by the Plan, and each Holder of a Class 1 Priority Non-Tax Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

2.  Class 2 - Secured Claims

(a) *Classification:* Class 2 consists of all Secured Claims.

(b) *Treatment:* Except to the extent a Holder of an Allowed Secured Claim has been paid prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Secured Claim shall receive, in full satisfaction, settlement, and discharge of, and in exchange for such Secured Claim, Cash to be paid from the Reserve Funds in an amount equal to the unpaid portion of such Allowed Secured Claim on the later of: (i) the Effective Date; and (ii) the date the Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as practicable. All Allowed Secured Claims not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors in the ordinary course of business in accordance with the terms thereof.

(c) *Voting:* Class 2 is Unimpaired by the Plan, and each Holder of a Class 2 Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 2 Secured Claims are not entitled to vote to accept or reject the Plan.

3.  Class 3 - General Unsecured Claims

(a) *Classification:* Class 3 consists of General Unsecured Claims.

(b) *Treatment:* Except to the extent a Holder of an Allowed General Unsecured Claim agrees to different treatment of that General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall be paid in full, in Cash from the Reserve Funds, on, or as soon as practicable after, the latest of: (i) the Effective Date, (ii) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, (iii) the date such General Unsecured Claim becomes due and payable according to its terms, or (iv) such other date as mutually may be agreed to by and between the Holder of such General Unsecured Claim and the Debtors or the Reorganized Debtors, as applicable.

(c) *Voting:* Class 3 is Unimpaired by the Plan, and each Holder of a Class 3 General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 3 General Unsecured Claims are not entitled to vote to accept or reject the Plan.

4.   Class 4 - Asbestos Personal Injury Claims

   (a)   *Classification:* Class 4 consists of Asbestos Personal Injury Claims.

   (b)   *Treatment:* As of the Effective Date, liability for all Asbestos Personal Injury Claims shall automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Asbestos Personal Injury Trust in accordance with, and to the extent set forth in, Articles IV and VIII below, the applicable Plan Documents and the Confirmation Order. Each Asbestos Personal Injury Claim shall be resolved in accordance with the terms, provisions and procedures of the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures. The Asbestos Personal Injury Trust shall be funded in accordance with the provisions of Section IV.E below. The sole recourse of the Holder of an Asbestos Personal Injury Claim on account of such Asbestos Personal Injury Claim shall be to the Asbestos Personal Injury Trust, and each such Holder shall have no right whatsoever at any time to assert its Asbestos Personal Injury Claim against any Protected Party.

   (c)   *Voting:* Class 4 is Impaired by the Plan, and each Holder of a Class 4 Asbestos Personal Injury Claim is entitled to vote to accept or reject the Plan.

5.   Class 5 - Environmental Claims

   (a)   *Classification:* Class 5 consists of Environmental Claims.

   (b)   *Treatment:* Each Holder of an Allowed Environmental Claim shall have its Allowed Environmental Claim Reinstated in full.

   (c)   *Voting:* Class 5 is Unimpaired by the Plan, and each Holder of a Class 5 Environmental Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 5 Environmental Claims are not entitled to vote to accept or reject the Plan.

6.   Class 6 - Intercompany Claims

   (a)   *Classification:* Class 6 consists of all Intercompany Claims.

   (b)   *Treatment:* On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, canceled, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or the Reorganized Debtors, as applicable, or as otherwise provided in Section IV.B herein.

   (c)   *Voting:* Holders of Class 6 Intercompany Claims are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code, respectively. Therefore, Holders of Class 6 Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.   Class 7 – Maremont Equity Interests

   (a)   *Classification:* Class 7 consists of all Maremont Equity Interests.

   (b)   *Treatment:* On the Effective Date, the Maremont Equity Interests shall be cancelled, annulled and extinguished.

(c) *Voting:* Class 7 is Impaired.  Holders of Class 7 Maremont Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 7 Maremont Equity Interests are not entitled to vote to accept or reject the Plan.

8. <u>Class 8 – Subsidiary Equity Interests</u>

(a) *Classification:* Class 8 consists of Subsidiary Equity Interests.

(b) *Treatment:* On the Effective Date, Subsidiary Equity Interests shall be Reinstated and the legal, equitable and contractual rights to which Holders of Subsidiary Equity Interests are entitled shall remain unaltered to the extent necessary to implement the Plan.

(c) *Voting:* Class 8 is Unimpaired.  Holders of Class 8 Subsidiary Equity Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Subsidiary Equity Interests are not entitled to vote to accept or reject the Plan.

D. *Special Provision Governing Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or Reorganized Debtors' rights in respect of any Unimpaired or Reinstated Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims.  Upon assuming the Environmental Claims and indemnifying the Reorganized Debtors (and all other parties indemnified under the Environmental Assumption and Indemnification Agreement) for Environmental Claims pursuant to the terms of the Environmental Assumption and Indemnification Agreement, Meritor HVS and the other Responsible Meritor Affiliate(s) party to the Environmental Assumption and Indemnification Agreement shall be subrogated to all of the defenses, rights, claims and Causes of Action of the Reorganized Debtors (and all other parties indemnified under the Environmental Assumption and Indemnification Agreement) in respect of Environmental Claims.

E. *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of any Allowed Claim or Allowed Interest or Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F. *Acceptance or Rejection of the Plan*

1. Presumed Acceptance of the Plan

Claims in Classes 1, 2, 3, 5, and (to the extent Unimpaired) 6 and Interests in Class 8 are Unimpaired under the Plan.  The Holders of such Claims and Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

2. Voting Classes

Claims in Class 4 are Impaired under the Plan and the Holders of such Claims are entitled to vote to accept or reject the Plan with respect to each Debtor against which they hold such Claims.  If Holders of Claims in a particular Impaired Class of Claims were given the opportunity to vote to accept or reject the Plan, but no Holders of Claims in such Impaired Class of Claims voted to accept or reject the Plan, then such Class of Claims shall be deemed to have accepted the Plan.

3.      Deemed Rejection of Plan

Claims in Class 6 (to the extent Impaired) and Interests in Class 7 are Impaired and Holders of such Claims and Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

4.      Class Acceptance Requirement

Acceptance of the Plan by Class 4 shall be determined in accordance with sections 524(g) and 1126 of the Bankruptcy Code.

5.      Issuance of Asbestos Personal Injury Channeling Injunction Pursuant to Section 524(g) of the Bankruptcy Code

The Bankruptcy Court shall be asked to issue the Asbestos Personal Injury Channeling Injunction if the Plan has been accepted by at least two-thirds (2/3) in amount of those Holders of Class 4 Claims actually voting on the Plan, in accordance with section 1126(c) of the Bankruptcy Code, and seventy-five percent (75%) in number of those Holders of Class 4 Claims actually voting on the Plan, in accordance with section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code.

6.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims, determined without including any acceptances of the Plan by any insiders of the Debtors. The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Interests.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Settlement of Claims and Interests*

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, effective upon the occurrence of the Effective Date. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019 and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are within the range of reasonableness, in the best interests of the Debtors, their estates, their creditors, and other parties in interest, and fair and equitable. Distributions and deliveries made to Holders of Allowed Claims and Interests in any Class are intended to be final.

B.      *Plan Contributions*

1.      Meritor Contribution.

On or prior to the Effective Date, Meritor will contribute, or cause to be contributed, to Maremont the Intercompany Receivables, the Intercompany Loan Payment and the Settlement Payment. In addition, effective automatically upon the occurrence of the Effective Date, (a) Meritor and the Non-Debtor Affiliates will release certain claims pursuant to the Meritor Release and (b) pursuant to and to the extent set forth in the Environmental Assumption and Indemnification Agreement, one or more Responsible Meritor Affiliates will assume Environmental Claims and Meritor HVS will indemnify the Reorganized Debtors and their affiliates from and against Environmental Claims as more fully set forth in the Environmental Assumption and Indemnification Agreement. The Meritor Contribution will be made by the Meritor Related Parties in settlement of any and all causes of action the Debtors may have against one or more Meritor Related Parties.

As part of the Meritor Contribution, Meritor and the Non-Debtor Affiliates will waive, release, and discharge any and all Claims, suits, causes of action, controversies, demands, rights, Liens, indemnities, guarantees, and judgments held by one or more Non-Debtor Affiliates against any Debtor, the Asbestos Claimants Committee, the Future Claimants' Representative, and each of their respective predecessors, successors, assigns, and Affiliates and its and their respective parents, subsidiaries, heirs, executors, estates, servants, nominees and Representatives, in each case solely in its capacity as such (the "Meritor Release"). The Meritor Release will be effectuated automatically upon the occurrence of the Effective Date.

        2.      Maremont Contribution. On the Effective Date, the Debtors will transfer, or cause to be transferred, to the Asbestos Personal Injury Trust (or, if the Asbestos Personal Injury Trust determines it would be more beneficial, the Reorganized Debtors shall retain) the Maremont Insurance, the Maremont Contributed Cash, and, to the extent not included in the Maremont Contributed Cash, the Meritor Contribution (the "Maremont Contribution"). Also on the Effective Date, Maremont will contribute the Intercompany Receivables to the Maremont Subsidiaries, thereby cancelling them, or, alternatively, cause the Intercompany Receivables to be cancelled and discharged for no consideration.

*C.*     *Restructuring*

        1.      On or prior to the Effective Date: (a) Maremont will contribute the Intercompany Receivables to AVM, FRCOC, and MEP, respectively, as the Entities from which such receivables are owed, thereby cancelling the Intercompany Receivables.

        2.      On the Effective Date: (a) all outstanding shares of Maremont will be cancelled; and (b) simultaneously with the cancellation of such shares, Maremont will issue the Reorganized Maremont Stock to the Asbestos Personal Injury Trust. Each of AVM, FRCOC, and MEP shall remain wholly owned subsidiaries of Reorganized Maremont.

        3.      The sequence of the foregoing transactions and other Restructuring Transactions will be set forth in the Implementation Step Plan.

*D.*     *Insurance Agreements*

Pursuant to Bankruptcy Rule 9019, and in consideration for the treatment of FFIC, Everest, Mt. McKinley, and Zurich, respectively, as Settling Insurers under the Plan, and other benefits provided under the Plan, the following treatment of the FFIC Agreement, the Zurich Agreement, and the Everest Agreement shall constitute a good faith compromise and settlement of such agreements, effective upon the occurrence of the Effective Date with no further action required:

        1.      FFIC Agreement. Notwithstanding any other provision of the Plan, subject to all of the terms and conditions of the FFIC Settlement Agreement, the FFIC Agreement shall be rejected by the Debtors effective automatically as of the Effective Date, without the need for any further action by any party. As of the Effective Date, the Reorganized Debtors and FFIC shall be bound by, and shall have the rights and obligations set forth in, the FFIC Settlement Agreement. Upon the payment by FFIC of the Settlement Amount (as defined in the FFIC Settlement Agreement), FFIC shall be a Settling Insurer under this Plan.

        2.      Everest Agreement. Notwithstanding any other provision of the Plan, the Everest Agreement shall be rejected by the Debtors effective automatically as of the Effective Date, without the need for any further action by any party. In exchange for the treatment of Everest and Mt. McKinley as Settling Insurers under the Plan, Everest and Mt. McKinley shall agree to waive any and all claims they may have against the Debtors and the Asbestos Personal Injury Trust including, but not limited to, any claims arising under the Everest Agreement, and shall fully release all rights, claims, and defenses available under the Everest Agreement, regardless of whether the Everest Agreement is ultimately determined by the Court to be an Executory Contract. In the event that Everest and

Mt. McKinley do not consent to such waiver and release, Everest and Mt. McKinley shall not be Settling Insurers under the Plan.

       3.    <u>Zurich Agreement</u>. Notwithstanding any other provision of the Plan, the Zurich Agreement shall be rejected by the Debtors effective automatically as of the Effective Date, without the need for any further action by any party. In exchange for the treatment of Zurich as a Settling Insurer under the Plan, Zurich shall agree to waive any and all claims it may have against the Debtors and the Asbestos Personal Injury Trust including, but not limited to, any claims arising under the Zurich Agreement for a refund payment or otherwise, and shall fully release all rights, claims, and defenses available under the Zurich Agreement, regardless of whether the Zurich Agreement is ultimately determined by the Court to be an Executory Contract. In the event that Zurich does not consent to such waiver and release, Zurich shall not be a Settling Insurer under the Plan.

*E.*    *Asbestos Personal Injury Trust*

       1.    <u>Creation of the Asbestos Personal Injury Trust</u>. On the Effective Date, the Asbestos Personal Injury Trust shall be established in accordance with the Plan Documents, the Asbestos Personal Injury Trust Documents, and section 524(g) of the Bankruptcy Code and managed pursuant to the terms and conditions of the Asbestos Personal Injury Trust Documents. On the Effective Date, the Asbestos Records Cooperation Agreement shall become effective and the Debtors' asbestos records shall be treated in accordance therewith.

       2.    <u>Purpose of the Asbestos Personal Injury Trust</u>. The purpose of the Asbestos Personal Injury Trust shall be to assume all liabilities and responsibility for all Asbestos Personal Injury Claims, and, among other things, to: (a) direct the processing, liquidation, and payment of all compensable Asbestos Personal Injury Claims in accordance with this Plan, the Asbestos Personal Injury Trust Agreement, the Asbestos Personal Injury Trust Distribution Procedures and the Confirmation Order; (b) preserve, hold, manage, and maximize the assets of the Asbestos Personal Injury Trust for use in paying and satisfying Asbestos Personal Injury Claims; and (c) qualify at all times as a qualified settlement fund. The Asbestos Personal Injury Trust shall use the Asbestos Personal Injury Trust's assets and income to resolve Asbestos Personal Injury Claims in accordance with the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures in such a way that Holders of Asbestos Personal Injury Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such Claims, and shall otherwise comply in all respects with the requirements of a trust established pursuant to section 524(g)(2)(B) of the Bankruptcy Code.

       3.    <u>Asbestos Personal Injury Trust Assets</u>. On the Effective Date, all right, title, and interest in and to the Asbestos Personal Injury Trust Assets, and any proceeds thereof, will be transferred to, and vested in, the Asbestos Personal Injury Trust, free and clear of all Claims, Demands, Interests, Encumbrances, and other interests of any Entity, without any further action of the Bankruptcy Court or any Entity, but subject to the remaining provisions of this Section IV.E.

       4.    <u>Appointment of Asbestos Personal Injury Trustee</u>. The individual nominated by the Asbestos Claimants Committee and the Future Claimants' Representative to serve as the initial Asbestos Personal Injury Trustee is identified in <u>Exhibit I</u> hereto. On the Effective Date, such individual shall be appointed as the Asbestos Personal Injury Trustee pursuant to the Plan, the Confirmation Order, and the Asbestos Personal Injury Trust Agreement. All subsequent Asbestos Personal Injury Trustees shall be appointed in accordance with the terms of the Asbestos Personal Injury Trust Agreement. For purposes of performing the duties and fulfilling the obligations under the Asbestos Personal Injury Trust Agreement and the Plan, the Asbestos Personal Injury Trustee shall be deemed to be a party or parties in interest within the meaning of section 1109(b) of the Bankruptcy Code.

       5.    <u>Appointment of Post-Effective Date Future Claimants' Representative</u>. Subject to approval of the Bankruptcy Court, on the Effective Date, James L. Patton, Jr. shall be appointed, pursuant to the Plan, the Confirmation Order, and the Asbestos Personal Injury Trust Agreement, as the Post-Effective Date Future Claimants' Representative. The Post-Effective Date Future Claimants' Representative shall have the functions, duties, and rights provided in, and shall serve in accordance with, the Asbestos Personal Injury Trust Agreement. In addition to the foregoing, the Post-Effective Date Future Claimants' Representative also may, at his option, participate in any: (a) appeal of the Confirmation Order; (b) hearing on a Professional Fee Claim; and (c) adversary proceeding pending on the Effective Date to which the Future Claimants' Representative is a party as of the Effective Date. Successor

Post-Effective Date Future Claimants' Representatives will be appointed as provided in the Asbestos Personal Injury Trust Agreement.

6.    Appointment of Asbestos Personal Injury Trust Advisory Committee Members. The five (5) individuals nominated by the Asbestos Claimants Committee to serve as the initial members of the Asbestos Personal Injury Trust Advisory Committee are identified in Exhibit I hereto. The Confirmation Order shall constitute an order of the Bankruptcy Court appointing the initial members of the Asbestos Personal Injury Trust Advisory Committee. The Asbestos Personal Injury Trust Advisory Committee shall have the functions, duties, and rights provided in, and shall serve in accordance with, the Asbestos Personal Injury Trust Agreement. Successor members of the Asbestos Personal Injury Trust Advisory Committee will be appointed as provided in the Asbestos Personal Injury Trust Agreement.

7.    Transfer of Claims and Demands to the Asbestos Personal Injury Trust. In consideration for the property transferred to the Asbestos Personal Injury Trust, on the Effective Date, all liabilities, obligations, and responsibilities relating to all present and future Asbestos Personal Injury Claims, including, without limitation, Demands, shall be transferred and channeled to the Asbestos Personal Injury Trust and shall be satisfied solely by the assets held by the Asbestos Personal Injury Trust. The Asbestos Personal Injury Trust shall have no liability for any Claims and Demands other than Asbestos Personal Injury Claims and Asbestos Personal Injury Trust Expenses, and no Claims other than Asbestos Personal Injury Claims and Asbestos Personal Injury Trust Expenses shall be transferred and channeled to the Asbestos Personal Injury Trust.

8.    Transfer of Rights and Defenses Related to Asbestos Personal Injury Claims. With the exception of those claims released by the Debtors pursuant to Section VIII.E of the Plan, on the Effective Date all claims, defenses, rights and Causes of Action of the Debtors and of the Reorganized Debtors relating to Asbestos Personal Injury Claims shall be transferred and assigned to the Asbestos Personal Injury Trust. In accordance with section 1123(b) of the Bankruptcy Code, the Asbestos Personal Injury Trust shall retain and may enforce such claims, defenses, rights, and Causes of Action and shall retain and may enforce all defenses and counterclaims to all Claims or Demands asserted against the Asbestos Personal Injury Trust, including, but not limited to, setoff, recoupment, and any rights under section 502(d) of the Bankruptcy Code; provided, however, that no such claims, defenses, Causes of Action, or counterclaims may be asserted against any Protected Party. The Asbestos Personal Injury Trust shall be deemed to be the appointed representative of the Debtors and the Reorganized Debtors and may pursue, litigate, compromise, and settle any rights, claims, or Causes of Action transferred to it, as appropriate.

9.    Asbestos Personal Injury Claimant Release. In connection with the resolution of Asbestos Personal Injury Claims, the Asbestos Personal Injury Trust Distribution Procedures shall provide on the Effective Date, and shall not thereafter cease to provide, that all Holders of Asbestos Personal Injury Claims shall execute an Asbestos Personal Injury Claimant Release as a precondition to receiving payment on account of their Asbestos Personal Injury Claims from the Asbestos Personal Injury Trust. The Asbestos Personal Injury Claimant Release shall be substantially in the form attached hereto as Exhibit B, and shall not be amended after the Effective Date without the consent of the Reorganized Debtors and Meritor.

10.    Asbestos Personal Injury Trust Indemnification. The Asbestos Personal Injury Trust shall indemnify and hold harmless each of the Non-Debtor Affiliates, the Reorganized Debtors and their respective Representatives and each person serving as a director or officer of Maremont as of the Petition Date and thereafter (if any), other than a Non-Indemnified Party, against any liability, obligation, fee, judgment, settlement, or expense, including, without limitation, reasonable legal fees and expenses, arising from or incurred in connection with any action based upon, attributable to, or arising out of an Asbestos Personal Injury Claim or any violation of the Asbestos Personal Injury Channeling Injunction by any Entity, as and to the extent provided in the Asbestos Claims Indemnification Agreement.

11.    Consideration for Asbestos Personal Injury Channeling Injunction. The release of the Intercompany Claims by the Non-Debtor Affiliates, and the assignment, transfer, and conveyance of the other Asbestos Personal Injury Trust Assets to the Asbestos Personal Injury Trust on the Effective Date supports the

imposition of the Asbestos Personal Injury Channeling Injunction in favor of all of the Protected Parties as of the Effective Date.

12.     Termination of Meritor Obligation to Fund the Settlement Payment.  Notwithstanding any other provision of the Plan, the obligations of Meritor to support the Plan and to contribute the Settlement Payment, shall expire if (a) the Plan is not approved by the required number of voting claimants under the terms of the Bankruptcy Code, (b) the Confirmation Order is not entered by the Confirmation Order Outside Date or (c) the Effective Date does not occur by the Plan Effective Date Outside Date, unless Meritor, Maremont, the Asbestos Claimants Committee, and the Future Claimants' Representative otherwise agree in writing.

13.     Institution and Maintenance of Legal and Other Proceedings.  From and after the Effective Date, the Asbestos Personal Injury Trust shall be empowered and entitled, in its sole and absolute discretion and at its own expense, to pursue, compromise or settle all legal actions and other proceedings related to any asset, liability, or responsibility of the Asbestos Personal Injury Trust that is not released pursuant to the Plan.

14.     Asbestos Personal Injury Trust Expenses.  The Asbestos Personal Injury Trust shall pay all Asbestos Personal Injury Trust Expenses from the Asbestos Personal Injury Trust Assets.  None of the Plan Proponents, the Debtors' Estates, the Reorganized Debtors, nor any other Protected Party shall have any obligation to pay any Asbestos Personal Injury Trust Expenses or any other liabilities of the Asbestos Personal Injury Trust. The Asbestos Personal Injury Trust shall promptly pay all Asbestos Personal Injury Trust Expenses incurred by the Reorganized Debtors for any and all liabilities, costs, or expenses as a result of taking any action on behalf of, and at the direction of, the Asbestos Personal Injury Trust.

15.     Investment Policy.  Pursuant to the Asbestos Personal Injury Trust Agreement, all monies held in the Asbestos Personal Injury Trust shall be invested, subject to the investment limitations and provisions enumerated in the Asbestos Personal Injury Trust Agreement, and shall not be limited to the types of investments described in section 345 of the Bankruptcy Code.

16.     Excess Asbestos Personal Injury Trust Assets.  To the extent there are any Asbestos Personal Injury Trust Assets remaining at such time as the Asbestos Personal Injury Trust is dissolved, such excess Asbestos Personal Injury Trust Assets shall be transferred to a charity or charities for such charitable purposes as the Asbestos Personal Injury Trustee, in his, her, or their reasonable discretion, shall determine, provided that, if practicable, the charity or charities to which such excess Asbestos Personal Injury Trust Assets are transferred shall be related to the treatment of, research on, or the relief of suffering of individuals suffering from asbestos-related disorders.

17.     Dissolution of Asbestos Personal Injury Trust.  Upon dissolution of the Asbestos Personal Injury Trust: (a) the Asbestos Personal Injury Trustee, members of the Asbestos Personal Injury Trust Advisory Committee and the Post-Effective Date Future Claimants' Representative shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Cases; and (b) the Asbestos Personal Injury Trust Advisory Committee shall be dissolved and the Post-Effective Date Future Claimants' Representative shall be deemed terminated.

F.     *Environmental Claims*

1.     No bar date has been established in these Chapter 11 Cases for the filing of Environmental Claims, and Holders of Environmental Claims are not required to file Proofs of Claim in these Chapter 11 Cases. Pursuant to the Environmental Assumption and Indemnification Agreement and this Plan, Environmental Claims will be assumed by and one or more Responsible Meritor Affiliates and Meritor HVS will indemnify, defend, pay the defense costs for, and hold harmless the Reorganized Debtors and their affiliates from and against any Environmental Claims and associated costs, expenses, actions, Causes of Action, suits, controversies, damages, demands, debts, liabilities or obligations of any nature as set forth in and to the extent provided under the Environmental Assumption and Indemnification Agreement.  Each Environmental Claim shall pass through the Plan, and the Holder of such Environmental Claim shall retain all legal, equitable, and contractual rights to which such Environmental Claim entitles such Holder, subject to the rights of the Debtors, the Reorganized Debtors and (upon assumption of such Environmental Claims by one or more Responsible Meritor Affiliates) pursuant to the Environmental Assumption and

Indemnification Agreement and this Plan, to contest or otherwise defend against such Environmental Claim when and if such Environmental Claim is sought to be enforced.

2.      Pursuant to the Environmental Assumption and Indemnification Agreement one or more Responsible Meritor Affiliates shall be responsible for any ongoing management or other costs and expenses related to any Environmental Claims at the Environmental Sites.  Without limiting the generality of the foregoing, in connection with such assumption and/or indemnity related to the Environmental Sites, one or more Responsible Meritor Affiliates shall manage and control any such environmental liabilities at the Environmental Sites and may fulfill their obligations under the Environmental Assumption and Indemnification Agreement by complying with the least stringent remediation requirements allowed by applicable law to the extent satisfactory to the relevant agency with jurisdiction or otherwise sufficient to resolve any such environmental liability.  In furtherance of and in connection with the assumption of liabilities and indemnification provided for by the Environmental Assumption and Indemnification Agreement, Maremont shall assign to one or more Responsible Meritor Affiliates and such Responsible Meritor Affiliate(s) shall assume all right, title, and ownership of the real property owned by Maremont in Paulding, Ohio.

G.      *Payment of Other Claims*

On the Effective Date, the Reorganized Debtors shall (a) with respect to each unpaid Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, Secured Claim and General Unsecured Claim, either pay the Allowed amount of such claim in full in Cash (collectively, the "Effective Date Payment") or reserve Cash sufficient for payment of the Allowed amount of such claim in full and (b) reserve Cash sufficient for payment of all legal fees and expenses reasonably likely to be incurred by the Reorganized Debtors through the closing of the Chapter 11 Cases, including all legal fees and expenses necessary to defend to final resolution any appeal of the Confirmation Order, hearing on a Professional Fee Claim, and any adversary proceeding pending as of the Effective Date (the aggregate amount of such reserved Cash pursuant to clauses (a) and (b), the "Reserve Funds").  The Reorganized Debtors will transfer, or cause to be transferred, to the Asbestos Personal Injury Trust any Reserve Funds remaining following the Reorganized Debtors' payment in full of all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims and Allowed General Unsecured Claims as well as all other post-Effective Date legal fees and expenses.

H.      *Timing of Effective Date Transactions*

1.      On the Effective Date, the following shall be deemed for all purposes to have occurred simultaneously:

(a)      the establishment of the Asbestos Personal Injury Trust;

(b)      the making of the Meritor Contribution to Maremont;

(c)      the making of the Maremont Contribution to the Asbestos Personal Injury Trust; and

(d)      the vesting of the Asbestos Personal Injury Trust Assets in the Asbestos Personal Injury Trust, as more fully described in Section IV.E.3 above.

2.      Also on the Effective Date, but after the occurrence of the events in each of Section IV.H.1(a) through Section IV.H.1(d), above, the following events shall be deemed for all purposes to have occurred simultaneously:

(a)      the effectiveness of Reorganized Maremont's Bylaws and Reorganized Maremont's Certificate of Incorporation;

(b)      the appointment of the officer and director of the Reorganized Debtors, as identified in the Plan Supplement and, thereafter, attached as Exhibit M hereto; and

27

(c)    any Distributions required to be made on the Effective Date (or as soon thereafter as is reasonably practicable) and that are actually made on or as soon as reasonably practicable after the Effective Date.

3.    Unless the Plan or the Confirmation Order provide otherwise, actions required to be taken on the Effective Date or as soon thereafter as is reasonably practicable shall be deemed to have been made on the Effective Date if made on or as soon as reasonably practicable after the Effective Date.

I.    *The Reorganized Debtors' Corporate Existence*

On the Effective Date, Reorganized Maremont shall issue the Reorganized Maremont Stock to the Asbestos Personal Injury Trust. Each of the Reorganized Subsidiaries shall remain wholly owned subsidiaries of Reorganized Maremont. Except as otherwise provided herein or as may be provided in the Plan Supplement or the Confirmation Order, the Reorganized Debtors will continue to exist after the Effective Date as separate corporate entities, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which the Reorganized Debtors are incorporated and pursuant to Reorganized Maremont's Bylaws, Reorganized Maremont's Certificate of Incorporation and any other formation documents in effect following the Effective Date, and such documents are deemed to be adopted pursuant to the Plan and require no further action or approval.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action in favor of any Debtor not otherwise waived, relinquished, exculpated, released, compromised, or settled under the Plan or any Final Order, and any property acquired by any of the Debtors pursuant to the Plan, except for the Professional Fee Escrow Account, shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court, or notice to any other Entity, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Without limiting the foregoing, the Reorganized Debtors may pay the charges they incur on or after the Effective Date for the fees, disbursements and expenses of Retained Professionals without application to the Bankruptcy Court.

J.    *Asbestos Creditors Committee and Future Claimants' Representative Professional Fees*

The Debtors shall, on or prior to the Effective Date, pay the accrued and unpaid reasonable and documented fees and expenses incurred prior to the Effective Date by the Asbestos Creditors Committee and the Future Claimants' Representative and their respective counsel, to the extent provided for under the Bankruptcy Code.

K.    *Effectuating Documents; Further Transactions*

On and after the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to implement the provisions of the Plan, including, without limitation, the creation of the Asbestos Personal Injury Trust and the preparations for the transfer of the Asbestos Personal Injury Trust Assets to the Asbestos Personal Injury Trust.

From and after the Effective Date, the Reorganized Debtors shall be governed pursuant to Reorganized Maremont's Bylaws, Reorganized Maremont's Certificate of Incorporation and any other applicable formation documents. The Reorganized Debtors and their officer and director shall be authorized to issue, execute, deliver, file, or record such agreements, instruments, releases, and other documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Restructuring Transactions, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan. The authorizations and approvals contemplated by this Section IV.K shall be effective notwithstanding any requirements under non-bankruptcy law.

**L.** *Reorganized Maremont's Bylaws and Reorganized Maremont's Certificate of Incorporation*

On or promptly after the Effective Date, the Reorganized Debtors will file Reorganized Maremont's Certificate of Incorporation with the Secretary of State in Delaware. After the Effective Date, the Reorganized Debtors may amend and restate Reorganized Maremont's Bylaws, Reorganized Maremont's Certificate of Incorporation and any other constituent documents as permitted by the laws of Delaware.

**M.** *Director and Officer of the Reorganized Debtors*

On the Effective Date, the Reorganized Maremont Board, as well as the officer of Reorganized Maremont and the director and officer of the Reorganized Subsidiaries, shall consist of the individual that will be identified in the Plan Supplement and, thereafter, attached as Exhibit M hereto.

**N.** *Corporate Action*

Upon the Effective Date, all actions contemplated by or necessary to effectuate the Plan shall be deemed authorized and approved in all respects, including: (1) rejection of Executory Contracts, except as otherwise provided in the Plan Supplement and, thereafter, attached as Exhibit J hereto, or any order of the Bankruptcy Court; (2) installation of the Reorganized Maremont Board and Reorganized Subsidiary Boards as set forth in the Plan Supplement and, thereafter, attached as Exhibit M hereto; (3) execution and entry into the Asbestos Personal Injury Trust Documents; (4) implementation of the Restructuring Transactions contemplated by the Plan (including by way of (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law, (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the Plan and having other terms to which the applicable parties agree, and (c) the filing of appropriate certificates of formation and memoranda and articles of association and amendments thereto, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law); and (5) all other actions contemplated by the Plan (whether occurring before on or after the Effective Date). Except as expressly provided in this Article IV, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, manager(s), members, directors, or officers of the Debtors or the Reorganized Debtors.

**O.** *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of any Security or other property pursuant hereto, as well as any sale transactions consummated by the Debtors in accordance with the Plan on and after the Confirmation Date through and including the Effective Date, shall not be subject to any stamp, real estate, transfer, mortgage recording or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien, or other security interest, (2) the making or assignment of any lease or sublease, (3) any Restructuring Transaction, or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; (d) bills of sale; or (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

**P.** *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Debtor Release), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action

in their favor, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interest of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action. Except with respect to Causes of Action as to which the Debtors or Reorganized Debtors have expressly released any Person or Entity on or prior to the Effective Date (pursuant to the Debtor Release or otherwise), the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or Consummation of the Plan.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.    General Treatment*

As of the Effective Date, the Debtors shall be deemed to have rejected any and all Executory Contracts to which any Debtor is a party, except for (1) any Executory Contracts listed on the Assumed Executory Contract and Unexpired Lease List and (2) any Executory Contracts specifically addressed pursuant to an order of the Bankruptcy Court that becomes a Final Order on or before the Effective Date. As of the Effective Date, the Debtors shall be deemed to have assumed any and all Executory Contracts on the Assumed Executory Contract and Unexpired Lease List. The Debtors shall provide notice of any amendment to the Assumed Executory Contracts and Unexpired Lease List to the counterparties affected by such amendment and to the parties on any master service list established by the Bankruptcy Court in the Chapter 11 Cases. The fact that any contract or lease is listed on the Assumed Executory Contract and Unexpired Lease List shall not constitute or be construed to constitute an admission that such contract or lease is an Executory Contract within the meaning of section 365 of the Bankruptcy Code or that any of the Debtors or any of their respective successors in interest (including the Reorganized Debtors) has any liability thereunder.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejections or assumptions, as the case may be, pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, subject to the Debtors' right to amend the Assumed Executory Contract and Unexpired Lease List at any time prior to the Effective Date.

*B.    Cure of Defaults*

On or as soon as reasonably practicable after the Effective Date, in accordance with section 365(b)(1) of the Bankruptcy Code, any monetary amounts by which each Executory Contract on the Assumed Executory Contract and Unexpired Lease List may be in default shall be satisfied in full by the payment of the proposed cure amount listed on the Assumed Executory Contract and Unexpired Lease List. In the event of a dispute regarding (1) the nature or amount of any cure payment, (2) the ability of the Debtors or the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract to be assumed, or (3) any other matter pertaining to the assumption, the payment of the cure amount, if any, shall occur following entry of a Final Order resolving the dispute.

*C.    Rejection Damages Claims*

In the event that the rejection of an Executory Contract by any of the Debtors pursuant to the Plan results in damages to a non-Debtor counterparty to such Executory Contract, a claim for such damages shall be forever barred and shall not be enforceable against any of the Debtors or the Reorganized Debtors, any of their respective Affiliates, or any of their respective properties or interests in property, and the non-Debtor counterparty shall be barred from

receiving any Distribution under the Plan on account of such Claim, unless a Proof of Claim with respect to such damages is filed with the Bankruptcy Court and served upon counsel for the Debtors on or before the Rejection Damages Claims Bar Date. All Rejection Damages Claims shall remain Disputed, subject to the procedures for disputed claims set forth in Article VII, unless and until, and only to the extent, such Rejection Damages Claim has become Allowed pursuant to (1) a Final Order of the Bankruptcy Court, (2) the terms of an agreement by and among the Holder(s) of such Rejection Damages Claim and one or more of the Debtors (or Reorganized Debtors, as the case may be), or (3) a provision of the Plan expressly allowing such Rejection Damages Claim.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A.    Distributions Generally*

Other than with respect to payments to be made on account of Asbestos Personal Injury Claims and Asbestos Personal Injury Trust Expenses from the Asbestos Personal Injury Trust, the Reorganized Debtors shall make all Distributions required to be made under the Plan as provided under this Article VI. All distributions to be made by the Asbestos Personal Injury Trust shall be made in accordance with the terms of the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures.

*B.    Record Date for Holders of Claims*

Except as otherwise provided in a Final Order, the transferees of Claims that are transferred pursuant to Rule 3001 of the Bankruptcy Rules on or prior to the Distribution Record Date shall be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

*C.    Timing of Distributions*

Except as otherwise provided herein, any Distributions to be made hereunder on account of Allowed Claims (other than Asbestos Personal Injury Claims) shall be made (1) on the Effective Date or as soon thereafter as is practicable for Claims that are Allowed as of the Effective Date or (2) within thirty (30) days of the date on which a Claim becomes Allowed if such Claim becomes Allowed after the Effective Date.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on, or as soon as reasonably practicable after, the next succeeding Business Day, but shall be deemed to have been completed as of the required date, and no interest shall accrue or be payable on any such payment on the basis that such payment was not actually made on the required date.

*D.    Postpetition Interest on Claims*

Except as otherwise provided in this Plan, the Plan Documents or the Confirmation Order, Holders of Claims and Interests shall not be entitled to interest, dividends or accruals on the Distributions provided for herein, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

*E.    Delivery of Distributions*

1.    Delivery of Distributions in General

All Distributions to any Holder of an Allowed Claim shall be made at the address of such Holder as set forth on (a) any Schedules filed with the Bankruptcy Court, (b) a Proof of Claim filed by or on behalf of such Holder in the Chapter 11 Cases, or (c) the books and records of the Debtors, unless the Debtors or the Reorganized Debtors, as applicable, have been notified in writing of a change of address.

If any Holder's Distribution is returned as undeliverable, then no further Distributions to such Holder shall be made unless and until the Reorganized Debtors are notified of such Holder's then-current address, at which time any missed Distribution shall be made to such Holder without interest. A Cash Distribution that is not claimed by the expiration of six (6) months from the date that such Distribution was made – along with any further Distributions withheld under this Section – shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in the Reorganized Debtors, and the Claim of any Holder to such Distributions or any further Distributions shall be discharged and forever barred. Nothing contained in the Plan shall require any of the Debtors or Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

    2.    <u>Cash Distributions</u>

At the option of the Debtors or Reorganized Debtors, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in any applicable agreement.

Checks issued by the Reorganized Debtors in respect of Distributions on Allowed Claims shall be null and void if not presented for payment within ninety (90) days after the date of issuance thereof. Requests for reissuance of any check shall be made in writing to the Reorganized Debtors by the Holder of the Allowed Claim to whom such check originally was issued on or before thirty (30) days after the expiration of the ninety (90) day period following the date of issuance of such check. All funds held on account of a check voided in accordance with this Section VI.E.2 shall be returned to the Reorganized Debtors, and the Claim of any Holder to such Distributions shall be discharged and forever barred.

    3.    <u>Fractional Cents</u>

No payment of fractional cents will be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with fractions of more than half a penny being rounded up and fractions of half of a penny or less being rounded down.

    4.    <u>Setoff and Recoupment</u>

Any Debtor or Reorganized Debtor (or the Asbestos Personal Injury Trust to the extent it pertains to an Asbestos Personal Injury Claim) may, but shall not be required to, set off and/or recoup against any Claim (for purposes of determining the Allowed Amount of such Claim on which a Distribution shall be made), any claims of any nature whatsoever that any Debtor or Reorganized Debtor (or the Asbestos Personal Injury Trust to the extent it pertains to an Asbestos Personal Injury Claim) may have against the Holder of such Claim, and the failure to do so shall not constitute a waiver or release by any Debtor or Reorganized Debtor of any such claims that any Debtor or Reorganized Debtor may have against the Holder of such Claim.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS OTHER THAN ASBESTOS PERSONAL INJURY CLAIMS AND PROFESSIONAL FEE CLAIMS**

All Disputed Claims against the Debtors other than Asbestos Personal Injury Claims and Professional Fee Claims shall be subject to the provisions of this Article VII.

*A.*    *Objection to and Estimation of Claims Other than Asbestos Personal Injury Claims and Professional Fee Claims*

Except as otherwise provided herein, including in Sections VII.C and VII.D, the Debtors or Reorganized Debtors, as the case may be, shall be entitled to file objections to Claims that have been brought in the Bankruptcy Court or should properly have been brought in the Bankruptcy Court but were brought in other forums, on or before the date that is sixty (60) days after the Effective Date (unless such day is not a Business Day, in which case such deadline shall be the next Business Day thereafter), as the same may be extended from time to time by the Bankruptcy Court. In addition, the Debtors or Reorganized Debtors, as the case may be, may, before the expiration of such period,

request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim for any reason pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate such Claim at any time, including, without limitation, during the pendency of litigation concerning any objection to any Claim or of any appeal relating thereto. The Debtors and Reorganized Debtors shall be authorized to settle, compromise, withdraw or litigate to judgment such objections without further approval of the Bankruptcy Court. The foregoing shall not apply to Asbestos Personal Injury Claims or Professional Fee Claims.

B.      *Payments and Distributions with Respect to Disputed Claims*

Notwithstanding any other provision hereof, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

C.      *Resolution of Asbestos Personal Injury Claims*

All Asbestos Personal Injury Claims shall be resolved by the Asbestos Personal Injury Trust in accordance with Section IV.E of the Plan, pursuant to the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures. Only the Asbestos Personal Injury Trust will have the right to object to and/or resolve Asbestos Personal Injury Claims. All Asbestos Personal Injury Claims must be submitted solely to the Asbestos Personal Injury Trust for payment, which shall be in accordance with the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures.

D.      *Resolution of Professional Fee Claims*

Professional Fee Claims shall be determined and, if Allowed, paid by Maremont or Reorganized Maremont in accordance with Section II.B of the Plan.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Debtors and Reorganized Debtors*

Except as specifically provided in the Plan or in the Confirmation Order, pursuant to sections 524 and 1141(d)(1)(A) of the Bankruptcy Code, confirmation of the Plan shall discharge the Debtors and Reorganized Debtors on the Effective Date from any and all Claims and Demands of any nature whatsoever, including, without limitation, all Claims and liabilities that arose before the Confirmation Date and all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code whether or not: (1) a Proof of Claim based on such Claim was filed under section 501 of the Bankruptcy Code, or such Claim was listed on any of the Debtors' Schedules; (2) such Claim is or was allowed under section 502 of the Bankruptcy Code; or (3) the Holder of such Claim has voted on or accepted the Plan. Except as otherwise specifically provided for in the Plan, as of the Effective Date, the rights provided in the Plan to Holders of Claims, Demands and Interests shall be in exchange for and in complete satisfaction, settlement and discharge of all Claims (including, without limitation, Asbestos Personal Injury Claims) and Demands against, Liens on, and Interests in the Debtors, the Reorganized Debtors and all of their respective assets and properties.

B.      *Maremont Discharge Injunction*

**Except as specifically provided in the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims or Demands against any Debtor are permanently enjoined, on and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind against any Debtor, Reorganized Debtor, or their respective property with respect to such Claim or Demand; (2) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against any Debtor, Reorganized Debtor, or their respective property with respect to such Claim or Demand; (3) creating, perfecting, or enforcing any Encumbrance of any kind against any Debtor, Reorganized Debtor,**

33

or their respective property with respect to such Claim or Demand; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to any Debtor or against the property or interests in property of any Debtor, with respect to such Claim or Demand; and/or (5) commencing or continuing any action, in any manner and in any place in the world, against any Debtor, Reorganized Debtor, or their respective property that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. The foregoing injunction shall extend to the successors of the Debtors (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property. The discharge provided in this provision shall void any judgment obtained against any Debtor at any time, to the extent that such judgment relates to a discharged Claim or Demand.

C.    *Asbestos Personal Injury Channeling Injunction*

1.    <u>Terms</u>. Pursuant to section 524(g) of the Bankruptcy Code, from and after the Effective Date, the sole recourse of any Holder of an Asbestos Personal Injury Claim on account of such Asbestos Personal Injury Claim shall be to the Asbestos Personal Injury Trust pursuant to this Section VIII.C.1 of the Plan and the Asbestos Personal Injury Trust Distribution Procedures, and such Holder shall have no right whatsoever at any time to assert its Asbestos Personal Injury Claim against any Protected Party or any property or interest in property of any Protected Party. On and after the Effective Date, all present and future Holders of Asbestos Personal Injury Claims shall be permanently and forever stayed, restrained, barred and enjoined from taking any of the following actions for the purpose of, directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Asbestos Personal Injury Claim other than from the Asbestos Personal Injury Trust pursuant to the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures:

(a)    commencing, conducting, or continuing in any manner, directly, indirectly or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interests in property of any Protected Party;

(b)    enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interests in property of any Protected Party;

(c)    creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Encumbrance against any Protected Party or any property or interests in property of any Protected Party;

(d)    setting off, seeking reimbursement of, contribution from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to any Protected Party or any property or interests in property of any Protected Party; and

(e)    proceeding in any manner in any place with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Asbestos Personal Injury Trust, except in conformity and compliance with the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures.

2.    <u>Reservations</u>.    This Asbestos Personal Injury Channeling Injunction shall not stay, restrain, bar, or enjoin:

(a)    the rights of Holders of Asbestos Personal Injury Claims to assert Asbestos Personal Injury Claims against the Asbestos Personal Injury Trust in accordance with the Asbestos Personal Injury Trust Distribution Procedures; and

(b)    the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Asbestos Personal Injury Trust Expenses against the Asbestos Personal Injury Trust.

D.    *Exculpation and Section 1125(e) Protection*

1.    Upon the Effective Date, none of the Exculpated Fiduciaries shall have or incur any liability to any Entity for any act or omission in connection with, related to, or arising out of the: (1) Chapter 11 Cases; (2) negotiation, formulation and preparation of the Plan and the other Plan Documents, and any of the terms and/or settlements and compromises reflected in the Plan and the other Plan Documents; (3) solicitation of votes in favor of the Plan and pursuit of confirmation of the Plan; (4) consummation of the Plan, or administration of the Plan or the property to be distributed under the Plan or the Asbestos Personal Injury Trust Distribution Procedures; (5) releases and injunctions contained in the Plan; or (6) management or operation of any Debtor during the Chapter 11 Cases, except for any liability that results from such Entity's willful misconduct or gross negligence as determined by a Final Order.

2.    Each of the Section 1125(e) Protected Parties shall be deemed to have acted in "good faith" under section 1125(e) in connection with the solicitation and/or participation in this Plan. Each of the Section 1125(e) Protected Parties shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.

E.    *Releases by Debtors and Estate and Related Injunction*

1.    Except as otherwise expressly provided in the Plan or the Confirmation Order (including with respect to the treatment of the FFIC Agreement, the Zurich Agreement and the Everest Agreement), on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors, and any Entity seeking to exercise the rights of the Estates, in each case, whether individually or collectively, including, without limitation, any successor to any Debtor or any Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, shall, and shall be deemed to, completely and forever release, waive and discharge unconditionally the Non-Estate Representative Released Parties from any and all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action and liabilities which any of the Debtors, their respective Estates, or Reorganized Debtors is entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, whether direct, indirect, or derivative, based upon, attributable to, or arising out of, in whole or in part, any act or omission, transaction, or occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) (other than the rights under the Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder), including, without limitation, the Non-Estate Representative Released Party Claims.

2.    Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors, and any Entity seeking to exercise the rights of the Estates, in each case whether individually or collectively, including, without limitation, any successor to any Debtor or any Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, shall, and shall be deemed to, completely and forever release, waive and discharge unconditionally the Released Parties (other than the Non-Estate Representative Released Parties, which Parties are the subject of Section VIII.E.1 above) from any and all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights,

Causes of Action and liabilities which any of the Debtors, their Estates, or Reorganized Debtors is entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, whether direct, indirect, or derivative, based upon, attributable to, arising out of, in whole or in part, any act or omission, transaction, or occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) (other than the rights under the Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder); provided, however, that nothing contained in this Section VIII.E.2 is intended to operate as a release of any liability based upon gross negligence or willful misconduct as determined by a Final Order.

3.      Except as provided in the Plan or the Confirmation Order, the Debtors, the Reorganized Debtors, and any and all Entities seeking to exercise the rights of any Debtor's Estate, in each case, whether individually or collectively, including, without limitation, any successor to any Debtor or any Debtor's Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, are permanently enjoined from taking any of the following actions on account of or based upon any and all Claims, obligations, suits, judgments, damages, Demands, debts, rights, Causes of Action and liabilities released pursuant to this Section VIII.E: (a) commencing or continuing any action or other proceeding against the Released Parties or the Non-Estate Representative Released Parties or their respective property; (b) enforcing, attaching, collecting or recovering any judgment, award, decree or order against the Released Parties or the Non-Estate Representative Released Parties or their respective property; (c) creating, perfecting or enforcing any Encumbrance against the Released Parties or the Non-Estate Representative Released Parties or their respective property; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Released Parties or the Non-Estate Representative Released Parties or against their respective property; and (e) commencing or continuing any action, in any manner and in any place in the world, against the Released Parties or the Non-Estate Representative Released Parties that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

F.      *Release by Holders of Claims and Interests*

1.      As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Holder of a Claim against, or Interest in, any of the Debtors who receives a Distribution pursuant to the Plan or who votes to approve the Plan shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action and liabilities whatsoever against the Released Parties and the Non-Estate Representative Released Parties, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estate, the conduct of the Debtors' business, the Chapter 11 Cases, this Plan or the Reorganized Debtors (other than the rights under this Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder), including, for the avoidance of doubt, any and all Causes of Action that the Holder of an Asbestos Personal Injury Claim, the Asbestos Personal Injury Trust, or the Future Claimants Representative did or could have commenced against any officer or director of any of the Debtors (in such capacity) that is based upon or arising from any acts or omissions of such officer or director occurring prior to the Effective Date on account of such Asbestos Personal Injury Claim, to the fullest extent permitted under section 524(g) of the Bankruptcy Code and applicable law (as now in effect or subsequently extended); provided, however, that nothing contained in this Section VIII.F.1 is intended to (a) operate as a release of (i) any claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities of the United States or any enforcement or regulatory agency thereof; (ii) any claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities of any State or any enforcement or regulatory agency of any State, under state or federal environmental laws; or (iii) any criminal liability under the laws of the United States or any State, or (b) affect the treatment of Asbestos Personal Injury Claims pursuant to this Plan and the channeling of Asbestos Personal Injury Claims pursuant to the Asbestos Personal Injury Channeling Injunction; provided, further, that the releases set forth in this Section VIII.F.1 shall not be granted or be deemed to have been granted by any Entity who returns the Opt-Out Election Form, within thirty (30) days after entry of the Effective Date, to the address specified on the Opt-Out Election Form, specifying that such Entity elects not to grant the releases contained

36

**in this Section VIII.F.1. Any election in the Opt-Out Election Form not to grant the releases contained in this Section VIII.F.1. shall not affect or alter the requirement that all Holders of Asbestos Personal Injury Claims must execute an Asbestos Personal Injury Claimant Release as a precondition to receiving payment on account of their Asbestos Personal Injury Claims from the Asbestos Personal Injury Trust.**

G.      *Certain Waivers*

1.      **Although the Debtors do not believe that California law is applicable to the Plan, nevertheless, in an abundance of caution, the Debtors hereby affirm that they understand and waive the effect of section 1542 of the California Civil Code to the extent that such section is applicable to any Debtor or any Debtor's Estate.  Section 1542 of the California Civil Code provides:**

> **§ 1542.  A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.**

**THE DEBTORS AGREE TO ASSUME THE RISK OF ANY AND ALL UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS WHICH ARE RELEASED BY THE PLAN AND THE DEBTORS HEREBY WAIVE AND RELEASE ALL RIGHTS AND BENEFITS WHICH ANY DEBTOR OR ANY DEBTOR'S ESTATE MIGHT OTHERWISE HAVE UNDER THE AFOREMENTIONED SECTION 1542 OF THE CALIFORNIA CIVIL CODE WITH REGARD TO THE RELEASE OF SUCH UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.  TO THE EXTENT (IF ANY) ANY OTHER LAWS SIMILAR TO SECTION 1542 OF THE CALIFORNIA CIVIL CODE MAY BE APPLICABLE, THE DEBTORS HEREBY WAIVE AND RELEASE ANY BENEFIT, RIGHT OR DEFENSE WHICH ANY DEBTOR OR ANY DEBTOR'S ESTATE MIGHT OTHERWISE HAVE UNDER ANY SUCH LAW WITH REGARD TO THE RELEASE OF UNKNOWN, UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.**

H.      *Disallowed Claims*

The Confirmation Order, except as otherwise provided therein or herein, shall constitute an order: (1) disallowing all Claims (other than Asbestos Personal Injury Claims) to the extent such Claims are not allowable under any provision of section 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims, and Claims for unmatured interest, and (2) disallowing or subordinating, as the case may be, any Claims, or portions of Claims, for penalties or non-compensatory damages.  On and after the Effective Date, the Debtors and their Estates shall be fully and finally discharged from any liability or obligation on a Disallowed Claim, and any order creating a Disallowed Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

I.      *Indemnification Obligations*

1.      Indemnification of Maremont Related Parties

As of the Effective Date, the Reorganized Debtors and the Asbestos Personal Injury Trust will, pursuant to the Asbestos Claims Indemnification Agreement, indemnify, release and hold harmless each Non-Debtor Affiliate and all Representatives of the Debtors and the Non-Debtor Affiliates, in each case other than any Non-Indemnified Party, in respect of any liability, obligation, fee, judgment, settlement, or expense, including, without limitation, legal fees and expenses, arising from or incurred in connection with any action based upon, attributable to, or arising out of

an Asbestos Personal Injury Claim, or any violation of the Asbestos Personal Injury Channeling Injunction by any Entity.

2.    Indemnification and Reimbursement of Certain Representatives

For purposes of the Plan, the obligations of Maremont or any Non-Debtor Affiliate to indemnify and reimburse persons who are, or were as of the Petition Date or at any time thereafter, directors, officers, or employees of any Debtor against and for any obligations as provided in such Debtor's certificate of incorporation, by-laws, applicable state law, or other agreement, or any combination of the foregoing, shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Petition Date; provided, however, that, pursuant to the Asbestos Claims Indemnification Agreement, such obligations (other than any obligations owed to Non-Indemnified Parties) shall be assumed by the Asbestos Personal Injury Trust on the Effective Date and the Asbestos Personal Injury Trust shall agree to indemnify, defend, pay the defense costs for, and hold harmless the Reorganized Debtors, the Non-Debtor Affiliates, and the Debtors' current and former directors, officers and employees, and the respective Representatives of the foregoing (other than any Non-Indemnified Parties), from and against any and all Asbestos Personal Injury Claims and any and all associated costs, expenses, actions, Causes of Action, suits, controversies, damages, demands, debts, liabilities or obligations of any nature, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, liquidated or unliquidated, matured or not matured, contingent or direct, whether arising at common law, in equity or under any statute.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

*A.    Conditions Precedent to the Confirmation of the Plan*

The following are conditions precedent to confirmation of the Plan that are designed, among other things, to ensure that the injunctions, releases and discharges set forth in Article VIII shall be effective, binding and enforceable and that must be satisfied, unless waived in accordance with Section IX.C below:

1.    The Bankruptcy Court shall have entered an order, acceptable in form and substance to the Plan Proponents, approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

2.    The Confirmation Order shall be acceptable in form and substance to the Plan Proponents, the Asbestos Claimants Committee, and the Future Claimants' Representative.

3.    The Confirmation Order shall, among other things:

(a)    order that the Confirmation Order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

(b)    provide that, except with respect to obligations specifically preserved in the Plan, the Debtors are discharged effective on the Effective Date (in accordance with the Plan) from any Claims and Demands, and the Debtors' liability in respect thereof, whether reduced to judgment or contingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, or known or unknown, that arose from any agreement of any Debtor entered into or obligation of any Debtor incurred before the Effective Date, or from any conduct of any Debtor prior to the Effective Date, whether such liability accrued before or after the Petition Date, is extinguished completely;

(c)    authorize the implementation of the Plan in accordance with its terms;

38

(d)     approve the Asbestos Personal Injury Channeling Injunction;

(e)     provide that the Asbestos Personal Injury Trust shall receive the Reorganized Maremont Stock as of the Effective Date;

(f)     provide that the Asbestos Personal Injury Trust and the Reorganized Debtors shall execute and deliver the Asbestos Claims Indemnification Agreement;

(g)     provide that the parties to the Environmental Assumption and Indemnification Agreement shall execute and deliver the Environmental Assumption and Indemnification Agreement;

(h)     provide that all transfers of assets of the Debtors contemplated under the Plan shall be free and clear of all Claims and Encumbrances against or on such assets;

(i)     except as otherwise provided in the Plan or Confirmation Order, provide that the assets revesting in the Reorganized Debtors shall be free and clear of all Claims and Encumbrances;

(j)     provide that any transfers effected or entered into, or to be effected or entered into, under the Plan shall be and are exempt under section 1146(a) of the Bankruptcy Code from any state, city or other municipal transfer taxes, mortgage recording taxes and any other stamp or similar tax;

(k)     provide that the transfers of property by the Debtors to the Reorganized Debtors (i) are or will be legal, valid, and effective transfers of property; (ii) vest or will vest the Reorganized Debtors with good title to such property; (iii) do not and will not constitute avoidable transfers under the Bankruptcy Code or under other applicable bankruptcy or non-bankruptcy law; and (iv) do not and will not subject the Reorganized Debtors to any liability by reason of such transfer under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, any laws affecting or effecting successor or transferee liability;

(l)     provide that all Executory Contracts assumed or assumed and assigned by the Debtors during the Chapter 11 Cases or under the Plan, if any, shall remain in full force and effect for the benefit of the Reorganized Debtors or any assignee thereof notwithstanding any provision in such contract (including those provisions described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease;

(m)     approve the treatment of the Settling Insurers;

(n)     require, as a condition to receiving any distributions of any kind from the Asbestos Personal Injury Trust, that each Holder of an Asbestos Personal Injury Claim execute the Asbestos Personal Injury Claimant Release; and

(o)     approve in all respects the other settlements, transactions and agreements to be effected pursuant to the Plan, including, without limitation, the Asbestos Personal Injury Trust Agreement, the Asbestos Personal Injury Trust Distribution Procedures, and the other Asbestos Personal Injury Trust Documents, and the releases herein of the Released Parties and Non-Estate Representative Released Parties.

4.  In addition to the foregoing, the Confirmation Order shall contain the following findings of fact and conclusions of law, among others:

(a)  the Plan complies with all applicable provisions of the Bankruptcy Code, including, without limitation, those requiring that the Plan be proposed in good faith and that the Confirmation Order not be procured by fraud;

(b)  the Plan and its acceptance otherwise comply with sections 524(g) and 1126 of the Bankruptcy Code, and confirmation of the Plan is in the best interests of all creditors;

(c)  the Plan does not provide for the liquidation of all or substantially all of the property of the Debtors, the Reorganized Debtors will operate as an ongoing business and continue in business as separate corporate entities, and confirmation of the Plan is not likely to be followed by the liquidation of any of the Reorganized Debtors or the need for further financial reorganization;

(d)  as of the Petition Date, the Debtors had been named as defendants in personal injury, wrongful death or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(e)  upon the Effective Date, the Asbestos Personal Injury Trust shall assume the liabilities of the Debtors with respect to Asbestos Personal Injury Claims;

(f)  the Asbestos Personal Injury Trust is to be funded by contribution of the Asbestos Personal Injury Trust Assets, including the Maremont Contribution and the Meritor Contribution;

(g)  the Asbestos Personal Injury Trust will on the Effective Date own one hundred percent (100%) of the Reorganized Maremont Stock and all rights to receive dividends or other distributions on account of such stock;

(h)  the Asbestos Personal Injury Trust is to use its assets and income to pay Asbestos Personal Injury Claims and Asbestos Personal Injury Trust Expenses;

(i)  the Debtors are likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Personal Injury Claims, and all such Demands are subject to the Asbestos Personal Injury Channeling Injunction;

(j)  the actual amounts, numbers, and timing of Demands cannot be determined;

(k)  pursuit of Demands outside the procedures prescribed by the Plan and the Asbestos Personal Injury Trust Distribution Procedures is likely to threaten the Plan's purpose to deal equitably with Asbestos Personal Injury Claims;

(l)  the Plan separately classifies Asbestos Personal Injury Claims in Class 4, and at least two-thirds (2/3) in amount and seventy-five percent (75%) of the members in such Class that actually voted on the Plan have voted to accept the Plan;

(m)  the Asbestos Personal Injury Trust will have the sole and exclusive authority as of the Effective Date to satisfy or defend against all Asbestos Personal Injury Claims;

(n)     pursuant to: (i) the Asbestos Personal Injury Trust Distribution Procedures; (ii) court order; or (iii) otherwise, the Asbestos Personal Injury Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos Personal Injury Claims or other comparable mechanisms, that provide reasonable assurance that the Asbestos Personal Injury Trust will value, and be in a financial position to pay, current and future Asbestos Personal Injury Claims in substantially the same manner regardless of the timing of the assertion of such Asbestos Personal Injury Claims;

(o)     the Future Claimants' Representative was appointed by the Bankruptcy Court pursuant to section 524(g) of the Bankruptcy Code as part of the proceedings leading to the issuance of the Asbestos Personal Injury Channeling Injunction for the purpose, among other things, of protecting the interests of Future Demand Holders;

(p)     the Asbestos Personal Injury Channeling Injunction is to be implemented in accordance with the Plan and the Asbestos Personal Injury Trust;

(q)     the Asbestos Personal Injury Channeling Injunction is essential to the Plan and the Debtors' reorganization efforts;

(r)     the terms of the Asbestos Personal Injury Channeling Injunction and the other injunctions contained in the Plan, including any provisions barring actions against third parties, are set forth in the Plan and the Disclosure Statement;

(s)     the Meritor Contribution is essential to the feasibility of the Plan and the successful reorganization of Maremont;

(t)     the Maremont Contribution and Meritor Contribution collectively constitute a sufficient basis upon which to provide the Protected Parties with the protections afforded to them under the Plan, Plan Documents and Confirmation Order;

(u)     in light of the benefits provided, or to be provided, to the Asbestos Personal Injury Trust by or on behalf of each Protected Party, the Asbestos Personal Injury Channeling Injunction is fair and equitable to all Holders of Asbestos Personal Injury Claims (including Demands);

(v)     the release received by Maremont, Representatives of Maremont, and the Non-Estate Representative Released Parties in exchange for the Maremont Contribution and Meritor Contribution, respectively, is essential to the global settlement of Asbestos Personal Injury Claims arising from the conduct or products of the Debtors reflected in the Plan; and

(w)     any and all claims that Everest, Mt. McKinley, and Zurich (in each case to the extent such Entity is a Settling Insurer) may have against the Debtors, including, but not limited to, claims arising under the Everest Agreement or the Zurich Agreement (as applicable), are released in consideration for the benefits provided to such Settling Insurer under the Plan.

B.      *Conditions Precedent to the Effective Date*

The following are conditions precedent to occurrence of the Effective Date of the Plan that must be satisfied, unless waived in accordance with Section IX.C hereof:

1.    all conditions precedent to the Confirmation Date shall have been satisfied or waived and shall continue to be satisfied or waived, and the Confirmation Date shall have occurred on or before the Confirmation Order Outside Date unless otherwise mutually agreed by the Debtors, Meritor, the Asbestos Claimants Committee, and the Future Claimants' Representative;

2.    the Confirmation Order, in form and substance acceptable to the Plan Proponents, the Asbestos Claimants Committee, and the Future Claimants' Representative, shall have been entered by the Bankruptcy Court and affirmed by the District Court or issued by the District Court;

3.    no request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending;

4.    no fact or circumstance shall exist that would prevent the Asbestos Personal Injury Channeling Injunction from coming into full force and effect immediately upon the occurrence of the Effective Date;

5.    the Asbestos Claims Indemnification Agreement shall have been executed and delivered, and no fact or circumstance shall exist that prevents the Asbestos Claims Indemnification Agreement from being in full force and effect immediately upon the occurrence of the Effective Date;

6.    the Environmental Assumption and Indemnification Agreement shall have been executed and delivered, and no fact or circumstance shall exist that prevents the Asbestos Claims Indemnification Agreement from being in full force and effect immediately upon the occurrence of the Effective Date;

7.    no fact or circumstance shall prevent the Asbestos Personal Injury Trust from being funded by the Maremont Contribution and the Meritor Contribution upon occurrence of the Effective Date;

8.    all Plan Documents shall have been executed and delivered; and

9.    all other actions, documents and agreements necessary to implement those provisions of the Plan to be effectuated on or prior to the Effective Date, in form and substance satisfactory to the Plan Proponents, shall have been effected or executed and delivered.

C.    *Waiver of Conditions*

To the fullest extent permitted by law, any of the conditions precedent set forth in Sections IX.A and IX.B above may be waived or modified, in whole or in part, by the Plan Proponents with the consent of the Asbestos Claimants Committee and Future Claimants' Representative (which consent shall not be unreasonably withheld). Any such waiver or modification may be effected at any time without leave or order of the Bankruptcy Court or District Court, and without any other formal action.

D.    *Failure to Achieve the Effective Date*

If each of the conditions to the Effective Date is not met or duly waived in accordance with Section IX.C, then upon motion by the Plan Proponents and notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court. If (1) the Plan Proponents revoke or withdraw the Plan, (2) the Confirmation Order is vacated, (3) the Plan is otherwise not confirmed by a Final Order, or (4) the Plan is confirmed and does not become effective for any other reason, then the rights of all parties in interest in the Chapter 11 Cases are and shall be reserved in full. In any such event, the Plan shall become null and void in all respects; any settlement or compromise embodied in the Plan, any assumption or rejection of Executory Contracts effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and nothing contained in the Plan or the Confirmation Order, if previously entered, and no acts taken in preparation for Consummation of the Plan, shall: (a) constitute or be deemed to constitute a waiver, release or settlement of any Claims by or against, or any Interests in, any of the Debtors or any other Entity, (b) prejudice in any manner the rights of any Debtor or any Entity in any further proceedings involving one or more of the Debtors; nor (c) constitute an admission of any sort by a Debtor or any other Entity.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

*A.    Modification and Amendments*

Subject to the limitations contained herein and in the other Plan Documents, and except as otherwise ordered by the Bankruptcy Court, the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules and with the consent of the Asbestos Claimants Committee and the Future Claimants' Representative, which consent may not be unreasonably withheld, to alter, amend, or modify the Plan or any exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to entry of the Confirmation Order and may include such amended exhibits in the Plan, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, without additional disclosure pursuant to section 1125 of the Bankruptcy Code. A Holder of a Claim that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Bankruptcy Court, if any, such Holder changes its previous acceptance or rejection, to the extent such Holder is afforded the opportunity to do so under section 1127(d) of the Bankruptcy Code.

*B.    Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the Solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Federal Bankruptcy Rule 3019 or that any additional disclosure or re-solicitation performed was sufficient.

*C.    Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any claims by or against, or any Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

*A.    Retention of Jurisdiction*

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court and, to the extent applicable, the District Court, shall, to the fullest extent permitted by law, retain jurisdiction over all matters arising out of and related to the Chapter 11 Cases and the Plan, including, among other things, jurisdiction to:

(a)    hear and determine any and all objections to and proceedings involving the allowance, estimation, classification, and subordination of Claims that have been or properly should have been brought in the Bankruptcy Court (other than Asbestos Personal Injury Claims) or Interests;

(b)    hear and determine all objections to the termination of the Asbestos Personal Injury Trust;

43

(c)     hear and determine such other matters that may be set forth in or arise in connection with the Plan, the Confirmation Order, the Asbestos Personal Injury Channeling Injunction, or the Asbestos Personal Injury Trust Agreement;

(d)     hear and determine any proceeding that involves the validity, application, construction, enforceability, or modification of the Asbestos Personal Injury Channeling Injunction;

(e)     hear and determine any conflict or other issues that may arise in the Chapter 11 Cases, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Cases, and in the administration of the Asbestos Personal Injury Trust;

(f)     enter such orders as are necessary to implement and enforce the releases and injunctions described herein, including, if necessary, in connection with application of the protections afforded by section 524 of the Bankruptcy Code and/or the Plan to the Protected Parties;

(g)     hear and determine any and all applications for allowance of Professional Fee Claims and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan;

(h)     enter such orders authorizing non-material modifications to the Plan as may be necessary to comply with section 468B of the Internal Revenue Code;

(i)     hear and determine any applications pending on the Effective Date for the assumption, assumption and assignment, or rejection, as the case may be, of Executory Contracts to which any Debtor is a party, and to hear and determine and, if necessary, liquidate any and all Claims arising therefrom;

(j)     hear and determine any proceeding to enforce the provisions of the FFIC Settlement Agreement;

(k)     hear and determine any and all applications, Claims, causes of action, adversary proceedings, and contested or litigated matters that may be pending in the Chapter 11 Cases on the Effective Date or commenced by one or more Debtors or any other party in interest (including, without limitation, the Asbestos Personal Injury Trust) in the Chapter 11 Cases subsequent to the Effective Date;

(l)     consider any modifications of the Plan, and remedy any defect or omission or reconcile any inconsistency or make any other necessary modifications in or to the Plan, the Asbestos Personal Injury Trust Documents or any order of the Bankruptcy Court, including the Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan, to the extent authorized by the Bankruptcy Code and the Bankruptcy Rules; provided, that there shall be no modification made at any time that would reduce or eliminate any of the protections provided herein to the Protected Parties or releases provided hereunder;

(m)     hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, or consummation of the Plan or any Entity's obligations hereunder and issue orders in aid of confirmation, consummation and execution of the Plan to the extent authorized by section 1142 of the Bankruptcy Code, including, but not limited to, compelling the conveyance

of property and other performance contemplated under the Plan and documents executed in connection herewith;

(n)    hear and determine all questions and disputes and enter such orders or judgments, including, but not limited to, injunctions, as are necessary to (i) enforce the title, rights and powers of the Reorganized Debtors and the Asbestos Personal Injury Trust, and (ii) enable Holders of Claims to pursue their rights against any Entity that may be liable therefor pursuant to applicable law or otherwise;

(o)    hear and determine any proposed compromise and settlement of any Claim against or cause of action by or against any Debtor that has been or properly should have been brought in the Bankruptcy Court to the extent requested by the Reorganized Debtors;

(p)    hear and determine any timely objections to Administrative Expense Claims asserted or to Proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to allow or disallow any Disputed Claim, in whole or in part;

(q)    hear and determine matters concerning state, local and federal taxes, tax refunds, tax attributes, tax benefits, and similar or related matters with respect to Maremont, the Reorganized Debtors, or the Asbestos Personal Injury Trust arising on or prior to the Effective Date, arising on account of transactions contemplated by the Plan Documents, or relating to the period of administration of the Chapter 11 Cases;

(r)    hear and determine such other matters as may be set forth in the Confirmation Order or other orders of the Bankruptcy Court, or which may arise in connection with the Plan, the Confirmation Order, or the Effective Date, as may be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(s)    hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, or consummation of the Plan or any Entity's obligations hereunder, including, but not limited to, performance of the Debtors' duties under the Plan;

(t)    hear and determine all controversies, suits, and disputes regarding interpretation or enforcement of the Asbestos Claims Indemnification Agreement;

(u)    enforce remedies upon any default under the Plan;

(v)    hear and determine any other matter not inconsistent with the Bankruptcy Code;

(w)    hear and determine any claim that in any way challenges or is based on any provision in the Confirmation Order; and

(x)    enter a final decree closing the Chapter 11 Cases.

If and to the extent that the Bankruptcy Court is not permitted under applicable law to exercise jurisdiction over any of the matters specified above, the reference to the "Bankruptcy Court" in the preamble to this Section XI.A shall be deemed to be a reference to the "District Court." Notwithstanding anything in this Section XI.A to the contrary, the Asbestos Personal Injury Trust Agreement and the Asbestos Personal Injury Trust Distribution Procedures shall govern the satisfaction of Asbestos Personal Injury Claims and the forum in which Asbestos Personal Injury Claims shall be determined.

*B.*        *Post-Confirmation Modification of Plan*

Subject to the limitations contained herein and in the other Plan Documents, and except as otherwise ordered by the Bankruptcy Court, the Plan Proponents, with the consent of the Asbestos Claimants Committee and the Future Claimants' Representative, which consent may not be unreasonably withheld, may alter, amend, or modify the Plan or any exhibits thereto under section 1127(b) of the Bankruptcy Code and in accordance with the Plan Documents, at any time after the entry of the Confirmation Order and prior to substantial consummation of the Plan (1) in accordance with the requirements of sections 1122 and 1123 of the Bankruptcy Code, or (2) to remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan either with Bankruptcy Court approval or, so long as the interests of the Holders of Allowed Claims are not adversely affected thereby in any material respect, without Bankruptcy Court approval. A Holder of a Claim that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Bankruptcy Court, if any, such Holder changes its previous acceptance or rejection, to the extent such Holder is afforded the opportunity to do so under section 1127(d) of the Bankruptcy Code.

After the Effective Date, the Reorganized Debtors, Meritor, or the Asbestos Personal Injury Trust, as applicable, may remedy any defects or omissions or reconcile any inconsistencies in the Plan Documents for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan, so long as the interests of the Holders of Allowed Claims and other applicable parties-in-interest are not adversely affected thereby.

Notwithstanding anything in this Article XI, there shall be no modification to the Plan made at any time that would reduce or eliminate any of the protections provided herein, or in the releases provided hereunder, to the Protected Parties, without the consent of Meritor and the Debtors or Reorganized Debtors, as applicable.

*C.*        *Consent to Jurisdiction*

Upon default under the Plan, the Debtors, the Reorganized Debtors, Meritor, the Asbestos Personal Injury Trust, the Asbestos Personal Injury Trustee, the Asbestos Personal Injury Trust Advisory Committee, and the Future Claimants' Representative, respectively, consent to the jurisdiction of the Bankruptcy Court, and agree that it shall be the preferred forum for all proceedings relating to any such default.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*A.*        *Immediate Binding Effect*

Notwithstanding Federal Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the documents and instruments contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts. The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e) and 7062. Upon Confirmation of the Plan, the Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

*B.*        *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all Holders receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *FFIC Settlement Agreement*

The terms and conditions of the FFIC Settlement Agreement are expressly incorporated into this Plan.

D.     *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at the Confirmation Hearing shall be paid on or prior to the Effective Date.  On and after the Effective Date, each Reorganized Debtor (individually or collectively with the other Reorganized Debtors) shall pay all such fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee, until that particular Reorganized Debtor's case has been closed, converted or dismissed, whichever occurs first.

E.     *Tax Reporting and Compliance*

In connection with the Plan and all instruments issued in connection therewith and Distributions thereon, the Debtors and the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements.  No Holder of an Allowed Claim against the Debtors shall effectuate any withholding with respect to the cancellation or satisfaction of such Allowed Claim under the Plan.  Reorganized Maremont is hereby authorized to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all taxable periods of Maremont ending after the Petition Date through and including the Effective Date of the Plan.

F.     *Reservation of Rights*

The Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

G.     *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of such Entity.

H.     *Notices*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors, Meritor, the Asbestos Personal Injury Trustee, the Asbestos Personal Injury Trust Advisory Committee, or the Future Claimants' Representative shall be served at the following addresses (as applicable):

**If to the Reorganized Debtors:**

Maremont Corporation
27 Albany Avenue
Brooklyn, New York 11216
Attn: Sherman K. Edmiston III, HI CapM Advisors

with copies (which alone will not constitute notice) to:

Sidley Austin LLP                          Cole Schotz P.C.
One South Dearborn Street                   500 Delaware Avenue, Suite 1410
Chicago, Illinois 60603                     Wilmington, Delaware 19801
Attn: Andrew F. O'Neill                     Attn: Norman L. Pernick

**If to Meritor:**

Meritor, Inc.
2135 West Maple Road
Troy, Michigan 48084
Attn: Loree J. Shelko

**If to the Asbestos Personal Injury Trustee:**

4244 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
Attn: Alan B. Rich, Esq.

with copies (which alone will not constitute notice) to:

Stutzman, Bromberg, Esserman & Plifka, a Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689
Attn: Sander L. Esserman, Esq.

**If to the Asbestos Personal Injury Trust Advisory Committee:**

Maremont Trust Advisory Committee          Maremont Trust Advisory Committee
Robinson & Cole LLP                         Robinson & Cole LLP
1000 North West Street, Suite 1200          Chrysler East Building
Wilmington, Delaware 19801                  666 Third Avenue, 20th Floor
Attn: Natalie D. Ramsey                     New York, New York 10017
                                            Attn: Mark A. Fink

**If to the Future Claimants' Representative:**

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Attn: James L. Patton, Jr., Esq.

with copies (which alone will not constitute notice) to:

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Attn: Robert S. Brady, Esq. and Edwin J. Harron, Esq

After the Effective Date, Reorganized Maremont may, in its sole discretion, notify Entities that, in order to continue to receive documents pursuant to Federal Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Federal Bankruptcy Rule 2002. After the Effective Date, Reorganized Maremont is

authorized to limit the list of Entities receiving documents pursuant to Federal Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests, <u>provided, however,</u> that the Asbestos Claimants Committee and the Future Claimants' Representative need not submit such a request and will continue to receive such documents unless each elects to opt out of such distributions.

In accordance with Bankruptcy Rules 2002 and 3020(c), within ten (10) Business Days of the Effective Date, the Debtors shall serve a combined Notice of Confirmation and Effective Date by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice; <u>provided</u> that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a prior notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. Mailing of the Notice of Confirmation and Effective Date in the time and manner set forth in this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

I.      *Entire Agreement*

Except as otherwise indicated in an order of the Bankruptcy Court, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which shall become merged and integrated into the Plan on the Effective Date.

J.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), or an exhibit hereto, or an instrument, agreement or other document executed in connection with the Plan provides otherwise, the rights, duties and obligations arising under the Plan, and the instruments, agreements and other documents executed in connection with the Plan, shall be governed by, and construed and enforced in accordance with, the internal laws of the State of Delaware without giving effect to the principles of conflicts of law thereof.

K.      *Exhibits*

All exhibits and documents included in the Plan (including the Plan Supplement and the documents incorporated therein) are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims, Notice and Balloting Agent at www.donlinrecano.com/maremontch11 or the Bankruptcy Court's website at http://www.deb.uscourts.gov.

L.      *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan and the other Plan Documents is: (1) valid and enforceable; (2) integral to the Plan and may not be amended, deleted, modified or supplemented except as provided therein and herein; and (3) non-severable and mutually dependent.

M.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of each Chapter 11 Case (which, for the avoidance of doubt, may occur at different times, including on the Effective Date), File with the Bankruptcy Court all documents required by Federal Bankruptcy Rule 3022 and a proposed form of any applicable order necessary to close the Chapter 11 Cases.

N.      *Conflicts*

In the event of an inconsistency between the Plan and any document or instrument Filed in the Plan Supplement, the terms of the relevant document or instrument in the Plan Supplement shall control unless otherwise specified in such document or instrument.  In the event of an inconsistency between the Plan and the Disclosure Statement, the Plan shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; provided, however, that if there is determined to be any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

O.      *Further Assurances*

The Debtors, the Reorganized Debtors, all Holders of Claims and Interests receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

*[Remainder of page intentionally left blank]*

Dated:   May 14, 2019
         Wilmington, Delaware

                                        MAREMONT CORPORATION, on behalf of itself and each
                                        of the other Debtors


                                        By: _/s/ Carl D. Anderson, II_____
                                        Name:  Carl D. Anderson, II
                                        Title:    Chairman and Sole Officer

COUNSEL:

_/s/ Norman L. Pernick_____


James F. Conlan
Andrew F. O'Neill
Allison Ross Stromberg
Blair M. Warner
**SIDLEY AUSTIN LLP**
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

- and -

Norman L. Pernick
J. Kate Stickles
**COLE SCHOTZ P.C.**
500 Delaware Avenue, Ste. 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

**Exhibit A**

**Asbestos Claims Indemnification Agreement**

## <u>ASBESTOS CLAIMS INDEMNIFICATION AGREEMENT</u>

This Asbestos Claims Indemnification Agreement (this "<u>Agreement</u>") is made and entered this ___ day of _____, 2019, by and among Meritor, the Asbestos Personal Injury Trust and the Reorganized Debtors.  The Asbestos Personal Injury Trust and the Reorganized Debtors are the "<u>Indemnifying Parties.</u>"  The Indemnified Parties and Indemnifying Parties are sometimes referred to herein, collectively, as the "<u>Parties</u>" and, individually, as a "<u>Party</u>."

RECITALS

WHEREAS, on January 22, 2019, Maremont Corporation and its Debtor affiliates commenced cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>") by filing voluntary petitions for relief with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>");

WHEREAS, pursuant to the Modified Joint Prepackaged Plan of Reorganization of Maremont Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, dated May 14, 2019 (together with any amendments or modifications thereto, the "<u>Plan</u>"), Meritor, on its own behalf and on behalf of all of the other Indemnified Parties (as hereinafter defined), is contributing the Meritor Contribution in consideration of receiving, <u>inter alia</u>, the benefit of the Asbestos Personal Injury Channeling Injunction, the Maremont Release, and this Agreement, as well as an Asbestos Personal Injury Claimant Release from each holder of an Asbestos Personal Injury Claim; and

WHEREAS, as partial consideration for the Meritor Contribution, the Indemnifying Parties have agreed to indemnify, defend and hold harmless the Indemnified Parties from Asbestos Personal Injury Claims in accordance with the terms and provisions of this Agreement;

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Definitions.  Capitalized terms not defined in this section or otherwise herein shall have the meanings set forth in the Plan.

a.    "Asbestos Personal Injury Claim" means each of (a) a General Asbestos Personal Injury Claim and (b) an Indirect Personal Injury Claim.

b.    "Asbestos Personal Injury Trust" means the asbestos personal injury trust established pursuant to section 524(g) of the Bankruptcy Code and in accordance with the Plan, the Confirmation Order, and the Asbestos Personal Injury Trust Agreement, which trust shall constitute a "qualified settlement fund" under section 468B of the Internal Revenue Code.

c.    "Assert" means to:

i.    commence a judicial, administrative, or other proceeding or take other action to adjudicate, collect, recover or receive payment of, on, or with respect to any claim;

ii.    make a written threat to take an action or commence a judicial, administrative, or other proceeding to adjudicate, collect, recover or receive payment of, on, or with respect to any claim;

iii.    take any other action with respect to a claim that, if such claim is an Asbestos Personal Injury Claim, would be contrary to the terms of the Asbestos Personal Injury Channeling Injunction, regardless of whether the claimant (or any other Entity) asserts, successfully or not, that the Asbestos Personal Injury Channeling Injunction is not binding on the Entity taking such action; or

iv. give written notice or take action evincing the intent to continue a judicial, administrative, or other proceeding that was initiated prior to the Effective Date to adjudicate, collect, recover or receive payment of, on, or with respect to any claim.

d. "Debtor Product Lines" means all asbestos-containing products (including those product lines listed on Exhibit F to the Plan), equipment, components, parts, improvements to real property, or materials engineered, designed, marketed, manufactured, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, or branded with the name of or under a license granted by (a) any of the Debtors or any predecessor thereof or any subsidiary or business line of any of the foregoing and/or (b) Nuturn Corporation or Ferodo America, Inc. as successors-in-interest to Maremont's Friction Products Business. For the avoidance of doubt, no Rockwell Entity is or shall be deemed to be, for purposes of this definition, a predecessor of any Debtor or a subsidiary of any Debtor or Debtor predecessor.

e. "Debtor(s)" means, individually or collectively, Maremont, AVM, Inc., Former Ride Control Operating Company, Inc. (f/k/a Arvin Meritor, Inc., a Delaware corporation), and Maremont Exhaust Products, Inc.

f. "District Court" means the United States District Court for the District of Delaware.

g. "General Asbestos Personal Injury Claim" means any Claim, Demand, or Cause of Action or any portion thereof against, or any debt, liability, or obligation of, any Protected Party, arising in any jurisdiction around the world, whether now existing or hereafter arising, whether a single disease or injury, combination of diseases or injuries, or separately or subsequently arising disease or injury, whether in the nature of or sounding in tort, or under contract, warranty, employer liability, or any other theory of law, equity, or admiralty, whether based on statute, treaty,

regulation, restatement or common law, whatsoever (including, without limitation, any Claim, Demand, or Cause of Action, whether direct, indirect or derivative, based upon (a) a legal or equitable theory of liability in the nature of veil piercing, alter ego, successor liability, vicarious liability, mere continuation, fraudulent transfer or conveyance, or conspiracy, upon which any of the Non-Debtor Affiliates are liable or are alleged to be liable, to the extent arising, directly, indirectly or derivatively, from (i) acts, omissions, business, or operations of any of the Debtors or their respective direct or indirect predecessors, and/or (ii) acts, omissions, business, or operations of any other Entity for whose products or operations any of the Debtors has liability or is alleged to have liability (including, without limitation, any of the Debtors' direct or indirect predecessors), to the extent any Debtor has or is alleged to have liability for such acts, omissions, business, operations, or products; and (b) (i) the manufacture, sale or distribution of Debtor Product Lines by any Seller or (ii) exposure to asbestos at any of the Debtor Sites) for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to, the manufacture, storage, sale, or distribution of Debtor Product Lines, or for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to asbestos at any of the Debtor Sites. For the avoidance of doubt, "General Asbestos Personal Injury Claim" shall include, but shall not be limited to, any Claim, Demand, Cause of Action, allegation, debt, liability, or obligation described in the immediately preceding sentence that, directly, indirectly or derivatively, arises from or is based upon any acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of any of the

Debtors or any other Entity for whose acts, omissions, business, operations, or products any of the Debtors has liability or is alleged to have liability (including, without limitation, any of the Debtors' direct or indirect predecessors), and any conduct for which any of the Debtors, or any other Entity for whose acts, omissions, business, operations, or products any of the Debtors has liability or is alleged to have liability (including, without limitation, any of the Debtors' direct or indirect predecessors), may be deemed to have strict liability under any applicable law, including claims, debts, obligations, or liabilities for compensatory damages (such as loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages, but only to the extent any such liability or alleged liability is (a) for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to, Debtor Product Lines or (b) for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to asbestos at any of the Debtor Sites.  For purposes of this definition, "veil piercing, alter ego, successor liability, vicarious liability, mere continuation, fraudulent transfer or conveyance, or conspiracy" claims shall include, but shall not be limited to, (a) fraudulent transfer or fraudulent conveyance claims, or claims seeking to avoid and/or recover any transfers of property, under applicable state or federal law; (b) denuding the corporation claims; (c) single business enterprise or common enterprise claims; (d) claims that any Debtor was the predecessor to any Non-Debtor Affiliate; (e) claims that any Debtor was the mere instrumentality, agent, dominated or controlled party, or alter ego of any of Non-Debtor Affiliate, or that any Non-Debtor

Affiliate was the mere instrumentality, agent, dominated or controlled party, or alter ego of any Debtor; (f) claims that any Non-Debtor Affiliate was the mere continuation of any Debtor; (g) negligent provision of services claims; (h) claims that any Non-Debtor Affiliate, on the one hand, and any Debtor, on the other hand, conspired with one another, aided and abetted one another, or acted in concert with one another; and (i) any other Claims, Demands, or Causes of Action asserted derivatively against any of the Non-Debtor Affiliates that belong to, or may be brought on behalf of, any Debtor, whether or not included in the foregoing list, including, without limitation, any other such claim or cause of action against a Non-Debtor Affiliate. Notwithstanding the foregoing, the term "General Asbestos Personal Injury Claim" shall not include (a) any Claim by any present or former employee of any Debtor for benefits under a policy of workers' compensation insurance or for benefits under any state or federal workers' compensation statute or other statute providing compensation to an employee from an employer; (b) any Claim arising out of the Rockwell Product Lines; or (c) any Indirect Asbestos Personal Injury Claim.

h.  "Indemnifiable Claim" means any claim with respect to which any Indemnified Party contends that the Indemnifying Parties have a duty to defend, indemnify and hold harmless such Indemnified Party pursuant to this Agreement.

i.  "Indemnification Claim Notice" means notice in the form of Exhibit 1 attached hereto and made a part hereof, or a written notice providing substantially the same information.

j.  "Indemnified Parties" means (i) the Non-Debtor Affiliates, (ii) Representatives of the Debtors, and (iii) Representatives of the Non-Debtor Affiliates; provided, however that former affiliates of Meritor and their Representatives shall only be included as Indemnified Parties only to the extent that Meritor or any current affiliate of Meritor is obligated to indemnify such former affiliate or Representative pursuant to a valid contractual obligation.

k.    "Indirect Asbestos Personal Injury Claim" means any cross-claim, contribution claim, subrogation claim, reimbursement claim, indemnity claim, guaranty claim, or other similar indirect Claim, Demand, or Cause of Action, arising in any jurisdiction around the world, against any Protected Party, whether or not such Claim, Demand, or Cause of Action is or has been reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, whether or not the facts of or legal bases therefor are known or unknown, and whether in the nature of or sounding in tort, or under contract or implied by law (as governed by the applicable non-bankruptcy law), statutory right, warranty, guaranty, contribution, joint liability, joint and several liability, subrogation, reimbursement, or indemnity, or any other theory of law, equity, or admiralty, whether based on statute, treaty, regulation, restatement or common law, whatsoever (a) for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to, Debtor Product Lines, or (b) for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to asbestos at any of the Debtor Sites.  For the avoidance of doubt, "Indirect Asbestos Personal Injury Claim" shall include, but shall not be limited to, any Claim, Demand, or Cause of Action described in the immediately preceding sentence that, directly, indirectly or derivatively, arises from or is based upon any acts or omissions that constituted or may have constituted ordinary or gross negligence or reckless, willful, or wanton misconduct of any Debtor or any other Entity for whose acts, omissions, business, operations, or products any Debtor has liability or is alleged to have liability (including, without limitation, any of the Debtors'

direct or indirect predecessors), and any conduct for which any Debtor, or any other Entity for whose acts, omissions, business, operations, or products any Debtor has liability or is alleged to have liability (including, without limitation, any of the Debtors' direct or indirect predecessors), may be deemed to have strict liability under any applicable law, including claims, debts, obligations, or liabilities for compensatory damages (such as loss of consortium, medical monitoring, personal or bodily injury, wrongful death, survivorship, proximate, consequential, general, and special damages) and punitive damages, but only to the extent any such liability or alleged liability is (a) for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to, Debtor Product Lines, or (b) for, attributable to, arising out of, based upon, or resulting from, directly or indirectly, death, bodily injury, sickness, disease, or other personal or emotional injuries to persons caused, or allegedly caused, directly or indirectly, by the presence of, or exposure to asbestos at any of the Debtor Sites. Notwithstanding the foregoing, the term "Indirect Asbestos Personal Injury Claim" shall not include any cross-claim, contribution claim, subrogation claim, reimbursement claim, indemnity claim, guaranty claim, or other similar indirect Claim, Demand, or Cause of Action arising out of the Rockwell Product Lines.

l. "Losses" means any and all actual damages, claims, costs, losses, liabilities, expenses, obligations or adverse judgments, administrative awards or binding arbitration awards (including, without limitation, interest, penalties, fines, court costs, costs of preparation and investigation and reasonable and substantiated attorneys', accountants' and other professional advisors' fees and expenses and adverse judgments or binding arbitration awards for compensatory damages, punitive damages, punitory damages, exemplary damages, vindictive damages, presumptive

damages, or other specified damages); provided, however, that notwithstanding the foregoing "Losses" shall not include (i) internal costs or allocations by any Indemnified Party, or (ii) any consequential, special damages or incidental damages on the part of any Indemnified Party, including without limitation lost profits, diminution of market value, the loss of goodwill or injury to the reputation of any Indemnified Party.

m. "Maremont" means Maremont Corporation.

n. "Meritor" means Meritor, Inc.

o. "Non-Debtor Affiliates" means (a) Meritor and all current and former affiliates of Meritor other than the Debtors and (b) all former affiliates and predecessors of the Debtors, including those set forth on Exhibit H to the Plan, and their respective successors and assigns, solely in their respective capacities as such.

p. "Reorganized Debtors" means, collectively, Reorganized Maremont and the Reorganized Subsidiaries.

q. "Reorganized Maremont" means Maremont, as reorganized pursuant to and under the Plan, or any successor thereto, on or after the Effective Date.

r. "Reorganized Subsidiaries" means, collectively, (a) Maremont Exhaust Products, Inc., as reorganized pursuant to and under the Plan, or any successor thereto, on or after the Effective Date, (b) AVM, Inc., as reorganized pursuant to and under the Plan, or any successor thereto, on or after the Effective Date, and (c) Former Ride Control Operating Company, Inc., as reorganized pursuant to and under the Plan, or any successor thereto, on or after the Effective Date.

s. "Representative" means, with respect to any specified Entity, any current or former principal, equity holder, member, partner, manager, officer, director, controlling person, employee, agent, attorney, accountant, financial advisor, investment banker, consultant, management

company, fund advisor, advisory board member any other professional, and any other representative or any person who controls any of these within the meaning of the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, solely in their capacities as such, as well as any of the successors and assigns of the foregoing.

2.      Indemnification.  Subject to the provisions of this Agreement, the Indemnifying Parties shall defend, indemnify and hold the Indemnified Parties harmless from and against any and all Losses arising from, based upon or associated with (i) any Asbestos Personal Injury Claim Asserted against any Indemnified Party after the Effective Date, including, without limitation, any Losses arising from, based upon, attributable to, or associated with actions taken by, or for the benefit of, any Entity asserting an Asbestos Personal Injury Claim or (ii) any other violation of the Asbestos Personal Injury Channeling Injunction.  The Indemnifying Parties shall be jointly and severally liable for any indemnification obligations owed to the Indemnified Parties under this Agreement.

3.      Notice and Procedures.

        a.      Time to Give Notice.  Within ten (10) Business Days after an Indemnified Party receives written notice that an Indemnifiable Claim has been Asserted against such Indemnified Party, such Indemnified Party shall deliver an Indemnification Claim Notice to the Indemnifying Parties, together with a copy of any papers received by such Indemnified Party regarding such claim.  Notwithstanding the foregoing, failure of such Indemnified Party to give the notice provided in this Section 3 within such ten (10) Business Day period shall not be a defense to the liability of the Indemnifying Parties for such claim, but the Indemnifying Parties may recover from

such Indemnified Party any Losses incurred by the Indemnifying Parties that have resulted from such Indemnified Party's failure to give such notice within such ten (10) Business Day period.

b.      Procedure.  All claims for indemnification by an Indemnified Party against the Indemnifying Parties under this Agreement are governed by the following procedures:

(i)      Response to Notice.  The Indemnifying Parties shall notify such Indemnified Party in writing within ten (10) Business Days after receipt of the Indemnification Claim Notice whether the Indemnifying Parties intend, at the sole cost and expense of the Indemnifying Parties, to defend such Indemnified Parties against the Indemnifiable Claim.

(ii)      Interim Actions of Indemnified Parties.  During the period before the Indemnifying Parties respond to the Indemnification Claim Notice (the "Interim Period"), such Indemnified Party may file any motion, answer or other pleading or take any other action that is necessary to protect such Indemnified Party's interests so long as any such action does not prejudice the ability of the Indemnifying Parties to defend the underlying claim.  If such Indemnified Party takes any such interim action during the Interim Period that is prejudicial to the ability of the Indemnifying Parties to defend the underlying action, the Indemnifying Parties shall be entitled to recover from such Indemnified Party any Losses incurred by the Indemnifying Parties that result from such Indemnified Party's actions during the Interim Period.  Under no circumstances shall the Interim Period, or the accompanying restriction on such Indemnified Party's actions, last more than ten (10) days after receipt of the Indemnification Claim Notice by the Indemnifying Parties.

(iii)      Control of Matter if Indemnifying Parties Undertake Defense.  If the Indemnifying Parties notify such Indemnified Party, in writing, within the ten (10)

Business Day period after receipt of an Indemnification Claim Notice that the Indemnifying Parties intend to defend such Indemnified Party against the Indemnifiable Claim, then the Indemnifying Parties have the right to defend, at their sole cost and expense, such Indemnifiable Claim by all appropriate proceedings, which proceedings shall be diligently defended by the Indemnifying Parties to a final conclusion.   The Indemnifying Parties shall have discretion to settle any such Indemnifiable Claim so long as any such settlement: (A) provides for an unconditional release of such Indemnified Party from all liability arising out of such Indemnifiable Claim; (B) does not admit or assume any liability or material allegations against such Indemnified Party, or waive any defense of any such Indemnified Party, in respect of such Indemnifiable Claim; (C) does not prejudice or otherwise compromise any Indemnified Party's defenses with respect to any Asbestos Personal Injury Claim; and (D) does not impose any financial or other obligation or duty on any Indemnified Party.  The Indemnifying Parties will have the full control of such defense and proceedings; provided, however, that the Indemnifying Parties shall not pursue any defense that prejudices or otherwise compromises any Indemnified Party's defenses to such Indemnifiable Claim or any Asbestos Personal Injury Claim.   The Indemnified Parties may participate in, but not control, any defense or settlement of any Indemnifiable Claim the Indemnifying Parties have undertaken to defend.   The Indemnified Parties shall bear their own costs and expenses with respect to such participation, unless the Indemnified Parties are participating pursuant to Section 3(b)(iv) hereof at the request of the Indemnifying Parties.  The Indemnifying Parties shall consult with the Indemnified Parties regarding the choice of counsel to defend such Indemnified Party against an Indemnifiable Claim, and to the extent reasonably practicable shall keep

the Indemnified Parties informed in advance of all material events, send copies to the Indemnified Parties of all material documents and correspondence relating to such Indemnifiable Claim and give the Indemnified Parties an opportunity to review any drafts of papers filed relating to the defense. A notification by the Indemnifying Parties pursuant to this Section 3(b)(iii) that they are undertaking defense of such Indemnified Party may, but need not, contain an express reservation of the Indemnifying Parties' rights to challenge such Indemnified Party's claim for indemnification under this Agreement in respect of such claim. The absence of a reservation of rights in any notification is not an admission that such Indemnified Party is entitled to indemnification hereunder. If the Indemnifying Parties undertake the defense of an Indemnifiable Claim, regardless of whether the Indemnifying Parties undertake such defense with or without a reservation of rights, the Indemnifying Parties must diligently defend such claim to a final conclusion; provided, however, that if the District Court determines prior to the resolution of such Indemnifiable Claim, that the Indemnifying Parties have no obligation to defend such Indemnified Party under this Agreement with respect to such Indemnifiable Claim, the Indemnifying Parties shall transfer the defense of such Indemnifiable Claim to such Indemnified Party pursuant to Section 3(b)(vi) hereof.

(iv)    Cooperation of Indemnified Parties. If the Indemnifying Parties in writing request, the Indemnified Parties shall cooperate, at the sole cost and expense of the Indemnifying Parties, with the Indemnifying Parties and their counsel in contesting any Indemnifiable Claim that the Indemnifying Parties elect to contest or in making any counterclaim or cross-claim against any Entity (other than the Indemnified Party) based

upon or in connection with substantially the same events or circumstances as those underlying such Indemnifiable Claim.

(v)    No Response; Delayed Undertaking to Defend or Refusal to Defend.  If the Indemnifying Parties give notice to such Indemnified Party, in writing, within ten (10) Business Days after receipt of an Indemnification Claim Notice that the Indemnifying Parties do not intend to defend such Indemnified Party with respect to such Indemnifiable Claim, or if the Indemnifying Parties fail to respond within such ten (10) Business Day period, then the Indemnified Parties will have the right (but not the obligation), at the sole cost and expense of the Indemnifying Parties (unless otherwise determined under Section 3(b)(vi) hereof), to defend the Indemnifiable Claim by all appropriate proceedings. If the Indemnified Party elects to defend the claim, it must maintain a defense for at least the next subsequent forty-five (45) days.  The Indemnified Parties will have the full control of such defense and proceedings, including any compromise or settlement.  The Indemnifying Parties shall cooperate with the Indemnified Parties and their counsel in contesting any such Indemnifiable Claim or in making any counterclaim or cross-claim against any Entity (other than the Indemnifying Parties) based upon or in connection with substantially the same facts and circumstances as those underlying such Indemnifiable Claim.  Such cooperation shall be at the cost and expense of the Indemnifying Parties (unless otherwise determined under Section 3(b)(vi) hereof).  If the Indemnifying Parties (A) request to be permitted to undertake the defense of such Indemnifiable Claim in writing at any time within forty-five (45) days after the date of receipt by the Indemnifying Parties of an Indemnification Claim Notice for such Indemnifiable Claim and (B) tender to the Indemnified Parties in cash the amount of their Losses in defending such Indemnifiable

Claim during such forty-five (45) day period within fifteen (15) days of being presented with an invoice with reasonable support therefor, the Indemnified Parties must turn over the defense of such Indemnifiable Claim to the Indemnifying Parties. In such event, the Indemnifying Parties must diligently defend such Indemnified Party against such Indemnifiable Claim, at the expense of the Indemnifying Parties, until the earlier of (a) the final resolution of the Indemnifiable Claim and (b) the District Court's determination under Section 3(b)(vi) hereof that the Indemnifying Parties have no obligation under this Agreement to such Indemnified Party with respect to such Indemnifiable Claim.

(vi)     Determination Regarding Indemnifying Parties' Duty to Defend. If the Indemnifying Parties notify such Indemnified Party that the Indemnifying Parties dispute any duty to defend or indemnify, in whole or in part, an Indemnified Party against an Indemnifiable Claim identified in an Indemnification Claim Notice, or if the Indemnifying Parties fail to respond within the ten (10) day period provided in Section 3(b)(i) hereof, either the Indemnified Parties or the Indemnifying Parties may seek a declaratory judgment or other judicial determination regarding this Agreement only in the District Court. If the District Court determines that the Indemnifying Parties have no obligation to such Indemnified Party under Section 2 or 3 of this Agreement with respect to such Indemnifiable Claim, such Indemnified Party shall reimburse the Indemnifying Parties in full for any Losses the Indemnifying Parties actually incurred prior to such determination in defending such Indemnified Party against such claim and, if such Indemnifiable Claim is still pending at such determination, the Indemnifying Parties shall transfer the defense of such claim, together with the defense files (including the pleadings and other filed documents, discovery, correspondence, evidence, etc.) to such Indemnified Party, and

provide reasonable assistance as requested by such Indemnified Party during such transfer, all at the Indemnified Parties' expense. If such dispute is resolved in favor of such Indemnified Party, the Indemnifying Parties shall defend, indemnify and hold such Indemnified Party harmless from any and all Losses with respect to such Indemnifiable Claim as set forth in this Agreement, and shall reimburse such Indemnified Party in full for any Losses previously incurred by such Indemnified Party in connection with such claim. Any prevailing Party in any such action shall be entitled to recover from any opposing Party in such action its reasonable costs and expenses incurred in such action, including its reasonable attorneys' fees.

4.    Lien.   The Indemnified Parties shall have a first priority lien upon all assets of the Indemnifying Parties to secure the obligations of the Indemnifying Parties in accordance with the provisions hereof.

5.    Limitations.   The Indemnifying Parties shall not be liable hereunder for Losses incurred in investigating, defending or otherwise responding to an Indemnifiable Claim prior to delivery to the Indemnifying Parties of a timely Indemnification Claim Notice with respect to such Indemnifiable Claim, other than necessary action taken by Indemnified Parties pursuant to Section 3(b)(ii) hereof.

6.    Covenant Not To Sue.   The Indemnifying Parties agree that they shall not assert, commence, maintain, or continue any claim, lawsuit or other proceeding against any Indemnified Party based on any Asbestos Personal Injury Claim or assist in, or permit the assets of the Indemnifying Parties to be used to fund, the assertion, commencement, maintenance, or continuance by any other Entity of any such claim, lawsuit or other proceeding other than with respect to any disputes among the Parties arising under this Agreement. Without limitation of the

foregoing, the Indemnifying Parties agree that failure to comply with this provision will cause irreparable harm to the Indemnified Parties and that specific performance and injunctive relief shall be available in the event of any breach hereof.

7.      <u>No Requirement to Hold Assets in Trust or Escrow</u>.  The Indemnifying Parties shall not have any duty or obligation to hold any funds or assets in trust or escrow, or otherwise segregate any funds or assets, for any purpose related to or in connection with this Agreement.  The Indemnifying Parties may establish and later terminate any reserve with respect to their obligations to the Indemnified Parties under this Agreement that the Indemnifying Parties believe appropriate for any reason or necessary to comply with generally accepted accounting principles.

8.      <u>Miscellaneous</u>.

  a.      <u>Benefit</u>.

This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective legal representatives, successors and assigns.

  b.      <u>No Third-Party Beneficiary</u>.

The terms and provisions of this Agreement are intended solely for the benefit of the Parties (including any Indemnified Parties who are not currently Parties) and their respective successors and permitted assigns, and are not intended to confer third-party beneficiary rights upon any other Entity.

  c.      <u>Waiver of Breach, Right or Remedy</u>.

The waiver by any Party of any breach or violation by another Party of any provision of this Agreement or of any right or remedy of the waiving Party in this Agreement (i) shall not waive or be construed to waive any subsequent breach or violation of the same provision, (ii) shall not

waive or be construed to waive a breach or violation of any other provision and (iii) shall be made in writing and may not be presumed or inferred from any Party's conduct.

    d.    <u>Notices</u>.

Any notice, demand or communication required, permitted or desired to be given hereunder shall be deemed effectively given if given in writing (i) on the date tendered by personal delivery, (ii) on the date received by email, or (iii) one (1) day after the date tendered for delivery by nationally recognized overnight courier:

If to any Indemnified Party:

Meritor, Inc.
[●]
Attn: [●]
Email: [●]

with a copy to:

[●]
Attn: [●]
Email: [●]

If to the Indemnifying Parties:

Asbestos Personal Injury Trust
[●]
Attn: [●]
Email: [●]

and

Reorganized Maremont
[●]
Attn: [●]
Email: [●]

with a copy to:

[●]
Attn: [●]
Email: [●]

or to such other address or number, and to the attention of such other person, as the Indemnifying

Parties or Meritor may designate at any time in writing in conformity with this Section as the

address, number and person for proper notice to the Indemnifying Parties or any Indemnified Party.

In addition, any Indemnified Party may designate an additional address or number, and person to

receive notices for that Indemnified Party in addition to the notice to Indemnified Parties required

by this subsection.

       e.      <u>Entire Agreement; Counterparts; Amendment</u>.

This Agreement supersedes all prior or contemporaneous contracts, agreements, letters of

intent and understandings and constitutes the entire agreement of whatsoever kind or nature

existing between or among the Parties representing the subject matter of this Agreement, and no

Party shall be entitled to benefits other than those specified herein. This Agreement may be

executed in counterparts, each of which shall be deemed an original and which together shall

constitute but one and the same instrument. This Agreement may not be amended except in a

written instrument executed by all of the Parties affected by such amendment, in which case such

amendment shall only be effective against the signing Parties.

       f.      <u>Severability</u>.

If any one or more of the provisions contained in this Agreement should be held invalid,

illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining

provisions contained herein shall not in any way be affected or impaired thereby. The parties shall

endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with

valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

g.   Drafting.

No provision of this Agreement shall be interpreted for or against any Party on the basis that such Party was the draftsman of such provision, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Further, neither the existence of this Agreement nor anything contained herein shall mean or be construed to suggest that the Parties believe that the injunctions and provisions of the Plan and Plan Documents prohibiting the assertion of Asbestos Personal Injury Claims against the Indemnified Parties are not fully enforceable in accordance with their terms.

h.   Assignment.

Neither this Agreement, nor any right, remedy, obligation or liability arising hereunder or by reason hereof, nor any of the documents executed in connection herewith, may be assigned by any Party without the consent of the Parties.

i.   Governing Law; Dispute Resolution.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to such state's conflicts of law rules.  Each of the Parties hereby submits to the exclusive jurisdiction of the District Court for such purposes.

j.   Venue. Each of the Parties hereto irrevocably waives, to the fullest extent permitted by law, any objection to the laying of venue of any proceeding brought under this Agreement in Wilmington, Delaware and any claim in connection with any such proceeding that a court of competent jurisdiction in Wilmington, Delaware is an inconvenient forum.

k.    <u>Common Interest</u>.  The Parties agree that they have a common legal interest with respect to the Indemnifiable Claims and intend to preserve to the fullest extent permitted by law the protection against disclosure afforded under the work-product doctrine, attorney-client privilege, common interest or joint-defense doctrines, self-evaluative privilege, and/or other applicable statutes and rules of law with respect to any communications, documents, deposition transcripts, electronically or computer generated data, research, factual material and summaries, digests, strategy, mental impressions, memoranda, reports and other non-public and confidential information relating to any Indemnifiable Claims.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be executed and delivered as of the date first written above.

MERITOR, INC.

By:_____
Name:_____
Title:_____


ASBESTOS PERSONAL INJURY TRUST

By:_____
Name:_____
Title:_____


REORGANIZED MAREMONT, on behalf of itself and its Reorganized Subsidiaries

By:_____
Name:_____
Title:_____

*SIGNATURE PAGE TO ASBESTOS CLAIMS INDEMNIFICATION AGREEMENT*

**EXHIBIT 1**
**ASBESTOS CLAIMS INDEMNIFICATION AGREEMENT**

**INDEMNIFICATION CLAIM NOTICE**

Date: _____

To:     Asbestos Personal Injury Trust and Reorganized Maremont, on behalf of itself and the Reorganized Subsidiaries

From:  [Name of Indemnified Party]

Date Indemnifiable Claim was Asserted against the party claiming indemnification:
_____

    This Indemnification Claim Notice serves as notice to the Indemnifying Parties pursuant to Section 3(a) of the Asbestos Claims Indemnification Agreement, dated as of _____, 201__ (the "Indemnification Agreement"), by and among Meritor, the Asbestos Personal Injury Trust and the Reorganized Debtors.  Capitalized terms not defined herein shall have the meanings given them in the Indemnification Agreement.

    The following is a short summary of the facts surrounding the Indemnifiable Claim, including, to the extent known, the purported basis for such Indemnifiable Claim, the amount of damages claimed, and any pending response or other deadlines with respect to such Indemnifiable Claim:

    [to be completed]

    Any papers received by the party claiming indemnification under the Indemnification Agreement in connection with the Indemnifiable Claim described herein are attached to this Indemnification Claim Notice.

Signed:_____
    [Name of Indemnified Party]

*Exhibit 1 to Asbestos Claims*
*Indemnification Agreement*                    -1-

**Exhibit B**

**Asbestos Personal Injury Claimant Release**

## ASBESTOS PERSONAL INJURY CLAIMANT RELEASE

This Asbestos Personal Injury Claimant Release (this "Release") is made and entered this _____ day of _____, by the undersigned who is either the "Injured Party" or the "Official Representative"[1] (either being referred to herein as the "Releasor" or the "Claimant"), the holder of one or more Asbestos Personal Injury Claims.

## RECITALS

WHEREAS, on January 22, 2019, Maremont and its Debtor affiliates commenced cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") by filing voluntary petitions for relief with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, pursuant to the Modified Joint Prepackaged Plan of Reorganization of Maremont Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code dated May 14, 2019 (together with any amendments or modifications thereto, the "Plan"),[2] Maremont and Meritor, on their own behalf and on behalf of the Reorganized Debtors, the Non-Debtor Affiliates, the Settling Insurers and Representatives of each of the foregoing (in each case that is not a Non-Indemnified Party) (collectively, and together with the Asbestos Personal Injury Trust, the "Asbestos Personal Injury Trust Released Parties") contributed the Asbestos Personal Injury Trust Assets to the Asbestos Personal Injury Trust in consideration of receiving the benefit of, inter alia, the Asbestos Personal Injury Channeling Injunction, the Asbestos Claims Indemnification Agreement, as well as receiving an Asbestos Personal Injury Claimant Release from each holder of an Asbestos Claim;

WHEREAS, all Asbestos Personal Injury Claims ("Asbestos Claims") have been channeled to the Asbestos Personal Injury Trust ("Asbestos Trust") pursuant to the Asbestos Personal Injury Channeling Injunction;

WHEREAS, in connection with the Asbestos Personal Injury Trust Contributions, the Asbestos Trust has agreed to indemnify, defend and hold harmless the Asbestos Personal Injury Trust Released Parties from Asbestos Claims in accordance with the terms and provisions of the Asbestos Claims Indemnification Agreement;

WHEREAS, Releasor has asserted one or more Asbestos Claims and desires to receive a distribution from the Asbestos Trust with respect to such Asbestos Claim(s); and

WHEREAS, it is a condition precedent to receiving a distribution from the Asbestos Trust that the Releasor execute and deliver this Release for the benefit of the Asbestos Trust and the Asbestos Personal injury Trust Released Parties.

---

[1] The "Official Representative" is the/a person who under applicable state law or legal documentation has the authority to represent the Injured Party, the Injured Party's estate or the Injured Party's heirs.

[2] Unless otherwise defined herein, capitalized terms shall have their respective meanings as set forth in the Plan, Asbestos Personal Injury Trust Agreement or Asbestos Personal Injury Trust Distribution Procedures (the "TDP"), as applicable, and such definitions are incorporated herein by reference.

## **RELEASE**

NOW, THEREFORE, in consideration of the foregoing recitals, which recitals are expressly incorporated herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Releasor agrees as follows:

1.      The words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to this Release as a whole and not to any particular section, subsection or clause contained in this Release.

2.      The Releasor hereby **COMPLETELY AND UNCONDITIONALLY RELEASES AND FOREVER DISCHARGES** the Asbestos Personal Injury Trust Released Parties from any and all known or unknown current and future Asbestos Claims ("Released Claims").

3.      Notwithstanding the paragraph immediately above or anything to the contrary contained herein, if the Asbestos Claim is for Severe Asbestosis (Disease Level I), a new Asbestos Claim for Mesothelioma (Disease Level IV) that is diagnosed after the date of the Claimant's original submission of a proof of claim form to the Asbestos Trust may be filed against the Asbestos Trust as provided in Section 5.11 of the TDP.

4.      The release set forth herein shall inure to the benefit of the Asbestos Personal Injury Released Parties and their successors and assigns, each of which is an express third-party beneficiary hereof.

5.      The release set forth herein shall be binding on any and all successors and assigns of the Releasor.

6.      The Releasor expressly warrants and represents that, if it is not a natural person, it is in good standing in its place of domicile; that the execution of this Release is fully authorized by it; that the person or persons executing this Release have the necessary and appropriate authority to do so; and that there are no pending agreements, transactions or negotiations to which it is a party that would render this Release or any part thereof void, voidable or unenforceable.

7.      Releasor agrees to execute promptly any and all voluntary dismissals, stipulations, supplemental agreements, releases, affidavits, waivers and other documents of any nature or kind which any Asbestos Personal Injury Trust Released Parties at any time may reasonably require in order to implement the provisions or objectives of this Release.

8.      This Release may be executed in multiple counterparts, each of which, when so executed and delivered, shall be an original but such counterparts shall together constitute one and the same instrument and agreement.

9.      Releasor agrees that it will not assert any Released Claims against the Asbestos Personal Injury Trust Released Parties or, unless compelled to testify by subpoena, voluntarily assist in any way in the prosecution by any other Entity of any Released Claims against the Asbestos Personal Injury Trust Released Parties.

10.     Releasor states that Releasor has carefully read and understands the contents of this Release, that Releasor has had the opportunity to consult with Releasor's own counsel (if any) regarding the terms of this Release, and that this Release is entered into freely and voluntarily, and without coercion.

11.     This Release is not intended to bar any cause of action, right, lien or claim that the Releasor may have against any alleged tortfeasor, or any other person or entity, not included in the definition of Asbestos Personal Injury Trust Released Parties. The Claimant hereby expressly reserves all of his or her rights against such persons or entities. This Release is not intended to release or discharge any Asbestos Claim or potential Asbestos Claim that the Injured Party's heirs (if any), spouse (if any), the Official Representative (if any) or the Official Representative's heirs (if any) (other than the Injured Party) may have as a result of their own exposure to asbestos or asbestos-containing products.

12.     The Releasor represents and warrants that all valid liens, subrogation and reimbursement claims relating to benefits paid to or on account of the Injured Party in connection with, or relating to, the Asbestos Claim have been resolved or will be resolved from the net proceeds of the settlement payment to the Releasor under this Release or otherwise. It is further agreed and understood that no Asbestos Personal Injury Trust Released Parties shall have any liability to the Releasor or any other person or entity in connection with such liens or reimbursement claims and that the Releasor will indemnify and hold the Asbestos Personal Injury Trust Released Parties harmless from any and all such alleged liability as provided in the following sentence. The Releasor will indemnify and hold the Asbestos Personal Injury Trust Released Parties harmless, to the extent of the amount of payment hereunder, excluding attorney's fees and costs, from any and all liability arising from subrogation, indemnity or contribution claims related to the Asbestos Claim released herein and from any and all compensation or medical payments due, or claimed to be due, under any applicable law, regulation or contract related to the Asbestos Claim released herein.

13.     The Releasor understands that the Asbestos Claim released herein is being resolved by the Asbestos Trust, and a liquidated value ($_____) has been established for such Asbestos Claim. The Releasor acknowledges that, pursuant to the TDP, the Asbestos Trust will only be able to pay the Releasor a percentage (the "Payment Percentage") of the liquidated value of such Asbestos Claim. The Payment Percentage applicable to the Asbestos Claim will be determined in the manner set forth in the TDP.  The Releasor further acknowledges that the Payment Percentage is based on estimates that change over time, and that other claimants may have in the past received, or may in the future receive, a smaller or larger percentage of the value of their claims than the Releasor.  The Releasor further acknowledges that, other than as specifically set forth in the TDP, the fact that earlier or later claimants may have been paid or may in the future be paid a smaller or larger percentage of the value of their claims shall not entitle the Releasor to any additional compensation from the Asbestos Trust.

14.     In the event of a verdict against others, any judgment entered on the verdict that takes into account the status of the Asbestos Trust as a joint tortfeasor legally responsible for the Injured Party's injuries shall be reduced by no more than the total and actual amount paid as consideration for this Release or such lesser amount as allowed by law.

15.     The Releasor understands, represents, and warrants that this Release is a compromise of a disputed claim and not an admission of liability by, or on the part of, the Asbestos Personal Injury Trust Released Parties. Neither this Release, the compromise and settlement evidenced hereby, nor any evidence relating thereto, will ever be admissible as evidence against the Asbestos Trust in any suit, claim, or proceeding of any nature except to enforce this Release. However, this Release is and may be asserted by the Asbestos Personal Injury Trust Released Parties as an absolute and final bar to any claim or proceeding now pending or hereafter brought by or on behalf of the Injured Party with respect to the Asbestos Claim released herein, except as expressly provided herein.

16.     The Releasor (a) represents that no judgment debtor has satisfied in full or in part, the Asbestos Trust's liability with respect to the Injured Party's Asbestos Claim as the result of a judgment entered in the tort system, and (b) upon information and belief, represents that the Releasor has not entered into a release (other than this Release) that discharges or releases the Asbestos Trust's liability to the Releasor with respect to the Injured Party's Asbestos Claim.

17.     The Releasor represents that he or she understands that this Release constitutes a final and complete release of the Asbestos Personal Injury Trust Released Parties with respect to the Injured Party's Asbestos Claim. The Releasor has relied solely upon his or her own knowledge and information, and the advice of his or her attorneys (if any), as to the nature, extent and duration of the Injured Party's injuries, damages, and legal rights, as well as the alleged liability of the Asbestos Trust and the legal consequences of this Release, and not on any statement or representation made by or on behalf of the Asbestos Trust or any of the Asbestos Personal Injury Trust Released Parties.

18.     This Release contains the entire agreement between the parties and supersedes all prior or contemporaneous, oral or written agreements or understandings relating to the subject matter hereof between or among any of the parties hereto, including, without limitation, any prior agreements or understandings with respect to the liquidation of the Asbestos Claim.

19.     This Release shall be governed by and shall be construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law principles thereof.

20.     **IT IS THE INTENTION OF THE RELEASOR EXPRESSLY TO WAIVE AND RELINQUISH ALL CLAIMS THAT ARE RELEASED HEREBY TO THE FULLEST EXTENT PERMITTED BY LAW, INCLUDING, TO THE EXTENT THAT IT IS OR MAY BECOME APPLICABLE, WAIVER OF THE PROVISIONS, RIGHTS AND BENEFITS OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE, WHICH PROVIDES:**

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THIS RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR;**

**AND ANY AND ALL PROVISIONS, RIGHTS AND BENEFITS OF ANY SIMILAR STATUTE OR COMMON-LAW RULE OF ANY OTHER JURISDICTION, WHOSE LAW MIGHT BE OR BECOME APPLICABLE TO THIS RELEASE. RELEASOR FURTHER ACKNOWLEDGES THAT RELEASOR IS AWARE THAT RELEASOR MAY HEREAFTER DISCOVER FACTS IN ADDITION TO, OR DIFFERENT FROM, THOSE THAT RELEASOR NOW KNOWS OR BELIEVES TO BE TRUE WITH RESPECT TO THE SUBJECT MATTER OF THE RELEASE, BUT IT IS RELEASOR'S INTENTION TO, AND RELEASOR DOES, FULLY, FINALLY AND FOREVER, RELEASE AND DISCHARGE ANY AND ALL RELEASED CLAIMS KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, THAT MAY NOW EXIST, MAY HEREAFTER EXIST, OR HERETOFORE HAVE EXISTED, WITHOUT REGARD TO THE SUBSEQUENT DISCOVERY OR EXISTENCE OF SUCH DIFFERENT OR ADDITIONAL FACTS.**

21.    The Claimant acknowledges that the Asbestos Trust's obligation to pay the Claimant is not triggered until the Asbestos Trust receives this executed Release.

22.    [THE CLAIMANT REPRESENTS AND WARRANTS THAT ALL EXPOSURE TO ASBESTOS-CONTAINING PRODUCTS OR CONDUCT FOR WHICH THE CLAIMANT IS ALLEGING THE DEBTOR HAS LEGAL RESPONSIBILITY OCCURRED PRIOR TO DECEMBER 5, 1980 AND MAKES NO CLAIM FOR EXPOSURE AFTER THIS DATE. THE CLAIMANT UNDERSTANDS THAT THE TRUST HAS RELIED ON THESE STATEMENTS TO CONCLUDE THAT NO REPORTING OR REIMBURSEMENT OBLIGATIONS EXIST UNDER THE MEANING OF THE MEDICARE SECONDARY PAYOR ACT.][3]

### CERTIFICATION

I state that I have carefully read the foregoing Release and know the contents thereof, and I sign the same as my own free act. I additionally certify, under penalty of perjury, that the information that has been provided to support the Asbestos Claim is true according to my knowledge, information, and belief, and further that I have the authority as the Claimant to sign this Release.

### MEDICARE SECONDARY PAYER CERTIFICATION

I further represent and certify to the Asbestos Trust that, in respect of the Asbestos Claim, the Claimant has paid or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, the Claim.

[signatures appear on following pages]

---

[3] [To be included as applicable]

IN WITNESS WHEREOF, the undersigned has executed this Release to be effective as of the date set forth above.

Releasor: _____

[Typed Name of Releasor]

STATE OF _____    )

                   ) SS

_____ COUNTY)    )

SWORN TO AND SUBSCRIBED before me this \_\_\_\_\_ day of _____.

_____

Notary Public

My Commission Expires:

**OR**

Signatures of two persons unrelated to the Releasor by blood or marriage who witnessed the signing of this Asbestos Personal Injury Claimant Release:

_____        _____

Witness Signature                         Witness Signature

**Exhibit C**

**Asbestos Personal Injury Trust Agreement**

**MAREMONT ASBESTOS PERSONAL INJURY TRUST AGREEMENT**

## **TABLE OF CONTENTS**

**Page**

ARTICLE I      AGREEMENT OF TRUST ........................................................................ 3

     1.1      Creation and Name ............................................................................ 3

     1.2      Purpose ............................................................................................. 3

     1.3      Transfer of Assets ............................................................................ 3

     1.4      Acceptance of Assets and Assumption of Liabilities ........................... 4

ARTICLE II      POWERS AND TRUST ADMINISTRATION ............................................. 5

     2.1      Powers .............................................................................................. 5

     2.2      General Administration ..................................................................... 9

     2.3      Claims Administration .................................................................... 13

ARTICLE III      ACCOUNTS, INVESTMENTS, AND PAYMENTS ................................... 13

     3.1      Accounts ......................................................................................... 13

     3.2      Investments .................................................................................... 13

     3.3      Source of Payments ......................................................................... 16

ARTICLE IV      TRUSTEE; DELAWARE TRUSTEE .......................................................... 16

     4.1      Number .......................................................................................... 16

     4.2      Term of Service ............................................................................... 16

     4.3      Appointment of Successor Trustee .................................................. 17

     4.4      Liability of Trustee, Members of the TAC and the FCR .................... 18

     4.5      Compensation and Expenses of Trustee and Delaware Trustee ......... 18

     4.6      Indemnification ............................................................................... 19

     4.7      Lien ................................................................................................ 20

     4.8      Trustee's Employment of Experts; Delaware Trustee's Employment of
         Counsel .......................................................................................... 21

     4.9      Trustee's Independence ................................................................... 21

     4.10      Bond .............................................................................................. 21

     4.11      Delaware Trustee ............................................................................ 22

     4.12      Medicare Reporting Obligations ...................................................... 24

ARTICLE V      TRUST ADVISORY COMMITTEE ........................................................... 24

     5.1      Members ......................................................................................... 24

     5.2      Duties ............................................................................................. 25

-i-

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 5.3 | Term of Office | 25 |
| 5.4 | Appointment of Successor | 26 |
| 5.5 | TAC's Employment of Professionals | 27 |
| 5.6 | Compensation and Expenses of the TAC | 28 |
| 5.7 | Procedures for Consultation With and Obtaining the Consent of the TAC | 29 |
| ARTICLE VI | THE FCR | 31 |
| 6.1 | Duties | 31 |
| 6.2 | Term of Office | 32 |
| 6.3 | Appointment of Successor | 32 |
| 6.4 | FCR's Employment of Professionals | 33 |
| 6.5 | Compensation and Expenses of the FCR | 34 |
| 6.6 | Procedures for Consultation with and Obtaining the Consent of the FCR | 34 |
| ARTICLE VII | GENERAL PROVISIONS | 36 |
| 7.1 | Irrevocability | 36 |
| 7.2 | Term; Termination | 36 |
| 7.3 | Amendments | 38 |
| 7.4 | Meetings | 39 |
| 7.5 | Severability | 39 |
| 7.6 | Notices | 39 |
| 7.7 | Successors and Assigns | 41 |
| 7.8 | Limitation on Claim Interests for Securities Laws Purposes | 41 |
| 7.9 | Entire Agreement; No Waiver | 41 |
| 7.10 | Headings | 42 |
| 7.11 | Governing Law | 42 |
| 7.12 | Settlors' Representative and Cooperation | 43 |
| 7.13 | Dispute Resolution | 43 |
| 7.14 | Enforcement and Administration | 44 |
| 7.15 | Effectiveness | 44 |
| 7.16 | Counterpart Signatures | 44 |

## MAREMONT ASBESTOS PERSONAL INJURY TRUST AGREEMENT

This Maremont Asbestos Personal Injury Trust Agreement (this "**Trust Agreement**"), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into, pursuant to the Modified Joint Prepackaged Plan of Reorganization of Maremont Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, dated as of May 14, 2019 (as it may be amended or modified, the "**Plan**"),[1] by Maremont Corporation and its Debtor affiliates (collectively referred to as the "**Debtors**"), the debtors and debtors-in-possession whose chapter 11 case is administered under Case No. 19-10118 (KJC) in the United States Bankruptcy Court for the District of Delaware; the Future Claimants' Representative (the "**FCR**"); the Asbestos Claimants Committee (the "**ACC**"); Wilmington Trust, N.A. (the "**Delaware Trustee**"); the Asbestos Personal Injury Trustee identified on the signature pages hereof (the "**Trustee**"); and the members of the Asbestos Personal Injury Trust Advisory Committee identified on the signature pages hereof (the "**TAC**"); and

**WHEREAS,** the Debtors have reorganized under the provisions of chapter 11 of the Bankruptcy Code in the case filed in the United States Bankruptcy Court for the District of New Delaware, administered and known as *In re Maremont Corporation, el al.*, Case No. 19-10118 (KJC); and

**WHEREAS,** the Confirmation Order has been (i) entered by the District Court or (ii) entered by the Bankruptcy Court and affirmed by the District Court; and

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference. All capitalized terms not defined herein or defined in the Plan, but defined in the Bankruptcy Code or Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Rules, and such definitions are incorporated herein by reference.

**WHEREAS,** the Plan provides, *inter alia,* for the creation of the Asbestos Personal Injury Trust (the "**Asbestos Trust**"); and

**WHEREAS,** pursuant to the Plan, the Asbestos Trust is to use its assets and income to satisfy all Asbestos Personal Injury Claims ("**Asbestos Claims**"); and

**WHEREAS,** it is the intent of the Debtors, the Trustee, the ACC, the TAC, and the FCR that the Asbestos Trust be administered, maintained, and operated at all times through mechanisms that provide reasonable assurance that the Asbestos Trust will satisfy all Asbestos Claims pursuant to the Maremont Asbestos Personal Injury Trust Distribution Procedures (the "**TDP**") attached to the Plan as Exhibit D in substantially the same manner, and in strict compliance with the terms of this Trust Agreement; and

**WHEREAS,** all rights of the holders of Asbestos Claims arising under this Trust Agreement and the TDP shall vest upon the Effective Date; and

**WHEREAS,** pursuant to the Plan, the Asbestos Trust is intended to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code (the "**QSF Regulations**"); and

**WHEREAS,** the Bankruptcy Court has determined that the Asbestos Trust and the Plan satisfy all the prerequisites for an injunction pursuant to section 524(g) of the Bankruptcy Code with respect to any and all Asbestos Claims, and such injunction has been entered in connection with the Confirmation Order;

**NOW, THEREFORE,** it is hereby agreed as follows:

# ARTICLE I

## AGREEMENT OF TRUST

**1.1** **Creation and Name.** The Debtors as Settlors hereby create a trust known as the "Maremont Asbestos Personal Injury Trust," which is the Asbestos Trust provided for and referred to in the Plan. The Trustee of the Asbestos Trust may transact the business and affairs of the Asbestos Trust in the name of the Asbestos Trust, and references herein to the Asbestos Trust shall include the Trustee acting on behalf of the Asbestos Trust. It is the intention of the parties hereto that the trust created hereby constitute a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. § 3801 et seq. (the "**Act**") and that this document constitutes the governing instrument of the Asbestos Trust. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto.

**1.2** **Purpose.** The purpose of the Asbestos Trust is to assume all liabilities and responsibility for all Asbestos Claims, and, among other things to: (a) direct the processing, liquidation and payment of all Asbestos Claims in accordance with the Plan, the TDP, and the Confirmation Order; (b) preserve, hold, manage, and maximize the assets of the Asbestos Trust for use in paying and satisfying Asbestos Claims; and (c) qualify at all times as a qualified settlement fund. The Asbestos Trust is to use the Asbestos Trust's assets and income to pay the holders of all Asbestos Claims in accordance with this Trust Agreement and the TDP in such a way that such holders of Asbestos Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such claims, and to otherwise comply in all respects with the requirements of a trust set forth in section 524(g)(2)(B) of the Bankruptcy Code.

**1.3** **Transfer of Assets.** Pursuant to, and in accordance with Article IV, Section E of the Plan the Asbestos Trust has received the Asbestos Personal Injury Trust Assets to fund the

Asbestos Trust and settle or discharge all Asbestos Claims.  In all events, the Asbestos Personal

Injury Trust Assets or any other assets to be transferred to the Asbestos Trust under the Plan will

be transferred to the Asbestos Trust free and clear of any liens or other claims by the Debtors, the

Reorganized Debtors, the other Protected Parties, any creditor, or other entity except as

otherwise provided in the Plan.  Article IV, Sections E, K, and N of the Plan provide for the

Debtors and the Reorganized Debtors, among others, to execute and deliver such documents to

the Asbestos Trust as the Trustee may request to effectuate the transfer and assignment of any

Asbestos Personal Injury Trust Assets to the Asbestos Trust.

   **1.4**  **Acceptance of Assets and Assumption of Liabilities.**

    (a)  In furtherance of the purposes of the Asbestos Trust, the Asbestos Trust

hereby expressly accepts the transfer to the Asbestos Trust of the Asbestos Personal Injury Trust

Assets or any other transfers contemplated by the Plan in the time and manner as, and subject to

the terms, contemplated in the Plan.

    (b)  In furtherance of the purposes of the Asbestos Trust, the Asbestos Trust

expressly assumes all liabilities and responsibility for all Asbestos Claims, and neither the

Reorganized Debtors nor any of the Protected Parties specified in the Plan shall have any further

financial or other responsibility or liability therefor.  Except as otherwise provided in this Trust

Agreement and the TDP, the Asbestos Trust shall have all defenses, cross-claims, offsets, and

recoupments, as well as rights of indemnification, contribution, subrogation, and similar rights,

regarding such claims that the Debtors or the Reorganized Debtors have or would have had

under applicable law; provided, however, that such claims, defenses or rights may not be

asserted against any Protected Party.  Regardless of the foregoing, however, a claimant must

meet otherwise applicable federal and state statutes of limitations and repose, except as otherwise provided in Section 5.1(a)(2) of the TDP.

(c)     Notwithstanding anything to the contrary herein, no provision herein or in the TDP shall be construed or implemented in a manner that would cause the Asbestos Trust to fail to qualify as a "qualified settlement fund" under the QSF Regulations.

(d)     Nothing in this Trust Agreement shall be construed in any way to limit (i) the scope, enforceability, or effectiveness of the Asbestos Personal Injury Channeling Injunctions, or (ii) subject to the provisions of Section 1.4(b) above, the Asbestos Trust's assumption of all liability for Asbestos Claims.

(e)     In this Trust Agreement and the TDP the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(f)     To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the Asbestos Trust (the **"Beneficial Owners"**) shall be deemed to be the holders of Asbestos Claims; provided that (i) the holders of Asbestos Claims, as such Beneficial Owners, shall have only such rights with respect to the Asbestos Trust and its assets as are set forth in the TDP, and (ii) no greater or other rights, including upon dissolution, liquidation or winding up of the Asbestos Trust, shall be deemed to apply to the holders of Asbestos Claims in their capacity as Beneficial Owners.

## ARTICLE II

## POWERS AND TRUST ADMINISTRATION

### 2.1    Powers.

(a)     The Trustee is and shall act as the fiduciary to the Asbestos Trust in accordance with the provisions of this Trust Agreement and the Plan. The Trustee shall, at all

times, administer the Asbestos Trust and the Asbestos Personal Injury Trust Assets in accordance with the purposes set forth in Section 1.2 above.  Subject to the limitations set forth in this Trust Agreement, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the Asbestos Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)      Except as required by applicable law or otherwise specified herein, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)      Without limiting the generality of Section 2.1(a) above, and except as limited below, the Trustee shall have the power to:

(i)      receive and hold the Asbestos Personal Injury Trust Assets and exercise all rights with respect thereto, including the right to vote and sell any securities that are included in the Asbestos Personal Injury Trust Assets;

(ii)      invest the monies held from time to time by the Asbestos Trust;

(iii)      sell, transfer, or exchange any or all of the Asbestos Personal Injury Trust Assets at such prices and upon such terms as the Trustee may consider proper, consistent with the other terms of this Trust Agreement;

(iv)      enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the Asbestos Trust to operate;

(v)      pay liabilities and expenses of the Asbestos Trust;

(vi)    establish such funds, reserves, and accounts within the Asbestos Trust estate, as deemed by the Trustee to be useful in carrying out the purposes of the Asbestos Trust;

(vii)    sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding;

(viii)    establish, supervise, and administer the Asbestos Trust in accordance with this Trust Agreement and the TDP and the terms thereof;

(ix)    appoint such officers and hire such employees and engage such legal, financial, accounting, investment, auditing, and forecasting, and other consultants and agents as the business of the Asbestos Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this Asbestos Trust;

(x)    pay employees, legal, financial, accounting, investment, auditing, and forecasting, and other consultants, advisors, and agents, including those engaged by the Asbestos Trust in connection with its alternative dispute resolution activities, reasonable compensation;

(xi)    as provided below, (a) compensate the Trustee, the Delaware Trustee, and the FCR, and the employees, legal, financial, accounting, investment, and other advisors, consultants, independent contractors, and agents of the Trustee, the Delaware Trustee, the TAC members and the FCR, and (b) reimburse the Trustee, the Delaware Trustee, the TAC members, and the FCR all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)    execute and deliver such instruments as the Trustee considers proper in administering the Asbestos Trust;

(xiii)    enter into such other arrangements with third parties as are deemed by the Trustee to be useful in carrying out the purposes of the Asbestos Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement;

(xiv)    in accordance with Section 4.6 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) (A) the Trustee, the Delaware Trustee, the members of the TAC, and the FCR, and (B) the officers and employees of the Asbestos Trust, and any agents, advisors and consultants of the Asbestos Trust, the TAC, or the FCR (the "**Additional Indemnitees**"), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to indemnify and/or insure its directors, trustees, officers, employees, agents, advisors, and representatives.  Notwithstanding anything to the contrary herein, no party shall be indemnified in any way for any liability, expense, claim, damage or loss for which he or she is liable under Section 4.4 below;

(xv)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Asbestos Personal Injury Trust Assets to any one or more reputable individuals or recognized institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 4.4 below;

(xvi)    consult with the TAC and the FCR at such times and with respect to such issues relating to the conduct of the Asbestos Trust as the Trustee considers desirable;

(xvii)    make, pursue (by litigation or otherwise), collect, compromise or settle, in the name of the Asbestos Trust, any claim, right, action, or cause of action included in

the Asbestos Personal Injury Trust Assets, including, but not limited to, insurance recoveries, before any court of competent jurisdiction.

(d)    The Trustee shall not have the power to guarantee any debt of other persons.

(e)    The Trustee agrees to take the actions of the Asbestos Trust required hereunder.

(f)    The Trustee shall give the TAC and the FCR prompt notice of any act performed or taken pursuant to Sections 2.1(c)(i), (iii), (vii), or (xv) above, and any act proposed to be performed or taken pursuant to Section 2.2(f) below.

**2.2    General Administration.**

(a)    The Trustee shall act in accordance with this Trust Agreement.

(b)    The Trustee shall (i) timely file such income tax and other returns and statements required to be filed and shall timely pay all taxes required to be paid by the Asbestos Trust, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the Asbestos Trust as a qualified settlement fund within the meaning of the QSF Regulations, and (iv) take no action that could cause the Asbestos Trust to fail to qualify as a qualified settlement fund within the meaning of the QSF Regulations.

(c)    The Trustee shall timely account to the Bankruptcy Court as follows:

(i)    The Trustee shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event within one hundred and twenty (120) days following the end of each fiscal year, an annual report (the **"Annual Report"**) containing financial statements of the Asbestos Trust (including, without limitation, a balance sheet of the

Asbestos Trust as of the end of such fiscal year and a statement of operations for such fiscal year) audited by a firm of independent certified public accountants selected by the Trustee and accompanied by an opinion of such firm as to the fairness of the financial statements' presentation of the cash and investments available for the payment of claims. The Trustee shall provide a copy of such Annual Report to the TAC and the FCR when such reports are filed with the Bankruptcy Court.

(ii)     Simultaneously with the filing of the Annual Report, the Trustee shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of claims disposed of during the period covered by the financial statements. The Trustee shall provide a copy of such report to the TAC and the FCR when such report is filed.

(iii)     All materials required to be filed with the Bankruptcy Court by this Section 2.2(c) shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court and shall be filed with the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**").

(d)     The Trustee shall cause to be prepared as soon as practicable prior to the commencement of each fiscal year a budget and cash flow projections covering such fiscal year. The budget and cash flow projections shall include a determination of the Maximum Annual Payment pursuant to Section 2.4 of the TDP. The Trustee shall provide a copy of the budget and cash flow projections to the TAC and the FCR.

(e)     The Trustee shall consult with the TAC and the FCR (i) on the general implementation and administration of the Asbestos Trust; (ii) on the general implementation and

administration of the TDP; and (iii) on such other matters as may be required under this Trust Agreement and the TDP.

(f)    The Trustee shall be required to obtain the consent of the TAC and the FCR pursuant to the Consent Process set forth in Section 5.7(b) and 6.6(b) below, in addition to any other instances elsewhere enumerated, in order:

(i)    to determine, establish, or change the Payment Percentage described in Section 2.3 of the TDP as provided in Section 4.2 of the TDP;

(ii)    to change the Claims Payment Ratio described in Section 2.5 of the TDP;

(iii)    to change the Disease Levels, Scheduled Values and/or Medical/Exposure Criteria set forth in Section 5.3(a)(3) of the TDP;

(iv)    to establish and/or to change the Claims Materials to be provided to holders of Asbestos Claims under Section 6.1 of the TDP;

(v)    to require that claimants provide additional kinds of medical evidence pursuant to Section 6.1 of the TDP;

(vi)    to change the form of release to be provided pursuant to Section 7.8 of the TDP;

(vii)    to terminate the Asbestos Trust pursuant to Section 7.2 below;

(viii)    to settle the liability of any insurer under any insurance policy or legal action related thereto;

(ix)    to change the compensation of the members of the TAC, the FCR, the Delaware Trustee or the Trustee, other than to reflect cost-of-living increases or to reflect changes approved by the Bankruptcy Court as otherwise provided herein;

-11-

(x)    to take actions to minimize any tax on the Asbestos Personal Injury Trust Assets; provided that no such action prevents the Asbestos Trust from qualifying as a qualified settlement fund within the meaning of the QSF Regulations or requires an election for the Asbestos Trust to be treated as a grantor trust for tax purposes;

(xi)    to amend any provision of this Trust Agreement or the TDP in accordance with the terms thereof;

(xii)    to acquire an interest in or to merge any claims resolution organization formed by the Asbestos Trust with another claims resolution organization that is not specifically created by this Trust Agreement or the TDP, or to contract with another claims resolution organization or other entity that is not specifically created by this Trust Agreement or the TDP, or permit any other party to join in any claims resolution organization that is formed by the Asbestos Trust pursuant to the Trust Agreement or the TDP; provided that such merger, acquisition, contract or joinder shall not (a) subject the Reorganized Debtors or any successors in interest thereto, to any risk of having any Asbestos Claim asserted against it or them, or (b) otherwise jeopardize the validity or enforceability of the Asbestos Personal Injury Channeling Injunction or any other injunction or release issued or granted in connection with the Plan; and provided further that the terms of such merger will require the surviving organization to make decisions about the allowability and value of claims in accordance with Section 2.1 of the TDP which requires that such decisions be based on the provisions of the TDP, or (c) cause the Asbestos Trust to fail to qualify as a "qualified settlement fund" under the QSF Regulations; or

(xiii)    if and to the extent required by Section 6.5 of the TDP, to disclose any information, documents, or other materials to preserve, litigate, resolve, or settle coverage,

or to comply with an applicable obligation under an insurance policy or settlement agreement pursuant to Section 6.5 of the TDP.

(g)    The Trustee shall meet with the TAC and the FCR no less often than quarterly. The Trustee shall meet in the interim with the TAC and the FCR when so requested by either. Meetings may be held in person, by telephone conference call, or by a combination of the two.

(h)    The Trustee, upon notice from either the TAC or the FCR, if practicable in view of pending business, shall at his or her next meeting with the TAC or the FCR consider issues submitted by the TAC or the FCR. The Trustee shall keep the TAC and the FCR reasonably informed regarding all aspects of the administration of the Asbestos Trust.

2.3    **Claims Administration.** The Trustee shall promptly proceed to implement the TDP.

## ARTICLE III

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

3.1    **Accounts.**

(a)    The Trustee may, from time to time, create such accounts and reserves within the Asbestos Trust estate as he or she may deem necessary, prudent, or useful in order to provide for the payment of expenses and payment of Asbestos Claims and may, with respect to any such account or reserve, restrict the use of monies therein, and the earnings or accretions thereto.

(b)    The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such account, the transfers made to such account, the proceeds of or earnings on the assets held in

each such account and the payments from each such account in the accounts to be filed with the Bankruptcy Court and provided to the TAC and the FCR pursuant to Section 2.2(c)(i) above.

      **3.2**    **Investments.**   Investment of monies held in the Asbestos Trust shall be administered in the manner consistent with the standards set forth in the Uniform Prudent Investor Act, subject to the following limitations and provisions;

      (a)    The Asbestos Trust may invest only in diversified equity portfolios whose benchmark is a broad equity market index such as, but not limited to, the S&P 500 Index, Russell 1000 Index, S&P ADR Index or MSCI EAFE Index.  The Asbestos Trust shall not acquire, directly or indirectly, equity in any entity (other than the Reorganized Debtors or any successor to the Reorganized Debtors) or business enterprise if, immediately following such acquisition, the Asbestos Trust would hold more than 5% of the equity in such entity or business enterprise. The Asbestos Trust shall not hold, directly or indirectly, more than 5% of the equity in any entity (other than the Reorganized Debtors, or any successor to the Reorganized Debtors) or business enterprise.

      (b)    The Asbestos Trust shall not acquire or hold any long-term debt securities unless (i) such securities are Asbestos Personal Injury Trust Assets under the Plan, (ii) such securities are rated "Baa" or higher by Moody's, "BBB" or higher by Standard & Poor's ("S&P"), or have been given an equivalent investment grade rating by another nationally recognized statistical rating agency, or (iii) have been issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.  This restriction does not apply to any pooled investment vehicles where pooled assets receive an investment grade rating (i.e., "BBB" rating or above) by a nationally recognized rating agency.

(c)    The Asbestos Trust shall not acquire or hold for longer than ninety (90) days any commercial paper unless such commercial paper is rated "Prime-l" or higher by Moody's or "A-l" or higher by S&P, or has been given an equivalent rating by another nationally recognized statistical rating agency.

(d)    The Asbestos Trust shall not acquire any debt securities or other debt instruments issued by any entity if, following such acquisition, the aggregate market value of all such debt securities and/or other debt instruments issued by such entity held by the Asbestos Trust would exceed 5% of the then current aggregate value of the Asbestos Trust's assets.  There is no limitation on holding debt securities or other debt instruments issued or fully guaranteed as to principal and interest by the United States of America or any agency or instrumentality thereof.

(e)    The Asbestos Trust shall not acquire or hold any certificates of deposit in an amount exceeding any federal insurance on such certificates of deposit unless all publicly held, long-term debt securities, if any, of the financial institution issuing the certificate of deposit and the holding company, if any, of which such financial institution is a subsidiary, meet the standards set forth in Section 3.2(b) above.

(f)    The Asbestos Trust may acquire and hold any securities or instruments issued by the Reorganized Debtors or any successor to the Reorganized Debtors or obtained as proceeds of litigation or otherwise to resolve disputes, without regard to the limitations set forth in Subsections (a)-(e) above.

(g)    The Asbestos Trust shall not acquire or hold any repurchase obligations unless, in the opinion of the Trustee, they are adequately collateralized.

(h)    The Asbestos Trust may allow its investment managers to acquire prudently or hold derivative instruments, including, without limitation, options, futures and swaps in the normal course of portfolio management.  Specifically, the Asbestos Trust may acquire or hold derivatives to help manage or mitigate portfolio risk, including, without limitation, interest rate risk and equity market risk.  Using derivative instruments to leverage a portfolio to enhance returns (at a much greater risk to the portfolio) is prohibited.

(i)    The Asbestos Trust may lend securities on a short-term basis, subject to adequate, normal and customary collateral arrangements.

(i)    Notwithstanding (a) above, the Asbestos Trust may acquire and hold an equity interest in a claims resolution organization without limitation as to the size of the equity interest acquired and held if prior to such acquisition, the Asbestos Trust complies with the provisions of Section 2.2(f)(xii) hereof with respect to the acquisition.

**3.3**    **Source of Payments.**

(a)    All Asbestos Trust expenses and payments and all liabilities with respect to Asbestos Claims shall be payable solely by the Trustee out of the Asbestos Personal Injury Trust Assets.  Neither the Trustee, the Delaware Trustee, the TAC or FCR, or any of their officers, agents, advisors, or employees, nor the Debtors, the Reorganized Debtors, or any other Protected Party shall be liable for the payment of any Asbestos Trust expense or any other liability of the Asbestos Trust, except to the extent provided in the Plan or Plan Documents.

(b)    The Trustee shall include a reasonably detailed description of any payments made in accordance with this Section 3.3 in the Annual Report.

## ARTICLE IV

### TRUSTEE; DELAWARE TRUSTEE

**4.1**    **Number.**  In addition to the Delaware Trustee appointed pursuant to Section 4.11, there shall be one (1) Trustee who shall be that person named on the signature page hereof.

**4.2**    **Term of Service.**

(a)    The initial Trustee named pursuant to Section 4.1 above shall serve an initial term of service of five (5) years.  Thereafter each term of service shall be five (5) years. The initial Trustee shall serve from the Effective Date until the earliest of (i) the end of his or her term, (ii) his or her death, (iii) his or her mandatory retirement at the end of the year in which the Trustee reaches the age of 70 (unless, and for so long as, this mandatory retirement requirement is waived by the agreement of the TAC and the FCR), (iv) his or her resignation pursuant to Section 4.2(b) below, (v) his or her removal pursuant to Section 4.2(c) below, or (vi) the termination of the Asbestos Trust pursuant to Section 7.2 below.

(b)    The Trustee may resign at any time by written notice to the TAC and the FCR.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The Trustee may be removed at the recommendation of the TAC and the FCR with the approval of the Bankruptcy Court, in the event that he or she becomes unable to discharge his or her duties hereunder due to accident or physical or mental deterioration, or for other good cause.  Good cause shall be deemed to include, without limitation, any substantial failure to comply with the general administration provisions of Section 2.2 above, a consistent pattern of neglect and failure to perform or participate in performing the duties of the Trustee hereunder, or repeated non-attendance at scheduled meetings.  Such removal shall require the

-17-

approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

**4.3**    **Appointment of Successor Trustee.**

(a)    In the event of a vacancy in the Trustee position, whether by term expiration, death, retirement, resignation, or removal, the vacancy shall be filled by the TAC and FCR.  In the event that the TAC and the FCR cannot agree on the successor Trustee, the Bankruptcy Court shall make the appointment.  Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as the Trustee for an additional term or terms.

(b)    Immediately upon the appointment of any successor Trustee, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in, and undertaken by, the successor Trustee without any further act.  No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee.  No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(c)    Each successor Trustee shall serve until the earliest of (i) the expiration of his or her term, (ii) his or her death, (iii) his or her mandatory retirement at the end of the year in which the Trustee reaches the age of 70 (unless, and for so long as, this mandatory retirement requirement is waived by the agreement of the TAC and the FCR), (iv) his or her resignation pursuant to Section 4.2(b) above, (v) his or her removal pursuant to Section 4.2(c) above, or (vi) the termination of the Asbestos Trust pursuant to Section 7.2 below.

**4.4**    **Liability of Trustee, Members of the TAC and the FCR.**  The Trustee, the Members of the TAC and the FCR shall not be liable to the Asbestos Trust, to any individual holding an asbestos claim, or to any other person, except for any act or omission by such party

that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing within the meaning of 12 Del. C. § 3806(e).

### 4.5    Compensation and Expenses of Trustee and Delaware Trustee.

(a)    The Trustee shall receive a retainer from the Asbestos Trust for his or her service as a Trustee in the amount of $25,000 per annum, paid annually.  Hourly time, as described below, shall first be billed and applied to the annual retainer.  Hourly time in excess of the annual retainer shall be paid by the Asbestos Trust.  For all time expended as Trustee, including attending meetings, preparing for such meetings, and working on authorized special projects, the Trustee shall receive the sum of $500 per hour.  For all non-working travel time in connection with Asbestos Trust business, the Trustee shall receive the sum of $250 per hour.  All time shall be computed on a decimal hour basis.  The Trustee shall record all hourly time to be charged to the Asbestos Trust on a daily basis.  The hourly compensation payable to the Trustee hereunder shall be reviewed every year by the Trustee and, after consultation with the members of the TAC and the FCR, appropriately adjusted by the Trustee for changes in the cost of living. The Delaware Trustee shall be paid such compensation as agreed to pursuant to a separate fee agreement.

(b)    The Asbestos Trust will promptly reimburse the Trustee and the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee or the Delaware Trustee in connection with the performance of their duties hereunder.

(c)    The Asbestos Trust shall include a description of the amounts paid under this Section 4.5 in the Annual Report.

**4.6**     **Indemnification.**

(a)     The Asbestos Trust shall indemnify and defend the Trustee, the members of the TAC, the Delaware Trustee, and the FCR in the performance of their duties hereunder to the fullest extent that a statutory trust organized under the laws of the State of Delaware as permitted by 12 Del. C. § 3817 (after the application of Section 7.11) is from time to time entitled to indemnify and defend such persons against any and all liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to the Effective Date in connection with the formation, establishment, or funding of the Asbestos Trust.  The Asbestos Trust may indemnify any of the Additional Indemnitees in the performance of their duties hereunder to the fullest extent that a statutory trust organized under the laws of the State of Delaware (after the application of Section 7.11) is from time to time entitled to indemnify and defend such persons against any and all liabilities, expenses, claims, damages, or losses incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to the Effective Date in connection with the formation, establishment or funding of the Asbestos Trust.  Notwithstanding the foregoing, no individual shall be indemnified or defended in any way for any liability, expense, claim, damage, or loss for which he or she is ultimately liable under Section 4.4 above.

(b)     Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trustee, a member of the TAC, the Delaware Trustee, the FCR or an Additional Indemnitee in connection with any action, suit, or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the Asbestos Trust pursuant to Section 4.6(a) above, shall be paid by the Asbestos Trust in advance of the final disposition

thereof upon receipt of an undertaking, by or on behalf of the Trustee, the member of the TAC, the Delaware Trustee, the FCR or the Additional Indemnitee, to repay such amount in the event that it shall be determined ultimately by final order that the Trustee, the member of the TAC, the FCR or the Additional Indemnitee is not entitled to be indemnified by the Asbestos Trust.

(c)     The Trustee must purchase and maintain reasonable amounts and types of insurance on behalf of an individual who is or was a Trustee, a member of the TAC, the FCR or an Additional Indemnitee, including against liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trustee, TAC member, FCR, an officer or an employee of the Asbestos Trust, or an advisor, consultant or agent of the Asbestos Trust, the TAC or the FCR.

**4.7     Lien.**    The Trustee, members of the TAC, the FCR and the Additional Indemnitees shall have a first priority lien upon the Asbestos Personal Injury Trust Assets to secure the payment of any amounts payable to them pursuant to Section 4.6 above.

**4.8     Trustee's Employment of Experts; Delaware Trustee's Employment of Counsel.**

(a)     The Trustee may, but shall not be required to, retain and/or consult with counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors and such other parties deemed by the Trustee to be qualified as experts on the matters submitted to them (the **"Trust Professionals"**), and in the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing, the written opinion of or information provided by any such party deemed by the Trustee to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any

action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

(b)    The Delaware Trustee shall be permitted to retain counsel only in such circumstances as required in the exercise of its obligations hereunder and compliance with the advice of such counsel shall be full and complete authorization and protection for actions taken or not taken by the Delaware Trustee in good faith in compliance with such advice.

**4.9    Trustee's Independence.**  The Trustee shall not, during the term of his or her service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for the Reorganized Debtors.  Notwithstanding the foregoing, the Trustee may serve, without any additional compensation other than the compensation to be paid by the Asbestos Trust pursuant to Section 4.5(a) above, as a director of the Reorganized Debtors.  The Trustee shall not act as an attorney for any person who holds an asbestos claim.  For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**4.10    Bond.**  The Trustee and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**4.11    Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee.  The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law and shall act through one or more persons authorized to bind such entity.  If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 4.11, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.11(c) below.  For the avoidance of

doubt, the Delaware Trustee will only have such rights and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)     The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Trustee set forth herein.  The Delaware Trustee shall be one of the trustees of the Asbestos Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act.  The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the Asbestos Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act (acting solely at the written direction of the Trustee) and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Asbestos Trust, the other parties hereto or any beneficiary of the Asbestos Trust, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.

(c)     The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.11(d) below.  The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; provided, that such resignation shall not become effective unless and until a

successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.11(d) below.  If the Trustee does not act within such 60-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee.  Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act.  Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee and any fees and expenses due to the outgoing Delaware Trustee are paid.  Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of its duties and obligations under this Trust Agreement.

### 4.12    Medicare Reporting Obligations.

(a)     The Asbestos Trust shall register as a Responsible Reporting Entity (**"RRE"**) under the reporting provisions of Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) (**"MMSEA"**).

(b)     The Asbestos Trust, acting as the RRE and reporting agent for its funders, shall, at its sole expense, timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the Asbestos Trust or with respect

to contributions to the Asbestos Trust.  The Asbestos Trust, in its role as RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(c)     The Trustee shall obtain prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Asbestos Claim a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Asbestos Claim.

## ARTICLE V

### TRUST ADVISORY COMMITTEE

**5.1**    **Members.**  The TAC shall consist of five (5) members who shall initially be the persons named on the signature page hereof.

**5.2**    **Duties.**  The members of the TAC shall serve in a fiduciary capacity representing all holders of present Asbestos Claims.  The TAC shall have no fiduciary obligations or duties to any party other than the holders of present Asbestos Claims.  The Trustee must consult with the TAC on matters identified in Section 2.2(e) above and in other provisions herein, and must obtain the consent of the TAC on matters identified in Section 2.2(f) above.  Where provided in the TDP, certain other actions by the Trustee are also subject to the consent of the TAC.  Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the TDP), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC.  To the extent that, at law or in

equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the Asbestos Trust, the other parties hereto or any beneficiary of the Asbestos Trust, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in this Trust Agreement and the documents referenced herein (including the TDP).

### 5.3    Term of Office.

(a)    The initial members of the TAC appointed in accordance with Section 5.1 above shall serve the staggered three-, four-, or five-year terms shown on the signature pages hereof.  Thereafter, each term of office shall be five (5) years.  Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) below, (iii) his or her removal pursuant to Section 5.3(c) below, (iv) the end of his or her term as provided above, or (v) the termination of the Asbestos Trust pursuant to Section 7.2 below.

(b)    A member of the TAC may resign at any time by written notice to the other members of the TAC, the Trustee and the FCR.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause.  Such removal shall be made at the recommendation of the remaining members of the TAC with the approval of the Bankruptcy Court.

**5.4**     **Appointment of Successor.**

(a)     If, prior to the termination of service of a member of the TAC other than as a result of removal, he or she has designated in writing an individual to succeed him or her as a member of the TAC, such individual shall be his or her successor.  If such member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service as contemplated above, such member's law firm may designate his or her successor.  If (i) a member of the TAC did not designate an individual to succeed him or her prior to the termination of his or her service and such member's law firm does not designate his or her successor as contemplated above or (ii) he or she is removed pursuant to Section 5.3(c) above, his or her successor shall be appointed by a majority of the remaining members of the TAC or, if such members cannot agree on a successor, the Bankruptcy Court.  Nothing in this Trust Agreement shall prevent the reappointment of an individual serving as a member of the TAC for an additional term or terms, and there shall be no limit on the number of terms that a TAC member may serve.

(b)     Each successor TAC member shall serve until the earlier of (i) the end of the full term of five (5) years for which he or she was appointed if his or her immediate predecessor member of the TAC completed his or her term, (ii) the end of the term of the member of the TAC whom he or she replaced if his or her predecessor member did not complete such term, (iii) his or her death, (iv) his or her resignation pursuant to Section 5.3(b) above, (v) his or her removal pursuant to Section 5.3(c) above, or (vi) the termination of the Asbestos Trust pursuant to Section 7.2 below.

(c)     No successor TAC member shall be liable personally for any act or omission of his or her predecessor TAC member.  No successor TAC member shall have any

duty to investigate the acts or omissions of his or her predecessor TAC member. No TAC member shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**5.5**    **TAC's Employment of Professionals.**

(a)    The TAC may but is not required to retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the TAC to be qualified as experts on matters submitted to the TAC (the **"TAC Professionals"**). The TAC and the TAC Professionals shall at all times have complete access to the Asbestos Trust's officers, employees and agents, as well as to the Trust Professionals, and shall also have complete access to all information generated by them or otherwise available to the Asbestos Trust or the Trustee provided that any information provided by the Trust Professionals shall not constitute a waiver of any applicable privilege. In the absence of a bad faith violation of the implied contractual covenant of good faith and fair dealing, reliance on the written opinion of or information provided by any TAC Professional or Trust Professional deemed by the TAC to be qualified as an expert on the particular matter submitted to the TAC shall be full and complete authorization and protection in support of any action taken or not taken by the TAC in good faith and in accordance with the written opinion of or information provided by the TAC Professional or Trust Professional.

(b)    The Asbestos Trust shall promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of legal counsel pursuant to this provision in connection with the TAC's performance of its duties hereunder. The Asbestos Trust shall also promptly reimburse, or pay directly if so instructed, the TAC for all reasonable fees and costs associated with the TAC's employment of any other TAC

Professional pursuant to this provision in connection with the TAC's performance of its duties hereunder; *provided, however,* that (i) the TAC has first submitted to the Asbestos Trust a written request for such reimbursement setting forth (A) the reasons why the TAC desires to employ such TAC Professional, and (B) the basis upon which the TAC seeks advice independent of the Trust Professionals to meet the need of the TAC for such expertise or advice, and (ii) the Asbestos Trust has approved the TAC's request for reimbursement in writing, which approval must not be unreasonably withheld, delayed, or denied. If the Asbestos Trust agrees to pay for the TAC Professional, such reimbursement shall be treated as an Asbestos Trust expense. If the Asbestos Trust declines to pay for the TAC Professional, it must set forth its reasons in writing. If the TAC still desires to employ the TAC Professional at the Asbestos Trust's expense, the TAC and/or the Trustee shall resolve their dispute pursuant to Section 7.13 below.

5.6     **Compensation and Expenses of the TAC.** The members of the TAC shall not receive compensation from the Asbestos Trust for their services as TAC members. However, the members of the TAC shall be reimbursed promptly for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder. Such reimbursement shall be deemed an Asbestos Trust expense. The Asbestos Trust shall include a description of the amounts paid under this Section 5.6 in the Annual Report to be filed with the Bankruptcy Court and provided to the FCR and the TAC pursuant to Section 2.2(c)(i).

5.7     **Procedures for Consultation With and Obtaining the Consent of the TAC.**

(a)     Consultation Process.

(i)     In the event the Trustee is required to consult with the TAC pursuant to Section 2.2(e) above or on other matters as provided herein, the Trustee shall provide the TAC with written advance notice of the matter under consideration, and with all relevant

-29-

information concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the Asbestos Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such matter, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee.

(ii)    In determining when to take definitive action on any matter subject to the consultation procedures set forth in this Section 5.7(a), the Trustee shall take into consideration the time required for the TAC, if its members so wish, to engage and consult with its own independent financial or investment advisors as to such matter. In any event, the Trustee shall not take definitive action on any such matter until at least thirty (30) days after providing the TAC with the initial written notice that such matter is under consideration by the Trustee, unless such time period is waived by the TAC.

(b)    Consent Process.

(i)    In the event the Trustee is required to obtain the consent of the TAC pursuant to Section 2.2(f) above, the Trustee shall provide the TAC with a written notice stating that their consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TAC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with such reasonable access to the Trust Professionals and other experts retained by the Asbestos Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall also

provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)     The TAC must consider in good faith and in a timely fashion any request for its consent by the Trustee, and must in any event advise the Trustee in writing of its consent or its objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee, or within such additional time as the Trustee and the TAC may agree.  The TAC may not withhold its consent unreasonably.  If the TAC decides to withhold its consent, it must explain in detail its objections to the proposed action.  If the TAC does not advise the Trustee in writing of its consent or its objections to the action within thirty (30) days of receiving notice regarding such request (or the additional time period agreed to by the Trustee and the TAC), the TAC's consent to the proposed actions shall be deemed to have been affirmatively granted.

(iii)     If, after following the procedures specified in this Section 5.7(b), the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and/or the TAC shall resolve their dispute pursuant to Section 7.13. However, the burden of proof with respect to the validity of the TAC's objection and withholding of its consent shall be on the TAC.

## ARTICLE VI

### THE FCR

**6.1     Duties.**  The initial FCR shall be the individual identified on the signature pages hereto.  He or she shall serve in a fiduciary capacity, representing the interests of the holders of future Asbestos Claims for the purpose of protecting the rights of such persons.  The FCR shall have no fiduciary obligations or duties to any party other than holders of future Asbestos Claims. The Trustee must consult with the FCR on matters identified in Section 2.2(e) above and on

-31-

certain other matters provided herein, and must obtain the consent of the FCR on matters identified in Section 2.2(f) above.  Where provided in the TDP, certain other actions by the Trustee are also subject to the consent of the FCR.  Except for the duties and obligations expressed in this Trust Agreement and the documents referenced herein (including the TDP), there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the FCR.  To the extent that, at law or in equity, the FCR has duties (including fiduciary duties) and liabilities relating thereto to the Asbestos Trust, the other parties hereto or any beneficiary of the Asbestos Trust, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the FCR expressly set forth in this Trust Agreement and the documents referenced herein (including the TDP).

    **6.2**    **Term of Office.**

    (a)    The FCR shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.2(b) below, (iii) his or her removal pursuant to Section 6.2(c) below, or (iv) the termination of the Asbestos Trust pursuant to Section 7.2 below.

    (b)    The FCR may resign at any time by written notice to the Trustee.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

    (c)    The FCR may be removed by the Bankruptcy Court in the event he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause.

(d)    No successor FCR shall be liable personally for any act or omission of his or her predecessor.  No successor FCR shall have any duty to investigate the acts or omissions of his or her predecessor.  No FCR shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**6.3    Appointment of Successor.**  A vacancy caused by resignation or death shall be filled with an individual nominated prior to the effective date of the resignation or the death by the resigning or deceased FCR, and a vacancy caused by removal of the FCR shall be filled with an individual selected by the Trustee in consultation with the TAC.  In the event a nominee has not been pre-selected, the successor shall be chosen by the Trustee in consultation with the TAC.

**6.4    FCR's Employment of Professionals.**

(a)    The FCR may, but is not required to, retain and/or consult counsel, accountants, appraisers, auditors, forecasters, experts, and financial and investment advisors, and such other parties deemed by the FCR to be qualified as experts on matters submitted to the FCR (the "**FCR Professionals**").  The FCR and the FCR Professionals shall at all times have complete access to the Asbestos Trust's officers, employees and agents, as well as to the Trust Professionals, and shall also have complete access to all information generated by them or otherwise available to the Asbestos Trust or the Trustee provided that any information provided by the Trust Professionals shall not constitute a waiver of any applicable privilege.  In the absence of gross negligence, reliance on the written opinion of or information provided by any FCR Professional or Trust Professional deemed by the FCR to be qualified as an expert on the particular matter submitted to the FCR shall be full and complete authorization and protection in support of any action taken, or not taken, by the FCR in good faith and in accordance with the written opinion of or information provided by the FCR Professional or Trust Professional.

(b)     The Asbestos Trust shall promptly reimburse, or pay directly if so instructed, the FCR for all reasonable fees and costs associated with the FCR's employment of legal counsel pursuant to this provision in connection with the FCR's performance of his or her duties hereunder.  The Asbestos Trust shall also promptly reimburse, or pay directly if so instructed, the FCR for all reasonable fees and costs associated with the FCR's employment of any other FCR Professionals pursuant to this provision in connection with the FCR's performance of his or her duties hereunder; *provided, however,* that (i) the FCR has first submitted to the Asbestos Trust a written request for such reimbursement setting forth (A) the reasons why the FCR desires to employ the FCR Professional, and (B) the basis upon which the FCR seeks advice independent of the Trust Professionals to meet the need of the FCR for such expertise or advice, and (ii) the Asbestos Trust has approved the FCR's request for reimbursement in writing, which approval must not be unreasonably withheld, delayed, or denied.  If the Asbestos Trust agrees to pay for the FCR Professional, such reimbursement shall be treated as an Asbestos Trust expense.  If the Asbestos Trust declines to pay for the FCR Professional, it must set forth its reasons in writing.  If the FCR still desires to employ the FCR Professional at the Asbestos Trust's expense, the FCR and/or the Trustee shall resolve their dispute pursuant to Section 7.13 below.

**6.5**    <u>**Compensation and Expenses of**</u> the **FCR.**  The FCR shall receive compensation from the Asbestos Trust in the form of payment at the FCR's normal hourly rate for services performed.  The Asbestos Trust will promptly reimburse the FCR for all reasonable out-of-pocket costs and expenses incurred by the FCR in connection with the performance of his or her duties hereunder.  Such reimbursement or direct payment shall be deemed an Asbestos Trust expense.  The Asbestos Trust shall include a description of the amounts paid under this Section

6.5 in the Annual Report to be filed with the Bankruptcy Court and provided to the FCR and the TAC pursuant to Section 2.2(c)(i).

**6.6**     **Procedures for Consultation with and Obtaining the Consent of the FCR.**

(a)     Consultation Process.

(i)     In the event the Trustee is required to consult with the FCR pursuant to Section 2.2(e) above or on any other matters specified herein, the Trustee shall provide the FCR with written advance notice of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also provide the FCR with such reasonable access to the Trust Professionals and other experts retained by the Asbestos Trust and its staff (if any) as the FCR may reasonably request during the time that the Trustee is considering such matter, and shall also provide the FCR the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee.

(ii)     In determining when to take definitive action on any matter subject to the consultation process set forth in this Section 6.6(a), the Trustee shall take into consideration the time required for the FCR, if he or she so wishes, to engage and consult with his or her own independent financial or investment advisors as to such matter. In any event, the Trustee shall not take definitive action on any such matter until at least thirty (30) days after providing the FCR with the initial written notice that such matter is under consideration by the Trustee, unless such period is waived by the FCR.

(b)     Consent Process.

(i)     In the event the Trustee is required to obtain the consent of the FCR pursuant to Section 2.2(f) above, the Trustee shall provide the FCR with a written notice

stating that his or her consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the FCR as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustee shall also provide the FCR with such reasonable access to the Trust Professionals and other experts retained by the Asbestos Trust and its staff (if any) as the FCR may reasonably request during the time that the Trustee is considering such action, and shall also provide the FCR the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)    The FCR must consider in good faith and in a timely fashion any request for his or her consent by the Trustee, and must in any event advise the Trustee in writing of his or her consent or objection to the proposed action within thirty (30) days of receiving the original request for consent from the Trustee, or within such additional time as the Trustee and FCR may agree. The FCR may not withhold his or her consent unreasonably. If the FCR decides to withhold consent, he or she must explain in detail his or her objections to the proposed action. If the FCR does not advise the Trustee in writing of his or her consent or objections to the proposed action within thirty (30) days of receiving the notice from the Trustee regarding such consent (or the additional time period agreed to by the Trustee and the FCR), the FCR's consent shall be deemed to have been affirmatively granted.

(iii)    If, after following the procedures specified in this Section 6.6(b), the FCR continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and/or the FCR shall resolve their dispute pursuant to Section 7.13. However,

the burden of proof with respect to the validity of the FCR's objection and withholding of his or her consent shall be on the FCR.

**ARTICLE VII**

**GENERAL PROVISIONS**

**7.1**    **Irrevocability.**  To the fullest extent permitted by applicable law, the Asbestos Trust is irrevocable.

**7.2**    **Term; Termination.**

(a)    The term for which the Asbestos Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of Section 7.2 (b) - (d) below.

(b)    The Asbestos Trust shall automatically dissolve on the date (the **"Dissolution Date"**) ninety (90) days after the first to occur of the following events:

(i)    the date on which the Trustee decides to dissolve the Asbestos Trust because (A) he or she deems it unlikely that new Asbestos Claims will be filed against the Asbestos Trust, (B) all Asbestos Claims duly filed with the Asbestos Trust have been liquidated and paid to the extent provided in this Trust Agreement and the TDP or have been disallowed by a final non-appealable order, to the extent possible based upon the funds available through the Plan, and (C) twelve (12) consecutive months have elapsed during which no new Asbestos Claim has been filed with the Asbestos Trust; or

(ii)    if the Trustee has procured and has in place irrevocable insurance policies and has established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the Asbestos Trust in a manner consistent with this Trust Agreement and the TDP, the date on

-37-

which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a final order; or

        (iii)    to the extent that any rule against perpetuities shall be deemed applicable to the Asbestos Trust, the date on which twenty-one (21) years less ninety-one (91) days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof.

        (c)    On the Dissolution Date or as soon as reasonably practicable, after the wind-up of the Asbestos Trust's affairs by the Trustee and payment of all the Asbestos Trust's liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in the Asbestos Trust estate shall be given to such organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, which tax-exempt organization(s) shall be selected by the Trustee using his or her reasonable discretion; *provided, however,* that (i) if practicable, the activities of the selected tax-exempt organization(s) shall be related to the treatment of, research on, or the relief of suffering of individuals suffering from asbestos-related disorders, and (ii) the tax-exempt organization(s) shall not bear any relationship to the Reorganized Debtors within the meaning of section 468B(d)(3) of the Internal Revenue Code.  Notwithstanding any contrary provision of the Plan and related documents, this Section 7.2(c) cannot be modified or amended.

        (d)    Following the dissolution and distribution of the assets of the Asbestos Trust, the Asbestos Trust shall terminate and the Trustee and the Delaware Trustee (acting solely at the written direction of the Trustee) shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the Asbestos Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the

Asbestos Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation.

7.3    **Amendments.**  The Trustee, after consultation with the TAC and the FCR, and subject to the unanimous consent of the TAC and the FCR, may modify or amend this Trust Agreement.   The Trustee, after consultation with the TAC and the FCR, and subject to the consent of the TAC and the FCR, may modify or amend the TDP; *provided, however,* that no amendment to the TDP shall be inconsistent with the provisions limiting amendments to that document provided therein, and in particular the provisions limiting amendment of the Payment Percentage set forth in Section 4.2 of the TDP.  Any modification or amendment made pursuant to this Section must be done in writing.   Notwithstanding anything contained in this Trust Agreement or the TDP to the contrary, neither this Trust Agreement, the TDP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) the applicability of section 524(g) of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Asbestos Personal Injury Channeling Injunction or any other injunction or release issued or granted in connection with the Plan, (iii) the Asbestos Trust's qualified settlement fund status under the QSF Regulations, or (iv) without the written consent Meritor and Reorganized Maremont, any rights, benefits, or protections provided to the Reorganized Debtors, the Non-Debtor Affiliates, the Settling Insurers or Representatives of the foregoing under the Plan, including, without limitation (a) the rights and protections of the Indemnified Parties (as defined in the Asbestos Claims Indemnification Agreement) under the Asbestos Claims Indemnification Agreement and (b) the scope and terms of the release provided to the Reorganized Debtors, Non-Debtor Affiliates, Settling Insurers and their Representatives in the Asbestos Personal Injury Claimant Release, or the obligation of the

Asbestos Trust to obtain a properly executed Asbestos Personal Injury Claimant Release as a pre-condition to a claimant receiving a distribution from the Asbestos Trust.  Any amendment affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent.

**7.4**    **Meetings.**  The Delaware Trustee shall not be required nor permitted to attend meetings relating to the Asbestos Trust.

**7.5**    **Severability.**  Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

**7.6**    **Notices.**  Notices to persons asserting claims shall be given by first class mail, postage prepaid, at the address of such person, or, where applicable, such person's legal representative, in each case as provided on such person's claim form submitted to the Asbestos Trust with respect to his or her Asbestos Claim.

(a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by e-mail or facsimile pursuant to the instructions listed below, or mailed by registered or certified mail, return receipt requested, postage prepaid, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Asbestos Trust through the Trustee:

      Maremont Asbestos Personal Injury Trust
      c/o Law Office of Alan B. Rich
      Attn: Alan B. Rich, Esq.
      4244 Renaissance Tower
      1201 Elm Street
      Dallas, Texas 75270
      Phone:  (214) 744-5100
      Fax: (214) 744-5101
      maremont@alanrichlaw.com

With a copy to:

      [_____]

To the Delaware Trustee;

      [_____]

To the TAC:

      [_____]

With a copy to:

To the FCR:

      James L. Patton, Esquire
      Young Conaway Stargatt & Taylor, LLP
      1000 North King Street
      Wilmington, DE 19801
      jpatton@ycst.com
      Phone:  (302) 571-6684

With a copy to:

      Edwin J. Harron, Esq.
      Young Conaway Stargatt & Taylor, LLP
      1000 North King Street
      Wilmington, DE 19801
      Email:  eharron@ycst.com
      Phone:  (302)571-6703

To the Reorganized Debtors:

[_____]

With a copy to:

[_____]

(b)    All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

7.7    **Successors and Assigns.**    The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Debtors, the Asbestos Trust, the Trustee, and the Reorganized Debtors, and their respective successors and assigns, except that neither the Debtors, the Asbestos Trust, the Trustee, nor the Reorganized Debtors may assign or otherwise transfer any of its, or their, rights or obligations, if any, under this Trust Agreement except, in the case of the Asbestos Trust and the Trustee, as contemplated by Section 2.1 above.

7.8    **Limitation on Claim Interests for Securities Laws Purposes.**    Asbestos Claims, and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest; provided, however, that clause (a) of this Section 7.8 shall not apply to the holder of a claim that is subrogated to an Asbestos Claim as a result of its satisfaction of such Asbestos Claim.

7.9    **Entire Agreement; No Waiver.**    The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written

-42-

agreements concerning the subject matter hereof.  No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege.  The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**7.10   Headings.**   The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**7.11   Governing Law.**   The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by laws of the State of Delaware, and the rights of all parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the parties hereto intend that the provisions hereof shall control and there shall not be applicable to the Asbestos Trust, the Trustee, the Delaware Trustee, the TAC, the FCR, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges; (b) affirmative requirements to post bonds for trustees, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property; (d) fees or other sums payable to trustees, officers, agents or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature,

amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, the TAC, or the FCR set forth or referenced in this Trust Agreement.  Section 3540 of the Act shall not apply to the Asbestos Trust.

      **7.12**   **Settlors' Representative and Cooperation.**  The Debtors are hereby irrevocably designated as the Settlors, and they are hereby authorized to take any action required of the Settlors by the Trustee in connection with the Trust Agreement.  The Reorganized Debtors agree to cooperate in implementing the goals and objectives of this Trust Agreement.

      **7.13**   **Dispute Resolution.**  Any disputes that arise under this Trust Agreement or under the TDP among the parties hereto shall be resolved by submission of the matter to an alternative dispute resolution (**"ADR"**) process mutually agreeable to the parties involved.  Should any party to the ADR process be dissatisfied with the decision of the arbitrator(s), that party may apply to the Bankruptcy Court for a judicial determination of the matter.  Any review conducted by the Bankruptcy Court shall be *de novo*.  In any case, if the dispute arose pursuant to the consent provision set forth in Section 5.7(b) (in the case of the TAC) or Section 6.6(b) (in the case of the FCR), the burden of proof shall be on the party or parties who withheld consent to show that the objection was valid.  Should the dispute not be resolved by the ADR process within thirty (30) days after submission, the parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court.  If the Trustee determines that the matter in

dispute is exigent and cannot await the completion of the ADR process, the Trustee shall have the discretion to elect out of the ADR process altogether or at any stage of the process and seek resolution of the dispute in the Bankruptcy Court.

**7.14    Enforcement and Administration.**  The provisions of this Trust Agreement and the TDP attached hereto shall be enforced by the Bankruptcy Court pursuant to the Plan.  The parties hereby further acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over the settlement of the accounts of the Trustee and over any disputes hereunder not resolved by alternative dispute resolution in accordance with Section 7.13 above.

**7.15    Effectiveness.**  This Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

**7.16    Counterpart Signatures.**  This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by facsimile or portable document format (pdf)), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Trust Agreement this_____ day

of _____, 2019.

**SETTLORS:**                                   **ASBESTOS CLAIMANTS COMMITTEE**

**MAREMONT CORPORATION**
**MAREMONT EXHAUST PRODUCTS, INC.**
**AVM, INC.**                                   By:_____
**FORMER RIDE CONTROL OPERATING**
  **COMPANY, INC.**

By:_____

Title:  In the capacity listed on Schedule I
      hereto with respect to each entity listed above


**TRUSTEE**                                     **DELAWARE TRUSTEE**
                                                **[_____]**


By:_____          By:_____
Name:                                           Name:
                                                Title:

-46-

**TRUST ADVISORY COMMITTEE**

_____
Name:  Perry Browder
Expiration Date of Initial Term: [_____] Anniversary
of the date of this Trust Agreement

_____
Name:  Lisa Busch
Expiration Date of Initial Term: [_____] Anniversary
of the date of this Trust Agreement

_____
Name:  John Cooney
Expiration Date of Initial Term: [_____] Anniversary
of the date of this Trust Agreement

_____
Name:  Beth Gori
Expiration Date of Initial Term: [_____] Anniversary
of the date of this Trust Agreement

_____
Name:  Armand Volta
Expiration Date of Initial Term: [_____] Anniversary
of the date of this Trust Agreement

**FCR**

_____
Name:  James L. Patton

-47-

**Exhibit 1**

Maremont Asbestos Personal Injury Claimant Release

**(See Plan Exhibit B)**

**Exhibit D**

**Asbestos Personal Injury Trust Distribution Procedures**

# MAREMONT ASBESTOS PERSONAL INJURY TRUST

# DISTRIBUTION PROCEDURES

ACTIVE 243359360

# MAREMONT ASBESTOS PERSONAL INJURY
# TRUST DISTRIBUTION PROCEDURES

## TABLE OF CONTENTS

Page

**ARTICLE 1** INTRODUCTION ................................................................................................ 1

    1.1    Purpose ................................................................................................................ 1

    1.2    Interpretation ....................................................................................................... 1

**ARTICLE 2** OVERVIEW ....................................................................................................... 2

    2.1    Asbestos Trust Goals ........................................................................................... 2

    2.2    Claims Liquidation Procedures ........................................................................... 4

    2.3    Establishment and Application of the Payment Percentage ................................. 5

    2.4    Asbestos Trust's Determination of the Maximum Annual Payment .................... 6

    2.5    Claims Payment Ratio .......................................................................................... 9

    2.6    Indirect Asbestos Personal Injury Claims .......................................................... 11

**ARTICLE 3** TDP ADMINISTRATION ................................................................................ 11

    3.1    Trust Advisory Committee and Future Claimants' Representative ..................... 11

    3.2    Consent and Consultation Procedures ................................................................ 12

**ARTICLE 4** PAYMENT PERCENTAGE: PERIODIC ESTIMATES ................................... 12

    4.1    Uncertainty of Debtors' Personal Injury Asbestos Liabilities ........................... 12

    4.2    Computation of Payment Percentage .................................................................. 13

    4.3    Applicability of the Payment Percentage ........................................................... 14

**ARTICLE 5** RESOLUTION OF ASBESTOS CLAIMS ........................................................ 17

    5.1    Ordering, Processing and Payment of Asbestos Claims. .................................... 17

            5.1(a)    Ordering of Claims. ............................................................................. 17

                     **5.1(a)(1)  Establishment of the FIFO Processing Queue** ................... 17

                     **5.1(a)(2)  Effect of Statutes of Limitation and Repose** ...................... 17

            5.1(b)    Payment of Claims ............................................................................... 18

    5.2    Reserved. ............................................................................................................ 19

    5.3    Resolution of Unliquidated Asbestos Claims ..................................................... 20

            5.3(a)    Expedited Review Process. ................................................................... 21

                     **5.3(a)(1)  In General** ........................................................................... 21

                     **5.3(a)(2)  Claims Processing Under Expedited Review Process** ........ 22

**TABLE OF CONTENTS**
(continued)

**Page**

|  |  |  |  |
|---|---|---|---|
| | | 5.3(a)(3) **Disease Levels, Scheduled Values and Medical/ Exposure Criteria** | 22 |
| | 5.3(b) Individual Review Process | | 24 |
| 5.4 | Categorizing Claims as Extraordinary and/or Exigent or Extraordinary Claims. | | 25 |
| | 5.4(a) "Extraordinary Claim" | | 25 |
| | | 5.4(a)(1) **Requirement to Identify Other Claims.** | 25 |
| | | 5.4(a)(2) **Information Required About Other Claims.** | 26 |
| | | 5.4(a)(3) **Authorization for Release of Information.** | 27 |
| | | 5.4(a)(4) **Claimant Certification.** | 27 |
| | 5.4(b) Exigent Claims | | 28 |
| | | 5.4(b)(1) **Exigent Health Claims** | 28 |
| | | 5.4(b)(2) **Exigent Hardship Claims** | 29 |
| 5.5 | Secondary Exposure Claims | | 29 |
| 5.6 | Indirect Asbestos Personal Injury Claims | | 29 |
| 5.7 | Evidentiary Requirements | | 32 |
| | 5.7(a) Medical Evidence | | 32 |
| | | 5.7(a)(1) **In General** | 32 |
| | | 5.7(a)(1)(A) Disease Level I | 32 |
| | | 5.7(a)(1)(B) Disease Levels II - V | 32 |
| | | 5.7(a)(2) **Credibility of Medical Evidence** | 33 |
| | | 5.7(a)(3) **Reliance by Asbestos Trust on Finding of another Asbestos Trust** | 34 |
| | 5.7(b) Exposure Evidence | | 34 |
| | | 5.7(b)(1) **In General** | 34 |
| | | 5.7(b)(2) **Significant Occupational Exposure** | 34 |
| | | 5.7(b)(3) **Debtor Exposure** | 35 |
| | | 5.7(b)(3)(A) Presumptive Occupations | 36 |
| | | 5.7(b)(3)(B) Standard of Exposure | 36 |
| 5.8 | Claims Audit Program | | 36 |
| 5.9 | Arbitration | | 38 |

**TABLE OF CONTENTS**
(continued)

Page

|  |  |  |  |
|---|---|---|---|
|  | 5.9(a) | Establishment of ADR Procedures | 38 |
|  | 5.9(b) | Limitations on and Payment of Arbitration Awards | 39 |
| 5.10 | Litigation | | 39 |
| 5.11 | Second Disease Claims | | 39 |
| **ARTICLE 6** | CLAIMS MATERIALS | | 39 |
| 6.1 | Claims Materials | | 39 |
| 6.2 | Content of Claims Materials | | 40 |
| 6.3 | Withdrawal or Deferral of Claims | | 40 |
| 6.4 | Filing Requirements and Fees | | 41 |
| 6.5 | Confidentiality of Claimants' Submissions | | 41 |
| **ARTICLE 7** | GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS | | 43 |
| 7.1 | Showing Required | | 43 |
| 7.2 | Costs Considered | | 43 |
| 7.3 | Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity | | 44 |
| 7.4 | Punitive Damages | | 45 |
| 7.5 | Sequencing Adjustment. | | 45 |
|  | 7.5(a) | In General | 45 |
|  | 7.5(b) | Unliquidated Asbestos Claims | 46 |
| 7.6 | Suits in the Tort System | | 46 |
| 7.7 | Payment of Judgments for Money Damages | | 47 |
| 7.8 | Releases | | 47 |
| 7.9 | Third-Party Services | | 48 |
| **ARTICLE 8** | **MEDICARE** | | 48 |
| 8.1 | Medicare | | 48 |
| **ARTICLE 9** | MISCELLANEOUS | | 54 |
| 9.1 | Amendments | | 54 |
| 9.2 | Severability | | 55 |
| 9.3 | Governing Law | | 55 |

-iii-

## MAREMONT ASBESTOS PERSONAL INJURY
## TRUST DISTRIBUTION PROCEDURES

The Maremont Asbestos Personal Injury Trust Distribution Procedures (the **"TDP"**) contained herein provide for resolving all Asbestos Personal Injury Claims (**"Asbestos Claims"**) as defined in the Modified Joint Prepackaged Plan of Reorganization of Maremont Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, dated as of May 14, 2019 (as it may be amended or modified, the **"Plan"**),[1] as provided in and required by the Plan and the Maremont Personal Injury Trust Agreement (the **"Trust Agreement"**). The Plan and the Trust Agreement establish the Maremont Asbestos Personal Injury Trust (the **"Asbestos Trust"**). The trustee of the Asbestos Trust (the **"Trustee"**) shall implement and administer this TDP in accordance with the Trust Agreement.

## ARTICLE 1

## INTRODUCTION

**1.1    Purpose.**  This TDP has been adopted pursuant to the Trust Agreement. It is designed to provide fair, equitable and substantially similar treatment for all similarly situated Asbestos Claims that may presently exist or may arise in the future.

**1.2    Interpretation.**  Except as may otherwise be provided below, nothing in this TDP shall be deemed to create a substantive right for any claimant. The rights and benefits provided herein, if any, to holders of Asbestos Claims shall vest in such holders as of the Effective Date.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan and, as applicable, the Trust Agreement.

## ARTICLE 2

## OVERVIEW

**2.1     Asbestos Trust Goals.**  The goal of the Asbestos Trust is to treat all similarly situated claimants equitably and in accordance with the requirements of Section 524(g) of the Bankruptcy Code. This TDP furthers that goal by setting forth procedures for processing and paying the Debtors' several shares of the unpaid portion of the liquidated value of Asbestos Claims, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system. To this end, the TDP establishes five (5) asbestos-related diseases (**"Disease Levels"**) which have presumptive medical and exposure requirements (**"Medical/Exposure Criteria"**) and specific liquidated values (**"Scheduled Values"**) and one of which has a liquidated value for those claims that qualify as an Extraordinary Claim as defined in Section 5.4 below (**"Maximum Value"**).

The Disease Levels, Medical/Exposure Criteria, Scheduled Values and Maximum Value, which are set forth in Sections 5.3 and 5.4 below, have all been selected and derived with the intention of achieving a fair allocation of the Asbestos Trust assets as among claimants suffering from these different Disease Levels in light of the best available information considering the settlement history of the Debtors and the rights claimants would have in the tort system absent the bankruptcy. Except as set forth in Section 5.11 hereof, a claimant may not assert more than one Asbestos Claim hereunder.

Historically, Debtors Maremont and MEP have been subjected to thousands of personal injury and wrongful death claims asserting that they are liable for damages caused by exposure to asbestos-containing products that Maremont or its predecessor(s)-in-interest and certain

-2-

successor-in-interest allegedly used, sold, manufactured, marketed, produced or distributed. Maremont manufactured, distributed, and sold aftermarket automotive products, including friction products such as brake linings, disc pads, and clutch facings, and aftermarket mufflers. As defined in the Plan, the "**Debtor Product Lines**" includes, among other products, all asbestos-containing products historically manufactured, sold, or distributed by, or branded with the name of or under a license granted by (a) any of the Debtors or any predecessor thereof or any subsidiary of any of the foregoing and/or (b) Nuturn Corporation or Ferodo America, Inc. as successors-in-interest to Maremont's Friction Products Business with respect to all of the Debtors' business lines.

Because of the nature of certain of the Debtor Products Lines, the vast majority of asbestos-related claims asserted against Maremont and MEP were asserted by (1) professional auto mechanics who were allegedly exposed to the Debtor Product Lines while working as professional mechanics in the automotive industry ("**Occupationally Exposed Claims**"); or (2) individual auto enthusiasts who worked on maintenance and upgrades to automobiles at home ("**Shade Tree Mechanic Claims**"). Because of the nature of the claims pool and the limited resources of the Asbestos Trust, this TDP only provides for the payment by the Asbestos Trust of Asbestos Claims based on certain diseases. The Trustee shall supervise the review of filed Asbestos Claims with the goal of approving only those Asbestos Claims that provide evidence of the type of exposure that was required by Maremont for settlement of claims in the tort system. To that end, the claim forms will contain objective criteria to qualify for payment. For example, such forms will require detailed employment history with years of service and the Asbestos Trust may make reasonable inquiries of claimants and/or co-workers, friends and relatives as to the

-3-

nature and extent of a claimant's exposure to the Debtor Product Lines.  Affidavit guidelines will also be developed by the Asbestos Trust to be used by Shade Tree Mechanic Claims.

    **2.2**    **Claims Liquidation Procedures.**  Except as set forth below with respect to Disease Level V Claims, Asbestos Claims shall be processed based on their place in the FIFO Processing Queue (as defined in Section 5.1(a)(1)) to be established pursuant to Section 5.1(a)(1) below. The Asbestos Trust shall take all reasonable steps to resolve Asbestos Claims as efficiently and expeditiously as possible at each stage of claims processing and arbitration, which steps may include, in the Asbestos Trust's sole discretion, conducting settlement discussions with claimants' representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the FIFO Processing Queue are maintained and each claim is individually evaluated pursuant to the valuation factors set forth herein. The Asbestos Trust shall also make every reasonable effort to resolve each year at least that number of Asbestos Claims required to exhaust the applicable Maximum Annual Payments (as that term is defined in Section 2.4 below).

    The Asbestos Trust shall, except as otherwise provided below, liquidate all Asbestos Claims under the Expedited Review Process described in Section 5.3(a) below. Based upon the Debtors' claims settlement history, applicable tort law, and current projections of present and future unliquidated claims, the Scheduled Values for all Disease Levels have been established as set forth in Section 5.3(a)(3).

    A Disease Level V (Mesothelioma 2) claim seeking to qualify as an Extraordinary Claim (as defined in Section 5.4(a)) and all Foreign Claims (as defined in Section 5.3(b)) may be liquidated only pursuant to the IR Process (as defined in Section 5.3(b)(1)).

-4-

All unresolved disputes over a claimant's medical condition or exposure history shall be subject to binding or non-binding arbitration as set forth in Section 5.9 below, at the election of the claimant, under the ADR Procedures (as defined in Section 5.9(a)) that are to be established by the Asbestos Trust. Asbestos Claims that are the subject of a dispute with the Asbestos Trust that cannot be resolved by non-binding arbitration may enter the tort system as provided in Sections 5.10 and 7.6 below. However, if and when a claimant obtains a judgment in the tort system, the judgment shall be payable as provided in Section 7.7 below (subject to, as applicable, the Payment Percentage (as defined in Section 4.1 below), and the Maximum Annual Payments, Maximum Available Payment and Claims Payment Ratio provisions set forth in Sections 2.4 and 2.5 herein).

    **2.3**    **Establishment and Application of the Payment Percentage.**  The initial Payment Percentage (the "**Initial Payment Percentage**") shall be 29.1%.[2] The Payment Percentage may thereafter be adjusted upwards or downwards from time to time by the Asbestos Trust, with the consent of the Trust Advisory Committee (**"TAC"**) and the Legal Representative for Future Claims (**"FCR"**). After the Distribution Value as defined in Section 2.4 below for a Shade Tree Mechanic Claim or the liquidated value of an Occupationally Exposed Claim as defined in Section 5.3(a)(3) below is determined pursuant to the procedures set forth herein under the Expedited Review Process, IR Process, arbitration, or litigation in the tort system, the claimant shall ultimately receive a pro rata share of that value based on a Payment Percentage described in Section 4.2 below. The Payment Percentage shall also apply to all sequencing adjustments paid pursuant to Section 7.5 below.

---

[2] The current initial payment percentage assumes initial funding of not less than $58 million. Should the initial funding be between $58 million and $65 million, the initial payment percentage will increase proportionately. To the extent the Asbestos Trust is funded with less than $58 million or more than $65 million the initial payment percentage may be adjusted.

The Payment Percentage may be adjusted upwards or downwards after a two (2) year re-evaluation period by the Asbestos Trust with the consent of the TAC and the FCR to reflect then-current estimates of the Asbestos Trust's assets and its liabilities, as well as the then-estimated value of then-pending and future claims. If the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under the TDP shall receive additional payments only as provided in Section 4.3 below. Because there is uncertainty in the prediction of both the number and severity of future Asbestos Claims, and the amount of the Asbestos Trust's assets, no guarantee can be made of any Payment Percentage of an Asbestos Claim's liquidated value.

**2.4    Asbestos Trust's Determination of the Maximum Annual Payment.**  After calculating the Payment Percentage, the Asbestos Trust shall create two models of cash flow, principal and income year-by-year to be paid over its entire life to ensure that all present and future holders of Occupationally Exposed Claims ("**Occupational Model**") and Shade Tree Mechanic Claims ("**Shade Tree Model**") (collectively, "**Models**") are compensated at the Payment Percentage. In each year, based upon the Occupational Model of cash flow, the Asbestos Trust shall be empowered to pay out the portion of its funds payable for that year to Occupationally Exposed Claims according to the Occupational Model (the **"Occupational Maximum Annual Payment"**).  In each year, based upon the Shade Tree Model of cash flow, the Asbestos Trust shall be empowered to pay out the portion of its funds payable for that year to Shade Tree Mechanic Claims according to the Shade Tree Model (the **"Shade Tree Maximum Annual Payments**" and together with the Occupational Maximum Annual Payments, the "**Maximum Annual Payments"**). The Asbestos Trust's distributions to Occupationally Exposed Claims and Shade Tree Mechanic Claims for that year shall not exceed the applicable Maximum

-6-

Annual Payment. All approved Shade Tree Mechanic Claims shall be paid at the end of each year and shall be paid the lesser of the pro rata share of the Shade Tree Maximum Annual Payment or the liquidated values established by the Asbestos Trust, subject to the Payment Percentage ("**Distribution Value**"). The Payment Percentage and the Maximum Annual Payments are based on projections over the lifetime of the Asbestos Trust. If such long-term projections are revised, the Payment Percentage may be adjusted accordingly, which will result in new Models of the Asbestos Trust's anticipated cash flow and a new calculation of the Occupational Maximum Annual Payment and the Shade Tree Maximum Annual Payment.

Year-to-year variations in the Asbestos Trust's flow of claims or the value of its assets, including earnings thereon, will not mean necessarily that the long-term projections are inaccurate; they may simply reflect normal variations, both up and down, from the smooth curve created by the Asbestos Trust's long-term projections. If, in a given year, however, asset values, including earnings thereon, are below projections, the Asbestos Trust may need to distribute less in that year than would otherwise be permitted based on the applicable Maximum Annual Payments derived from long-term projections. Accordingly, the applicable Maximum Annual Payments for a given year may be temporarily decreased if the present value of the assets of the Asbestos Trust as measured on a specified date during the year is less than the present value of the assets of the Asbestos Trust projected for that date by the Models described in the foregoing paragraph. The Asbestos Trust shall make such a comparison whenever the Trustee becomes aware of any information that suggests that such a comparison should be made. If the Asbestos Trust determines that as of the date in question, the present value of the Asbestos Trust's assets is less than the projected present value of its assets for such date, then it will remodel the cash flow year-by-year to be paid over the life of the Asbestos Trust based upon the reduced value of the

total assets as so calculated and identify the reduced portion of its funds to be paid for that year, which will become the "**Temporary Maximum Annual Payments**" (additional reductions in the Maximum Annual Payments can occur during the course of that year based upon subsequent calculations). If in any year the Maximum Annual Payments were temporarily reduced as a result of an earlier calculation and, based upon a later calculation, the difference between the projected present value of the Asbestos Trust's assets and the actual present value of its assets has decreased, the Temporary Maximum Annual Payments shall be increased to reflect the decrease in the differential. In no event, however, shall the Temporary Maximum Annual Payments exceed the original Maximum Annual Payments. As a further safeguard, the Asbestos Trust's distribution to Occupationally Exposed Claims for the first nine months of a year shall not exceed 85% of the Occupational Maximum Annual Payment determined for that year.  To the extent the Occupational Maximum Annual Payment is reached in a given year, the Asbestos Trust may continue processing such claims, but shall delay issuing offers or releases until January 1 of the next year. If on December 31 of a given year, the original Maximum Annual Payments for such year is not in effect, the original Maximum Annual Payments for the following year shall be reduced proportionately.

The remaining portion of the Occupational Maximum Annual Payment (the "**Maximum Available Payment**") shall be allocated and used to satisfy all previously liquidated Occupationally Exposed Claims subject to the Claims Payment Ratio set forth in Section 2.5 below; provided, however, that if the Occupational Maximum Annual Payment is reduced during a year pursuant to the provisions above, the Maximum Available Payment shall be adjusted accordingly. The Occupational Maximum Annual Payment shall apply to offers on all Occupationally Exposed Claims.

**2.5**    **Claims Payment Ratio.**  A Claims Payment Ratio has been determined which, as of the Effective Date, has been set at 90% for Category A claims, which consist of Asbestos Claims involving Disease Level IV) and at 10% for Category B claims, which are Asbestos Claims involving Disease Levels I-III. In each year, after the determination of the Occupational Maximum Available Payment described in Section 2.4 above, 90% of that amount shall be available to pay Category A claims and 10% shall be available to pay Category B claims that have been liquidated since the Effective Date; provided, however, that if the Occupational Maximum Annual Payment is reduced during the year pursuant to Section 2.4 above, the amounts available to pay Category A and Category B claims shall be recalculated based on the adjusted Occupational Maximum Available Payment. In the event there are insufficient funds in any year to pay the liquidated claims within either or both of the Categories, the available funds allocated to the particular Category shall be paid to the maximum extent to claimants in that Category based on their place in the FIFO Payment Queue described in Section 5.1(b) below. Claims for which there are insufficient funds allocated to the relevant Category shall be carried over to the next year where they shall be placed at the head of the FIFO Payment Queue. If there is a decrease in the Payment Percentage prior to the payment of such claims, such claims shall nevertheless be entitled to be paid at the Payment Percentage that they would have been entitled to receive but for the application of the Claims Payment Ratio. If, at the end of any calendar year during the first three years the Asbestos Trust is accepting claims, there are excess funds in Category A, because there is an insufficient amount of liquidated claims to exhaust the respective Maximum Available Payment amount for that Category, then the excess funds for that Category shall be rolled over and remain dedicated to Category A.  Notwithstanding any other provision herein, if, at the end of any calendar year following the third anniversary of the date

the Asbestos Trust began accepting claims, there are excess funds available in Category B and insufficient funds in Category A to pay such Category's claims, then the Trustee may transfer up to a specified amount of excess funds (the "**Permitted Transfer Amount**" as defined below) to Category A to cover the shortfall; provided, however, that the Trustee shall never transfer more than the amount of the Category A shortfall. The "Permitted Transfer Amount" shall be determined as follows: (a) the Trustee shall first determine the cumulative amount allocated to Category B based on the Claims Payment Ratio since the date the Asbestos Trust last calculated its Payment Percentage; (b) the Trustee shall then determine the cumulative amount that the Asbestos Trust estimated would be paid to Category B since the date the Asbestos Trust last calculated its Payment Percentage; (c) the Trustee shall then subtract the amount determined in (b) from the amount determined in (a), and the difference between the two shall be referred to as the "Permitted Transfer Amount." The Trustee shall provide the TAC and the FCR with the Permitted Transfer Amount calculation thirty (30) days prior to making a transfer. If, at the end of any calendar year following the third anniversary of the date the Asbestos Trust began accepting claims, there are excess funds in either or both Categories because there is an insufficient amount of liquidated claims to exhaust the respective Maximum Available Payment amount for that Category, or, in a year where there was a transfer from Category B to Category A, if the amount transferred was less than the amount of excess funds, then the excess funds for the Category or Categories with excess funds shall be rolled over and remain dedicated to the respective Category to which they were originally allocated.

During the first nine months of a given year, the Asbestos Trust's payments to claimants in either Category shall not exceed the amount of any excess funds that were rolled over for such

Category from the prior year plus 85% of the amount that would otherwise be available for payment to claimants in such Category.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions, the Trustee shall consider the reasons for which the Claims Payment Ratio and its rollover provisions were adopted, the settlement history that gave rise to its calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any need to make an amendment. In that regard, the Trustee should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually paid to claimants.

No amendment to the Claims Payment Ratio may be made without the consent of the TAC members and the FCR as set forth in the Trust Agreement and Article 3 below. The consent process set forth in Sections 5.7(b) and 6.6(b) of the Trust Agreement shall apply in the event of any amendments to the Claims Payment Ratio. The Trustee, with the consent of the TAC and the FCR, may offer the option of a reduced Payment Percentage to holders of claims in either Category A or Category B in return for prompter payment (the "**Reduced Payment Option**").

2.6     **Indirect Asbestos Personal Injury Claims.**  As set forth in Section 5.6 below, any Indirect Asbestos Personal Injury Claim shall be subject to the same categorization, evaluation, and payment provisions of this TDP as all other Asbestos Claims.

**ARTICLE 3**

**TDP ADMINISTRATION**

3.1     **Trust Advisory Committee and Future Claimants' Representative.**  Pursuant to the Plan and the Trust Agreement, the Asbestos Trust and this TDP shall be administered by the Trustee in consultation with the TAC, which represents the interests of holders of present

Asbestos Claims, and the FCR, who represents the interests of holders of Asbestos Claims that will be asserted in the future. The duties of the TAC and FCR with respect to the Asbestos Trust are set forth in the Trust Agreement.  The Trustee shall obtain the consent of the TAC and the FCR on any amendments to this TDP pursuant to Section 9.1 below, and on such other matters as are otherwise required below and in Section 2.2(f) of the Trust Agreement. The Trustee shall also consult with the TAC and the FCR on such matters as are provided below and in Section 2.2(e) of the Trust Agreement. The initial Trustee, the initial members of the TAC and the initial FCR are identified in the Trust Agreement.

**3.2    Consent and Consultation Procedures.**    In those circumstances in which consultation or consent is required, the Trustee shall provide written notice to the TAC and the FCR of the specific amendment or other action that is proposed. The Trustee shall not implement such amendment nor take such action unless and until the parties have engaged in the Consultation Process described in Sections 5.7(a) and 6.6(a), or the Consent Process described in Sections 5.7(b) and 6.6(b), of the Trust Agreement, respectively.

**ARTICLE 4**

**PAYMENT PERCENTAGE: PERIODIC ESTIMATES**

**4.1    Uncertainty of Debtors' Personal Injury Asbestos Liabilities.**    As discussed above, there is inherent uncertainty regarding the Debtors' total asbestos-related tort liabilities, as well as the total value of the assets available to the Asbestos Trust to pay Asbestos Claims. Consequently, there is inherent uncertainty regarding the amounts that holders of Asbestos Claims will receive. To seek to ensure substantially equivalent treatment of all present and future Asbestos Claims, the Trustee must determine from time to time the percentage of full liquidated

-12-

value that holders of present and future Asbestos Claims shall be likely to receive, *i.e.,* the "**Payment Percentage**" described in Section 2.3 above and Section 4.2 below.

  **4.2**  **Computation of Payment Percentage.** As provided in Section 2.3 above, the Payment Percentage shall be established by the Trustee with the consent of the TAC and the FCR, and shall apply to all Asbestos Claims.

  The Payment Percentage shall be subject to change pursuant to the terms of this TDP and the Trust Agreement if the Trustee with the consent of the TAC and FCR determines that an adjustment is required. No less frequently than once every two  (2) years, commencing with the first day of January occurring after the Effective Date, the Trustee shall reconsider the then-applicable Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration, change the Payment Percentage, if necessary, with the consent of the TAC and the FCR. The Trustee shall also reconsider the then-applicable Payment Percentage at shorter intervals if he or she deems such reconsideration to be appropriate or if requested to do so by the TAC or the FCR. In any event, no less frequently than once every twelve (12) months commencing on the date that the Asbestos Trust first makes available the proof of claim forms and other claims materials required to file a claim with the Asbestos Trust (the six-month anniversary of the date the Asbestos Trust first makes available the proof of claim form and other claims materials required to file a claim being referred to herein as the "**Initial Claims Filing Date**"), the Trustee shall compare the liability forecast on which the then applicable Payment Percentage is based with the actual claims filing and payment experience of the Asbestos Trust to date. If the results of the comparison call into question the ability of the Asbestos Trust to continue to rely upon the current liability forecast, the Trustee shall undertake a reconsideration of the Payment Percentage.

The Trustee must base his or her determination of the Payment Percentage on current estimates of the number, types, and values of present and future Asbestos Claims, the value of the assets then available to the Asbestos Trust for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of full value to all holders of Asbestos Claims. When making these determinations, the Trustee shall exercise common sense and flexibly evaluate all relevant factors.

4.3     **Applicability of the Payment Percentage.**  Except as otherwise provided (a) in Section 5.1(b) below for Asbestos Claims involving deceased or incompetent claimants for which approval of the Asbestos Trust's offer by a court or through a probate process is required, (b) in the paragraph below with respect to Released Claims, and (c) in Section 2.5 above with respect to Asbestos Claims whose payment is delayed as a result of the Claims Payment Ratio, no holder of any other Asbestos Claim shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment; provided, however, that if there is a reduction in the Payment Percentage, the Trustee, in his or her sole discretion, may cause the Asbestos Trust to pay an Asbestos Claim based on the Payment Percentage that was in effect prior to the reduction if such Asbestos Claim was filed and actionable with the Asbestos Trust ninety (90) days or more prior to the date the Trustee proposed the new Payment Percentage in writing to the TAC and the FCR (the "**Proposal Date**") and the processing of such claim was unreasonably delayed due to circumstances beyond the control of the claimant or the claimant's counsel, but only if such claim had no deficiencies for the ninety (90) days prior to the Proposal Date.

-14-

If a redetermination of the Payment Percentage has been proposed in writing by the Trustee to the TAC and the FCR but has not yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage. However, if the proposed Payment Percentage was the lower amount but was not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount. Conversely, if the proposed Payment Percentage was the higher amount and was subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

Notwithstanding anything contained herein, if the proposed Payment Percentage is lower than the current Payment Percentage, a claimant whose Asbestos Claim was liquidated prior to the Proposal Date and who either (a) transmitted[3] an executed release to the Asbestos Trust prior to the Proposal Date or (b) with respect to those claimants who had received releases fewer than thirty (30) days prior to the Proposal Date, transmitted an executed release to the Asbestos Trust within thirty (30) days of the claimant's receipt of the release (the claims described in (a) and (b) are collectively referred to herein as the "**Released Claims**") shall be paid based on the current Payment Percentage (the "**Released Claims Payment Percentage**"). For purposes hereof, (a) a claimant represented by counsel shall be deemed to have received a release on the date that the claimant's counsel receives the release, (b) if the Asbestos Trust transmits a release electronically, the release shall be deemed to have been received on the date the Asbestos Trust transmits the offer notification, and (c) if the Asbestos Trust places the release in the U.S. mail, postage prepaid, the release shall be deemed to have been received three (3) business days after such mailing date. A delay in the payment of the Released Claims for any reason, including

---

[3] For purposes of this sentence, "transmitted" is defined as the date/time postmarked if submitted by mail or the date/time uploaded if submitted electronically.

delays resulting from limitations on payment amounts in a given year pursuant to Section 2.4 or Section 2.5 hereof, shall not affect the rights of the holders of the Released Claims to be paid based on the Released Claims Payment Percentage.

At least thirty (30) days prior to proposing in writing to the TAC and the FCR a change in the Payment Percentage, the Trustee shall issue a written notice to claimants or claimants' counsel indicating that the Trustee is reconsidering such Payment Percentage.

If the Trustee, with the consent of the TAC and the FCR, makes a determination to increase the Payment Percentage, the Trustee shall make supplemental payments to all claimants who previously liquidated their claims against the Asbestos Trust and received payments based on a lower Payment Percentage. The amount of any such supplemental payment for Occupationally Exposed Claims shall be, the liquidated value of the claim in question, times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (excluding the portion of such previously paid amounts that was attributable to any sequencing adjustment paid pursuant to Section 7.5 below). The amount of any such supplemental payment for Shade Tree Mechanic Claims shall be the Distribution Value, times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (excluding the portion of such previously paid amounts that was attributable to any sequencing adjustment paid pursuant to Section 7.5 below).

The Trustee's obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $250, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $250. However, the

Trustee's obligation shall resume and the Trustee shall pay any such aggregate supplemental payments due the claimant at such time that the total exceeds $250.

## ARTICLE 5

## RESOLUTION OF ASBESTOS CLAIMS

5.1    **Ordering, Processing and Payment of Asbestos Claims.**

5.1(a)  **Ordering of Claims.**

5.1(a)(1)    **Establishment of the FIFO Processing Queue**.    The Asbestos Trust shall order claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the "**FIFO Processing Queue**"). The claimant's position in the FIFO Processing Queue shall be determined by the date the claim is filed with the Asbestos Trust. If any claims are filed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the date of the diagnosis of the asbestos-related disease for which the claim was filed. If any claims are filed and diagnosed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

5.1(a)(2)    **Effect of Statutes of Limitation and Repose**.    All unliquidated Asbestos Claims must meet either (i) for claims first filed in the tort system against a Debtor prior to the Petition Date, the applicable federal or state statute of limitation and repose that was in effect at the time of the filing of the claim in the tort system, or (ii) for claims not filed against a Debtor in the tort system prior to the Petition Date, the applicable federal or state statute of limitation that was in effect at the time of the filing with the Asbestos Trust. However, the running of the relevant statute of limitation shall be tolled as of the earliest of (A) the actual filing of the claim against a Debtor prior to the Petition Date, whether in the tort system or by

-17-

submission of the claim to a Debtor pursuant to an administrative settlement agreement; (B) the tolling of the claim against a Debtor prior to the Petition Date by an agreement or otherwise, provided such tolling is still in effect on the Petition Date; or (C) the Petition Date.

If an Asbestos Claim meets any of the tolling provisions described in the preceding sentence and the claim was not barred by the applicable federal or state statute of limitation at the time of the tolling event, it shall be treated as timely filed if it is actually filed with the Asbestos Trust within three (3) years after the Initial Claims Filing Date, or within three (3) years after the date of the diagnosis of the disease for which the claim is filed, whichever occurs later. In addition, any Asbestos Claims that were first diagnosed after the Petition Date, irrespective of the application of any relevant federal or state statute of limitation or repose, may be filed with the Asbestos Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever occurs later. However, the processing of any Asbestos Claim by the Asbestos Trust may be deferred at the election of the claimant pursuant to Section 6.3 below.

**5.1(b) Payment of Claims.** Occupationally Exposed Claims that have been liquidated by the Expedited Review Process as provided in Section 5.3(a)(1) below, by arbitration as provided in Section 5.9 below, or by litigation in the tort system provided in Section 5.10 below, shall be paid in FIFO order based on the date their liquidation became final (the **"FIFO Payment Queue"**), all such payments being subject to the applicable Payment Percentage, the Occupational Maximum Annual Payment, the Claims Payment Ratio and the sequencing adjustment provided for in Section 7.5 below.

All Shade Tree Mechanic Claims that have been liquidated by the Expedited Review Process as provided in Section 5.3(a)(1) below, the IR Process as provided in Section 5.3(b)

below, by arbitration as provided in Section 5.9 below, or by litigation in the tort system provided in Section 5.10 below, shall be paid at the end of each year and shall be paid the Distribution Value, all such payments being subject to the Payment Percentage, the Shade Tree Maximum Annual Payment provisions above, and the sequencing adjustment provided for in Section 7.5 below.

Where the claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer made by the Asbestos Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the Asbestos Trust has been furnished with evidence that the settlement offer has been submitted to such court or in the probate process for approval. If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the Asbestos Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any Occupationally Exposed Claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos- related disease for which the claim was filed. If any Occupationally Exposed Claims are liquidated on the same date and the respective holders' asbestos-related diseases were diagnosed on the same date, the position of those claims in the FIFO Payment Queue shall be determined by the Asbestos Trust based on the dates of the claimants' birth, with older claimants given priority over younger claimants.

**5.2    Reserved.**

-19-

**5.3**     **Resolution of Unliquidated Asbestos Claims.**  As soon as possible after the establishment of the Asbestos Trust, the Trustee, with the consent of the TAC and the FCR, shall adopt procedures for reviewing and liquidating all unliquidated Asbestos Claims, which shall include deadlines for processing such claims. Such procedures shall also require that claimants seeking resolution of unliquidated Asbestos Claims must first file a proof of claim form, together with the required supporting documentation, in accordance with the provisions of Sections 6.1 and 6.2 below.  It is anticipated that the Asbestos Trust shall provide an initial response to the claimant within six (6) months of receiving the proof of claim form.

The proof of claim form shall require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing. Irrespective of the Disease Level alleged on the proof of claim form, all claims shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future shall be treated as subsumed into the higher Disease Level for both processing and payment purposes.

The proof of claim form shall also require the claimant to specify whether the claim is asserted to be an Occupationally Exposed Claim or a Shade Tree Mechanic Claim as defined in Section 2.1 above.  The Trustee shall have the right (in addition to all other rights) to challenge any such assertion or designation.

Upon filing of a valid proof of claim form with the required supporting documentation, the claimant shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a) above.  When the claim reaches the top of the FIFO Processing Queue, the Asbestos Trust shall process and liquidate the claim based upon the medical/exposure evidence submitted by the claimant and under the process elected by the

claimant, if such an elections is available under this TDP for the Disease Level alleged by the claimant.

### 5.3(a)  Expedited Review Process.

5.3(a)(1)      **In General.**  The Expedited Review Process is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all Asbestos Claims (except those involving Disease Level V Extraordinary Claims and all Foreign Claims, which shall only be liquidated pursuant to the IR Process) eligible for payment under this TDP. Expedited Review is also intended to provide qualifying claimants a fixed and certain claims payment.

Thus, except as set forth in Sections 2.4 and 5.1(b) above, claims that undergo Expedited Review and meet the presumptive Medical/ Exposure Criteria for the relevant Disease Level shall be paid the Scheduled Value for such Disease Level set forth in Section 5.3(a)(3) below. All claims liquidated by Expedited Review Process shall be subject to the Payment Percentage, the applicable Maximum Annual Payment, Maximum Available Payment and Claims Payment Ratio limitations set forth above.

Subject to the provisions of Section 5.7, the claimant's eligibility to receive the Scheduled Value for his or her Occupationally Exposed Claim under the Expedited Review Process shall be determined solely by reference to the Medical/Exposure Criteria set forth below.

Subject to the provisions of Section 5.7, the claimant's eligibility to receive the lesser of the pro rata share of the Shade Tree Maximum Annual Payment or Scheduled Value for his or her Shade Tree Mechanic Claim under the Expedited Review Process shall be determined solely by reference to the Medical/Exposure Criteria set forth below.

**5.3(a)(2)        Claims Processing Under Expedited Review Process.**
All claimants seeking liquidation of their claims pursuant to Expedited Review Process shall file the Asbestos Trust's proof of claim form. As a proof of claim form is reached in the FIFO Processing Queue, the Asbestos Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for one of the Disease Levels, and shall advise the claimant of its determination. Except as provided herein for Shade Tree Mechanic Claims, if a Disease Level is determined, the Asbestos Trust shall tender to the claimant an offer of payment of the Scheduled Value for the relevant Disease Level that is subject to the applicable Payment Percentage, together with a form of release approved by the Asbestos Trust. If the claimant accepts the Scheduled Value and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following which the Asbestos Trust shall disburse payment subject to the limitations of the Occupational Maximum Annual Payment, Maximum Available Payment, and the Claims Payment Ratio.

**5.3(a)(3)        Disease Levels, Scheduled Values and Medical/ Exposure Criteria.**   The five Disease Levels covered by this TDP, together with the Medical/Exposure Criteria and the Scheduled Values for these Disease Levels are set forth below. Except as provided herein, these Disease Levels, Scheduled Values, and Medical/Exposure Criteria shall apply to all Asbestos Claims filed with the Asbestos Trust on or before the Initial Claims Filing Date provided in Section 4.2. In addition, commencing on January 1, 2020, the Asbestos Trust shall increase these valuation amounts proportionately by one percent (1%) per annum. Any such increases shall be applicable to offers made following the dates of such increases.

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| Mesothelioma 2 (Level V) | $12,100 | (1) Diagnosis[4] of mesothelioma; (2) Substantial Debtor Exposure[5]; and (3) claim qualifies as Shade Tree Mechanic Claim as defined in Section 2.1. Holders of a Disease Level V Claim may also seek to establish that such claim qualifies as an Extraordinary Claim under Section 5.4(a) below. No presumption of validity shall be available for any claims in this category. |
| Mesothelioma (Level IV) | $111,500 | (1) Diagnosis of mesothelioma; (2) Debtor Exposure as defined in Section 5.7(b)(3); and (3) claimant qualifies as an Occupationally Exposed Claim as defined in Section 2.1. |
| Lung Cancer (Level III) | $25,400 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease,[6] (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure[7] to asbestos, (4) claimant qualifies as an Occupationally Exposed Claim as defined in Section 2.1, and (5) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question |
| Other Cancer (Level II) | $5,400 | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an |

---

[4] The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of this TDP are set forth in Section 5.7 below.

[5] **"Substantial Debtor Exposure"** requires that the claimant (1) to demonstrate meaningful and credible exposure to the Debtor Product Lines; and (2) provide evidence that claimant's Debtor Product Lines exposure was substantial in duration.

[6] Evidence of "Bilateral Asbestos-Related Nonmalignant Disease," for purposes of meeting the criteria for establishing Disease Levels II and III means either (i) a chest X ray read by a qualified B reader of 1/0 or higher on the ILO scale or (ii)(x) a chest X ray read by a qualified B reader or other Qualified Physician, (y) a CT scan read by a Qualified Physician, or (z) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification. Evidence submitted to demonstrate (i) or (ii) above must be in the form of a written report stating the results (e.g., an ILO report, a written radiology report or a pathology report). Solely for asbestos claims filed against a Debtor or another defendant in the tort system prior to the Commencement Date, if an ILO reading is not available, either (i) a chest X ray or a CT scan read by a Qualified Physician, or (ii) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with or compatible with a diagnosis of asbestos-related disease, shall be evidence of a Bilateral Asbestos-Related Nonmalignant Disease for purposes of meeting the presumptive medical requirements of Disease Levels II or III. Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982). For all purposes of this TDP, a "Qualified Physician" is a physician who is board-certified (or in the case of Canadian Claims or Foreign Claims, a physician who is certified or qualified under comparable medical standards or criteria of the jurisdiction in question) in one or more relevant specialized fields of medicine such as pulmonology, radiology, internal medicine or occupational medicine; provided, however, subject to the provisions of Section 5.8, that the requirement for board certification in this provision shall not apply to otherwise qualified physicians whose X ray and/or CT scan readings are submitted for deceased holders of Asbestos Claims.

[7] The term "Significant Occupational Exposure" is defined in Section 5.7(b)(2) below.

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| | | underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, (4) claimant qualifies as an Occupationally Exposed Claim as defined in Section 2.1, and (5) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level I) | $25,400 | (1) Diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestos, plus (a) TLC less than 65%,[8] or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, (4) claimant qualifies as an Occupationally Exposed Claim as defined in Section 2.1, and (5) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |

**5.3(b) Individual Review Process.**

(1) **In General**. Whether a Disease Level V Claim qualifies as an Extraordinary Claim under Section 5.4(a) shall be established only under the Individual Review Process ("**IR Process**").

The liquidated value of all Foreign Claims[9] asserted or payable under this TDP shall be established only under the IR Process. Asbestos Claims of individuals exposed in Canada who were resident in Canada when such claims were filed ("**Canadian Claims**") shall not be considered Foreign Claims hereunder and shall be eligible for liquidation under the Expedited Review Process. Accordingly, a "**Foreign Claim**" is an Asbestos Claim with respect to which the claimant's exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which the Debtors have legal responsibility as

---

[8] Actual measured value as opposed to the percentage of predicted.

[9] The Debtors have represented that they have no history of paying Foreign Claims. Should the Asbestos Trust receive any Foreign Claims, prior to processing the Foreign Claims, the Trustee, in consultation with TAC and the FCR, shall develop the procedures and requirements for the submission, evaluation and payment of Foreign Claims.

a result of the purchase of or exposure to asbestos-containing products outside the United States and its Territories and Possessions.

**5.4**     **Categorizing Claims as Extraordinary and/or Exigent or Extraordinary Claims.**

      **5.4(a) "Extraordinary Claim"** means a Shade Tree Mechanic Claim that otherwise satisfies the Medical Criteria for Disease Level– V, and that is held by a claimant whose exposure to asbestos was at least 75% the result of exposure to asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which the Debtors have legal responsibility, and there is little likelihood of a substantial recovery elsewhere. All such Extraordinary Claims shall be presented for IR Process and, if valid, shall be entitled, except as set forth below, to a liquidation value of up to $34,264 ("**Maximum Value**"), multiplied by the applicable Payment Percentage.

      Any dispute as to Extraordinary Claim status shall be submitted to a special panel established by the Asbestos Trust with the consent of the TAC and FCR (the "**Extraordinary Claims Panel**"). All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review. An Extraordinary Claim shall be paid at the end of each year and shall be paid the lesser of the pro rata share of the Shade Tree Maximum Annual Payment or the Maximum Value, subject to the Payment Percentage.

      **5.4(a)(1)     Requirement to Identify Other Claims**. A claimant asserting an Extraordinary Claim must submit the information described in Section 5.4(a)(2) about all other claims asserted by the claimant that relate in any way to the alleged injuries for which the claimant seeks compensation. Other claims about which information must be submitted include claims by the claimant, the claimant's decedent, and any present or past

Holder of the Claim.  Such other claims include, but are not limited to, the following: (a) lawsuits filed in any court, arbitration proceedings before any panel or tribunal, and administrative proceedings (such as workers' compensation claims) before any governmental or quasi-governmental body; (b) claims that were resolved or settled without the institution of litigation (such as pre-filing settlements reached after notification of the existence of a claim without the need to file a lawsuit); and (c) claims that have been submitted in bankruptcy proceedings or to other asbestos trusts or settlement facilities that resulted from bankruptcy proceedings.

        **5.4(a)(2)**        **Information Required About Other Claims**. A claimant asserting an Extraordinary Claim shall submit the following information for each other claim: (a) the name of the entity against whom the other claim was made, (b) the date of the other claim, and (c) the amounts of all payments received or to be received from the entity to whom the other claim was submitted. The claimant must also submit copies of any documents submitted to or served upon any such entity containing information regarding the alleged injured party's contact with or exposure to asbestos or asbestos-containing products, including without limitation any claim forms submitted to other asbestos trusts or settlement facilities that resulted from bankruptcy proceedings (along with any attachments), ballots submitted by or on behalf of the claimant in any bankruptcy case, and any discovery response filed or served in tort litigation. The claimant shall also certify that, to the best of his knowledge, at that time, with the exception of the other claims that have been expressly disclosed and identified by the claimant, no other entity is known to the claimant to be potentially responsible for the alleged injuries that are the basis of the Extraordinary Claim.

**5.4(a)(3)    Authorization for Release of Information.**  A claimant asserting an Extraordinary Claim shall execute a release of information form in favor of the Asbestos Trust, in the form attached hereto as Appendix I, authorizing all other asbestos trusts or settlement facilities against whom any such other claim has been made or asserted based on the injured party's injury to release to the Asbestos Trust all information submitted to it by such claimant or entity who made such other claim and to disclose the status of any such claim and the amount and date of any payment on the claim. The release of information form shall authorize the Asbestos Trust to obtain all submissions made by the claimant or his or her heirs, executors, successors, or assigns in the future to any other asbestos trust or settlement facility.  The Asbestos Trust may amend the form attached as Appendix I from time to time to add newly established asbestos trusts or settlement facilities.  These authorizations will be used not only to verify information provided in connection with particular Extraordinary Claims but also in connection with the Asbestos Trust's periodic audits for fraud

**5.4(a)(4)    Claimant Certification.**

(i) If the claimant asserting an Extraordinary Claim is or has been represented by an attorney in any litigation or in the filing of other asbestos trust claims based on the injury that forms the basis for the Extraordinary Claim, the claimant's attorney shall provide a certification under penalty of perjury. The certification shall affirm that the attorney has fully investigated the alleged injuries that are the basis of the Extraordinary Claim, including conferring with any other attorneys who represent the claimant asserting an Extraordinary Claim with respect to claims against other asbestos trusts or any other entity, and that no good-faith basis exists, at the time the certification is executed, to bring a claim against any entity that is not identified in the proof of claim form submitted to the Asbestos Trust by the claimant asserting an Extraordinary Claim.

(ii)  If the claimant asserting an Extraordinary Claim has not been represented by an attorney in any litigation or in the filing of other asbestos trust claims based on the injury that forms the basis for the Extraordinary Claim, the claimant shall provide a certification under penalty of perjury that he or she has fully investigated the alleged injuries that are the basis of the Extraordinary Claim, and that no good-faith basis exists, at the time the certification is executed, to bring a claim against any entity that is not identified in the proof of claim form submitted to the Asbestos Trust by the claimant.

        **5.4(b)  Exigent Claims**.  At any time the Asbestos Trust may liquidate and pay Occupationally Exposed Claims that qualify as Exigent Health Claims or Exigent Hardship Claims (together, "**Exigent Claims**") as defined below.  An Exigent Claim, following its liquidation, shall be placed first in the FIFO Payment Queue ahead of all other Asbestos Claims and shall be subject to the Payment Percentage, Occupational Maximum Annual Payment and Claims Payment Ratio described above.

        **5.4(b)(1)**    **Exigent Health Claims**.  An Occupationally Exposed Claim qualifies for payment as an Exigent Health Claim if the claim meets the Medical/Exposure Criteria for Mesothelioma (Disease Level IV) and the claimant is living when the claim is filed. A claim in Disease Levels I-III qualifies as an Exigent Health Claim if the claim meets the Medical/Exposure Criteria for the Disease Level, and the claimant provides a declaration or affidavit made under penalty of perjury by a physician who has examined the claimant within one hundred twenty (120) days of the date of declaration or affidavit in which the physician states (a) that there is substantial medical doubt that the claimant will survive beyond six (6) months from the date of the declaration or affidavit, and (b) that the claimant's terminal condition is caused by the relevant asbestos-related disease.

**5.4(b)(2)     Exigent Hardship Claims.**  An Occupationally Exposed Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the Medical/Exposure Criteria for Disease Levels I-IV and the Asbestos Trust, in its sole discretion, determines (i) that the claimant needs immediate financial assistance based on the claimant's expenses and all sources of available income, and (ii) that there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

**5.5     Secondary Exposure Claims.**  If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant must establish that the occupationally exposed person would have met the exposure requirements under this TDP that would have been applicable had that person filed a direct claim against the Asbestos Trust.  In addition, the claimant with secondary exposure must establish that he or she is suffering from Disease Levels I-IV described in Section 5.3(a)(3) above, that his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person was exposed to asbestos, asbestos-containing products, or conduct for which the Debtors have legal responsibility, and that such secondary exposure was a cause of the claimed disease. All other liquidation and payment rights and limitations under this TDP shall be applicable to such claims.

**5.6     Indirect Asbestos Personal Injury Claims.**  Indirect Asbestos Personal Injury Claims asserted against the Asbestos Trust shall be treated as presumptively valid and paid by the Asbestos Trust subject to the applicable Payment Percentage if the holder of such claim (the **"Indirect Claimant"**) establishes to the satisfaction of the Trustee that (i) the Indirect Claimant has paid in full the liability and obligation of the Asbestos Trust to the individual claimant to whom the Asbestos Trust would otherwise have had a liability or obligation under this TDP (the

-29-

"**Direct Claimant**") (and which has not been paid by the Asbestos Trust), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Asbestos Trust from all liability to the Direct Claimant, and (iii) the claim is not otherwise barred by a statute of limitations or repose or by other applicable law. In no event shall any Indirect Claimant have any rights against the Asbestos Trust superior to the rights of the related Direct Claimant against the Asbestos Trust, including any rights with respect to the timing, amount or manner of payment. In addition, no Indirect Asbestos Personal Injury Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant.

To establish a presumptively valid Indirect Asbestos Personal Injury Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the Asbestos Trust) or a Final Order (as defined in the Plan) provided that such claim is valid under the applicable state law. In any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the Asbestos Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the Asbestos Trust a release in form and substance satisfactory to the Trustee.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the Asbestos Trust with a full release of the Direct Claimant's claim, the Indirect Claimant may request that the Asbestos Trust review the Indirect Asbestos Personal Injury Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the Asbestos Trust had to the Direct Claimant. If the Indirect Claimant can show that it has paid all or a portion of such a liability or obligation, the

Asbestos Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the then applicable Payment Percentage. However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled. Further, the liquidated value of any Indirect Asbestos Personal Injury Claim paid by the Asbestos Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any Asbestos Claim that might be subsequently asserted by the Direct Claimant against the Asbestos Trust.

Any dispute between the Asbestos Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures provided in Section 5.9 below. If such dispute is not resolved by said ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.10 and 7.6 below.

The Trustee may develop and approve a separate proof of claim form for Indirect Asbestos Personal Injury Claims. Indirect Asbestos Personal Injury Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Trustee consistent with the provisions of this Section 5.6, which procedures (a) shall determine the validity, acceptability and enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Asbestos Trust would have afforded the holders of the underlying valid Asbestos Claims.

**5.7**    **Evidentiary Requirements.**

**5.7(a)  Medical Evidence.**

**5.7(a)(1)**        **In General.**  All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period.

**5.7(a)(1)(A)    Disease Level I.**  All diagnoses of Severe Asbestosis (Disease Level I) shall be based, in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease. All living claimants must also provide (i) an ILO reading of 2/1 or greater or pathological evidence of asbestosis and (ii) pulmonary function testing (unless the claimant is able to meet the requirements in (l)(c) of the Medical/Exposure Criteria for Severe Asbestosis in Section 5.3(a)(3) above). [10]

**5.7(a)(1)(B)    Disease Levels II - V.**  All diagnoses of an asbestos-related malignancy (Disease Levels II - V) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related

---

[10] "Pulmonary function testing" or "PFT" shall mean testing that is in material compliance with the quality criteria established by the American Thoracic Society ("**ATS**") and is performed on equipment which is in material compliance with ATS standards for technical quality and calibration. PFT performed in a hospital accredited by The Joint Commission ("**JC**"), or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician shall be presumed to comply with ATS standards, and the claimant may submit a summary report of the testing. If the PFT was not performed in a JC-accredited hospital, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician, the claimant must submit the full report of the testing (as opposed to a summary report); provided, however, that if the PFT was conducted prior to the Effective Date of the Plan and the full PFT report is not available, the claimant must submit a declaration signed by a Qualified Physician or other qualified party, in the form provided by the Asbestos Trust, certifying that the PFT was conducted in material compliance with ATS standards.

disease, or (ii) a diagnosis of such a malignant Disease Level by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by The Joint Commission.

> **5.7(a)(2)**      **Credibility of Medical Evidence.**   Before making any payment to a claimant, the Asbestos Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards. The Asbestos Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable. Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to a Debtor to settle for payment similar disease cases prior to the Debtors' bankruptcy, or (iii) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge, using the same methodology or standard, is presumptively reliable, although the Asbestos Trust may seek to rebut the presumption. Notwithstanding the foregoing or any other provision of this TDP, any medical evidence submitted by a physician or entity that the Asbestos Trust has determined, after consulting with the TAC and the FCR, to be unreliable shall not be acceptable as medical evidence in support of any Asbestos Claim.

In addition, claimants who otherwise meet the requirements of this TDP for payment of an Asbestos Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a

judgment, involving another defendant may be introduced by either the claimant or the Asbestos Trust in any Arbitration proceeding conducted pursuant to 5.9.

**5.7(a)(3)** **Reliance by Asbestos Trust on Finding of another Asbestos Trust.** The Trustee may review the governing documents of another asbestos trust or claims facility and, with the consent of the TAC and the FCR, and for the sole purpose of accepting the medical diagnosis of a claimant determine to accept the disease level classifications as found by such other asbestos trust or claims facility in lieu of the medical evidence claimants are required to submit under this TDP.

**5.7(b) Exposure Evidence.**

**5.7(b)(1)** **In General.** As set forth above in Section 5.3(a)(3), to qualify for any Disease Level, the claimant must demonstrate a minimum exposure to asbestos, asbestos-containing products, or conduct for which the Asbestos Trust has legal responsibility. Claims based on conspiracy theories that involve no exposure to asbestos, asbestos-containing products, or conduct for which the Asbestos Trust has legal responsibility are not compensable under this TDP. To meet the presumptive exposure requirements of Expedited Review set forth in Section 5.3(a)(3) above, the claimant must show (i) for all Disease Levels, Debtor Exposure as defined in Section 5.7(b)(3) below; and (ii) for Severe Asbestosis (Disease Level I), Other Cancer (Disease Level II), or Lung Cancer (Disease Level III), the claimant must show six (6) months Debtor Exposure plus Significant Occupational Exposure to asbestos.

**5.7(b)(2)** **Significant Occupational Exposure**. "**Significant Occupational Exposure**" means employment for a cumulative period of at least five (5) years in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products so that the claimant in the fabrication process

was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).

5.7(b)(3)    **Debtor Exposure.**    The claimant must demonstrate meaningful and credible exposure to asbestos, asbestos-containing products, or conduct for which the Asbestos Trust has legal responsibility as described in this Section 5.7(b)(3) (**"Debtor Exposure"**). That meaningful and credible exposure evidence may be established by an affidavit or sworn statement of the claimant, by an affidavit or sworn statement of a co-worker or the affidavit or sworn statement of a family member in the case of a deceased claimant (providing the Asbestos Trust finds such evidence reasonably reliable), by invoices, employment, construction or similar records, or by other credible evidence. The specific exposure information required by the Asbestos Trust to process a claim shall be set forth on the proof of claim form to be used by the Asbestos Trust. The Asbestos Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary.

Evidence submitted to establish proof of Debtor Exposure is for the sole benefit of the Asbestos Trust, not third parties or defendants in the tort system. Except with respect to Disease Level 5, the Asbestos Trust has no need for, and therefore claimants are not required to furnish the Asbestos Trust with, evidence of exposure to specific asbestos products other than those for which the Asbestos Trust has responsibility, except to the extent such evidence is required elsewhere in this TDP. Similarly, failure to identify Debtor Product Lines in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from

recovering from the Asbestos Trust, provided the claimant otherwise satisfies the medical and exposure requirements of this TDP.

      **5.7(b)(3)(A)    Presumptive Occupations.**  Because of the nature of the Debtors' businesses, the Asbestos Trust shall consider that there is a limited universe of occupations in which claimants are likely to have been directly exposed to asbestos, asbestos- containing products, or conduct for which the Asbestos Trust has legal responsibility. Those occupations are automotive mechanics (the **"Presumptive Occupations"**). The Asbestos Trust may add occupations to the Presumptive Occupations if the Trustee determines, with the consent of the TAC and FCR, that based on an analysis of claims submitted to the Asbestos Trust establishing Debtor Exposure, claimants with such occupations are likely to have been directly exposed to asbestos, asbestos-containing products, or conduct for which the Asbestos Trust has legal responsibility.  The Asbestos Trust may also remove occupations from the Presumptive Occupations if it determines that such occupations should not have been included.

      **5.7(b)(3)(B)    Standard of Exposure.**  In order for a claim to be approved by the Asbestos Trust, the injured party must have worked in a Presumptive Occupation and must demonstrate to the Asbestos Trust's satisfaction that he or she worked directly with the Debtor Product Lines.   When evaluating whether an injured party has demonstrated that he or she worked directly with the Debtors' Product Lines, the Asbestos Trust shall base its determination upon whether the circumstances of the injured party's exposure to the product are the same as those of claimants with respect to which the Debtors historically paid claims.

    **5.8    Claims Audit Program.**  The Asbestos Trust, with the consent of the TAC and the FCR, shall develop methods for auditing (i) the reliability of medical evidence, including

additional reading of X-rays, CT scans and verification of pulmonary function tests, and (ii) the reliability of evidence of exposure to asbestos, including exposure to asbestos-containing products for which the Asbestos Trust has legal responsibility and occupational evidence (a claims audit program). The Asbestos Trust may hire independent third-parties to implement the audit programs. In the event that the Asbestos Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable evidence to the Asbestos Trust, it may decline to accept additional evidence from such provider in the future.

The Asbestos Trust shall utilize the services of a third-party claims processing facility (the **"Claims Processor"**) to assist in the evaluation of claims submitted to the Asbestos Trust. The Asbestos Trust shall participate in a cross-trust audit program. Such cross-trust audit program shall include a comparison of claims filed with the Asbestos Trust against claims filed with all other asbestos trusts administered by the Claims Processor that participate in the cross trust audit program but in any case shall include no fewer than four other trusts. The filing of any claim with the Asbestos Trust, regardless of the treatment sought, shall constitute consent for each other asbestos trust participating in the cross-trust audit program to release to the entity overseeing the cross-trust audit program all information submitted to such other asbestos trust by or on behalf of the claimant pursuant to the provisions of the cross-trust audit program and to disclose the status of any such claim and the amount and date of any payment on the claim.

To the extent that the Asbestos Trust or the entity overseeing the claims audit program or cross-trust audit program believe that it is relevant, nothing herein shall preclude the Asbestos Trust or the entity overseeing the claims audit program or cross-trust audit program, in the Asbestos Trust's sole discretion, from reviewing or taking into consideration other claims filed in state court complaints or against trusts in addition to those trusts involved in the cross-trust audit

program. Any claimant subject to the claims audit program or cross-trust audit program shall cooperate and, if requested, provide the Asbestos Trust or the entity overseeing the claims audit program or cross-trust audit program with authorization to obtain from other asbestos trusts any information such claimant has submitted to such other asbestos trusts.

Further, in the event that an audit reveals that fraudulent information has been provided to the Asbestos Trust, the Asbestos Trust may penalize any claimant or claimant's attorney by rejecting the Asbestos Claim or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Asbestos Claims, raising the level of scrutiny of additional information submitted from the same source or sources, increasing the filing fee for future claims submitted by such claimant or claimant's attorney, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152, and seeking sanctions from the Bankruptcy Court.

### 5.9    Arbitration.

**5.9(a) Establishment of ADR Procedures.**    The Asbestos Trust, with the consent of the TAC and the FCR, shall institute binding and non-binding arbitration procedures ("**ADR Procedures**") for resolving disputes concerning whether the claimant's medical condition or exposure history meets the requirements of this TDP for purposes of categorizing a claim involving Disease Levels I-V.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 5.7 above. With respect to all claims eligible for arbitration, the claimant, but not the Asbestos Trust, may elect either non-binding or binding

arbitration. The ADR Procedures may be modified by the Asbestos Trust with the consent of the TAC and the FCR.

**5.9(b)  Limitations on and Payment of Arbitration Awards.**  The arbitrator shall not return an award in excess of the Scheduled Value for the appropriate Disease Level as set forth in Section 5.3(a)(3) above, and for an Extraordinary Claim Disease Level V, the arbitrator shall not return an award greater than the Maximum Value as set forth in Section 5.4 above. A claimant who submits to arbitration and who accepts the arbitral award shall receive payments in the same manner as one who accepts the Asbestos Trust's original valuation of the claim.

**5.10    Litigation.**  Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the Asbestos Trust pursuant to Section 7.6 below. However, a claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the Asbestos Trust's available cash only as provided in Section 7.7 below.

**5.11    Second Disease Claims.**  The holder of a Severe Asbestosis (Disease Level I) claim may assert a new Asbestos Claim against the Asbestos Trust for a Mesothelioma (Disease Level IV) claim that is subsequently diagnosed. Any additional payments to which such claimant may be entitled with respect to the Mesothelioma (Disease Level IV) claim shall be reduced by the amount paid to the claimant for the Severe Asbestosis (Disease Level I) claim.

## ARTICLE 6

## CLAIMS MATERIALS

**6.1    Claims Materials.**  The Asbestos Trust shall prepare suitable and efficient claims materials (**"Claims Materials"**) for all Asbestos Claims, and shall provide such Claims

-39-

Materials upon a written request for such materials to the Asbestos Trust. The proof of claim form to be submitted to the Asbestos Trust shall require the claimant to assert the highest Disease Level for which the claim qualifies at the time of filing. The proof of claim form shall also include a certification by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure. In developing its claim filing procedures, the Asbestos Trust shall make every reasonable effort to provide claimants with the opportunity to utilize currently available technology at their discretion, including filing claims and supporting documentation over the Internet. The proof of claim form to be used by the Asbestos Trust shall be developed by the Asbestos Trust and submitted to the TAC and the FCR for approval; it may be changed by the Asbestos Trust with the consent of the TAC and the FCR.

**6.2    Content of Claims Materials.**  The Claims Materials shall include a copy of this TDP, such instructions as the Trustee shall approve, and a detailed proof of claim form. This TDP has been prepared with the goal of simplifying the filing of claims, reducing paperwork by claimants, and reducing the cost of reviewing claims in an effort to maximize distribution to claimants, as well as ensuring the accuracy of such submissions. Accordingly, instead of collecting some or all of the claims information from a claimant or the claimant's attorney, the Asbestos Trust may, with the consent of the claimant or the claimant's attorney, obtain such information from electronic databases maintained by any other asbestos claims resolution organization. If requested by the claimant, the Asbestos Trust shall accept information provided electronically. The claimant may, but shall not be required to, provide the Asbestos Trust with evidence of recovery from other defendants and claims resolution organizations.

**6.3    Withdrawal or Deferral of Claims.**  A claimant can withdraw an Asbestos Claim at any time upon written notice to the Asbestos Trust and file another claim subsequently

-40-

without affecting the status of the claim for statute of limitations purposes, but any such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing. A claimant can also request that the processing of his or her Asbestos Claim by the Asbestos Trust be deferred for a period not to exceed two (2) years without affecting the status of the claim for statute of limitations purposes, in which case the claimant shall also retain his or her original place in the FIFO Processing Queue. During the period of such deferral, a sequencing adjustment on such claimant's Asbestos Claim as provided in Section 7.5 hereunder shall not accrue and payment thereof shall be deemed waived by the claimant. Except for Asbestos Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the Asbestos Trust's offer is required, or an Asbestos Claim for which deferral status has been granted, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within one (1) year of the Asbestos Trust's written offer of payment or rejection of the claim. Upon written request and good cause, the Asbestos Trust may extend the withdrawal or deferral period for an additional six (6) months,

**6.4    Filing Requirements and Fees.** Each claimant must submit a filing fee of $100 to have an Asbestos Claim processed by the Asbestos Trust. The fee shall be refunded in full to claimants who receive and accept payment of a settlement offer from the Asbestos Trust. The filing fee may be changed by the Trustee with the consent of the TAC and the FCR. The Asbestos Trust may impose a higher filing fee as set forth in Section 5.8 above.

**6.5    Confidentiality of Claimants' Submissions.** All submissions to the Asbestos Trust by a holder of an Asbestos Claim, including a proof of claim form and materials related thereto, shall be treated as made in the course of settlement discussions between the holder and the Asbestos Trust, and intended by the parties to be confidential and to be protected by all

-41-

applicable state and federal privileges and protections, including but not limited to those directly applicable to settlement discussions. The Asbestos Trust will preserve the confidentiality of such claimant submissions, and shall disclose the contents thereof only, with the permission of the holder, to another trust established for the benefit of asbestos personal injury claimants pursuant to section 524(g) of the Bankruptcy Code or other applicable law, to such other persons as authorized by the holder, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware State Court, or the United States District Court for the District of Delaware. Furthermore, the Asbestos Trust shall provide counsel for the holder a copy of any such subpoena immediately upon being served; provided, however, that if a subpoena seeks records or information pertaining to more than fifty (50) claimants, the Asbestos Trust may instead first provide a copy of the subpoena to counsel for the TAC and the FCR and delay providing a copy of the subpoena to counsel for individual holders of Asbestos Claims until, in the Trustee's judgment, it appears likely that information or records relating to the holders may have to be produced in response to the subpoena. In such a case, the Asbestos Trust shall ensure that the notice that is provided to counsel for the holders allows such counsel sufficient time to object to the production. The Asbestos Trust shall on its own initiative or upon request of the claimant in question take all necessary and appropriate steps to preserve said privileges before the Bankruptcy Court, a Delaware State Court, or the United States District Court for the District of Delaware and before those courts having appellate jurisdiction related thereto. Notwithstanding anything in the foregoing to the contrary, with the consent of the TAC and the FCR, the Asbestos Trust may, in specific limited circumstances, disclose information, documents or other materials reasonably necessary in the Asbestos Trust's judgment to preserve, litigate, resolve, or settle coverage, or to comply with an applicable obligation under an insurance policy

or settlement agreement; provided, however, that the Asbestos Trust shall take any and all steps reasonably feasible in its judgment to preserve the further confidentiality of such information, documents and materials, and prior to the disclosure of such information, documents or materials to a third party, the Asbestos Trust shall receive from such third party a written agreement of confidentiality that (a) ensures that the information, documents and materials provided by the Asbestos Trust shall be used solely by the receiving party for the purpose stated in the agreement and (b) prohibits any other use or further dissemination of the information, documents and materials by the third party except as set forth in the written agreement of confidentiality. Nothing in this TDP, the Plan or the Trust Agreement expands, limits or impairs the obligation under applicable law of a claimant to respond fully to lawful discovery in any underlying civil action regarding his or her submission of factual information to the Asbestos Trust for the purpose of obtaining compensation for asbestos-related injuries from the Asbestos Trust.

## ARTICLE 7

## GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS

**7.1    Showing Required.**  To establish a valid Asbestos Claim, a claimant must meet the requirements set forth in this TDP.

**7.2    Costs Considered.**  Notwithstanding any provisions of this TDP to the contrary, the Trustee shall always give appropriate consideration to the cost of investigating and uncovering invalid Asbestos Claims so that the payment of valid Asbestos Claims is not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting an Asbestos Claim. The Trustee shall also have the latitude to make judgments regarding the amount of transaction costs to be expended by the Asbestos Trust so that valid Asbestos Claims are not unduly further impaired by the costs of additional investigation. Nothing

-43-

herein shall prevent the Trustee, in appropriate circumstances, from contesting the validity of any claim against the Asbestos Trust whatever the costs, or declining to accept medical evidence from sources that the Trustee has determined to be unreliable pursuant to the Claims Audit Program described in Section 5.8 above or otherwise.

**7.3    Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.**    Consistent with the provisions hereof and subject to the FIFO Processing and Payment Queues and the Maximum Annual Payment, Maximum Available Payment and Claims Payment Ratio requirements set forth above, the Trustee shall proceed as quickly as possible to liquidate valid Asbestos Claims, and shall make payments to holders of such claims in accordance with this TDP promptly as funds become available and as claims are liquidated, while maintaining sufficient resources to pay future valid claims in substantially the same manner.

Because the Asbestos Trust's income over time remains uncertain, and decisions about payments must be based on estimates that cannot be done precisely, they may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants. However, the Trustee shall use his or her best efforts to treat similar claims in substantially the same manner, consistent with his or her duties as Trustee, the purposes of the Asbestos Trust, and the practical limitations imposed by the inability to predict the future with precision.

In the event that the Asbestos Trust faces temporary periods of limited liquidity, the Trustee may, with the consent of the TAC and the FCR, (a) suspend the normal order of payment, (b) temporarily limit or suspend payments altogether, (c) offer a Reduced Payment

Option as described in Section 2.5 above and/or (d) commence making payments on an installment basis.

**7.4    Punitive Damages.**  Except as provided below for claims asserted under the Alabama Wrongful Death Statute, in determining the value of any liquidated or unliquidated Asbestos Claim, punitive or exemplary damages, i.e., damages other than compensatory damages, shall not be considered or paid, notwithstanding their availability in the tort system. Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the Asbestos Trust in the tort system pursuant to Sections 5.10 above and 7.6 below. The only damages that may be awarded pursuant to this TDP to Alabama claimants who are deceased and whose personal representatives pursue their claims only under the Alabama Wrongful Death Statute shall be compensatory damages determined pursuant to the statutory and common law of the Commonwealth of Pennsylvania, without regard to the choice of law principles.

**7.5    Sequencing Adjustment.**

**7.5(a)  In General.**  Subject to the limitations set forth below, a sequencing adjustment shall be paid on all Asbestos Claims with respect to which the claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years, or for a period when the claim was deferred or withdrawn at the claimant's request. The sequencing adjustment factor shall be the one-year U.S. Treasury bill interest rate in effect on January 1 of the year in which the accrual of the sequencing adjustment commences. The rate of the sequencing adjustment shall be adjusted each January 1 to correspond to the one-year Treasury bill interest rate then in effect. The applicable sequencing adjustment shall be calculated based only on the value of the claim specified in

Section 7.5(b) or (c) below, subject to the Payment Percentage; any accrued but unpaid sequencing adjustment shall not be included in such calculation.

**7.5(b) Unliquidated Asbestos Claims**.    A sequencing adjustment shall be payable on the Scheduled Value of any unliquidated Asbestos Claim, whether the claim is liquidated under Expedited Review, IR Process, or by arbitration. No sequencing adjustment shall be paid on any claim liquidated in the tort system pursuant to Section 5.10 above and Section 7.6 below. Sequencing adjustments on all such unliquidated claims shall be measured from the date of payment back to the earliest of the date that is one year after the date on which (a) the claim was filed against a Debtor prior to the Petition Date; (b) the claim was filed against another defendant in the tort system on or after the Petition Date but before the Effective Date; (c) the claim was filed with the Bankruptcy Court during the pendency of the Chapter 11 proceeding; or (d) the claim was filed with the Asbestos Trust after the Effective Date.

**7.6      Suits in the Tort System.**  If the holder of a disputed claim disagrees with the Asbestos Trust's determination regarding the Disease Level of the claim or the claimant's exposure history, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.9 above, the holder may file a lawsuit against the Asbestos Trust in the Claimant's Jurisdiction as defined in Section 9.3 below. Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. All defenses (including, with respect to the Asbestos Trust, all defenses which could have been asserted by a Debtor) shall be available to both sides at trial; however, the Asbestos Trust may waive any defense and/or concede any issue of fact or law. If the claimant was alive at the time the initial pre-petition complaint was filed or on the date the proof of claim form was filed with the Asbestos Trust, the

case shall be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

**7.7    Payment of Judgments for Money Damages.**  If and when a claimant obtains a judgment in the tort system, the claim shall be placed in the FIFO Payment Queue based on the date on which the judgment became final. Thereafter, the claimant shall receive from the Asbestos Trust an initial payment (subject to the applicable Payment Percentage and the Maximum Annual Payment, Maximum Available Payment and Claims Payment Ratio provisions set forth above) of an amount equal to the greater of (i) the Asbestos Trust's last offer to the claimant or (ii) the award that the claimant declined in non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system. The claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage and the Maximum Annual Payment, Maximum Available Payment and Claims Payment Ratio provisions above in effect on the date of the payment of the subject installment).

The total amounts paid with respect to such claims shall not exceed the relevant Scheduled Value for the appropriate Disease Level as set forth in Section 5.3(b)(2) above, and for an Extraordinary Claim involving one of those Disease Levels, the arbitrator shall not return an award greater than the Maximum Value for such a claim as set forth in Section 5.3(b)(2) above. Under no circumstances shall (a) a sequencing adjustment be paid pursuant to Section 7.5 or (b) interest be paid under any statute on any judgments obtained in the tort system.

**7.8    Releases**.  As a condition to receiving any payment from the Asbestos Trust, a claimant shall be required to execute the Asbestos Personal Injury Claimant Release attached

-47-

hereto as Exhibit 1. In the case of an Indirect Personal Injury Claim, the Indirect Claimant. The Trustee may modify the provisions of the Asbestos Personal Injury Claimant Release with the consent of the TAC and FCR, provided, however, that notwithstanding anything to the contrary in this TDP, the Trustee may not modify any provision that would materially impact the rights and protections afforded to the Reorganized Debtors, the Non-Debtor Affiliates, the Settling Insurers and Representatives of the foregoing under the Asbestos Personal Injury Claimant Release without the written consent of Meritor and the Reorganized Debtors, including, without limitation, (i) the scope and the terms of the release of the Reorganized Debtors, the Non-Debtor Affiliates, the Settling Insurers, and the Representatives of each of the foregoing (each as defined in the Plan), (ii) the requirement that the Asbestos Trust obtain a properly-executed Asbestos Personal Injury Claimant Release from any claimant as a pre-condition to making a distribution to any such claimant.

  **7.9 Third-Party Services.** Nothing in this TDP shall preclude the Asbestos Trust from contracting with another asbestos claims resolution organization to provide services to the Asbestos Trust so long as decisions about the categorization and liquidated value of Asbestos Claims are based on the relevant provisions of this TDP, including the Disease Levels, Scheduled Values, and Medical/Exposure Criteria set forth above.

**ARTICLE 8**

**MEDICARE**

  **8.1 Medicare.**

    (a) It is the position of the parties to the Trust Agreement that the Protected Parties will have no reporting obligations in respect of their contributions to the Asbestos Trust, or in respect of any payments, settlements, resolutions, awards, or other claim liquidations by the

-48-

Asbestos Trust, under the reporting provisions of 42 U.S.C. §1395y et seq. or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or relating thereto ("**MSPA**"), including Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P. L. 110-173), or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or relating thereto ("**MMSEA**"). Unless and until there is definitive regulatory, legislative, or judicial authority (as embodied in a final non-appealable decision from the United States Court of Appeals for the Third Circuit or the United States Supreme Court), or a letter from the Secretary of Health and Human Services confirming that the Protected Parties have no reporting obligations under MMSEA with respect to any settlements, payments, or other awards made by the Asbestos Trust or with respect to contributions the Protected Parties have made or will make to the Asbestos Trust, the Asbestos Trust shall, at its sole expense, in connection with the implementation of the Plan, act as a reporting agent for the Protected Parties, and shall timely submit all reports that would be required to be made by any of the Protected Parties under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the Asbestos Trust or with respect to contributions to the Asbestos Trust. The Asbestos Trust, in its role as reporting agent for the Protected Parties, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(b)     As long as the Asbestos Trust is required to act as a reporting agent for any Protected Party pursuant to the provisions of Section 8.1(a) above, the Asbestos Trust shall

within ten (10) business days following the end of each calendar quarter, provide a written certification to the party designated in writing by each Protected Party for which the Asbestos Trust is required to act as reporting agent, confirming that all reports to CMS required by Section 8.1(a) above have been submitted in a timely fashion, and identifying (i) any reports that were rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance, and (ii) any payments to Medicare benefits recipients or Medicare-eligible beneficiaries that the Asbestos Trust did not report to CMS.

(c)     With respect to any reports rejected or otherwise identified as noncompliant by CMS, the Asbestos Trust shall, upon request by a Protected Party for which the Asbestos Trust is required to act as reporting agent, promptly provide copies of the original reports submitted to CMS, as well as any response received from CMS with respect to such reports; provided, however, that the Asbestos Trust may redact from such copies the names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the injured parties, claimants, guardians, conservators and/or other personal representatives, as applicable.   With respect to any such reports, the Asbestos Trust shall reasonably undertake to remedy any issues of noncompliance identified by CMS and resubmit such reports to CMS, and, upon request by a Protected Party, provide such Protected Party with copies of such resubmissions; provided, however, that the Asbestos Trust may redact from such copies the names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the injured parties, claimants, guardians, conservators

-50-

and/or other personal representatives, as applicable. In the event the Asbestos Trust is unable to remedy any issues of noncompliance, the provisions of Section 8.1(g) below shall apply.

(d)    As long as the Asbestos Trust is required to act as a reporting agent for a Protected Party pursuant to Section 8.1(a) above, with respect to each claim of a Medicare benefits recipient or Medicare-eligible beneficiary that was paid by the Asbestos Trust and not reported to CMS, the Asbestos Trust shall, upon request by such Protected Party, promptly provide the claimant's name, last four digits of the claimant's Social Security number, the year of the claimant's birth, the claimants' asbestos-related disease, and any other information that may be necessary in the reasonable judgment of such Protected Party to satisfy its obligations, if any, under MMSEA, as well as the basis for the Asbestos Trust's failure to report the payment. In the event the Protected Party informs the Asbestos Trust that it disagrees with the Asbestos Trust's decision not to report a claim paid by the Asbestos Trust, the Asbestos Trust shall promptly report the payment to CMS. All documentation relied upon by the Asbestos Trust in making a determination that a payment did not have to be reported to CMS shall be maintained for a minimum of six years following such determination. The Protected Parties shall keep any information and documents received from the Asbestos Trust pursuant to this Section 8.1(d) confidential and shall not use such information for any purpose other than meeting obligations under MSPA and/or MMSEA.

(e)    As long as the Asbestos Trust is required to act as a reporting agent for any Protected Party pursuant to Section 8.1(a) above, the Asbestos Trust shall make the reports and provide the certifications required by Section 8.1(a) and (b) above until such time as the Protected Party shall determine, in its reasonable judgment, that it has no further legal obligation under MMSEA or otherwise to report any settlements, resolutions, payments, or liquidation

determinations made by the Asbestos Trust or contributions to the Asbestos Trust. Furthermore, following any permitted cessation of reporting, or if reporting has not previously commenced due to the satisfaction of one or more of the conditions set forth in Section 8.1(a) above, and if the Protected Party reasonably determines, based on subsequent legislative, administrative, regulatory, or judicial developments, that reporting is required, then the Asbestos Trust shall promptly perform its obligations under Section 8.1(a) and (b) above.

(f)     Section 8.1(a) above is intended to be purely prophylactic in nature, and does not imply, and shall not constitute an admission, that any Protected Party, is, in fact, an "applicable plan" within the meaning of MMSEA, or that any Protected Party has a legal obligation to report any actions undertaken by the Asbestos Trust or contributions to the Asbestos Trust under MMSEA or any other statute or regulation.

(g)     In the event that CMS concludes that reporting done by the Asbestos Trust in accordance with Section 8.1(a) above is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS communicates to the Asbestos Trust or any of the  Protected Parties a concern with respect to the sufficiency or timeliness of such reporting, or there appears to a Protected Party a reasonable basis for a concern with respect to the sufficiency or timeliness of such reporting or non-reporting based upon the information received pursuant to Section 8.1(b), (c) or (d) above, or other credible information, then each Protected Party shall have the right to submit its own reports to CMS under MMSEA, and the Asbestos Trust shall provide in a timely manner to any Protected Party that elects to file its own reports such information as the electing Protected Party may require in order to comply with MMSEA, including, without limitation, the full reports filed by the Asbestos Trust pursuant to Section 8.1(a) above without any redactions.  Such Protected Party

shall keep any information it receives from the Asbestos Trust pursuant to this Section 8.1(g) confidential and shall not use such information for any purpose other than meeting obligations under MSPA and/or MMSEA.

(h)      Notwithstanding any other provision hereof, if the Asbestos Trust is required to act as a reporting agent for any of the Protected Parties pursuant to the provisions contained herein, then such Protected Parties shall take all steps necessary and appropriate as required by CMS to permit any reports contemplated by Section 8.1 to be filed.  Furthermore, until a Protected Party provides the Asbestos Trust with any necessary information regarding that Protected Party's identifying information that may be required by CMS's Coordination of Benefits Contractor to effectuate reporting, the Asbestos Trust shall have no obligation to report under Section 8.1 (a) above with respect to any such entity that has not provided such information and the Asbestos Trust shall have no indemnification obligation under Section 8.1 to such Protected Party for any penalty, interest, or sanction that may arise solely on account of the Protected Party's failure to timely provide such information to the Asbestos Trust in response to a timely request by the Asbestos Trust for such information.

(i)      The Trustee shall obtain prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Asbestos Claim a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under MSPA in connection with, or relating to, such Asbestos Claim and that the Protected Parties also are beneficiaries of such certification.  The Asbestos Trust shall provide a quarterly certification of its compliance with the terms of the immediately preceding sentence to the party designated in writing by each Protected Party for which the Asbestos Trust is required to act as reporting agent, and shall permit reasonable audits

by such Protected Parties, no more often than quarterly, to confirm the Asbestos Trust's compliance with this Section 8.1(i) during which Protected Parties may request copies of claimant certifications. For the avoidance of doubt, the Asbestos Trust shall be obligated to comply with the requirements of this Section 8.1(i) regardless of whether a Protected Party elects to file its own reports under MMSEA pursuant to Section 8.1(g) above. The Protected Parties shall keep any information and documents received from the Asbestos Trust pursuant to this Section 8.1(i).

## ARTICLE 9

## MISCELLANEOUS

**9.1** **Amendments.** Except as otherwise provided herein, the Trustee may amend, modify, delete, or add to any provisions of this TDP (including, without limitation, amendments to conform this TDP to advances in scientific or medical knowledge or other changes in circumstances), provided he or she first obtains the consent of the TAC and the FCR pursuant to the Consent Process set forth in Sections 5.7(b) and 6.6(b) of the Trust Agreement, except that the right to amend the Claims Payment Ratio is governed by the provisions of Section 2.5 above, and the right to adjust the Payment Percentage is governed by Section 4.2 above. Nothing herein is intended to preclude the TAC or the FCR from proposing to the Trustee, in writing, amendments to this TDP. Any amendment proposed by the TAC or the FCR shall remain subject to Section 7.3 of the Trust Agreement. For the avoidance of doubt, nothing herein shall permit the Trustee, TAC or FCR to amend any provision in this TDP that would materially impact the rights and protections afforded to the Reorganized Debtors, the Non-Debtor Affiliates, the Settling Insurers and Representatives of the foregoing under the Plan without the written consent of Meritor and the Reorganized Debtors, including, without limitation, (i) the scope and the

terms of the release of the Reorganized Debtors, the Non-Debtor Affiliates, the Settling Insurers, and the Representatives of each of the foregoing (each as defined in the Plan) included in the Asbestos Personal Injury Claimant Release or (ii) the requirement that the Asbestos Trust obtain a properly-executed Asbestos Personal Injury Claimant Release as a pre-condition to making a distribution to a claimant.

9.2    **Severability.**  Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this TDP. Should any provision contained in this TDP be determined to be inconsistent with or contrary to the Debtors' obligations to any insurance company providing insurance coverage to a Debtor in respect of claims for personal injury based on exposure to an asbestos-containing product or to conduct for which a Debtor has legal responsibility, the Asbestos Trust with the consent of the TAC and the FCR may amend this TDP and/or the Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of the Debtors to said insurance company.

9.3    **Governing Law.**  Except for purposes of determining the liquidated value of any Asbestos Claim, administration of this TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware. The law governing the liquidation of Asbestos Claims in the case of arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described below.

For these purposes, the "**Claimant's Jurisdiction**" is the jurisdiction in which the claim was filed (if at all) against a Debtor in the tort system prior to the Petition Date. If the claim was not filed against a Debtor in the tort system prior to the Petition Date, the claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction in which the claimant resides at the time of

diagnosis or when the claim is filed with the Asbestos Trust; or (ii) a jurisdiction in which the claimant experienced exposure to an asbestos-containing product or to conduct for which a Debtor has legal responsibility.

# APPENDIX I

## AUTHORIZATION FOR RELEASE OF RECORDS OF OTHER ASBESTOS TRUSTS AND SETTLEMENT FACILITIES

TO WHOM IT MAY CONCERN:

The claimant named below hereby authorizes each other asbestos trust or settlement facility listed in the attachment hereto to provide directly to the Maremont Asbestos Personal Injury Trust ("Asbestos Trust"), or any of its representatives, all submissions made by claimant and (if different from the claimant) the party whose injury forms the basis of the claim (the "Injured Party"), including claim forms, any attachments to claim forms, and any amended or supplemental claim forms. Claimant expressly acknowledges that the other asbestos trust or settlement facility may provide such documents directly to the Asbestos Trust and need not obtain any further authorization from the claimant or his/her representatives.

A copy of this Authorization shall be as valid as the original. This Authorization contains no expiration date and may be exercised by the Trust at any time. If claimant's representative has signed this Authorization, a notarized power of attorney is attached.

Name of Claimant: _____

Social Security No.: _____

Date of Birth: _____

Name of Injured Party (if different from claimant):

Social Security No.: _____

Date of Birth: _____

Name of representative for claimant or Injured Party:

Signing party: _____

Signature: _____

Date: _____

Notarized:

Attachment: List of Other Asbestos Trusts and Settlement Facilities

Appendix 1

## List of Other Asbestos Trusts and Settlement Facilities

| | | |
|---|---|---|
| A&I Corp. Asbestos Bodily Injury Trust | Forty-Eight Insulations Qualified Settlement Trust | Raytech Corp. Asbestos Personal Injury Settlement Trust |
| A-Best Asbestos Settlement Trust | Fuller-Austin Asbestos Settlement Trust | Rock Wool Mfg Company Asbestos Trust |
| AC&S Asbestos Settlement Trust | G-I Asbestos Settlement Trust | Rutland Fire Clay Company Asbestos Trust |
| Amatex Asbestos Disease Trust Fund | H.K. Porter Asbestos Trust | Shook & Fletcher Asbestos Settlement Trust |
| APG Asbestos Trust | Hercules Chemical Company, Inc. Asbestos Trust | Skinner Engine Co. Asbestos Trust |
| API, Inc. Asbestos Settlement Trust | J.T. Thorpe Settlement Trust | Stone and Webster Asbestos Trust |
| Armstrong World Industries Asbestos Personal Injury Settlement Trust | JT Thorpe Company Successor Trust | Swan Asbestos and Silica Settlement Trust |
| ARTRA 524(g) Asbestos Trust | Kaiser Asbestos Personal Injury Trust | T H Agriculture & Nutrition, LLC Industries Asbestos Personal Injury Trust |
| ASARCO LLC Asbestos Personal Injury Settlement Trust | Keene Creditors Trust | Thorpe Insulation Company Asbestos Personal Injury Settlement Trust |
| Babcock & Wilcox Company Asbestos Personal Injury Settlement Trust | Lummus 524(g) Asbestos PI Trust | United States Gypsum Asbestos Personal Injury Settlement Trust |
| Bartells Asbestos Settlement Trust | Lykes Tort Claims Trust | United States Lines, Inc. and United States Lines (S.A.) Inc. Reorganization Trust |
| Brauer 524(g) Asbestos Trust | M.H. Detrick Company Asbestos Trust | United States Mineral Products Company Asbestos Personal Injury Settlement Trust |

| | | |
|---|---|---|
| Burns and Roe Asbestos Personal Injury Settlement Trust | Manville Personal Injury Settlement Trust | UNR Asbestos-Disease Claims Trust |
| C.E. Thurston & Sons Asbestos Trust | Muralo Trust | Utex Industries, Inc. Successor Trust |
| Celotex Asbestos Settlement Trust | NGC Bodily Injury Trust | Wallace & Gale Company Asbestos Settlement Trust |
| Combustion Engineering 524(g) Asbestos PI Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (OC Sub-Fund) | Western MacArthur-Western Asbestos Trust |
| Congoleum Plan Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (FB Sub-Fund) | W.R. Grace Trust |
| DII Industries, LLC Asbestos PI Trust | PLI Disbursement Trust | Pittsburgh Corning Trust |
| Eagle-Picher Industries Personal Injury Settlement Trust | Plibrico Asbestos Trust | Bondex Trust |
| Federal Mogul U.S. Asbestos Personal Injury Trust | Porter Hayden Bodily Injury Trust | Flintkote Company and Flintkote Mines Limited Asbestos Personal Injury Trust |
| ffMLC Asbestos Personal Injury Trust | Metex Asbestos Trust | Leslie Controls, Inc. Asbestos Personal Injury Trust |
| Plant Insulation Company Asbestos Settlement Trust | Quigley Co. Inc. Asbestos Personal Injury Trust | Yarway Asbestos Personal Injury Trust |
| GST Settlement Facility | Geo. V. Hamilton, Inc. Asbestos Trust | |

Appendix 1

**Exhibit E**

**Asbestos Records Cooperation Agreement**

## ASBESTOS RECORDS COOPERATION AGREEMENT

In connection with the *Modified Joint Prepackaged Plan of Reorganization of Maremont Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated May 14, 2019, as such may be modified, amended or supplemented (the "Plan"),[1] as confirmed by order of the United States Bankruptcy Court for the District of Delaware, which confirmation was affirmed by an order of the United States District Court for the District of Delaware, this agreement (this "Cooperation Agreement") is made, effective as of the Effective Date of the Plan, _____, 2019, by and among the Asbestos Personal Injury Trust and the Reorganized Debtors (collectively, the "Parties") with respect to, among other things, the Asbestos Personal Injury Trust's access to certain documents and information of or concerning the Debtors, as described below.  The Parties hereto agree as follows:

1.        The Reorganized Debtors shall provide, or cause to be provided, to the Asbestos Personal Injury Trust the following (collectively, the "Asbestos Records"):

(a)        To the extent the following information has been recorded as of the Effective Date and is retrievable using reasonable effort and at reasonable expense, copies of any and all databases pertaining to the Asbestos Personal Injury Claims, in the form maintained by the Debtors, containing (to the extent available): case name, state of lawsuit, county of lawsuit, case number, entity named or served, case status, date filed or opened, date served, plaintiff counsel, plaintiff name, alleged disease, occupation, exposure period, demand amount, settlement amount, year closed, settled date, dismissed date, number of active plaintiffs, number of non-active or dismissed plaintiffs, and number of total plaintiffs.  Such databases shall be provided even if the Reorganized Debtors do not have all such information for every plaintiff,

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan.

and the Reorganized Debtors shall not be required to take steps to ensure that the databases contain all such information.

(b) To the extent the following information exists and is reasonably available on the Effective Date, access to:

(i) all of the records of the Debtors relating to the use, manufacture, marketing, production, installation, sale or distribution of products giving rise to Asbestos Personal Injury Claims, including but not limited to:

(A) all Documents[2] relating to the Debtor Product Lines, including the dates of manufacture, production, installation, sale, and/or distribution;

(B) all Documents referring to or otherwise identifying locations where the Debtors engineered, designed, marketed, manufactured, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, branded with the name of or under a license granted by, or in any way used asbestos or asbestos-containing products including but not limited to all product invoices and sales records;

(C) all Documents relating to the engineering, design, marketing, manufacture, construction, sale, supply, production, installation, maintenance, service, specification, selection, repair, removal, replacement, release, distribution, branding or use by the Debtors of asbestos-containing material; and

(D) all Documents relating to where the Debtors sold, installed, or distributed asbestos-containing products;

---

[2] The term "Document" shall refer to all documents, data, information, compilations, correspondence, materials, records and writings of any type or description, however created, reproduced or retrieved, and in every form, including, without limitation, databases, computer/electronic files, drafts and partially completed documents maintained by, or in the possession or control of, the Debtors (prior to the Effective Date) or the Reorganized Debtors (as of the Effective Date).

2

(ii)    any existing electronic database of the Debtors' information from records maintained by any service center, which contains any customer information relating to the sale, installation, or distribution of products giving rise to Asbestos Personal Injury Claims;

(iii)    all Documents concerning the purchase by, or distribution to, any of the Debtors of asbestos or asbestos-containing products, the use or sale of which may have resulted in, or given rise to, an Asbestos Personal Injury Claim;

(iv)    all product manuals of any of the Debtors for products giving rise to Asbestos Personal Injury Claims; and

(v)    all Documents concerning the transition of certain products of the Debtors giving rise to Asbestos Personal Injury Claims from asbestos-containing to non-asbestos-containing.

(c)    Access to all relevant Documents maintained by, or in the possession, custody, or control of the Debtors' or the Debtors' outside counsel, or consultants or experts, relating to the pre-petition defense of Asbestos Personal Injury Claims against the Debtors, including but not limited to:

(i)    all depositions, transcripts, and affidavits;

(ii)    all discovery responses;

(iii)    all exhibit lists prepared for use at trials, which include Documents relating to the Debtors and Documents relating to co-defendants that were alleged to have used asbestos or asbestos-containing products supplied by the Debtors;

(iv)    all depositions, transcripts, affidavits, or any other sworn statements of current or former employees or customers of the Debtors and all discovery

3

responses of the Debtors' employees or customers obtained in the course of defense of the Debtors;

(v)    all case files respecting Asbestos Personal Injury Claims;

(vi)    all dismissal orders and all executed releases;

(vii)    any proofs of claim filed in connection with the Chapter 11 Cases relating to an Asbestos Personal Injury Claim;

(viii)    any ballots submitted in connection with the Chapter 11 Cases that relate to Asbestos Personal Injury Claims;

(ix)    any complaint, demand letter or similar Document identifying individuals that have asserted or may assert Asbestos Personal Injury Claims;

(x)    any database or Document that identifies or provides contact information for individuals and/or their counsel that have asserted unresolved Asbestos Personal Injury Claims;

(xi)    all physical repositories of Documents made available to asbestos personal injury claimants and their attorneys with respect to Asbestos Personal Injury Claims;

(xii)    a listing of the location of all physical repositories of Documents relating to Asbestos Personal Injury Claims; and

(xiii)    all Documents or any database listing workers' compensation Claims against the Debtors brought by employees of the Debtors related to asbestos exposure.

As necessary, the Reorganized Debtors will provide such direction to such outside counsel or to such consultants and experts as the Asbestos Personal Injury Trust may reasonably request. To the extent an outside counsel, consultant or expert expends material time and/or resources in connection with responding to a request or a series of requests made by the Asbestos

4

Personal Injury Trust pursuant to this Cooperation Agreement, the Asbestos Personal Injury Trust and/or Reorganized Debtors shall pay the reasonable documented fees and expenses incurred by the outside counsel, consultant or expert.

(d)    Access to all written settlement agreements and releases, and any other Documents reflecting the settlement, payment, or other disposition of Asbestos Personal Injury Claims against any Debtor.

2.    As used herein, with respect to all Asbestos Records kept in paper form, "access" means that the Reorganized Debtors will provide the Asbestos Records in the manner and location in which the Reorganized Debtors generally retain their business records in the ordinary course of business at a date and time (or series of set dates, depending upon the amount of time necessary to review and copy the Asbestos Records) that is reasonably acceptable to the Asbestos Personal Injury Trust.  With respect to Asbestos Records kept in electronic form, "access" means that the Reorganized Debtors will provide the Asbestos Records on thumbdrive(s), .pst file(s) or other electronic media as maintained by the Reorganized Debtors. With respect to any Asbestos Records kept in microfiche form, "access" means that the Reorganized Debtors will provide the Asbestos Records on microfiche or other media as maintained by the Reorganized Debtors.  At its option, the Asbestos Personal Injury Trust may employ an outside contractor to photocopy, electronically reproduce, or otherwise reproduce any of the Asbestos Records.  When providing the Asbestos Records or access thereto, the Reorganized Debtors will provide the Asbestos Personal Injury Trust with any available electronic or paper index that identifies or describes the contents of any relevant files, boxes, discs, and databases.  To the extent any Asbestos Records in electronic form are stored in a format with full text or other searchable capabilities, the Reorganized Debtors will provide (a) all

search engines, software, and programs necessary to enable all potential search functions as to such Asbestos Records in electronic form, and (b) descriptions of the data tables and fields used in the database.

3. With respect to any database covered by this Cooperation Agreement, to the extent necessary to resolve any difficulties in accessing the information in such database, the Reorganized Debtors will provide such direction to their outside counsel, consultants, and experts as the Asbestos Personal Injury Trust may reasonably request, including, without limitation, access to the physical records from which the database was created.

4. The Reorganized Debtors hereby authorize the Future Claimants' Representative and his agents and professionals to provide to the Asbestos Personal Injury Trust all data and any other information concerning Asbestos Personal Injury Claims against the Debtors or the Debtors' insurance coverage or settlements that was provided by the Debtors, directly or indirectly, to the Future Claimants' Representative or his agents or professionals on or prior to the Effective Date.

5. The Reorganized Debtors hereby authorize the Asbestos Claimants Committee and its agents and professionals to provide to the Asbestos Personal Injury Trust all data and any other information concerning Asbestos Personal Injury Claims against the Debtors or the Debtors' insurance coverage or settlements that was provided by the Debtors, directly or indirectly, to the Asbestos Claimants Committee, or their agents or professionals on or prior to the Effective Date.

6. To the extent that providing information as contemplated by this Cooperation Agreement would involve the property or other rights of third parties unaffiliated with the Reorganized Debtors, the Reorganized Debtors shall undertake reasonably appropriate efforts to

facilitate the provision of such information by such unaffiliated third parties in compliance with the requirements of this Cooperation Agreement.

7.      The Reorganized Debtors shall use commercially reasonable efforts, and shall cause their counsel to use commercially reasonable efforts, to grant the Asbestos Personal Injury Trust access to the Asbestos Records within thirty (30) days from the date of a written request by the Asbestos Personal Injury Trust.  The Asbestos Personal Injury Trust may retain copies of all the Asbestos Records that it has caused to be reproduced at its expense or which have been provided to it.

8.      The fees for storing the Asbestos Records, and the costs and expenses of copying and searching the Asbestos Records, are costs of implementation of the Plan.  The reasonable fees for storing the Asbestos Records, and the reasonable costs and expenses of copying and searching the Asbestos Records, shall be paid by the Asbestos Personal Injury Trust.

9.      Upon the request of the Asbestos Personal Injury Trust, the Reorganized Debtors shall provide the Asbestos Personal Injury Trust with a certification substantially in the form attached as Exhibit A that, in responding to a particular request by the Asbestos Personal Injury Trust for one or more Asbestos Records, the Reorganized Debtors used reasonable efforts to meet the requirements of this Cooperation Agreement.

10.      Nothing in this Cooperation Agreement shall require the Reorganized Debtors to create any new Documents or to provide any Documents not in its respective possession, custody, or control.

11.      The Asbestos Personal Injury Trust shall use the Asbestos Records solely for the purposes of processing, evaluating, defending, and resolving Asbestos Personal Injury Claims submitted to the Asbestos Personal Injury Trust; *provided, however*, that the Asbestos Personal

Injury Trust may share those Asbestos Records with a Holder of an Asbestos Personal Injury Claim that are relevant to that Asbestos Personal Injury Claim.

12.    The Reorganized Debtors shall have no duty to check or verify the accuracy of any information contained in the Asbestos Records and do not make any representation or warranty, express or implied, as to the accuracy of such information.

13.    With respect to all Documents contemplated by or under Paragraph 1 of this Cooperation Agreement that are or were in the possession, custody, or control of the Debtors, Reorganized Debtors, or their outside counsel as of the Petition Date, the Reorganized Debtors represent and warrant, to the best of their knowledge and information, that they have taken reasonable steps to preserve the Documents in their possession, custody, or control up to and through the Effective Date, except such Documents as may have been destroyed or otherwise disposed of pursuant to and in accordance with a document retention policy formally approved or established by such entity, which policy with regard to any such Documents shall be provided to the Asbestos Personal Injury Trust upon request.

14.    The Reorganized Debtors shall take all reasonable steps to preserve the Asbestos Records in their possession, custody or control, and the Reorganized Debtors shall cause counsel to take all reasonable steps to preserve the Asbestos Records in the possession, custody, or control of counsel, at all times prior to the termination of this Cooperation Agreement.  The Reorganized Debtors, and any of their successors, shall not dispose of or destroy, and the Reorganized Debtors shall instruct counsel not to dispose of or destroy, the Asbestos Records which are not duplicative and are producible under this Cooperation Agreement until the tenth (10th) anniversary of the Effective Date of the Plan, without providing at least one hundred and eighty (180) days' advance written notice to the Asbestos Personal Injury Trust, within which

180-day period the Asbestos Personal Injury Trust shall be entitled to take possession, custody, or control of the Asbestos Records at its own expense; *provided, however,* the earliest date on which the Reorganized Debtors or any of their successors may deliver such notice to the Asbestos Personal Injury Trust is the second (2nd) anniversary of the Effective Date. Notwithstanding the foregoing, nothing in this Cooperation Agreement shall be construed as precluding the Asbestos Personal Injury Trust from taking possession, custody, or control of the Asbestos Records at its own expense at any time on or after the Effective Date.

15.    This Cooperation Agreement shall expire on the tenth (10th) anniversary of the Effective Date.  Up to one hundred and twenty (120) days before it is set to expire, this Cooperation Agreement can be renewed by mutual consent; *provided, however,* that the Reorganized Debtors and any of their successors shall remain obligated to provide the Asbestos Personal Injury Trust with access to the Asbestos Records as set forth herein for as long as such entities remain in possession, custody, or control thereof, subject to the provisions of Paragraph 14 hereof, and shall remain obligated to cause outside counsel to provide the Asbestos Personal Injury Trust with access to the Asbestos Records as set forth herein for as long as such entities remain in possession, custody, or control thereof, subject to the provisions of Paragraph 14 hereof.

16.    Any privileges belonging to the Debtors on the Petition Date in the Asbestos Records shall belong to the Asbestos Personal Injury Trust as of the Effective Date.  The Reorganized Debtors do not waive any privilege, including but not limited to the attorney-client privilege or work-product doctrine, that may protect any Asbestos Record, and nothing in this Cooperation Agreement shall be construed as a waiver of any privilege by any party hereto by

virtue of entering this Cooperation Agreement or providing or disclosing any Asbestos Record under this Cooperation Agreement.

17.    In providing Asbestos Records pursuant to this Cooperation Agreement, the Reorganized Debtors may designate all or a portion of certain Asbestos Records as containing material protected from disclosure by the attorney-client privilege, work-product doctrine, or other privilege or protection available to the Debtors and/or the Reorganized Debtors under applicable state or federal law ("Privileged Material").  The Asbestos Personal Injury Trustee may not disclose the portions of Asbestos Records designated as containing Privileged Material to any person, including any member of, counsel for, or other agent of the Asbestos Personal Injury Trust Advisory Committee or the Future Claimants' Representative, without first obtaining written consent from the Reorganized Debtors approving such disclosure.  Nothing in this Cooperation Agreement shall be construed as a waiver of any privilege of the Reorganized Debtors by virtue of entering this Cooperation Agreement or providing or disclosing, or facilitating the provision or disclosure of, any Asbestos Records under this Cooperation Agreement.

18.    If the Reorganized Debtors designate all or a portion of any Asbestos Records as Privileged Material in accordance with Paragraph 17 hereof, and the Asbestos Personal Injury Trust disputes such designation, the Asbestos Personal Injury Trust shall give written notice of the dispute to the Reorganized Debtors.  The Asbestos Personal Injury Trust and the Reorganized Debtors shall then negotiate in good faith to attempt to resolve the dispute.  If any dispute cannot be resolved through negotiation, the Asbestos Personal Injury Trust shall have ten (10) Business Days from the date of actually delivering a written notice to the Reorganized Debtors declaring an impasse to seek an order from the Bankruptcy Court or the District Court to resolve the

10

dispute.  The Asbestos Personal Injury Trust shall provide the Reorganized Debtors with at least ten (10) Business Days' notice of any hearing on any pleading, petition, application, or motion that the Asbestos Personal Injury Trust has filed with the Bankruptcy Court or the District Court in order to resolve the dispute.  The Asbestos Records subject to the dispute shall be treated as Privileged Material pending a Final Order.

19.    Within ninety (90) days from the execution of this Cooperation Agreement, the Reorganized Debtors shall identify for the Asbestos Personal Injury Trust any present or former officers, employees, and agents of the Debtors or the Reorganized Debtors who likely have significant knowledge about the Asbestos Records, including, without limitation, those present or former officers, employees, and agents who are competent to authenticate and prove the chain of custody of Documents for admissibility purposes in court or other proceedings.  Upon the request of the Asbestos Personal Injury Trust, the Reorganized Debtors will take reasonable steps to make such officers, employees, or agents available to the Asbestos Personal Injury Trust, and the Asbestos Personal Injury Trust will reimburse the Reorganized Debtors for all lost time and reasonable expenses incurred in making such employees or agents available.  To the extent information leading to or locating any Asbestos Records is held by any former officers, employees, or agents of the Debtors or the Reorganized Debtors, the Reorganized Debtors do not object to the Asbestos Personal Injury Trust contacting those persons for such information.  Upon request, each of the Reorganized Debtors will provide any contact information it has for former officers, employees, and agents and for third parties having possession of or knowledge about Asbestos Records.  The Reorganized Debtors, to the extent possible, will cooperate with the Asbestos Personal Injury Trust and not take any action to dissuade any person from cooperating with the Asbestos Personal Injury Trust.  Additionally, the Asbestos Personal Injury

Trust is authorized to contact Michael E. Hutchins at Kasowitz Benson Torres LLP ("Kasowitz") (or another attorney as may be designated by Kasowitz) directly to discuss any Asbestos Records.

20.     Each party to this Cooperation Agreement shall take such steps and execute such documents as may be necessary or proper to effectuate the purpose and intent of this Cooperation Agreement, and to preserve its validity and enforceability. Without limitation to any part of the immediately preceding sentence, any provision in this Cooperation Agreement that requires the Reorganized Debtors to provide Asbestos Records or any other information to the Asbestos Personal Injury Trust shall be construed as also requiring the Reorganized Debtors, whenever necessary or proper, to cause such Asbestos Records or other information to be provided or made accessible to the Asbestos Personal Injury Trust, including, without limitation, the execution and delivery by the Reorganized Debtors of any written instructions to their counsel to provide or make accessible such Asbestos Records or other information.

21.     This Cooperation Agreement shall be construed in accordance with the laws of the State of Delaware, without regard to any Delaware conflict of law principles that would result in the application of laws of any other jurisdiction.

22.     This Cooperation Agreement states the entire agreement among the Asbestos Personal Injury Trust and the Reorganized Debtors with respect to the subject matter hereof, and supersedes all prior representations and agreements among the Parties as to such subject matter. Any modification, waiver, or amendment of any provision of this Cooperation Agreement must be in writing and executed by the Asbestos Personal Injury Trust and the Reorganized Debtors, and no waiver of any term or breach of this Cooperation Agreement shall be deemed a waiver of such term for the future or any subsequent or other breach hereof.

23.    This Cooperation Agreement shall be binding upon the Asbestos Personal Injury Trust, the Reorganized Debtors, and their respective successors.

24.    This Cooperation Agreement may be executed in any number of counterparts, each of which shall constitute an original but all of which together shall constitute one and the same instrument.  Facsimiles or scanned versions of signatures by the Parties shall be treated as originals.

25.    The Bankruptcy Court or the District Court, as applicable, shall, to the fullest extent permitted by law, have exclusive jurisdiction over all matters regarding the interpretation, implementation, and enforcement of this Cooperation Agreement.

26.    Notices to the Asbestos Personal Injury Trust shall be sent by overnight mail or certified mail, return receipt requested, addressed to:

> Maremont Asbestos Personal Injury Trust
> c/o Law Office of Alan B. Rich
> Attn: Alan B. Rich, Esq.
> 7324 Gaston Avenue
> Suite 124, LB 430
> Dallas, Texas 75214
> Phone: (214) 744-5100
> Fax: (214) 744-5101
> maremont@alanrichlaw.com

with a copy (which alone will not constitute notice) to:

_____

_____

Notices to the Reorganized Debtors shall be sent by overnight mail or certified mail, return receipt requested, addressed to:

_____

_____

with copies (which alone will not constitute notice) to:

_____

_____

IN WITNESS WHEREOF, the Parties have executed this Asbestos Records Cooperation Agreement, effective as of the Effective Date of the Plan.

**ASBESTOS PERSONAL INJURY TRUST**

By:_____

Its:_____

**MAREMONT CORPORATION**

By:_____

Its:_____

**MAREMONT EXHAUST PRODUCTS, INC.**

By:_____

Its:_____

**AVM, INC.**

By:_____

Its:_____

**FORMER RIDE CONTROL OPERATING COMPANY, INC.**

By:_____

Its:_____

*[Signature Page to Cooperation Agreement]*

**EXHIBIT A**

CERTIFICATION

I, _____ as a duly authorized representative of the Reorganized Debtors, provide this Certification pursuant to Section 9 of the Asbestos Records Cooperation Agreement (the "Cooperation Agreement").[1]

I certify that on _____, the Asbestos Personal Injury Trust delivered a request to the Reorganized Debtors for the following Asbestos Records:_____ (the "Requested Records").

I further certify that the Reorganized Debtors used reasonable efforts to meet the requirements of the Cooperation Agreement to locate and identify the Requested Records including _____.

I further certify that to the extent the Reorganized Debtors were able to locate and identify the Requested Records that they were provided to the Asbestos Personal Injury Trust on _____.    No other documents were located or identified following the search.

_____
Name:
Title:

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed in the Cooperation Agreement.

**Exhibit F**

**List of Debtor Product Lines**

**Debtor Product Lines[1]**

| | |
|---|---|
| AVM | Motion Control |
| Brake-In-A-Box | Friction Products |
| Brake-King | Friction Products |
| D.D. Silvertip | Friction Products |
| Gabriel | Ride Control |
| Grizzly | Friction Products |
| Hyper | Friction Products |
| Leland | Friction Products |
| Load Guard | Friction Products |
| Maremont | Exhaust Products |
| MightyLift | Motion Control |
| Power Duty | Friction Products |
| Pratt | Exhaust Products |
| S.S. Metallic | Friction Products |
| Safety-Set | Friction Products |
| Saftibond | Friction Products |
| Saftigrip | Friction Products |
| Saf-T-Stop | Friction Products |
| Sears (supplied under Sears name) | Friction Products |
| Silvertip | Friction Products |
| SteadyLift | Motion Control |
| StrongArm | Motion Control |
| Syncro | Friction Products |
| The Stop Box | Friction Products |
| Tru-Guard | Friction Products |
| Ultra | Friction Products |
| X-T Woven | Friction Products |

---

[1] As of the date of this Plan, the Debtor Product Lines listed on this Exhibit F represent, to the best of the Debtors' knowledge, the full list of products manufactured, sold and distributed by the Debtors.

**Exhibit G**

**Environmental Assumption and Indemnification Agreement**

## ENVIRONMENTAL LIABILITIES
## ASSUMPTION AND INDEMNIFICATION AGREEMENT

This Assumption and Indemnification Agreement (the "Agreement") is made as of [●] among Maremont Corporation, a Delaware corporation ("Maremont"), its subsidiaries, Maremont Exhaust Products, Inc., a Delaware corporation ("MEP"), AVM, Inc., a South Carolina corporation ("AVM") and Former Ride Control Operating Company, Inc., f/k/a ArvinMeritor, Inc., a Delaware corporation (collectively with Maremont, MEP and AVM, the "Debtors," and as reorganized, the "Reorganized Debtors"), Meritor Heavy Vehicle Systems, LLC, a Delaware limited liability company ("Meritor HVS"), and Arvin Environmental Management, LLC, a Delaware limited liability company and affiliate of Meritor HVS ("Arvin Environmental"). All capitalized terms not defined herein shall have the meanings ascribed to them in the Plan (as defined below). For convenience, and as the context may require, the Reorganized Debtors, Meritor HVS and Arvin Environmental shall each be referred to individually as a "Party" and collectively as "Parties."

## RECITALS

**WHEREAS**, on January 22, 2019 (the "Petition Date"), the Debtors commenced a voluntary case under chapter 11 of title 11 of United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and contemporaneously filed the *Modified Joint Prepackaged Plan of Reorganization of Maremont Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated May 14, 2019 [Docket No. __] (as may be amended, modified, or supplemented, the "Plan");

**WHEREAS**, the Plan has been confirmed pursuant to an order of the Bankruptcy Court dated [●], 2019 [Docket No. __] and approved by the United States District Court for the District of Delaware on [●], 2019 [Docket No. __], which orders contain, among other things, the Asbestos Personal Injury Channeling Injunction (as defined below);

**WHEREAS**, prior to the Petition Date, the Debtors engaged in negotiations with Meritor, Inc. to determine its contributions to the Debtors under the Plan;

**WHEREAS**, under the terms of the Plan as confirmed, and in consideration of the releases in favor of Meritor and its affiliates and representatives, their inclusion in the Asbestos Personal Injury Channeling Injunction and the other benefits of the Plan to Meritor and its affiliates and representatives, Meritor HVS has agreed to indemnify the Reorganized Debtors from and against all Environmental Liabilities (as defined below) of the Reorganized Debtors, including without limitation Environmental Liabilities relating to the real property sites listed on Exhibit 1 (the "Real Property Sites"), and the Reorganized Debtors will not incur any costs or expenses in relation to such liabilities;

**THEREFORE**, in consideration of the promises and mutual covenants set forth below and other good and valuable consideration, the receipt and sufficiency whereof are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"Agreement" has the meaning specified in the Preamble.

"Arvin Environmental" has the meaning specified in the Preamble.

"Asbestos Personal Injury Channeling Injunction" has the meaning set forth in Section I.A.8 of the Plan.

"Asbestos Personal Injury Claim" has the meaning set forth in Section I.A.9 of the Plan.

"AVM" has the meaning specified in the Preamble.

"Bankruptcy Code" has the meaning specified in the Recitals.

"Bankruptcy Court" has the meaning specified in the Recitals.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the City of Detroit, Michigan.

"Debtors" has the meaning specified in the Preamble.

"Environmental Law" means any Law relating to protection of the environment or human health (in respect of exposure to Hazardous Materials), including the use, handling, transportation, treatment, storage, disposal, Release or discharge of Hazardous Materials.

"Environmental Liabilities" means any Claim, Liability, or other legal obligation including any investigatory, remedial, or corrective obligation as well as any liability for response costs or natural resources damages, fines, fees, or penalties, against any of the Reorganized Debtors under any applicable Law or Order concerning public health or safety, or pollution or protection of the environment (including all those pertaining to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any hazardous materials, substances or wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, polychlorinated biphenyls, noise or radiation and all those pertaining to, or asserting liability on the part of one or more Debtors related to, the Real Property Sites), provided that any Liability qualifying as an Asbestos Personal Injury Claim or related to the post-Effective Date operations or assets of the Reorganized Debtors shall not be an Environmental Liability.

"Government Authority" means any U.S. or non-U.S. federal, state, provincial, local, municipal, regional, territorial, aboriginal or any supra-national or non-U.S. government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, body or commission or any court, tribunal, or judicial or arbitral body or any quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of them, and any subdivision of them.

"Hazardous Materials" means (a) petroleum, petroleum products, by-products or breakdown products, friable asbestos or polychlorinated biphenyls and (b) any chemical,

2

material or substance defined or regulated as toxic or as a pollutant, contaminant, hazardous substance or hazardous waste under, or for which liability or standards of care are imposed by, any applicable Environmental Law.

"Indemnified Party" and "Indemnified Parties" have the meanings specified in Section 3.1(a).

"Indemnitors" has the meaning specified in Section 3.1(a).

"Law" means any U.S. or non-U.S. federal, state, provincial, local, municipal, regional, territorial statute, law, common law, ordinance, regulation, rule, code, Order or other requirement or rule of law.

"Liabilities" means any loss, liability, debt, guarantee, claim, cause of action, demand, judgment, damage, fine, penalty, expense, commitment or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) of every kind and description, including any injury, death or damage or destruction of property, damages, assessed for the maintenance of a public or private nuisance or for the carrying on of an abnormally dangerous activity, remedial, removal or ameliorative activity and all legal, consultant, engineering, and expert fees and expenses and other costs and expenses related to any of the foregoing.

"Maremont" has the meaning specified in the Preamble.

"MEP" has the meaning specified in the Preamble.

"Meritor HVS" has the meaning specified in the Preamble.

"Order" means any order, writ, judgment, injunction, temporary restraining order, decree, stipulation, determination or award entered by or with any Government Authority.

"Party" and "Parties" have the meanings specified in the Preamble.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

"Petition Date" has the meaning specified in the Recitals.

"Plan" has the meaning specified in the Recitals.

"Real Property Sites" has the meaning specified in the Recitals.

"Reorganized Debtors" has the meaning specified in the Preamble.

"Release" means any release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment or disposing into or through the environment (including surface water, groundwater, land surface or subsurface strata).

"Ride Control" has the meaning specified in the Preamble.

"Third Party Claim" has the meaning specified in Section 3.2(a).

## ARTICLE II
## ASSUMPTION

Section 2.1    Assumption by Arvin Environmental.  Each Reorganized Debtor hereby assigns, grants, conveys and transfers all of such Party's right title and interest in and to all of its Environmental Liabilities to Arvin Environmental, including Environmental Liabilities relating to the Real Property Sites.  Arvin Environmental hereby assumes from the Reorganized Debtors, without recourse, representation or warranty, any and all Environmental Liabilities and agrees to pay and perform, if and when due, all Environmental Liabilities as obligations of each Reorganized Debtor, as and from the Effective Date of the Plan.

## ARTICLE III
## INDEMNIFICATION

Section 3.1    Indemnification by Meritor HVS and Arvin Environmental.

(a)    As of and after the Effective Date of the Plan, Meritor HVS and Arvin Environmental (the "Indemnitors"), jointly and severally, shall indemnify Reorganized Debtors, their Affiliates and their respective current and former trustees, fiduciaries, officers, members, managers, directors, employees, agents, representatives, attorneys, accountants and other advisors (collectively the "Indemnified Parties" and each a "Indemnified Party") and save and hold each of them harmless against, and pay on behalf of or reimburse any of the Indemnified Parties as and when incurred for any Liability which any of the Indemnified Parties suffers, sustains or becomes subject to as a result of, arising out of or in connection with any Environmental Liabilities, including without limitation Environmental Liabilities relating to the Real Property Sites.  Indemnitors shall manage and control any such Environmental Liabilities and may fulfill their obligations to the Indemnified Parties under this Agreement by complying with the least stringent remediation requirements allowed by applicable Environmental Law to the extent satisfactory to the relevant Governmental Authority or otherwise sufficient to resolve each such Environmental Liability.

(b)    As between Indemnitors and Indemnified Parties, Indemnitors shall be responsible for and have control over the performance of any work or obligations relating to any Environmental Liabilities, including without limitation the exclusive right to (i) investigate any suspected contamination or noncompliance, (ii) conduct and obtain any tests, reports, surveys and investigations, (iii) prepare any plan for such Environmental Liabilities, and (iv) conduct or direct any work regarding such Environmental Liabilities. As between Indemnitors and Indemnified Parties, Reorganized Debtors acknowledge and agree that Indemnitors shall control all correspondence, discussions and negotiations with, and submissions to, any Governmental Authority concerning, or that may affect, any Environmental Liabilities.  Unless required by applicable Environmental Law, Reorganized Debtors shall refrain from communicating either orally or in writing, or in any other manner, with any Governmental Authority concerning Indemnitor's obligations under this Agreement.  Reorganized Debtors shall reasonably cooperate with Indemnitors with respect to any action required of any Reorganized Debtor relating to any Environmental Liabilities.  Without limiting the generality of the foregoing, Reorganized Debtors shall reasonably cooperate with Indemnitors to the extent any of their participation is required in order for Indemnitors to execute, file and record on the local

4

land records any legal instrument to establish any covenants or agreements that Indemnitors may determine from time to time are necessary relating to the Environmental Liabilities, all at Indemnitor's expense.

(c)     If and to the extent any provision of Sections 3.1(a) and (b) are unenforceable for any reason, the Indemnitors, jointly and severally, hereby each agrees to make the maximum contribution to Reorganized Debtors to the payment and satisfaction of the Environmental Liability for which indemnification is provided in Section 3.1(a) to the extent permissible under applicable Laws.

Section 3.2     Notice; Third Party Claims.

(a)     If an Indemnified Party receives notice of the assertion or commencement of any action, suit or proceeding asserted against such Indemnified Party by a third Person (a "Third Party Claim") in respect of any matter that is subject to indemnification under Section 3.1(a), that Indemnified Party shall give Indemnitors prompt written notice thereof, specifying the facts constituting the basis for such claim, the amount, to the extent known, and the Indemnified Party shall tender to Indemnitors copies of any papers that it has received in respect of the claim. The failure of the Indemnified Party to provide prompt notice as provided herein with respect to any claim for which indemnification is sought shall not relieve Indemnitors of their obligations hereunder, except to the extent that they are prejudiced by the failure to provide prompt notice.

(b)     If, within ten Business Days of the receipt of notice from the Indemnified Party pursuant to Section 3.2(a), the Indemnitors jointly acknowledge in writing to the Indemnified Parties their obligation to indemnify the Indemnified Parties hereunder against any Environmental Liability that may result from such Third Party Claim, the Indemnitors shall assume the defense at their sole expense of that Third Party Claim with counsel that they select, which Indemnitors shall prosecute diligently; provided, however, that the Indemnified Party shall be entitled to retain its own counsel in each jurisdiction for which the Indemnified Party determines counsel is required, at the expense of the Indemnified Party. The Indemnified Parties shall cooperate with the Indemnitor in such defense, including by entering into a mutually acceptable joint defense agreement, and the Indemnified Parties shall make available to the Indemnitor, at the Indemnitor's expense, all witnesses, pertinent records, materials and information in the Indemnified Parties' possession or under their control relating thereto as is reasonably required by the Indemnitors. No such Third Party Claim may be settled by the Indemnitor without the prior written consent of the Indemnified Party; provided, however, that the Indemnified Party shall not unreasonably withhold, condition or delay such consent.

## ARTICLE IV
## REPRESENTATIONS, WARRANTIES AND ADDITIONAL COVENANTS

Section 4.1     Each Party hereby represents and warrants to each other Party as follows:

(a)     Such Party is duly incorporated, organized or formed (as applicable), validly existing and in good standing under the Laws of the jurisdiction of its incorporation, organization or formation; if required by applicable Laws, that it is duly qualified and in good standing in the jurisdiction of its principal place of business, if

different from its jurisdiction of incorporation, organization or formation; and that it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, and all necessary actions by the board of directors, shareholders, managers, members, partners, trustees, beneficiaries or other applicable Persons necessary for the due authorization, execution, delivery and performance of this Agreement by that Party have been duly taken.

(b)    Such Party has duly executed and delivered this Agreement and it constitutes the legal, valid and binding obligations of such Party, enforceable against it in accordance with their terms (except as may be limited by bankruptcy, insolvency, reorganization or similar laws of general application relating to or affecting creditors' rights, generally and by the effect of general principles of equity, regardless of whether considered at Law or in equity).

(c)    Such Party's authorization, execution, delivery and performance of this Agreement does not and will not (A) conflict with, or result in a breach, default or violation of, (1) its organizational documents, (2) any contract or agreement to which that Party is a party or is otherwise subject, or (3) any Law, order, judgment, decree, writ, injunction or arbitral award to which that Party is subject; or (B) require any consent, approval or authorization from, filing or registration with, or notice to, any Governmental Authority or other Person, unless such requirement has already been satisfied.

Section 4.2    Meritor HVS represents and warrants that Arvin Environmental is and will remain its affiliate during all times in which Meritor HVS has any obligations under this Agreement.

## MISCELLANEOUS

Section 5.1    No Third-Party Beneficiaries.  This Agreement will not confer any rights or remedies upon any person other than the Parties and the other Indemnified Parties, provided, however, that pursuant to Section IV.F of the Plan, any governmental unit asserting claims related to Environmental Liabilities may apply to any court of competent jurisdiction for an order to require the applicable Reorganized Debtor to enforce against Arvin Environmental or Meritor HVS the provisions in this Agreement.

Section 5.2    Entire Agreement.  As of the Effective Date, this Agreement constitutes the entire agreement among the Parties hereto with respect to the subject matter hereof and supersedes any prior understandings, agreements, or representations between or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

Section 5.3    Effectiveness of Agreement.  This Agreement will be of no force or effect unless and until (a) this Agreement is duly executed by the Parties and (b) the Effective Date of the Plan has occurred.

Section 5.4    Succession and Assignment.  This Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the Parties hereto, and any assignment without such prior consent shall be void.

Section 5.5    Counterparts.    This Agreement may be executed in one or more counterparts, including by means of facsimile, each of which will be deemed an original but all of which together will constitute one and the same instrument.

Section 5.6    Headings.  The section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

Section 5.7    Notices.  Any notice, statement, or other report required or permitted by this Agreement must be: (a) in writing and is deemed given when (i) delivered personally to the recipient, (ii) sent by facsimile before 5:00 p.m. prevailing Eastern Time on a Business Day with a copy of such facsimile sent to the recipient by reputable overnight courier service (charges prepaid) on the same day, (iii) five (5) days after deposit in the United States mail, mailed by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid); and (b) addressed to the parties to whom such notice, statement or report is directed (and, if required, its counsel) at the addresses set forth below, or at such other address as such party may designate from time to time in writing in accordance with this section.

If to Reorganized Debtors:

Maremont Corporation
27 Albany Avenue
Brooklyn, New York 11216
Attention: Sherman K. Edmiston III, HI CapM Advisors

with a copy to

Sidley Austin LLP
One South Dearborn Street
Chicago, Illinois 60603
Attention:  Andrew F. O'Neill

If to Meritor HVS or Arvin Environmental:

Meritor Heavy Vehicle Systems, LLC
2135 West Maple Road
Troy, MI 48084
Attention:  Loree J. Shelko

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

Section 5.8    Bankruptcy Court Jurisdiction.  Notwithstanding anything to the contrary contained in this Agreement, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or related to disputes arising in connection with the interpretation, implementation or enforcement of this Agreement, and the parties consent to the exclusive jurisdiction of the Bankruptcy Court.

Section 5.9    Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of Michigan.

7

Section 5.10    Amendments and Waivers.  No amendment of any provision of this Agreement will be valid unless the same is in writing and signed by the Parties hereto.  No waiver of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether or not intentional, will be valid unless the same is in writing and signed by the party making such waiver; nor will such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation, or breach of warranty or covenant.

Section 5.11    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any circumstance in any jurisdiction will not affect the validity or enforceability of the offending term or provision in any other circumstance or in any other jurisdiction, nor will it affect the validity or enforceability of the remaining terms and provisions hereof, unless the prohibition or unenforceability of such provisions will materially change the purpose or effect of this Agreement.

Section 5.12    Incorporation.  The exhibits and schedules attached hereto and identified in this Agreement are incorporated by reference and made a part of this Agreement.

Section 5.13    Further Assurances. Each of the parties shall execute and deliver, at the reasonable request of the other party hereto, such additional documents, instruments, conveyances and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

8

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their authorized representatives as indicated below as of the date set forth above in the preamble.

MAREMONT CORPORATION

By: _____

    Name: Carl D. Anderson, II
    Title: Chairman and Sole Officer

MAREMONT EXHAUST PRODUCTS, INC.

By: _____

    Name: Carl D. Anderson, II
    Title: Chairman and Sole Officer

AVM, INC.

By: _____

    Name: Carl D. Anderson, II
    Title: Chairman and Sole Officer

FORMER RIDE CONTROL OPERATING COMPANY, INC.

By: _____

    Name: Carl D. Anderson, II
    Title: Chairman and Sole Officer

ARVIN ENVIRONMENTAL, LLC

By: _____

      Name:  Brett L. Eilander
      Title:  Vice President and Secretary

MERITOR HEAVY VEHICLE SYSTEMS, LLC

By: _____

      Name:  Brett L. Eilander
      Title:   Vice President and Secretary

## Exhibit 1

### Real Property Sites

| Site | Location |
|------|----------|
| Paulding Site | 700 West Caroline Street, Paulding, Ohio 45879 |
| Chickasha Site | 700 North Industrial Boulevard, Chickasha, Oklahoma 73018 |
| Hardage/Criner Site | 3/4 Miles West of Town on Highway 122, Criner, Oklahoma 73080 |
| Marion Site | 144 Tranquil Church Road, Mullins, South Carolina 29574 |
| Zion Site | Old Zion School Road, Mullins, South Carolina 29574 |
| Easley Site | 619 Rolling Hills Circle, Easley, South Carolina 29640 |
| Cape Town Site | 76 White Road, Retreat, Cape Town, 7965, South Africa |

**Exhibit H**

**List of Non-Debtor Affiliates**

## Non-Debtor Affiliates

### Current Non-Debtor Affiliates

Arvin Canada Holding Limited
Arvin Environmental Management, LLC
Arvin European Holdings (UK) Limited
Arvin European Holdings (UK) Limited
    French Branch
Arvin Finance, LLC
Arvin Holdings Netherlands B.V.
Arvin International, Inc.
Arvin International (UK) Limited
Arvin Motion Control Limited
Arvin Technologies, Inc.
ArvinMeritor A&ET Limited
ArvinMeritor Filters Operating Co., LLC
ArvinMeritor Finance Ireland Unlimited
    Company
ArvinMeritor Holdings France SNC
ArvinMeritor Light Vehicle Systems (UK)
    Limited
ArvinMeritor Light Vehicle Systems
    Australia Pty. Ltd.
ArvinMeritor Limited
ArvinMeritor OE, LLC
ArvinMeritor Pension Trustees Limited
ArvinMeritor Receivables Corporation
Arvinmeritor Sweden AB
ArvinMeritor Technology, LLC
Automotive Axles Limited
Braseixos Administradora de Bens Ltd.
Ege Fren Sanayaii ve Ticaret A.S.
Fonderie Vénissieux SAS
Indi, S.A.
Master Sistemas Automotivos Ltda.
Meritor (China) Holdings, Limited
Meritor Aftermarket Canada Inc.
Meritor Aftermarket France SAS
Meritor Aftermarket Italy, S.r.l.
Meritor Aftermarket Netherlands B.V.
Meritor Aftermarket Spain, S.A.
Meritor Aftermarket Switzerland AG
Meritor Aftermarket Switzerland AG (UK
    Branch)
Meritor Aftermarket UK Limited
Meritor Aftermarket USA, LLC

Meritor Axles France SAS
Meritor Brazil Holdings, LLC
Meritor Cayman Islands, Ltd.
Meritor Commercial Vehicle Systems India
    Private Limited
Meritor Czech s.r.o.
Meritor do Brasil Sistemas Automotivos
    Ltda.
Meritor Drivetrain Systems (Nanjing) Co.
    Ltd.
Meritor Electric Vehicles, LLC
Meritor Finance (Barbados) Limited
Meritor France Holdings, LLC
Meritor France SNC
Meritor Germany GmbH
Meritor GmbH
Meritor Heavy Vehicle Braking Systems
    (U.S.A.), LLC
Meritor Heavy Vehicle Braking Systems
    (UK) Limited
Meritor Heavy Vehicle Systems
    (Manufacturing) Limited
Meritor Heavy Vehicle Systems (Singapore)
    Pte., Ltd.
Meritor Heavy Vehicle Systems (Singapore)
    Pte., Ltd. (Singapore Branch)
Meritor Heavy Vehicle Systems
    (Venezuela), Inc.
Meritor Heavy Vehicle Systems Australia
    Ltd.
Meritor Heavy Vehicle Systems Australia
    Ltd. (Vietnam Branch)
Meritor Heavy Vehicle Systems Cameri
    SpA
Meritor Heavy Vehicle Systems de
    Venezuela S.A.
Meritor Heavy Vehicle Systems Limited
Meritor Heavy Vehicle Systems, LLC
Meritor Holdings (Barbados) Limited
Meritor Holdings France SNC
Meritor Holdings Spain, S.A.
Meritor Holdings UK Ltd.
Meritor Holdings, LLC
Meritor HVS (India) Limited
Meritor HVS AB

Meritor HVS Istanbul Irtibat Burosu
Meritor, Inc.
Meritor, Inc. (a Nevada Corporation)
Meritor International Holdings, LLC
Meritor Japan K.K.
Meritor Luxembourg S.a.r.l.
Meritor Management Corp.
Meritor Manufacturing de México, S.A. de
    C.V.
Meritor México, S. de R.L. de C.V.
Meritor Netherlands B.V.
Meritor Netherlands Brazil B.V.
Meritor Services de Mexico, S.A. de C.V.
Meritor Specialty Products LLC
Meritor Technology, LLC
Schrader Far East Ltd.
Sistemas Automotrices de Mexico, S.A. de
    C.V.
Super Diesel, S.A.
Transportation Power, Inc.
    ("Transpower"/investment)
Trucktechnic S.A.
Wilmot-Breeden (Holdings) Limited
Xuzhou Meritor Axles Co. Ltd.

### Former Non-Debtor Affiliates

Arvin Exhause de Venezuela
Arvin Exhaust de Venezuela
Arvin Industries, Inc.
Arvin Innovation Australia Pty. Limited
Arvin International Holdings, LLC
Arvin-Kayaba LLC
ArvinMeritor Canada
ArvinMeritor Former Ride Control
    Operating Co., Inc.
ArvinMeritor Investments SA (Proprietary)
    Limited
ArvinMeritor Mexicana, S.A. DE C.V.
Business Builders International
Carvica C.A.
Carvicay Ltd
Carvireca C.A.
Gabricay Ltd.
Gabriel de Colombia
Gabriel de México, S.A. de C.V.
Gabriel de Venezuela C.A.
Gabriel Europe Inc. Rosendall
Gabriel Europe, Inc.
Gabriel India Limited
Gabriel International, Inc.
Gabriel Ride Control Products, Inc.
Gabriel South Africa (Proprietary) Limited
Gabripan de Caribe S.A.
Gem Muffler Company
Leland Packaging & Distributing
Maremont Automotive Products, Inc.
Maremont Automotive Whse Inc.
Marwil Products Company
Meritor Mexicana, S.A. DE C.V.
MTC Inc.
Pratt Industries, Inc.
Saco-Lowell Shops, Inc.

**Exhibit I**

**Names and Affiliations of Future Claimants' Representative, Asbestos Personal Injury Trustee,
and Members of the Asbestos Personal Injury Trust Advisory Committee**

**Names and Affiliations of Future Claimants' Representative, Asbestos Personal
Injury Trustee, and Member of the Asbestos Personal Injury Trust Advisory Committee**

**Future Claimants' Representative – James L. Patton, Jr.**

James L. Patton, Jr., Esq., has been proposed as the initial Future Claimants' Representative pursuant to the terms of the Asbestos Personal Injury Trust Agreement. Mr. Patton has extensive experience with asbestos-related personal injury litigation and asbestos-focused bankruptcy cases. He is chairman of the law firm Young Conaway Stargatt & Taylor, LLP ("Young Conaway") and a partner in its Bankruptcy and Corporate Restructuring section. He specializes in corporate restructurings, mass tort insolvencies and complex asbestos bankruptcies, and post-confirmation asbestos settlement trusts. He has been involved in virtually every complex asbestos bankruptcy case in the region, as well as numerous other significant general bankruptcy cases.

Mr. Patton has served as the Future Claimants' Representative for the Celotex Asbestos Settlement Trust since May 8, 2006. He has also served as the Future Claimants' Representative in In re Leslie Controls, Inc., Case No. 10-12199 (Bankr. D. Del.) following his appointment on July 12, 2010, In re United Gilsonite Laboratories, Case No. 5:11-bk-02032 (RNO) (Bankr. M.D. Pa.) following his appointment on June 30, 2011, and In re Yarway Corp., Case No. 13-11025 (Bankr. D. Del.) following his appointment on April 22, 2013. He continues to serve as the Future Claimants' Representative for the asbestos personal injury settlement trusts established from those cases. Mr. Patton is the proposed future claimants' representative in the pending case of In re The Fairbanks Company, Case No. 18-41768-PWB (Bankr. N.D. Ga.).

Mr. Patton and Young Conaway have represented the Future Claimants' Representatives in connection with numerous asbestos-related bankruptcy cases and post-bankruptcy settlement trusts in multiple jurisdictions. Young Conaway represented the legal representative for future claimants in the asbestos bankruptcy cases for the following entities that reached confirmation: ACandS; Armstrong World Industries, Inc.; Babock & Wilcox Co.; Celotex Corporation; Durabla Mfg. Company; Federal-Mogul Global, Inc.; Flintkote Company; Global Industrial Technologies, Inc.; Kaiser Aluminum Corporation; Leslie Controls, Inc.; Metex Mfg. Corporation; Mid-Valley, Inc.; North American Refractories Company; Owens Corning; Pittsburgh Corning Corporation; Porter-Hayden Company; Specialty Products Holding Corp.; United Gilsonite Laboratories; USG Corporation; and Yarway Corporation. In addition, Young Conaway represented the legal representative for future claimants exposed to tetrochloroethylene in the bankruptcy case of Met-Coil Systems Corporation.

Mr. Patton and Young Conaway currently represent the legal representative for future claimants in the pending bankruptcy cases of In re Bestwall LLC, Case No. 17-31795 (Bankr. W.D.N.C.), In re Kaiser Gypsum Co., Case No. 16-31602 (Bankr. W.D.N.C.), In re Rapid-Am. Corp., Case No. 13-10687 (Bankr. S.D.N.Y.), and In re Sepco Corp., Case No. 16-50058 (AK) (Bankr. N.D. Ohio).

Young Conaway represents the legal representative for future claimants in connection with asbestos personal injury settlement trusts established from the ACandS, Babcock & Wilcox,

Celotex, Durabla, Federal-Mogul, Flintkote, Global Industrial Techs., Kaiser Aluminum, Leslie Controls, Metex, NARCO, Pittsburgh Corning, Porter-Hayden, Specialty Products Holding Corp., United Gilsonite Labs., and Yarway bankruptcy cases. In addition, Young Conaway represents the legal representative for future claimants in connection with the asbestos and silica settlement trusts established from the Mid-Valley (DII Industries, LLC) bankruptcy case, the legal representative for future claimants in connection with the asbestos settlement trust established from the bankruptcy case of Quigley Company and the legal representative for future claimants in connection with the Met-Coil TCE Trust. Young Conaway also represents the State Insulation Corporation Asbestos Personal Injury Trust.

Mr. Patton and Young Conaway represented the debtor in the asbestos-related chapter 11 case of In re Fuller-Austin Insulation Company, Case No. 98-2038 (JJF) (Bankr. D. Del. 1998), for which a plan was confirmed in 1998.

**Asbestos Personal Injury Trustee – Alan B. Rich**

Alan B. Rich, Esq., has been proposed as the initial Asbestos Personal Injury Trustee pursuant to the terms of the Asbestos Personal Injury Trust Agreement.

Mr. Rich practices civil appellate law, complex civil litigation, and toxic-tort-related bankruptcy law. He is the Managing Trustee of the G-I Holdings, Inc. Asbestos Personal Injury Settlement Trust, and the Trustee of the APG Asbestos Trust, the Christy Refractories Company, LLC Asbestos Personal Injury Trust, the Geo. V. Hamilton, Inc. Asbestos Trust, and the United Gilsonite Laboratories Asbestos Personal Injury Trust. In addition, he serves as counsel to (a) the Trust Advisory Committees of both the Fuller-Austin Asbestos Settlement Trust and the Swan Asbestos and Silica Trust, and (b) the Asbestos PD Future Claimants' Representative of the WRG Asbestos Property Damages Trust. For several months in 2007, he served on the Trust Advisory Committee of the ARTRA Asbestos Trust.

Mr. Rich has received nine (9) Pro Bono Legal Service Awards from the Dallas Bar Association and Legal Services of North Texas, including the Meritorious and the Distinguished Pro Bono Service Awards. He has been practicing law for more than thirty (30) years.

**Members of the Asbestos Personal Injury Trust Advisory Committee**

**Beth Gori, Gori Julian & Associates, P.C.** Beth Gori, Esq., has been proposed as an initial member of the Asbestos Personal Injury Trust Advisory Committee. Ms. Gori serves on trust advisory committees for the United Gilsonite Laboratories Asbestos Personal Injury Trust, the Yarway Asbestos Personal Injury Trust, the Metex Asbestos PI Trust, and the Brauer Asbestos Trust. Ms. Gori serves on the asbestos claimants committees in In re Bestwall LLC, Case No. 17-31795 (Bankr. W.D.N.C.), In re Sepco Corp., Case No. 16-50058 (AK) (Bankr. N.D. Ohio), and In re Kaiser Gypsum Co., Case No. 16-31602 (Bankr. W.D.N.C.).

Ms. Gori is a partner at Gori Julian & Associates, P.C. She practices law in the areas of asbestos litigation and personal injury litigation, and is admitted to practice law in Missouri (1999), Illinois (2000), and the U.S. District Court Southern District of Illinois (2000). Ms. Gori received her undergraduate degree from State University of New York at Buffalo (B.A. 1995)

and attended Saint Louis University School of Law (J.D., 1999). She is a member of the American Bar Association, Illinois Bar Association, and the Madison County Bar Association.

**Perry Browder, Simmons Hanly Conroy LLC.** Perry Browder, Esq., has been proposed as an initial member of the Asbestos Personal Injury Trust Advisory Committee. Mr. Browder serves on the trust advisory committees for the ASARCO Asbestos Personal Injury Settlement Trust, the T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust, the Bondex Trust, the Quigley Company, Inc. Asbestos Personal Injury Trust, the Geo. V. Hamilton, Inc. Asbestos Trust, and the Brauer 524(g) Asbestos Trust. Mr. Browder has been proposed to serve on the trust advisory committee in In re Duro Dyne Nat'l Corp., Case No. 18-27963 (MBK) (Bankr. D.N.J.), In re Sepco Corp., Case No. 16-50058 (AK) (Bankr. N.D. Ohio), In re Kaiser Gypsum Co., Case No. 16-31602 (Bankr. W.D.N.C.), and In re Oakfabco, Inc., Case No. 15-27062 (Bankr. N.D. Ill.). Mr. Browder has also served on numerous asbestos committees.

Mr. Browder is the chair of the Asbestos Group and a shareholder at Simmons Hanly Conroy LLC, a law firm with Illinois offices in Alton and Chicago. His current practice focuses on mesothelioma, asbestos, toxic tort, and personal injury law. His former practice included defense work, working as a states attorney and in legal aid. Mr. Browder received his undergraduate degree from Bradley University (B.S.) and his Juris Doctor from Valparaiso University School of Law. Mr. Browder was admitted to practice law in Illinois in 1988.

Mr. Browder's ISBA activities include the following: Board of Governors (2017 – present); current president, Illinois Bar Foundation; current member, Tort Law Section (2012 – present) and Board Liaison Privacy and Information Security Law (2017 – present); founding member, Lincoln Legacy Society; past member, CLE Section and Judicial Advisory Evaluations; former co-chair, Illinois Bar Foundation Gala; ISBA Speaker; Gold Fellow; and Pillar of the Foundation member, IBF.

Other activities of Mr. Browder include: former president, Illinois Trial Lawyers Association; Founder's Circle Member, American Association for Justice; member, Madison County Bar Association, Alton/Wood River Bar Association, and the American Bar Association. Mr. Browder has served as a speaker at the following events: HarrisMartin, Perrin, Plaintiffs Asbestos Litigation Seminar, and ITLA conferences, and speaker for Valparaiso and other events. Mr. Browder has received the following awards: Super Lawyers, Illinois Super Lawyer (2011-present); Best Lawyer in America, Personal Injury Litigation – Plaintiffs (2013 – present); Best Lawyers "Lawyer of the Year" in Personal Injury Litigation – Plaintiffs in St. Louis (2015); and AV-Rating, Martindale-Hubbell.

**Armand J. Volta, Jr., Law Offices of Peter Angelos, P.C.** Armand J. Volta, Jr., Esq., has been proposed as an initial member of the Asbestos Personal Injury Trust Advisory Committee. Mr. Volta serves on the trust advisory committees for the ACandS Asbestos Settlement Trust, the Owens Corning Fibreboard Asbestos Personal Injury Trust, the Plibrico Asbestos Trust, the Porter Hayden Bodily Injury Trust, the Wallace & Gale Asbestos Settlement Trust, the APG Asbestos Trust, the Quigley Company, Inc. Asbestos Personal Injury Trust, the United States Mineral Products Company Asbestos Personal Injury Settlement Trust, and the Hercules Chemical Company, Inc Asbestos Settlement Trust. Mr. Volta serves on the asbestos

claimants' committees in <u>In re Bestwall LLC</u>, Case No. 17-31795 (Bankr. W.D.N.C.) and <u>In re Kaiser Gypsum Co.</u>, Case No. 16-31602 (Bankr. W.D.N.C.).

Mr. Volta practices law in the areas of products liability, toxic torts, and personal injury litigation, and has negotiated asbestos claims for the Law Offices of Peter Angelos, P.C. since 1998. Mr. Volta has served as Plaintiffs' Liaison Counsel in asbestos litigation in Maryland since 1985. Mr. Volta is admitted to practice law in Maryland (1980), the U.S. District Court for the District of Maryland (1981), the District of Columbia (1989), the U.S. Supreme Court (1991), and New York (2000). Mr. Volta received his undergraduate degree from Frostburg State College (B.A., 1977) and received his Juris Doctor from the University of Baltimore (J.D., 1979). Mr. Volta is a member of the following organizations: The Bar Association of Baltimore City, the Baltimore County, Maryland State and American Bar Associations, the District of Columbia Bar, and the American Association for Justice. He was named as a top 100 lawyer in 2017.

**John D. Cooney, Cooney & Conway.** John D. Cooney, Esq., has been proposed as an initial member of the Asbestos Personal Injury Trust Advisory Committee. Mr. Cooney serves on the trust advisory committees for the Owens Corning Fibreboard Asbestos Personal Injury Trust, the G-I Holdings Inc. Asbestos Personal Injury Settlement Trust, the WRG Asbestos PI Trust, the United States Gypsum Asbestos Personal Injury Settlement Trust, the ACandS Asbestos Settlement Trust, the Armstrong World Industries Asbestos Trust, the Babcock & Wilcox Asbestos Trust, the Kaiser Asbestos Personal Injury Trust, the Plibrico Asbestos Trust, the Combustion Engineering 524(g) Asbestos PI Trust, the DII Industries, LLC Asbestos PI Trust, the Motors Liquidation Company Asbestos PI Trust, the T H Agriculture & Nutrition, L.L.C. Asbestos Personal Injury Trust, the Bondex Trust, the ASARCO Asbestos Personal Injury Settlement Trust, the ARTRA Asbestos Trust, the North American Refractories Company Asbestos Personal Injury Settlement Trust, the Federal Mogul Asbestos Personal Injury Trust, the Congoleum Plan Trust, the Yarway Asbestos Personal Injury Trust, and the Quigley Company, Inc. Asbestos Personal Injury Trust.

Mr. Cooney has previously served or currently serves on the asbestos claimants committee or unsecured creditors' committee in the following cases: <u>In re Owens Corning</u>, Case No. 00-03837 (JKF) (Bankr. D. Del.), <u>In re G-I Holdings Inc.</u>, Case No. 01-30135 (RG) (Bankr. D.N.J.), <u>In re W. R. Grace & Co.</u>, Case No. 01-1139 (JKF) (Bankr. D. Del.), <u>In re USG Corp.</u>, Case No. 01-02094 (KG) (Bankr. D. Del.), <u>In re ACandS, Inc.</u>, Case No. 02-12687 (JKF) (Bankr. D. Del.), <u>In re Armstrong World Indus., Inc.</u>, Case No. 00-4471 (JKF) (Bankr. D. Del.), <u>In re Global Indus. Tech., Inc.</u>, Case No. 02-21626 (JKF) (Bankr. W.D. Pa.), <u>In re Kaiser Aluminum Corp.</u>, Case No. 02-10429 (JKF) (Bankr. D. Del.), <u>In re Plibrico Co.</u>, Case No. 02-09952 (Bankr. N.D. Ill.), <u>In re Combustion Eng'g, Inc.</u>, Case No. 03-10495 (JKF) (Bankr. D. Del.), <u>In re Mid-Valley, Inc.</u>, Case No. 03-35592 (JKF) (Bankr. W.D. Pa.), <u>In re Motors Liquidation Co.</u>, Case No. 09-50026 (REG) (Bankr. S.D.N.Y.), <u>In re T H Agriculture & Nutrition, L.L.C.</u>, Case No. 08-14692 (REG) (Bankr. S.D.N.Y.), <u>In re Specialty Prods. Holding Corp.</u>, Case No. 10-11780 (PJW) (Bankr. D. Del.), <u>In re Garlock Sealing Tech. LLC</u>, Case No. 10-31607 (Bankr. W.D.N.C.), <u>In re Leslie Controls, Inc.</u>, Case No. 10-12199 (CSS) (Bankr. D. Del.), <u>In re Metex Mfg. Corp.</u>, Case No. 12-14554 (CGM) (Bankr. S.D.N.Y.), <u>In re Rapid-Am. Corp.</u>, Case No. 13-10687 (Bankr. S.D.N.Y.), <u>In re Yarway Corp.</u>, Case No. 13-11025 (BLS) (Bankr. D. Del.), <u>In re Quigley Co.</u>, Case No. 04-15739 (SMB) (Bankr. S.D.N.Y.), <u>In re Federal-</u>

Mogul Global Inc., Case No. 01-10578 (JKF) (Bankr. D. Del.), In re Kaiser Gypsum Co., Case No. 16-31602 (JCW) (Bankr. W.D.N.C.), and In re Bestwall LLC, Case No. 17-31795 (Bankr. W.D.N.C.).

Mr. Cooney is a partner in the Chicago law firm of Cooney and Conway, which is dedicated to trial litigation.  He is a Past President-Elect of the Illinois Trial Lawyers Association, and a governor emeritus of the American Association for Justice.  Mr. Cooney was the founding chairman of the Mass Torts Litigation Committee of the American Bar Association.  He holds a Bachelor of Arts Degree from the College at Georgetown University (1976), and a Juris Doctor from Loyola University of Chicago School of Law (1979).

**Marcus E. Raichle, Jr., Maune Raichle Hartley French & Mudd, LLC.**  Marcus E. Raichle, Jr., Esq., has been proposed as an initial member of the Asbestos Personal Injury Trust Advisory Committee.  Mr. Raichle serves on the asbestos claimants committees in the following cases: In re Bestwall LLC, Case No. 17-31795 (Bankr. W.D.N.C.), In re Fraser's Boiler Service, Inc., Case No. 18-41245 (Bankr. W.D.W.A.), and In re The Fairbanks Company, Case No. 18-41768-PWB (Bankr. N.D. Ga.).

Mr. Raichle is a founding partner at Maune Raichle Hartley French & Mudd.  Since 1994 he has practiced exclusively in the area of asbestos litigation.  Since 2000, his experience has involved only the litigation of asbestos cases involving mesothelioma claims.  Prior to his work in asbestos litigation from 1992 to 1994, he served as the Legal Assistant for the ACLU of Eastern Missouri.  Mr. Raichle is admitted to practice law in Missouri (1993), Illinois (1995), Oklahoma (1992), Indiana (1997), the United States District Court for the Southern District of Illinois (1995), and the United States District Court for the Southern District of Indiana (1998).

Mr. Raichle received his undergraduate degree from Washington University in St. Louis (B.A., 1988) and attended the University of Tulsa College of Law (J.D., 1992).  He is a member of the American Bar Association, American Association for Justice (Co-Chair of the AAJ Asbestos Litigation Group), the Illinois Bar Association, the Illinois Trial Lawyers Association (Member of the ITLA Board of Governors), the Missouri Bar Association, the Bar Association of Metropolitan St. Louis, and the Madison County Bar Association.

**Exhibit J**

**Assumed Executory Contract and Unexpired Lease List**

## Assumed Executory Contract and Unexpired Lease List[1]

| Counterparty Name | Notice Address(es) | Contract/Lease Description |
|---|---|---|
| *Executory Contracts to be assumed in accordance with Article V of the Plan and assigned to the Asbestos Personal Injury Trust:* | | |
| Dolgencorp, LLC, a Kentucky limited liability company | 100 Mission Ridge Goodlettsville, TN 37072 Attn: Lease Administration | Lease, dated May 19, 2017 |
| *Executory Contracts to be assumed and assigned to Responsible Mertior Affiliate (as defined in the Plan) in accordance with the Environmental Assumption and Indemnification Agreement, attached to the Plan as Exhibit G:* | | |
| Hardage Site Remedy Corporation Trust | 15213 180th Street Lindsay, OK 73052 Attn: Mark Kamilow<br><br>Spencer Fane LLP 1000 Walnut Street, Suite 1400 Kansas City, MO 64106 Attn: Pete Mirakian III | Judgment and Order, *United States v. Hardage*, Case No. CIV-86-1401-W (W.D. Okla.), dated August 9, 1990, as modified pursuant to order dated April 24, 1999 |
| Great American E&S Insurance Company | Great American Insurance Company Attention: Claims 397 Eagleview Blvd., Suite 100 Exton, PA 19341 | Closure and Post-Closure Financial Assurance Policy, Solid Waste Management Facility(ies) |
| Oklahoma Department of Environmental Quality | P.O. Box 1677 Oklahoma City, OK 73101-1677 Attn: Stephen Baldridge | Consent Order for Site Characterization and Risk-Based Remediation with Oklahoma Department of Environmental Quality, dated August 26, 2014 |
| Platt Saco Lowell Corporation | McCall Environmental, P.A. 100 Tower Drive, Unit 16 Greenville, South Carolina 29607 Attn: Eugene C. McCall, Jr., Easley Trust Co-Trustee | Easley Site Trust Agreement between Maremont Corporation and Platt Saco Lowell Corporation, dated October 13, 1992 |

[1] The fact that a contract or lease is listed on this Exhibit 1 shall not constitute or be construed to constitute an admission: (a) as to the executory or non-executory nature of such contract or lease within the meaning of section 365 of the Bankruptcy Code, (b) as to the existence or validity of any claims held by the counterparty or counterparties to such contract or lease, or (c) that the Debtors or any successor in interest to the Debtors (including any of the Reorganized Debtors) has any liability thereunder.

| South Carolina Department of Health and Environmental Control | Bureau of Land and Waste Management – Voluntary Cleanup Program South Carolina Department of Health and Environmental Control 2600 Bull Street Columbia, SC 29201 Attn: Regan Rahn and Robert Hodges | Voluntary Cleanup Contract 05-5626-RP, In the Matter of AVM, Inc. Marion Facility, Marion County and AVM, Inc., dated March 2, 2006 |

**Exhibit K**

**Reorganized Maremont's Bylaws**

BYLAWS

OF

**MAREMONT CORPORATION**
(hereinafter called the "**Corporation**")

ARTICLE I
MEETINGS OF STOCKHOLDERS

Section 1.1.    Place of Meetings. Meetings of the stockholders of the Corporation for the election of directors or for any other purpose shall be held at such time and place, either within or without the State of Delaware, as shall be designated from time to time by the board of directors of the Corporation (the "**Board**"). The Board may, in its sole discretion, determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communications as authorized by Section 211(a)(2) of the General Corporation Law of the State of Delaware, as amended (the "**DGCL**").

Section 1.2.    Annual Meetings. The annual meeting of stockholders of the Corporation for the election of directors and for the transaction of such other business as may properly be brought before the meeting in accordance with these bylaws of the Corporation (as amended from time to time in accordance with the provisions hereof, these "**Bylaws**") shall be held on such date and at such time as shall be designated from time to time by the Board. The Chairperson of the Board, the President or the Board may postpone, reschedule or cancel any annual meeting of stockholders previously scheduled by the Board.

Section 1.3.    Special Meetings. Unless otherwise required by law or by the certificate of incorporation of the Corporation (including, without limitation, the terms of any certificate of designation with respect to any series of preferred stock), as amended and restated from time to time (the "**Certificate of Incorporation**"), special meetings of the stockholders of the Corporation, for any purpose or purposes, may be called only by the Chairperson of the Board, the President or the Board. At a special meeting of stockholders, only such business shall be conducted as shall be specified in the notice of meeting. The Board may postpone, reschedule or cancel any special meeting of stockholders previously called by any of them.

Section 1.4.    Notice. Whenever stockholders of the Corporation are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed present in person and vote at such meeting, the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Unless otherwise required by law or the Certificate of Incorporation, written notice of any meeting shall be given either personally, by mail or by electronic transmission (if permitted under the circumstances by the DGCL) not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting as of the record date for determining stockholders entitled to notice of the meeting. If mailed, such notice shall be deemed to be given when deposited in the United States mail with postage thereon prepaid, addressed to

-1-

the stockholder at the stockholder's address as it appears on the stock transfer books of the Corporation. If notice is given by means of electronic transmission, such notice shall be deemed to be given at the times provided in the DGCL. Any stockholder may waive notice of any meeting before or after the meeting. The attendance of a stockholder at any meeting shall constitute a waiver of notice at such meeting, except where the stockholder attends the meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any annual or special meeting of stockholders need be specified in any waiver of notice unless so required by law.

Section 1.5.    Adjournments.  Any meeting of stockholders of the Corporation may be adjourned from time to time to reconvene at the same or some other place, if any, by holders of a majority of the voting power of the Corporation's capital stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, though less than a quorum, or by the chairperson of the meeting or any officer entitled to preside at or to act as secretary of such meeting, and notice need not be given of any such adjourned meeting if the time and place, if any, thereof, and the means of remote communication, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting, are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Corporation may transact any business that might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, notice of the adjourned meeting in accordance with the requirements of Section 1.4 of these Bylaws shall be given to each stockholder of record entitled to vote at the meeting. If, after the adjournment, a new record date for determination of stockholders entitled to vote is fixed for the adjourned meeting, the Board shall fix as the record date for determining stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote at the adjourned meeting and shall give notice of the adjourned meeting to each stockholder of record as of the record date so fixed for notice of such adjourned meeting.

Section 1.6.    Quorum.  Unless otherwise required by applicable law or the Certificate of Incorporation, the holders of a majority of the voting power of the Corporation's capital stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at a meeting of stockholders. Where a separate vote by a class or classes or series is required, a majority of the voting power of the shares of such class or classes or series present in person or represented by proxy shall constitute a quorum entitled to take action with respect to such vote. If a quorum shall not be present or represented at any meeting of stockholders, the chairperson of the meeting, any officer entitled to preside at or to act as secretary of such meeting or the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, in the manner provided in Section 1.5 of these Bylaws, until a quorum shall be present or represented. A quorum, once established, shall not be broken by the withdrawal of enough votes to leave less than a quorum. The Corporation shall not vote, directly or indirectly, shares of its own stock owned by it and such shares shall not be counted for quorum purposes.

Section 1.7.    Voting.

(a)    Matters Other Than Election of Directors.  Any matter brought before any meeting of stockholders of the Corporation, other than the election of

directors, shall be decided by the affirmative vote of the holders of a majority of the voting power of the Corporation's capital stock present in person or represented by proxy at the meeting and entitled to vote on such matter, voting as a single class, unless the matter is one upon which, by express provision of law, the Certificate of Incorporation or these Bylaws, a different vote is required, in which case such express provision shall govern and control the decision of such matter.  Except as provided in the Certificate of Incorporation, every stockholder having the right to vote shall have one vote for each share of stock having voting power registered in such stockholder's name on the books of the Corporation.  Such votes may be cast in person or by proxy as provided in <u>Section 1.10</u> of these Bylaws.  The Board, in its discretion, or the officer of the Corporation presiding at a meeting of stockholders, in such officer's discretion, may require that any votes cast at such meeting shall be cast by written ballot.

(b)    <u>Election of Directors</u>.  Except as provided in Section 2.7 of these Bylaws, election of directors at all meetings of the stockholders at which directors are to be elected shall be by a plurality of the votes cast.

Section 1.8.    <u>Voting of Stock of Certain Holders</u>.  Shares of stock of the Corporation standing in the name of a deceased person, a minor, an incompetent or a debtor in a case under Title 11, United States Code, and entitled to vote may be voted by an administrator, executor, guardian, conservator, debtor-in-possession or trustee, as the case may be, either in person or by proxy, without transfer of such shares into the name of the official or other person so voting.  A stockholder whose shares of stock of the Corporation are pledged shall be entitled to vote such shares, unless on the transfer records of the Corporation such stockholder has expressly empowered the pledgee to vote such shares, in which case only the pledgee, or the pledgee's proxy, may vote such shares.

Section 1.9.    <u>Treasury Stock</u>.  Shares of stock of the Corporation belonging to the Corporation, or to another corporation a majority of the shares entitled to vote in the election of directors of which are held by the Corporation, shall not be voted at any meeting of stockholders of the Corporation and shall not be counted in the total number of outstanding shares for the purpose of determining whether a quorum is present.  Nothing in this <u>Section 1.9</u> shall limit the right of the Corporation to vote shares of stock of the Corporation held by it in a fiduciary capacity.

Section 1.10.    <u>Proxies</u>.  Each stockholder entitled to vote at a meeting of stockholders of the Corporation may authorize another person or persons to act for such stockholder by proxy filed with the Secretary before or at the time of the meeting.  No such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period.  Each proxy shall be revocable unless expressly provided therein to be irrevocable and coupled with an interest sufficient in law to support an irrevocable power.

Section 1.11.    <u>Consent of Stockholders in Lieu of Meeting</u>.  Any action required to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of the stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all

shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.

Section 1.12.  List of Stockholders Entitled to Vote.  The officer of the Corporation who has charge of the stock ledger of the Corporation shall prepare and make or have prepared and made, at least ten (10) days before every meeting of stockholders of the Corporation, a complete list of the stockholders entitled to vote at the meeting (provided, however, that if the record date for determining the stockholders entitled to vote is less than ten (10) days before the meeting date, the list shall reflect the stockholders entitled to vote as of the tenth (10th) day before the meeting date), arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Nothing contained in this Section 1.12 shall require the Corporation to include electronic mail addresses or other electronic contact information on such list.  Such list shall be open to the examination of any stockholder for any purpose germane to the meeting for a period of at least ten (10) days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation.  In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available on to stockholders of the Corporation.  If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof and may be examined by any stockholder who is present.  If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.

Section 1.13.  Record Date.  In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders of the Corporation or any adjournment thereof, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting, but the Board may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance with the foregoing provisions of this Section 1.13 at the adjourned meeting.

Section 1.14.  Organization and Conduct of Meetings.  The Chairperson of the Board shall act as chairperson of meetings of stockholders of the Corporation (the "**Chairperson of the Meeting**").  The Board may designate any other director or officer of the Corporation to act as Chairperson of the Meeting in the absence of the Chairperson of the Board, and the Board may further provide for determining who shall act as Chairperson of the Meeting in the absence of the Chairperson of the Board and such designee.  If the Chairperson of the Board is absent and the Board has not designated a replacement for Chairperson of the Meeting, the Vice Chairperson of the Board, if any, or in the absence of the foregoing person, the President, if any, or in the absence of the foregoing person, a Vice President of the Company, if any, or in the absence of the foregoing person, the Secretary, or in the absence of the foregoing person, a chairperson chosen at such meeting by the holders of a majority of the shares present or represented at such meeting, shall serve as the Chairperson of the Meeting.  The Board may adopt by resolution such rules and regulations for the conduct of any meeting of stockholders as it shall deem appropriate.  Such rules, regulations or procedures, whether adopted by the Board or prescribed by the chairperson of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) the determination of when the polls shall open and close for any given matter to be voted on at the meeting; (iii) rules and procedures for maintaining order at the meeting and the safety of those present; (iv) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairperson of the meeting shall determine; (v) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (vi) limitations on the time allotted to questions or comments by participants.  Except to the extent inconsistent with the rules and regulations as adopted by the Board, the Chairperson of the Meeting shall have the right and authority to convene and (for any or no reason) to recess or adjourn the meeting to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such Chairperson of the Meeting, are appropriate for the proper conduct of the meeting.  Except to the extent determined by the Board or the Chairperson of the Meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.  The Secretary of the Corporation, or in the Secretary's absence an Assistant Secretary, shall act as secretary of the meeting of stockholders, but if neither the Secretary nor an Assistant Secretary is present, the Chairperson of the Meeting shall appoint any person present to act as secretary of the meeting.

Section 1.15.  Inspectors of Election.  In advance of any meeting of stockholders of the Corporation, the Chairperson of the Board, the President or the Board, by resolution, may, but need not, appoint one or more inspectors to act at the meeting and make a written report thereof. One or more other persons may be designated as alternate inspectors to replace any inspector who fails to act.  If no inspector or alternate is able to act at a meeting of stockholders, the Chairperson of the Meeting may, but need not, appoint one or more inspectors to act at the meeting.  Unless otherwise required by applicable law, inspectors may be officers, employees or agents of the Corporation.  Each inspector, before entering upon the discharge of the duties of inspector, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of such inspector's ability.  The inspector (if any) shall have the duties prescribed by law and shall take charge of the polls and, when the vote is completed, shall make a certificate of the result of the vote taken and of such other facts as may be required by applicable law.

## ARTICLE II
## DIRECTORS

Section 2.1.    <u>Number; Term</u>.  The Board shall consist of one or more members.  Unless the Certificate of Incorporation fixes the number of directors, the number of directors shall be fixed, from time to time, exclusively by the Board, subject to any limitations in any stockholder agreement or the rights of the holders of preferred stock with respect to the election of directors, if any.  Each director shall hold office until the next annual meeting of stockholders and until a successor is duly elected and qualified or until the director's death, resignation, disqualification or removal.  Unless otherwise provided in the Certificate of Incorporation, directors need not be stockholders nor residents of the State of Delaware.

Section 2.2.    <u>Duties and Powers</u>.  The business and affairs of the Corporation shall be managed by or under the direction of the Board which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by law or by the Certificate of Incorporation required to be exercised or done by the stockholders.

Section 2.3.    <u>Meetings; Order of Business; Place of Meetings</u>.  The Board may hold meetings, both regular and special, either within or without the State of Delaware.  Regular meetings of the Board may be held without notice at such time and at such place as may from time to time be determined by the Board.  Special meetings of the Board may be called by the Chairperson of the Board (if there be one), the President or the Board and shall be held at such place, on such date and at such time as he, she or it shall specify.  At all meetings of the Board, business shall be transacted in such order as shall from time to time be determined by the Chairman of the Board (if any), or by resolution of the Board.  The Board may have an office and keep the books of the Corporation, except as otherwise provided by law, in such place or places, within or without the State of Delaware or within or without the United States of America, as the Board of Directors may from time to time determine by resolution.

Section 2.4.    <u>Notice</u>.  Notice of any meeting of the Board stating the place, date and time of the meeting shall be given to each director by mail posted not less than five (5) days before the date of the meeting, by nationally recognized overnight courier deposited not less than two (2) days before the date of the meeting or by email, facsimile or other means of electronic communication delivered or sent not less than twenty-four (24) hours before the date and time of the meeting, or on such shorter notice as the person or persons calling such meeting may deem necessary or appropriate in the circumstances.  If mailed or sent by overnight courier, such notice shall be deemed to be given at the time when it is deposited in the United States mail with first class postage prepaid or deposited with the overnight courier.  Notice by facsimile or other electronic transmission shall be deemed given when the notice is transmitted.  Any director may waive notice of any meeting before or after the meeting.  The attendance of a director at any meeting shall constitute a waiver of notice of such meeting, except where the director attends the meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board need be specified in any notice or waiver of notice of such meeting unless so required by law.

Section 2.5.    <u>Chairperson of the Board</u>.  The Chairperson of the Board shall be chosen from among the directors and may be the President.  Except as otherwise provided by law, the

-6-

Certificate of Incorporation or these Bylaws, the Chairperson of the Board shall preside at all meetings of stockholders and of the Board. The Chairperson of the Board shall have such other powers and duties as may from time to time be assigned by the Board.

Section 2.6.    Organization. At each meeting of the Board, the Chairperson of the Board, or, in the Chairperson's absence, a director chosen by a majority of the directors present, shall act as chairperson. The Secretary shall act as secretary at each meeting of the Board. In case the Secretary shall be absent from any meeting of the Board, an assistant secretary shall perform the duties of secretary at such meeting; and in the absence from any such meeting of the Secretary and all assistant secretaries, the chairperson of the meeting may appoint any person to act as secretary of the meeting.

Section 2.6.    Resignations and Removals of Directors. Any director of the Corporation may resign at any time, by giving notice in writing or by electronic transmission to the Chairperson of the Board, the President or the Secretary. Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the occurrence of some other event, and, unless otherwise specified in such notice, the acceptance of such resignation shall not be necessary to make it effective.

Section 2.7.    Newly Created Directorships and Vacancies.    Any newly created directorships and any vacancies on the Board shall be filled by the affirmative votes of a majority of the remaining members of the Board, although less than a quorum. A director so elected shall hold office until the earlier of the expiration of the term of the director whom he or she has replaced, the proper election and qualification of a successor or that director's death, resignation, disqualification or removal.

Section 2.8.    Quorum and Action at Meeting. At all meetings of the Board, a majority of directors constituting the Board shall constitute a quorum for the transaction of business, and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board. If a quorum shall not be present at any meeting of the Board, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting of the time and place of the adjourned meeting, until a quorum shall be present. At any meeting of the Board of Directors at which a quorum is present, the vote of a majority of those present shall be sufficient to take any action, unless a different vote is specified by law or by these Bylaws.

Section 2.9.    Actions of the Board by Written Consent. Any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting, if all the members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission are filed with the minutes of proceedings of the Board or committee.

Section 2.10.    Telephonic Meetings. Members of the Board, or any committee thereof, may participate in a meeting of the Board or such committee by means of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Section 2.10 shall constitute presence in person at such meeting.

Section 2.11.  <u>Committees</u>.  The Board may designate one or more committees, each committee to consist of one or more of the directors of the Corporation and, to the extent permitted by law, to have and exercise such authority as may be provided for in the resolutions creating such committee, as such resolutions may be amended from time to time.  The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of any such committee.  In the absence or disqualification of a member of a committee, and in the absence of a designation by the Board of an alternate member to replace the absent or disqualified member, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board to act at the meeting in the place of any absent or disqualified member.  Each committee shall keep regular minutes and report to the Board when required.  A majority of any committee may determine its action and fix the time and place of its meetings, unless the Board shall otherwise provide.  The Board shall have the power at any time to fill vacancies in, to change the membership of or to dissolve any such committee.

Section 2.12.  <u>Compensation</u>.  The Board shall have the authority to fix the compensation of directors.  The directors shall be paid their reasonable expenses, if any, of attendance at each meeting of the Board or any committee thereof and may be paid a fixed sum for attendance at each such meeting and an annual retainer or salary for service as director or committee member, payable in cash or securities.  No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.  Directors who are full-time employees of the Corporation shall not receive any compensation for their service as director.

Section 2.13.  <u>Interested Directors</u>.  No contract or transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any other corporation, partnership, association or other organization in which one or more of the Corporation's directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the Board or committee thereof that authorizes the contract or transaction, or solely because any such director's or officer's vote is counted for such purpose if: (i) the material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the Board or the committee, and the Board or committee in good faith authorizes the contract or transaction by the affirmative vote of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; (ii) the material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders; or (iii) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified by the Board, a committee thereof or the stockholders.  Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board or of a committee that authorizes the contract or transaction.

## ARTICLE III
## OFFICERS

Section 3.1.   <u>General</u>.  The officers of the Corporation shall be chosen by the Board and shall be a President, and a Secretary.  The Board, in its discretion, may also choose a Chairperson

of the Board (who must be a director), a Vice Chairperson of the Board (who must be a director), a Treasurer, one or more Executive Vice Presidents, Senior Vice Presidents, Vice Presidents, Assistant Secretaries, Assistant Treasurers and such other officers as the Board from time to time may deem appropriate. Any two or more offices may be held by the same person. The officers of the Corporation need not be stockholders of the Corporation nor, except in the case of the Chairperson of the Board or the Vice Chairperson of the Board, need such officers be directors of the Corporation.

Section 3.2.    Election; Term.   The Board shall elect the officers of the Corporation who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board, and each officer of the Corporation shall hold office until such officer's successor is elected and qualified, or until such officer's earlier death, resignation or removal. Any officer may be removed at any time by the Board, either with or without cause. Any officer may resign upon notice given in writing or electronic transmission to the President or the Secretary. Such resignation shall be effective upon receipt unless it is specified to be effective at some other time or upon the occurrence of some other event. Any vacancy occurring in any office of the Corporation shall be filled in the manner prescribed in this Article III.

Section 3.3.    Voting Securities Owned by the Corporation.   Powers of attorney, proxies, waivers of notice of meeting, consents and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the President or any other officer authorized to do so by the Board, and any such officer may, in the name of and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation in which the Corporation may own securities and at any such meeting shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed if present. The authority granted herein may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority. The Board may, by resolution, from time to time confer like powers upon any other person or persons.

Section 3.4.    President.   The President shall, subject to the control of the Board, have general supervision over the business of the Corporation and shall direct the affairs and policies of the Corporation. The President shall also perform such other duties and may exercise such other powers as may from time to time be assigned to such officer by these Bylaws or by the Board.

Section 3.7.    Secretary.   The Secretary shall give the requisite notice of meetings of stockholders and directors and shall record the proceedings of such meetings and, besides the Secretary's powers and duties prescribed by law, shall have such other powers and perform such other duties as shall at any time be assigned to such officer by the Board.

Section 3.8.    Other Officers.   Such other officers as the Board may choose shall perform such duties and have such powers as from time to time may be assigned to them by the Board. The Board may delegate to any other officer of the Corporation the power to choose such other officers and to prescribe their respective duties and powers.

Section 3.9.    Salaries.   The salaries or other compensation of the officers and agents of the Corporation shall be fixed from time to time by the Board in accordance with these Bylaws.

Section 3.10.  Vacancies.  Any vacancy occurring in any office of the Corporation may be filled by the Board of Directors in accordance with these Bylaws.

ARTICLE IV
STOCK

Section 4.1.  Stock Certificates and Issuance of Stock.  The shares of the Corporation shall be represented by certificate, provided that the Board may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Company.  Every holder of stock represented by certificates shall be entitled to have a certificate signed by, or in the name of, the Company by any two authorized officers of the Company representing the number of shares registered in certificate form.  Any or all of the signatures on the certificate may be a facsimile.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate has ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Company with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.  Uncertificated shares shall be transferable only on the books of the Corporation by the holder thereof in person or by attorney upon presentment of proper evidence of succession, assignation or authority to transfer in accordance with the customary procedures for transferring shares in uncertificated form.  Unless otherwise voted by the stockholders and made subject to the provisions of the Certificate of Incorporation, the whole or any part of any unissued balance of the authorized capital stock of the Corporation or the whole or any part of any issued, authorized capital stock of the Corporation held in its treasury may be issued, sold, transferred or otherwise disposed of by vote of the Board of Directors in such manner, for such consideration and on such terms as the Board of Directors may determine.

Section 4.2.  Record Date.  In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted and which record date shall be not more than sixty (60) days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be the close of business on the day on which the Board adopts the resolution relating thereto.

Section 4.3.  Dividends.  Subject to applicable law and the Certificate of Incorporation, dividends upon the shares of capital stock of the Corporation may be declared by the Board of Directors at any regular or special meeting of the Board of Directors.  Dividends may be paid in cash, in property, or in shares of the Corporation's capital stock, unless otherwise provided by applicable law or the Certificate of Incorporation.

Section 4.4.  Record Owners.  The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise required by law.

-10-

Section 4.5.    Lost, Stolen or Destroyed Certificates.  The Corporation, may issue a new certificate of stock in place of any previously issued certificate alleged to have been lost, stolen, or destroyed, upon such terms and conditions as the President or other authorized officer may prescribe, including the presentation of reasonable evidence of such loss, theft or destruction and the giving of such indemnity as the President or other authorized officer may require for the protection of the Corporation or any transfer agent or registrar.

ARTICLE V
MISCELLANEOUS

Section 5.1.    Contracts.  The Board may authorize any officer or officers or any agent or agents to enter into any contract or execute and deliver any instrument or other document in the name of and on behalf of the Corporation, and such authority may be general or confined to specific instances.

Section 5.2.    Disbursements.   All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board may from time to time designate.

Section 5.3.    Fiscal Year.  The fiscal year of the Corporation shall end on the 31st day of December in each year or on such other day as may be fixed from time to time by resolution of the Board.

Section 5.4.    Corporate Seal.  The Company may adopt a corporate seal, which shall be in such form as may be approved from time to time by the Board.  The Company may use the corporate seal by causing it or a facsimile thereof to be impressed or affixed or otherwise reproduced.

Section 5.5.    Offices.  The Corporation shall maintain a registered office inside the State of Delaware and may also have other offices outside or inside the State of Delaware.  The books of the Corporation may be kept (subject to any applicable law) outside the State of Delaware at the principal executive offices of the Corporation or at such other place or places as may be designated from time to time by the Board.

Section 5.6.    Conflict with Certificate of Incorporation.   These Bylaws are adopted subject to the Certificate of Incorporation.   Whenever these Bylaws may conflict with the Certificate of Incorporation, such conflict shall be resolved in favor of the Certificate of Incorporation.

Section 5.7.    Waiver of Notice.  Whenever any notice whatsoever is required to be given by law, by the Certificate of Incorporation or by these Bylaws, a waiver of such notice either in writing signed by the person entitled to such notice or such person's duly authorized attorney, or by telegraph, facsimile transmission, electronic mail, or any other available method, whether before, at or after the time stated in such waiver, or the appearance of such person or persons at such meeting in person or by proxy, shall be deemed equivalent to such notice.

## ARTICLE VI
## AMENDMENTS

These Bylaws may be adopted, amended, altered or repealed by the Board or by the stockholders of the Corporation by the affirmative vote of the holders of at least 75% of the voting power of all then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

* * *

Adopted as of: _____, 2019

ACTIVE 243271476

**Exhibit L**

**Reorganized Maremont's Certificate of Incorporation**

CERTIFICATE OF INCORPORATION

OF

**MAREMONT CORPORATION**

FIRST:  The name of the corporation (which is hereinafter referred to as the "**Corporation**") is MAREMONT CORPORATION.

SECOND:  The address of the Corporation's registered office in the State of Delaware is 100 West Tenth Street in the City of Wilmington, County of New Castle.  The name of the Corporation's registered agent at such address is The Corporation Trust Company.

THIRD:  The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "**DGCL**").

FOURTH:  The total number of shares of all classes of capital stock which the Corporation shall have the authority to issue is 1,000 shares of common stock with a par value of $0.01 per share.

FIFTH:  In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to adopt, make, alter or repeal the By-laws of the Corporation, subject to any specific limitation on such power contained in any By-laws adopted by the stockholders.  Elections of directors need not be by written ballot, except and to the extent provided in the By-laws of the Corporation.

SIXTH:  A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for such liability as is expressly not subject to limitation under the General Corporation Law of the State of Delaware, as the same exists or may hereafter be amended to further limit or eliminate such liability.  Any repeal or modification of the foregoing paragraph by the stockholders of the Corporation shall not adversely affect any right or protection of director of the Corporation existing at the time of such repeal or modification.

SEVENTH: Each person who was a director or officer of the Corporation prior to the Effective Date (as defined in the *Modified Joint Prepackaged Plan of Reorganization of Maremont Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated as of May 14, 2019, as such may be modified, amended, or supplemented (the "**Plan**")) of the Plan, and each person who served at the request of the Corporation as a director or officer of another enterprise prior to the Effective Date of the Plan, shall be indemnified in accordance with Section VIII.I.2 of the Plan.  On and after the Effective Date, the Corporation shall indemnify, advance expenses, and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person who was or is a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative in nature, by reason of the fact that such person is or was a director, officer, employee or agent of

the Corporation on or after the Effective Date, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, employee benefit plan, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding to the full extent permitted by law on and after the Effective Date, and the Corporation may enter into agreements with any such person for the purpose of providing for such indemnification. Notwithstanding the preceding sentence, except for claims for indemnification (following the final disposition of any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "**Proceeding**"), or advancement of expenses not paid in full, the Corporation shall be required to indemnify in connection with a Proceeding (or part thereof) commenced by such person only if the commencement of such Proceeding (or part thereof) by such person was authorized in the specific case by the board of directors of the Corporation.

Advancing Expenses. On and after the Effective Date, expenses (including attorneys' fees) incurred by a present or former director or officer of the Corporation in defending a civil, criminal, administrative or investigative action, suit or proceeding by reason of the fact that such person is or was a director, officer, employee or agent of the Corporation on or after Effective Date (or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise) shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the Corporation as authorized by relevant provisions of the DGCL and this Certificate of Incorporation; provided, however, the Corporation shall not be required to advance such expenses to a director or officer (i) who commences any action, suit or proceeding as a plaintiff unless such advance is specifically approved by a majority of the Board or (ii) who is a party to an action, suit or proceeding brought by the Corporation and approved by a majority of the Board that alleges willful misappropriation of corporate assets by such director, disclosure of confidential information in violation of such director's fiduciary or contractual obligations to the Corporation, or any other willful and deliberate breach in bad faith of such director's duty to the Corporation or its stockholders. Notwithstanding the preceding sentence, except for claims for indemnification (following the final disposition of a Proceeding, or advancement of expenses not paid in full, the Corporation shall be required to indemnify in connection with a Proceeding (or part thereof) commenced by such person only if the commencement of such Proceeding (or part thereof) by such person was authorized in the specific case by the board of directors of the Corporation.

Continuing Obligation. The provisions of this Article VII shall be deemed to be a contract between the Corporation and each director of the Corporation who serves in such capacity at any time while this Certificate of Incorporation is in effect, and any repeal or modification thereof shall not affect any rights or obligations then existing with respect to any state of facts then or theretofore existing or any action, suit or proceeding theretofore or thereafter brought based in whole or in part upon any such state of facts.

Nonexclusive. The indemnification and advancement of expenses provided for under this Article VII shall (i) not be deemed exclusive of any other rights to which those indemnified may be entitled under any bylaw, agreement or vote of stockholders or disinterested directors or otherwise, both as to action in their official capacities and as to action in another capacity while holding such office, (ii) continue unto a person who has ceased to be a director and (iii) inure to the benefit of the heirs, executors and administrators of such a person.

Other Persons. In addition to the indemnification rights of directors, officers, employees or agents of the Corporation, the Board in its discretion shall have the power, on behalf of the Corporation, to indemnify any other person made a party to any action, suit or proceeding who the Corporation may indemnify under Section 145 of the DGCL.

Insurance. The Corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the corporation would have the power to indemnify him against such liability.

Definitions. Except as expressly stated otherwise, the phrases and terms set forth in this Article VII shall be given the same meaning as the identical terms and phrases are given in Section 145 of the DGCL, as such section may be amended and supplemented from time to time.

EIGHTH: The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon the stockholders herein are granted subject to this reservation.

NINTH: Notwithstanding anything herein to the contrary, the Corporation shall not be authorized to issue nonvoting capital stock of any class, series or other designation to the extent prohibited by section 1123(a)(6) of title 11 of the United States Code (the "**Bankruptcy Code**"); provided, however, that the foregoing restriction shall (i) have no further force and effect beyond that required under section 1123(a)(6) of the Bankruptcy Code, (ii) only have such force and effect for so long as such section 1123(a)(6) is in effect and applies to the Corporation, and (iii) be deemed void or eliminated if required under applicable law. The prohibition on the issuance of nonvoting equity securities is included in this Certificate of Incorporation in compliance with section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

TENTH: Whenever a compromise or arrangement is proposed between this corporation and its creditors or any class of them and/or between this corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of this corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for this corporation under § 291 of Title 8 of the Delaware Code or on the application of trustees in

-3-

dissolution or of any receiver or receivers appointed for this corporation under § 279 of Title 8 of the Delaware Code order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this corporation as consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this corporation, as the case may be, and also on this corporation.

ELEVENTH: To the fullest extent permitted by law, including, without limitation, as provided in Section 115 of the General Corporation Law of the State of Delaware, as the same exists or may hereafter be amended, and unless the Corporation consents in writing to the selection of an alternative forum, any or all claims to which the Corporation, a current or former director or officer thereof, or a current or former stockholder thereof is a party shall be brought solely and exclusively in any or all of the courts in the State of Delaware.

THE UNDERSIGNED, being an authorized person on behalf of the Corporation, has executed this Certificate on [●].

Name: [●]
Title: [●]

**Exhibit M**

**List of Members of Reorganized Maremont Board and Reorganized Subsidiary Board,
and List of Officers of Reorganized Maremont and Reorganized Subsidiaries**

### Reorganized Maremont Directors and Officers

Sherman K. Edmiston III                              Sole Officer and Director

### Reorganized Subsidiary Directors and Officers

Sherman K. Edmiston III                              Sole Officer and Director

### Background and Nature of Compensation

Sherman K. Edmiston III is currently a director of Maremont, and is the proposed sole officer and director of each of the Reorganized Debtors. Mr. Edmiston was retained as director by Maremont in March 2018 and is not, and has never been, an employee of any of the Debtors or Non-Debtor Affiliates. Mr. Edmiston receives a fixed monthly fee for his services as a director of Maremont.

### Affiliations and Additional Information

Mr. Edmiston is the Managing Member at HI CapM Advisors, a consulting firm that provides strategic and financial advice to corporations, private equity firms, and hedge funds. In addition to his position as director of Maremont, Mr. Edmiston currently sits on the board of directors of Arch Coal, Inc., Key Energy Services, Inc., Goodman Networks, Inc., Emerald Plantation Holdings, Ltd., Harvey Gulf International Marine, and Holding Company. Mr. Edmiston has formerly served on the board of directors for HCR ManorCare Inc. and JL French Automotive, and as a Chief Restructuring Officer for Xinergy, Ltd.

Prior to his management of HI CapM Advisors, Mr. Edmiston was a Managing Director at Zolfo Cooper LLC, and prior to that, was a Managing Director at Glass & Associates (a Huron Consulting Group company). Mr. Edmiston received his undergraduate degree in engineering from Arizona State University (B.S.) and received a Master of Business Administration degree in finance and accounting from the University of Michigan (M.B.A.).

**<u>Exhibit N</u>**

**FFIC Settlement Agreement**

## PERMANENT SETTLEMENT AGREEMENT AND RELEASE

This Permanent Settlement Agreement and Release (the "Agreement," as defined below) is entered into on March 15, 2019 between Maremont Corporation ("Maremont") and Fireman's Fund Insurance Company ("FFIC") (collectively referred to as "Parties," as defined below).

## <u>RECITALS</u>

WHEREAS, FFIC issued policy number XLX 136 64 70 (June 30, 1980-June 30, 1981) and policy number XLX 143 63 10 (June 30, 1981-March 10, 1982) to Maremont (the "Policies," as defined below); and

WHEREAS, Maremont is and will be subject to Asbestos Personal Injury Claims and Demands; and

WHEREAS, Maremont and FFIC are signatories to the June 19, 1985 Agreement Concerning Asbestos-Related Claims (the "Wellington Agreement"); and

WHEREAS, Maremont and FFIC are parties to the November 15, 2010 Settlement Agreement and Release (the "FFIC Agreement"); and

WHEREAS, Maremont, Maremont Exhaust Products, Inc, AVM, Inc, and Former Ride Control Operating Company. Inc. (f/k/a ArvinMeritor, a Delaware corporation) (collectively, the "Debtors") filed the Chapter 11 Cases and intend to seek confirmation of the Plan that provides protection pursuant to §524(g) of the Bankruptcy Code against Asbestos Personal Injury Claims and Demands to certain Protected Parties, including Settling Insurers, and channel Asbestos Personal Injury Claims and Demands to the Asbestos Personal Injury Trust; and

WHEREAS, on February 4, 2019, the United States Trustee for the District of Delaware appointed the Committee of Asbestos Personal Injury Claimants in the Chapter 11 Cases (the "Committee"); and

WHEREAS, on March 13, 2019, the Bankruptcy Court entered an order appointing James L. Patton, Jr. as the Future Claimants' Representative ("FCR"); and

WHEREAS, Debtors filed the Plan on January 22, 2019, which, among other things, provides for the FFIC Amendment; and

WHEREAS, FFIC has raised various issues concerning the FFIC Amendment and the Plan and their potential impact on FFIC's contractual rights under the Policies, the Wellington Agreement, the FFIC Agreement, and applicable law; and

WHEREAS, Maremont has demanded that FFIC pay certain costs and expenses associated with the Chapter 11 Cases and the Asbestos Personal Injury Trust and its operations, and FFIC disputes any obligation under the FFIC Agreement or the Policies to pay or reimburse such costs and expenses; and

1

WHEREAS, representatives of the Debtors, Committee, and the FCR (together, the "Plan Proponents"), on the one hand, and FFIC, on the other hand, engaged in negotiations to resolve all disputes among them with respect to coverage under the Policies, the FFIC Agreement, and the Wellington Agreement, including disputes that have arisen or may arise in the future with respect to the Plan; and

WHEREAS, in consideration of payment of the Settlement Amount and other consideration as more fully set forth herein, the Parties intend to adopt, by way of compromise and release, a full and final settlement that releases and terminates all rights, obligations, and liabilities of FFIC and Maremont arising out of, relating to, and/or in connection with the Policies or FFIC Agreement; and

WHEREAS, the Parties are entering into this Agreement in good faith and as the result of arms-length negotiations between the Plan Proponents and FFIC.

NOW, THEREFORE, in full consideration of the foregoing and the mutual agreements contained herein, the Parties agree as follows:

**AGREEMENTS**

1.    **DEFINITIONS**

As used in this Agreement, the following terms shall have the following meanings. Capitalized terms not specifically defined in this Agreement shall have the meanings set forth in the Plan as filed on January 22, 2019 at Doc. No. 10.

(a) "Affiliate" means an Entity that is an affiliate of, or an Entity that is affiliated with, another specified Entity because it directly, indirectly, or through one or more intermediaries, controls, is controlled by, or is under common control with the other specified Entity.

(b) "Agreement" shall mean this Permanent Settlement Agreement and Release, as the same may be modified in accordance with its provisions.

(d) "Claim" means any and all past, present, or future, actual, alleged or potential, liability, duty, obligation, claim, debt, demand, allegation, action, damages, suit, expense, loss, cost, assertion of liability, and/or cause of action of any type whatsoever, whether in law, in equity, in admiralty, or otherwise, and whether or not presently known, contractual or extracontractual (including without limitation any claims for "bad faith," unfair claims practices, or breach of any implied duty of good faith and fair dealing).

(e) "Execution Date" means the earliest date on which this Agreement is signed by all of the Parties and persons contemplated to sign the Agreement.

(f) "FFIC Parties" means:  (i) FFIC, as it exists on the Execution Date, along with (ii) each of its predecessors, successors, Affiliates, (iii) any joint venture in which FFIC has participated as of the Execution Date, and (iv) all of the officers, directors, employees, agents, representatives, members, and attorneys of any of the foregoing, solely in their capacity as such. FFIC Parties also shall include any Entity that acquired or acquires FFIC, or becomes successor

in interest to FFIC through assignment, merger, or otherwise, but only to the extent that such successor succeeds to FFIC's rights or obligations as they existed on the Execution Date.

(g) "Maremont Parties" means: (i) Maremont Corporation, along with (ii) each of its predecessors, successors, Affiliates (including but not limited to the Debtors), (iii) any joint venture in which Maremont has participated as of the Execution Date, (iv) each Entity insured or allegedly insured under the Policies, and (v) all of the officers, directors, employees, agents, representatives, members, and attorneys of any of the foregoing, solely in their capacity as such. Maremont Parties also shall include any Entity that acquired or acquires Maremont, or becomes successor in interest to Maremont through assignment, merger, or otherwise, but only to the extent that such successor succeeds to Maremont's rights or obligations as they existed on the Execution Date.

(h) "Party" means a signatory of this Agreement; "Parties" means the Maremont Parties and the FFIC Parties, together.

(i) "Policies" means (i) FFIC policies XLX 136 64 70 and XLX 143 63 10 issued to Maremont; and (ii) any and all known and unknown liability insurance policies ever issued by the FFIC Parties to any Maremont Party, or that potentially or actually provides coverage to any Maremont Party for any Asbestos Personal Injury Claim or other Claims.

(j) "Settlement Amount" means Eight Million Dollars ($8,000,000).

(k) "Settlement Effective Date" means the first Business Day upon which the Debtors have provided notice to FFIC pursuant to Section 10 of this Agreement that the Effective Date has occurred.

## 2.    Settlement Payment

(a) Within 28 days after the Settlement Effective Date, FFIC shall pay the Settlement Amount to Maremont pursuant to the instructions to be provided with the notice to FFIC that the Effective Date has occurred.

(b) Maremont hereby acknowledges that FFIC is not acting as a volunteer in paying the Settlement Amount, and FFIC's payment of the Settlement Amount reflects potential liabilities and obligations to Maremont that FFIC allegedly is obligated to pay under the Policies on account of certain Claims.

3

**3.    Full and Mutual Releases**

(a) Release of the FFIC Parties By The Maremont Parties

In consideration of FFIC's paying the Settlement Amount, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Maremont Parties hereby irrevocably and forever settle, remise, release, covenant not to sue, and discharge the FFIC Parties from and with respect to any and all Claims that the Maremont Parties ever had, now have, or hereafter may have under, arising out of, connected to, and/or in connection with the Policies or the FFIC Agreement, and the FFIC Parties shall be irrevocably released from all Claims under, arising out of, related to, and/or in connection with the Policies, including but not limited to:

i. Claims for insurance coverage and/or other obligations under the Policies, the FFIC Agreement, and/or the Wellington Agreement;

ii. Claims under, arising out of, related to, and/or in connection with any act, omission, representation, or conduct of any sort under, arising from, related to, and/or in connection with the Policies, the FFIC Agreement, and/or the Wellington Agreement;

iii. Claims for any form of extra-contractual liability under, arising out of, related to, and/or in connection with the Policies, including Claims for punitive or exemplary damages, antitrust or unfair competition, breach of any duty of good faith and fair dealing, bad faith or other misconduct or alleged wrongdoing, breach of statutory duties, and/or breach of common law duties, such as, but not limited to, negligent undertaking, breach of fiduciary duty, and/or any other theory of extra-contractual liability.

The releases provided in this Section 3(a) shall not, however, relieve FFIC of any of its obligations under this Agreement.

For the avoidance of doubt, and without limitation, immediately upon FFIC's payment of the Settlement Payment, all past, present, and future claims of the Maremont Parties against the FFIC Parties under, arising out of, related to, and/or in connection with the Policies, the FFIC Agreement, and the Wellington Agreement shall be deemed to be fully and finally released and extinguished; and the FFIC Parties shall have no further obligations under, arising out of, related to, and/or in connection with the Policies, the FFIC Agreement, or the Wellington Agreement.

(b) Release of the Maremont Parties By The FFIC Parties

In consideration of the releases and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the FFIC Parties hereby irrevocably and forever settle, remise, release, covenant not to sue, and discharge the Maremont Parties from and with respect to any and all Claims that the FFIC Parties ever had, now have, or hereafter may have under, arising out of, connected to, and/or in connection with the Policies or the FFIC Agreement, and the Maremont Parties shall be irrevocably released from all Claims under, arising out of, related to, and/or in connection with the Policies, including but not limited to:

i. Obligations under the Policies, the FFIC Agreement, and/or the Wellington Agreement;

ii. Claims under, arising out of, related to, and/or in connection with any act, omission, representation, or conduct of any sort under, arising from, related to, and/or in connection with the Policies, the FFIC Agreement, and/or the Wellington Agreement;

iii. Claims for any form of extra-contractual liability under, arising out of, related to, and/or in connection with the Policies, including Claims for punitive or exemplary damages, antitrust or unfair competition, breach of any duty of good faith and fair dealing, bad faith or other misconduct or alleged wrongdoing, breach of statutory duties, and/or breach of common law duties, such as, but not limited to, negligent undertaking, breach of fiduciary duty, and/or any other theory of extra-contractual liability.

The releases provided in this Section 3(b) shall not, however, relieve FFIC of any of its obligations under this Agreement.

For the avoidance of doubt, and without limitation, immediately upon FFIC's payment of the Settlement Payment, all past, present, and future claims of the FFIC Parties against the Maremont Parties under, arising out of, related to, and/or in connection with the Policies, the FFIC Agreement, and the Wellington Agreement shall be deemed to be fully and finally released and extinguished; and the Maremont Parties shall have no further obligations under, arising out of, related to, and/or in connection with the Policies, the FFIC Agreement, or the Wellington Agreement.

(c) The Parties understand and acknowledge that (i) Claims that have been or may be asserted against Maremont or the Asbestos Personal Injury Trust may increase or decrease in amount or in severity over time and may include progressive, cumulative, unknown, and/or unforeseen elements and (ii) there may be hidden, unknown, and unknowable damages, defense expenses, or other costs related to such Claims. Each of the Parties acknowledges and agrees that it nevertheless willingly enters into this Agreement, including the releases set forth in this Section 3. Likewise, each of the Parties expressly assumes the risk that Claims, acts, omissions, matters, causes, or other facts or things arising out of, related to, and/or in connection with the Policies, FFIC Agreement, or the Wellington Agreement may have occurred that one or more Parties do not know or do not suspect to exist, and the Parties expressly assume the risk of new or additional facts, Claims, or legal theories, or subsequent legal developments, that were not known and/or could not be anticipated at the Execution Date. Each of the Parties waives, with respect to the Claims released in this Agreement, the terms and provisions of any statute, rule, or doctrine of common law that either (i) narrowly construes releases purporting by their terms to release Claims in whole or in part under, arising out of, or related to, and/or in connection with such acts, omissions, matters, causes, or things, or (ii) restricts or prohibits the releasing of such Claims.

(d) This settlement and the Agreement are explicitly acknowledged by all concerned to be complete and effective notwithstanding any facts, legal theories, alleged mistakes, misrepresentations, alleged duties to disclose, or failures to disclose that are presently known to, or that subsequently become known to, FFIC, Maremont, or anyone else. This Agreement shall

5

not be subject to any claims of accident, unilateral mistake, mutual mistake, mistake of fact, estoppel, rescission, or reformation, and/or comparable claims, as the Parties intend by this Agreement permanently to resolve all present and future disputes.

(e) The Parties acknowledge they have been advised by their respective legal counsel and are familiar with the provisions of Section 1542 of the California Civil Code, which provides:

**A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of the executing of the release, and that if known by him or her would have materially affected his or her settlement with the debtor or released party.**

## 5.    Bankruptcy-Related Obligations

(a) Before the Confirmation Hearing, Debtors shall file a revised Plan that (i) eliminates any and all references to the "FFIC Amendment," and includes a reference to this Agreement as the "FFIC Settlement Agreement", (ii) designates FFIC as a Settling Insurer, (iii) revises Section IV.D.1 of the Plan to read as follows (or to include such other language agreed between Maremont and FFIC):

Notwithstanding any other provision of the Plan, and subject to all of the terms and conditions of the FFIC Settlement Agreement, the FFIC Agreement shall be rejected by the Debtors effective automatically as of the Effective Date, without the need for any further action by any Party.  As of the Effective Date, the Reorganized Debtors and FFIC shall be bound by, and shall have the rights and obligations set forth in, the FFIC Settlement Agreement. Upon the payment by FFIC of the Settlement Amount (as defined in the FFIC Settlement Agreement), FFIC shall be a Settling Insurer under this Plan.

and (iv) revises Section XII.C of the Plan to provide as follows:

*FFIC Settlement Agreement*.  The terms and conditions of the FFIC Settlement Agreement are expressly incorporated into this Plan.

(b)  The Debtors shall submit to the Bankruptcy Court a proposed form order confirming the Plan, as revised, that shall include language in form and substance agreed to by the Parties: (i) approving this Agreement in its entirety, (ii) authorizing and directing the Debtors to perform their obligations under this Agreement, (iii) directing FFIC to perform its obligations under this Agreement, (iv) binding the Debtors' bankruptcy estates to the terms and conditions of this Agreement, (v) designating FFIC as a Settling Insurer, and (vi) containing a provision that the Bankruptcy Court shall retain jurisdiction over any proceeding to enforce the provisions of this Agreement to the fullest extent permissible under applicable law.

(c)    It is a condition precedent to the Parties' obligations under this Agreement that authorized representatives of the Committee and the FCR indicate in writing that each consents to (i) Maremont's entry into this Agreement and (ii) the terms and conditions set forth in this Agreement.

**6.      Reinsurance Claims/Limitations on Reimbursement Claims**

(a) FFIC will be free to pursue reinsurance claims against any and all reinsurers or retrocessionaires regarding any consideration paid by FFIC in connection with this Agreement (as well as for other reinsured amounts such as, without limitation, FFIC's counsel fees). FFIC is free to allocate the Settlement Amount among the Policies in its sole discretion, and such allocation shall not be binding on Maremont in any other proceeding.

(b) Subject to the provision allowing them to pursue reinsurance claims that is set forth in Section 6.(a), FFIC will not otherwise seek reimbursement of the Settlement Amount from any other insurer (or such other insurers' Affiliates) that enters into a settlement with Maremont in which such other insurer(s) agree, specifically as to FFIC or with respect to other Maremont insurers more generally: (1) not to seek any defense costs or indemnity payments from FFIC; and (2) not to assert a Claim for contribution, subrogation, or reimbursement against FFIC.

**7.      Cooperation**

(a) Each Party will use its best efforts to obtain the outcomes sought by this Agreement, and to take such steps and to execute such documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Agreement and to preserve its validity and enforceability. In the event that any action or proceeding of any type whatsoever is commenced or prosecuted by any Entity not a Party hereto to invalidate, interpret, or prevent the validation, enforcement, or carrying out of all or any of the provisions of this Agreement, the Parties mutually agree represent, warrant, and covenant to cooperate fully in opposing such action or proceeding.

(b) Maremont agrees to undertake all reasonable actions and cooperate with FFIC in connection with FFIC's claims against its reinsurers and retrocessionaires relating to payment of the Settlement Amount, this Agreement, and/or Asbestos Personal Injury Claims. In particular, and without limiting other actions and cooperation that FFIC may request, Maremont will provide FFIC with a report once each quarter from the date that the Asbestos Personal Injury Trust begins processing claims that identifies (i) claimant name, (ii) date of alleged first exposure to a Maremont product, (iii) alleged injury, (iv) claim payment amount and (v) claim payment date for all claims processed through the Asbestos Personal Injury Trust (collectively, the "Reporting Material") until the total claim payments exhaust the Settlement Amount. Fireman's Fund shall keep all Reporting Material confidential, and Fireman's Fund shall not provide Reporting Material to any Entity other than its reinsurers, retrocessionaires, or reinsurance arbitrators solely for the purpose of obtaining reinsurance for any portion of the Settlement Amount. When providing Reporting Material to its reinsurers, retrocessionaires, or reinsurance arbitrators, Fireman's Fund shall advise the receiving Entity in writing to maintain the confidentiality of the Reporting Material and not to disclose such Material to any other Entity other than a reinsurer's retrocessionaires. Fireman's Fund shall not, and will confirm in writing with its reinsurers, retrocessionaires, and/or reinsurance arbitrators to which any Reporting Material will be provided, that they shall not, disclose any Reporting Material to any other Entity unless such Reporting Material is sought pursuant to a subpoena or other valid legal process.

**8.      Representations By Counsel**

The Parties acknowledge and agree that this Agreement was bargained for and entered into in good faith and as the result of arms-length negotiations.   This Agreement involves compromises of the Parties' previously stated legal positions, and the Parties expressly agree that at all material times they have been represented by counsel of their own choosing concerning the rights affected by this Agreement, the form and content of it, and the advisability of executing it. This Agreement does not reflect the Parties' views as to their rights and obligations with respect to matters or Entities outside the scope of this Agreement. This Agreement is without prejudice to positions taken by FFIC with regard to other insureds or claimants, and without prejudice to positions taken by Maremont with regard to other insurers. The Parties specifically disavow any intention to create rights in third parties under or in relation to this Agreement. This Agreement is the jointly-drafted product of multi-lateral negotiations among parties of equal sophistication and bargaining power and thus shall not be interpreted for or against any Party notwithstanding statutes, rules, or doctrines that presumptively construe agreements or contracts against certain parties, and no provision of this Agreement shall be construed against FFIC because of its status as an insurance company or as having issued or allegedly issued the Policies to Maremont.  This Agreement is not, nor shall it be construed as, an insurance policy.

**9.      Entire Agreement/Amendments to Agreement**

This Agreement constitutes the entire agreement between the Parties. Except as expressly set forth herein to the contrary, this Agreement supersedes all prior written and oral agreements, commitments or understandings with respect to the matters provided for in this Agreement. No amendments or variations of the terms of this Agreement shall be valid unless made in writing and signed by all Parties hereto, or their successors or assigns.

**10.     Notices**

(a) All notices, requests, demands and other communications required or permitted to be given under this Agreement shall be deemed to have been duly given if in writing and delivered personally, or by registered or certified mail, return receipt requested, or by Federal Express with signature required, <u>and</u> also by email, addressed as follows:

| | |
|---|---|
| Reorganized Maremont: | Maremont Corporation<br>27 Albany Avenue<br>Brooklyn, New York 11216<br>Attn: Sherman K. Edmiston III, HI CapM Advisors |
| With a copy to: | Sidley Austin LLP<br>One South Dearborn Street<br>Chicago, Illinois 60603<br>Attn: Andrew F. O'Neill<br>aoneill@sidley.com |

8

Maremont Asbestos
Personal Injury Trust:

4244 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
Attn: Alan B. Rich, Esq.

With a copy to:

Stutzman, Bromberg, Esserman & Plifka, a
Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, TX 75201-2689
Attn: Sander L. Esserman, Esq.

FFIC:

Amanda Webber
Claims Director – Asbestos and Toxic Tort Claims
Allianz Reinsurance America, Inc.
1465 North McDowell Blvd., Suite 100
Petaluma, CA 94954
amanda.webber@allianzrm-us.com

With a copy to:

Leslie A. Davis
Troutman Sanders LLP
401 9th Street, NW
Washington, DC 20004
leslie.davis@troutman.com

## 11. Binding Effect

This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

## 12. Execution

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. Execution of this Agreement may be effected by facsimile, PDF, or other electronic transmission of executed copies of the signature pages delivered to counsel for the Parties. This Agreement shall become effective as of the Execution Date.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement by their duly-authorized officers or representatives.

**MAREMONT CORPORATION**

_____

By: Carl D. Anderson, II
Its: Chairman and Sole Officer
Date: 3/18/2019

**FIREMAN'S FUND INSURANCE COMPANY**

_____

By:
Its:
Date:

*Signature Page to Permanent Settlement Agreement and Release*

**IN WITNESS WHEREOF,** the Parties have executed this Agreement by their duly-authorized officers or representatives.

**MAREMONT CORPORATION**

_____

By: Carl D. Anderson. II
Its: Chairman and Sole Officer
Date:

**FIREMAN'S FUND INSURANCE COMPANY**

By: Brooke Green, Allianz Reinsurance America, Inc.
Its: authorized representative
Date: 3/18/2019

*Signature Page to Permanent Settlement Agreement and Release*